*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

*The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007*

May 6, 2016

**BY ECF AND HAND DELIVERY**

The Honorable Ronald L. Ellis
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States* **v.** *Nico Burrell* et al., S2 15 Cr. 95 (AJN)

Dear Judge Ellis:

      The Government respectfully submits this letter in advance of the bail hearings for defendants Daquan Reid, scheduled for May 9, 2016, and Jose Rodriguez, scheduled for May 10, 2016. The defendants were arrested on April 27, 2016, and presented before Magistrate Judge James C. Francis IV that day. Both defendants consented to detention at that time without prejudice to future bail applications.

      Reid and Rodriguez are violent drug dealers and associates of a street gang responsible for multiple murders, attempted murders, and other acts of violence. They cannot overcome the presumption that there are no conditions or combination of conditions that would reasonably assure the safety of the community or their return to Court if they were at liberty pending trial. Reid and Rodriguez should be remanded pending trial.

      **I.**    **Legal Standard**

      Congress has enacted a statutory presumption that a defendant charged with certain offenses should be detained while awaiting trial because "no condition or combination of conditions will reasonably assure the appearance of the person and the safety of the community." 18 U.S.C. § 3142(e)(3). That presumption applies to the charges against King and Stewart. *See id.* § 3142(e)(3)(B) (applying presumption to "an offense under section 924(c)"); *id.* § 3142(e)(3)(A) (applying presumption to "an offense for which the maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 et seq.)"); 21 U.S.C. § 841(b)(1)(A) (imposing maximum sentence of life imprisonment). This presumption requires the defendant to produce evidence that he does not pose a danger to the community or a risk of flight. "Satisfying the burden of production does not," however, "eliminate the presumption favoring detention; it 'remains a factor to be considered among those weighed by the district court.'" *United States* v. *English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting *United States* v. *Mercedes,* 254 F.3d 433, 436 (2d Cir.2001)).

      In addition to the statutory presumption applicable in this case, courts considering a federal defendant's application for bail examine four factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, . . . or involves . . . a controlled substance [or] firearm . . .; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including-- (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

## II.    Discussion

Reid and Rodriguez are affiliated with a violent street gang known as the Big Money Bosses ("BMB"). The danger both defendants pose if bailed, and their incentive to flee the grave charges against them, thus stems in large part from the dangerous nature of that gang, and the crimes the defendants committed as part of their association with that gang. This letter therefore discusses BMB as a whole, then examines the specific statutory factors as applied to each defendant.

### A.    The "Big Money Bosses"

The Indictment charges that BMB constitutes a racketeering enterprise based on evidence obtained from: (1) four Title III wiretaps on the cellular phones of three BMB members and one BMB associate; (2) more than 30 undercover purchases of narcotics from members and associates of BMB conducted as part of this investigation, as well as numerous other undercover purchases conducted separately from this investigation; (3) evidence obtained through search warrants of seized cellular telephones and narcotics and other contraband seized from BMB members and associates; (4) ballistics evidence from the scene of certain shootings, including a murder, that are matches with firearms recovered from BMB members; (5) the expected testimony of civilian and law enforcement witnesses who witnessed some of the acts of violence and, in some instances, are able to identify the perpetrators; (6) the expected testimony of nine cooperating witnesses who were acquaintances of BMB members and associates at various times relevant to the Indictment, and three cooperating witnesses who were members of a rival gang and who became familiar with BMB members and associates as a consequence of the gang rivalry;[1] (7) Facebook, YouTube, and Twitter postings in which members and associates of BMB

---

[1] Each of the cooperating witnesses ("CWs") is cooperating with the Government in hopes of receiving leniency for past crimes. Each of the CWs has provided reliable information in the past, and has been corroborated by, among other things, information previously known to law enforcement and evidence acquired independent of the CWs, such as Title III wiretaps, search warrants, and controlled purchases of narcotics, some of which are described herein.

promote their gang and belittle rival gangs, brandish firearms, discuss the gang's narcotics trafficking, and allude to the primary territories of their gang; among other sources of evidence.

The above evidence shows, in sum, that BMB is a violent street gang that commits murders and other acts of violence, traffics narcotics, and commits other crimes. BMB is a subset of the "Young Bosses," or "YBz" street gang, which operates throughout the New York City area. BMB—whose members also sometimes refer to themselves as the "Money Making Mafia" or "Triple M"—operates primarily on White Plains Road from 215th Street to 233rd Street in the Bronx, which is a long stretch of road under a subway train overpass that is hedged on each side by single-family homes and local commercial establishments. BMB's narcotics trafficking activity is based principally in the vicinity of White Plains Road and 224th Street, an open-air drug market that is referred to by gang members as the "Forts." BMB members sell drugs up and down White Plains Road, however, including at a location on 219th Street and a house on 230th Street. BMB members have kept firearms at each of these White Plains Road locations. BMB members also operate a drug spot on Boston Road and Eastchester Road in the Bronx, which they refer to as "B Road." BMB members who work principally at the B Road spot typically refer to themselves as "Blamma." Generally speaking, BMB members are encouraged to openly "jack," or proclaim their membership in the gang, and many do so not only in person but also through social media websites.

BMB members and associates engage in acts of violence, including shootings, stabbings, and gang assaults. These acts of violence protect the power of the gang, deter attacks from rivals, and secure the gang's territories and drug spots. Members who engage in a sufficient amount of violence can earn a leadership position, which is referred to as a "Big Suit." Members with "Big Suit" status are further subcategorized as, among other things, "Burberry Suits," "Louis Suits," "Gucci Suits," "Ferragamo Suits," and "Sean John Suits," in order to signify their relative rank in the gang. Among other things, a BMB member with "Big Suit" status has the authority to recruit other individuals into the gang. Two of the highest-ranking "Big Suits" in BMB are Nico Burrell, a/k/a "Zico Nico," and Douglas McLarty, a/k/a "Q Don." Both Burrell and McLarty enhanced their status in the gang, in part, by committing attempted murders when they were juveniles.

Members of BMB can rise in status and rank within the gang not only by engaging in acts of violence, but also by maintaining their membership in the gang for a long period of time. Members who have been loyal associates for a substantial amount of time are referred to as "Day One Niggas," meaning that they have been associating with the gang since its earliest days. For example, in a posting on Facebook on July 7, 2013, BMB member Rasheid Butler, a/k/a "Rah," writes, "i love my Day1 Niggas that was here since this #TripleM Shit 1ST STARTED." Similarly, BMB leader Burrell discusses the "Day One" concept in a rap video posted on YouTube in December 2015 and entitled "Live From Gutter." In the video, Burrell raps, "No new niggas, only day one / I know they ain't tellin' if that day come," after which another rapper repeats in the background, "no snitchin.'"

BMB has, more generally, developed a gang rule against "snitchin,'" or cooperating with law enforcement. For example, BMB associate Vashon Bennett, a/k/a "V-Bands," posted on Facebook on July 20, 2011, "Like QuDOn Said 'No Snitchin Policy.'" The reference to

"QuDOn" is believed to be a reference to McLarty, who is one of BMB's leaders and whose alias is "Q Don." BMB's norm against "snitchin'" is fostered through YouTube videos and social media postings, including postings in which gang members are praised for their refusals to cooperate with law enforcement in particular instances. The norm is also enforced through disparagement of and threats of violence against BMB members suspected of cooperating with law enforcement. In one instance, for example, a BMB member's home was fired upon because he made a statement to law enforcement about individuals with whom he had committed a robbery.

Many of the specific acts of violence at issue in this case, including those discussed in the Indictment, relate to BMB's longstanding rivalries with other street gangs in the northern Bronx. In connection with these rivalries, BMB members have developed a practice of "mobbing," meaning to gather in large groups and travel to the base of operations of a rival gang to engage in violence there. Members of rival gangs also sometimes go "mobbing" and attack or attempt to attack BMB at its bases of operations. Videos of "mobbing" incidents have been posted on YouTube. The close proximity of BMB's and other gangs' bases of operations—all of which are in or on the border of the New York City Police Department's 47th Precinct—contributes to the frequency of acts of violence.

### B. Daquan Reid, a/k/a "DQ"

1. Nature and Circumstances of the Offense

Daquan Reid, a/k/a "DQ," is charged in Counts Two and Three of the Indictment. Counts Two and Three charge Reid with narcotics offenses. The Second Circuit has held that narcotics trafficking presents a serious danger to the community, and should be treated as such for purposes of bail determinations. *See United States* v. *Leon,* 766 F.2d 77, 81 (2d Cir. 1985). That principle has special force here, because BMB's narcotics trafficking was not simply a means to make money, but the lifeblood and daily activity of a gang that controlled its drug territory through violence and threats of violence. By converting poor neighborhoods into open-air drug markets such as "the Forts" and "B-Road," BMB members endangered the lives and the futures of the innocent families living there. That danger is particularly captured by Count Three, which charges Reid with trafficking narcotics near schools and playgrounds.

The nature and circumstances of Reid's offenses also demonstrate that, if bailed, his return to court cannot be assured. If convicted, Reid faces a mandatory minimum sentence of ten years and a maximum term of life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A). It is thus unsurprising that many of Reid's co-defendants have already chosen to flee rather than face the charges against them: At this time, there are several charged defendants in this case and the corresponding case of rival gang 2Fly who remain fugitives.[2]

---

[2] The Government's investigation into both gangs is ongoing. The Government expects to seek a Superseding Indictment in the BMB case charging certain defendants with multiple acts of violence in aid of racketeering, including murders in aid of racketeering, conspiracies to commit murder in aid of racketeering, and assaults and attempted murders in aid of racketeering, among

2. The Weight of the Evidence

The evidence against Reid is strong, consisting of the testimony of multiple cooperating witnesses who corroborate each other, as well as social media evidence and Reid's arrest record. Cooperating witness testimony will show that Reid, along with BMB member and co-defendant Michael Redley, sold resale quantities of crack cocaine and marijuana out of a residence located in the heart of BMB territory at the intersection of 226th Street and White Plains Road in the Bronx. On the day of the takedown in this case, law enforcement officers arrested BMB member and co-defendant Durrell Guy at that residence, and conducted a consent search. Pursuant to the search, agents recovered, among other items, three firearms, ammunition, a package containing over ten pounds of marijuana, a drug scale, and numerous other smaller packages of marijuana. Photographs taken of the residence are attached as Exhibit A. Reid was arrested at a different residence. Nevertheless, the evidence recovered from the search corroborates cooperating witnesses' information that the residence functioned as a location from which member and associates of BMB sold narcotics.

In addition, cooperating witness testimony will establish that Reid was involved in BMB's acts of violence. Specifically, he and BMB leader Nico Burrell, a/k/a "Zico Nico," discussed plans for a shooting against members of rival gang 2Fly in retaliation for an earlier shooting of Burrell's sister and fellow BMB member Michelle Jemison, a/k/a "Pebbles." Reid agreed to participate in the shooting.

Evidence obtained from the Facebook accounts of Reid and other BMB members provides powerful corroboration of Reid's association with BMB and his involvement in the sale of narcotics. Reid's Facebook account, which was publicly accessible until shortly after his arrest, bears the user name "DeeQu D QuaBank (TrapGod Dq)." The profile picture shows an individual recognizable as Reid. His username contains evidence of his association with BMB as well as his involvement in the drug trade: "QuaBank" is believed to be a reference to two former members of BMB who were murdered by rival gangs, Quarrozay Clarke, a/k/a "Qua," a/k/a "Rozay," and Antonio Lyles, a/k/a "Big Head," whom BMB members memorialized on social media as "BigBank." The phrase "TrapGod," which appears in his username, refers to a "trap," a term commonly used to refer to a location where narcotics are concealed.

The content of Reid's Facebook page contains further evidence of his association with BMB. For example, the "cover photo" on his profile page depicted a memorial for slain BMB member Quarrozay Clarke. The photograph shows a series of candles that spell out Clarke's street name, "Rozay." On November 30, 2013, Reid posted a photograph of a memorial that had been set up for BMB member Antonio Lyles. The photograph shows a cardboard box with the words "BigBank$," "LongLive BiggHead $$," and "Big Money" written on it. In addition, Reid is "friends" on Facebook with several members of BMB, including Brian Richards, a/k/a "B

---

other offenses. Should Reid or Rodriguez be charged in a Superseding Indictment, he could face additional serious penalties, increasing the risk of flight.

Rich," Donque Tyrell, a/k/a "Polo Rell," Robert Houghton, a/k/a "Duke," and many others. These social media friendships are further evidence of Reid's association with the gang.

Records obtained pursuant to search warrants of Facebook accounts belonging to other BMB members provide further corroboration of Reid's association with BMB and narcotics trafficking; he engaged in drug deals using social media. For example, on May 7, 2015, BMB member Shawn Reid,[3] a/k/a "Sama," a/k/a "Sama Lama," sent a message to Daquan Reid and BMB member Martin Mitchell, a/k/a "Tyliek," stating, "Tell Fb & The Bros I Got The Dope Bro . . . . #SuperSour." This was an advertisement of marijuana that Shawn Reid had for sale. In connection with the message, Shawn Reid sent Daquan Reid a photograph of packaged marijuana. Daquan Reid responded, "Aight." On June 10, 2015, Daquan Reid wrote and offered to let Shawn Reid "hold" the "25 sacks" that were left. Shawn Reid responded, "It's sour? I'll dead pay for that on the Guyz," indicating that Shawn Reid was willing to pay upfront for the marijuana and then earn his money back from his purchasers. On June 14, 2015, Daquan Reid wrote to Shawn Reid, "Yo Sama Slide Up On Me Gotta Deal W Some Shit Soon," and when Shawn Reid did not respond in a timely manner, Daquan Reid wrote, "Wen u ignore me dats wen I think u tryna play me," and that Daquan Reid was concerned that "Now u going around me bro but aight," apparently because Daquan Reid was concerned that Shawn Reid might have secured a different marijuana supplier. Shawn Reid responded on June 20, 2015, asking where Daquan Reid was, and Daquan Reid responded that he was at "226," meaning White Plains Road and 226th Street, the residence which cooperating witnesses identified as the location where Daquan Reid sold narcotics. Shawn Reid then wrote Daquan Reid another message to give him assurances: "You know you my son."

As early as February 22, 2013, Shawn Reid sent Daquan Reid messages in which he offered to distribute some of Daquan Reid's marijuana. Shawn Reid began by writing, "So What Up Lets Talk $$$." Daquan Reid responded, "I'm Omw to burke to slapped one I'm reup tmm mornin so Wat u saying BRO," in which Daquan Reid meant that he was on his way to complete a drug sale at Burke Avenue, that he was going to get a new supply of drugs the next morning, and that he wanted Shawn Reid to clarify what his message meant. Shawn Reid responded with a string of messages: "Wat You Can't Throw Me Something & We Both Eat," "We Can Both Get This Money," "In Like 5 Days I Can Be Done," "You Take 280 I Take 280," "A Ounce Bagged UP In Dimes Is 560," "I Can Deal With That Asap." In these messages, Shawn Reid is offering to help Daquan Reid distribute his marijuana supply and is assuring Daquan Reid that if entrusted with product, he can distribute it quickly. Daquan Reid responded, later that day, "Kopy say nomore wen I get up n touch rd Imma link you brozay," by which Daquan Reid indicated that he was agreeing to supply Shawn Reid with product for resale. Together, these Facebook communications confirm that Daquan Reid sold marijuana along with BMB member Shawn Reid.

The testimony and social media evidence are further corroborated by Reid's prior encounters with law enforcement, when he was caught with distribution quantities of drugs and participating in drug deals. On January 26, 2015, NYPD officers executed a search warrant of the residence at 226th Street and White Plains Road. Reid, BMB member Michael Redley and one

---

[3] The Government does not believe that Shawn Reid and Daquan Reid are related.

of the main drug suppliers for BMB were arrested. A large amount of crack cocaine (approximately 200 grams) and marijuana were recovered. On April 8, 2015, Reid was arrested in the vicinity of 227th Street and White Plains Road, after an NYPD officer observed him take a large object appearing to be narcotics and exchange it for cash with another individual. The object turned out to be a large quantity of marijuana. This case was adjourned in contemplation of dismissal. However, it was just a few months later, on January 10, 2016, when Reid was stopped for a traffic infraction just blocks from the 226th Street and White Plains Road residence. He was arrested after an officer observed and recovered a pill jar that contained 10 oxycodone pills. Although these state cases against Reid did not result in convictions, the Government will introduce evidence of this conduct at Reid's trial on the narcotics conspiracy charges.

3. The History and Characteristics of the Defendant

Reid's history and characteristics further favor detention. As discussed above, the defendant has been arrested in BMB territory, in connection with narcotics, on three occasions, including as recently as January 2016. The January 2016 arrest indicates not only that he was very recently engaged in illegal activity—possessing 10 pills of oxycodone—but that Reid's two prior arrests did not deter him from continued engagement in the sale of narcotics. Furthermore, the Facebook messages discussing the sale of marijuana demonstrate that Reid has been involved in the narcotics conspiracy since at least February 2013. His criminal record therefore does not adequately reflect the extent of his illegal activity.

4. The Nature and Seriousness of the Danger to Any Person or the Community

Finally, the fourth factor also weighs strongly in favor of detention. The defendant distributed crack and marijuana with members of BMB. The distribution of drugs is itself a danger to the community, especially when that drug-selling conduct fuels gang activity. Furthermore, as set forth above, witness testimony will establish that Reid discussed and agreed to participate in a retaliatory shooting on behalf of BMB, a gang which has a strong policy against "snitchin'." Reid's involvement in the activities of the gang, including a willingness to commit violence, therefore constitutes a real threat if he remains at liberty to engage in unmonitored and undetectable communications with gang members and individuals with whom he has a close relationship. This is especially the case because Shawn Reid and Michael Redley, two of Reid's close associates and co-defendants in this case, remain at large in the community. Accordingly, the nature and seriousness of the danger to the community weighs strongly in favor of continued detention.

**C. Jose Rodriguez, a/k/a "Hov"**

1. Nature and Circumstances of the Offense

Rodriguez is charged in all four counts of the Indictment. In addition to the narcotics offenses described above, Rodriguez is also charged in Count One and Count Four of the Indictment. Count One charges Rodriguez with participation in a racketeering enterprise, and the predicate acts for that charge include numerous acts of violence such as murder, attempted murder, and robbery. (Indictment ¶ 11). Count One therefore constitutes a "crime of violence"

under § 3142(g), weighing in favor of detention. *See United States* v. *Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002). That is particularly the case where, as here, the evidence shows that the defendant personally engaged in acts of violence on behalf of BMB. Count Four charges Reid with discharge of firearms in furtherance of the racketeering enterprise and narcotics conspiracy charged in Counts One and Two. This charge thus plainly "involves . . a firearm" and constitutes a "crime of violence" under § 3142(g), further supporting detention. *See, e.g.*, *English*, 629 F.3d at 322 (upholding district court's denial of bail for defendant charged with violations of 21 U.S.C. § 846 and 18 U.S.C. § 924(c)).

If convicted, Rodriguez faces a mandatory minimum sentence of twenty years and a maximum term of life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A); 18 U.S.C. 924(c)(iii). The heavy penalties he faces therefore make risk of flight a real concern, especially in a case where many of Rodriguez's co-defendants and fellow gang members remain at large.

2. The Weight of the Evidence

The evidence against Rodriguez is strong, consisting of cooperating witness testimony corroborated by his arrest history. Cooperating witness testimony will show that Rodriguez is one of the original members of BMB. Rodriguez was involved in the sale of narcotics at the "Forts" location at White Plains Road and 224th Street in the Bronx, as demonstrated by his arrest records. On October 15, 2010, Rodriguez was arrested in the vicinity of White Plains Road and 224th Street in possession of an unloaded .25 caliber firearm. On July 1, 2015, NYPD officers observed Rodriguez selling narcotics to multiple unknown buyers at the "Forts," and when officers arrested Rodriguez, he was found to be in possession of seven small bags of marijuana. At time of that arrest, Rodriguez was on parole. On the same day, also at the "Forts," officers arrested BMB member Mark Williams, a/k/a "Markie Bossin," for selling crack cocaine. The arrests of Rodriguez and Williams on the same day at the same location, each with a different narcotic for sale, demonstrates that were working in concert and provides further corroboration for Rodriguez's gang membership.

Most significantly, Rodriguez has been involved in acts of violence as part of BMB. Witness testimony will establish that on October 31, 2009, Rodriguez entered Edenwald—a public housing complex that is the center of operations of rival-gang 2Fly—and stabbed a victim in the back with a sharp object. Rodriguez was arrested for this stabbing eight months later. On September 23, 2009, Rodriguez participated in a robbery of a victim's cellphone with five other individuals, including BMB members James Pilgrim, a/k/a "Jizzle," and Jafar Borden, a/k/a "Jaffy." Rodriguez and the others forcibly removed the cellphone from the victim, causing him physical injury.

Rodriguez has also taken active steps to help a member of BMB avoid apprehension. On January 6, 2011, NYPD observed BMB member Jafar Borden, a/k/a "Jaffy," trying to escape from the window of an apartment where Rodriguez was present. When NYPD approached, Rodriguez prevented the apprehension of Borden by force even after being warned that Borden had an outstanding warrant for robbery. Rodriguez then resisted arrest. This event occurred just a month after Rodriguez pled guilty to possession of a firearm (see below), and was awaiting sentencing on that case.

In addition to the above, Rodriguez was arrested on October 4, 2011, in the vicinity of East Tremont Avenue and Commonwealth Avenue in the Bronx, while in possession of a defaced, loaded .32 caliber firearm. He was on conditional discharge at the time of that arrest.

3. The History and Characteristics of the Defendant

Rodriguez's history and characteristics strongly favor detention. As discussed above, Rodriguez has several arrests for firearms, narcotics offenses, a robbery, and a violent assault. His criminal record reflects three Youthful Offender adjudications stemming from arrests on November 24, 2009 (robbery), September 8, 2010 (weapon possession), and October 15, 2010 (weapon possession). The latter two adjudications led to a sentence of conditional discharge. As a result of the October 4, 2011 arrest, which occurred while he was on conditional discharge, Rodriguez was convicted for attempted criminal possession of a loaded firearm. He was sentenced to 621 days to 4 years' imprisonment. As a result of that conviction, Rodriguez was incarcerated from January 17, 2012 through March 16, 2015, when he was released to parole. However, this significant sentence did not deter him from returning to criminal activity. Just slightly over four months after his release, while still on parole, Rodriguez was arrested for, and ultimately convicted of, possession of marijuana after an NYPD officer observed him conducting hand-to-hand sales at the "Forts" location. Indeed, although some of the incidents described above occurred several years ago, Rodriguez's criminal history demonstrates that, except for the period during which he was incarcerated, he has continuously committed serious crimes.

Moreover, Rodriguez has a history of disobeying law enforcement and the orders of the court. In addition to engaging in criminal activity while on conditional discharge and parole, Rodriguez—while awaiting sentencing for October 4, 2011 firearm offense—not only forcibly helped a fellow BMB member avoid capture, but he himself resisted arrest. Such conduct indicates that Rodriguez, who now faces a much steeper sentence than any he has served before, cannot be trusted under court supervision and poses a significant risk of flight.

4. The Nature and Seriousness of the Danger to Any Person or the Community

Rodriguez's membership in BMB, a violent gang that holds witness intimidation as part of its creed, makes Rodriguez a danger to the community – and in particular a danger to any persons he believes are cooperating with the Government – if bailed. Rodriguez's multiple firearms arrests, as well as his perpetration of a violent assault and robbery, show that he personally presents a lethal threat. And no conditions of bail can reasonably be expected to prevent Rodriguez from undertaking dangerous activity given his manifest disregard for judicial authority as reflected in his actively aiding a gang member to escape law enforcement and his swift violation of parole after release from a lengthy sentence.

**III.     Conclusion**

For the foregoing reasons, the Government respectfully submits that Reid and Rodriguez cannot overcome the statutory presumption that they be detained pending trial.

> Respectfully submitted,
>
> PREET BHARARA
> United States Attorney
>
> By: ___/s_____
> Jessica K. Feinstein
> Rachel Maimin
> Micah W.J. Smith
> Hagan Scotten
> Drew T. Johnson-Skinner
> Assistant United States Attorneys
> 914-993-1924/(212) 637-2460/2439/1946/1587

Cc: Bryan Konoski, Esq.
    David Wikstrom, Esq.

# EXHIBIT A





