**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 9, 2016

**BY ECF AND HAND DELIVERY**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

     **Re:**   *United States* **v.** *Nico Burrell* **et al., S2 15 Cr. 95 (AJN)**

Dear Judge Nathan:

       The Government respectfully submits this letter in anticipation of the bail hearing for defendant Daquan Reid, presently scheduled before the Court on May 11, 2016.  Reid is a drug dealer closely associated with violent street gang the "Big Money Bosses" ("BMB" or "the gang"), who supplied narcotics to BMB in gang-controlled territory. Reid has not, and cannot, overcome the presumption that there are no conditions or combination of conditions that can reasonably assure the safety of the community or his return to Court.  Accordingly, he should be detained pending trial.

    **A.  Background**

       On April 27, 2016, Indictment S2 15 Cr. 95 (AJN) was unsealed charging the defendant with: (a) narcotics conspiracy, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A); and (b) narcotics distribution within 1000 feet of a school, playground, or public housing development, in violation of Title 21, United States Code, Section 860.

       The defendant was arrested on or about April 27, 2016, and was presented before the Honorable Frank Maas, United States District Judge.  At that time, he consented to detention without prejudice to future applications. On or about May 9, 2016, the Honorable Ronald L. Ellis held a bail hearing. The transcript of the hearing is attached as Exhibit A. The defendant was granted bail subject to the following conditions:

- A personal recognizance bond of $50,000, signed by three financially responsible persons;
- Travel restricted to the SDNY and EDNY;
- Surrender of travel documents and no new applications;
- Strict pretrial supervision with drug testing and treatment;
- Home detention with location monitoring;
- The defendant must seek and maintain employment; and
- The defendant may be released once all the conditions are met.

Judge Ellis stayed the decision granting bail for 48 hours.

## B.  Legal Standard

A district court reviews *de novo* a magistrate judge's decision to release or detain a defendant.  *United States* v. *Leon*, 766 F.2d 77, 80 (2d Cir. 1985).  The Court must order detention if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).

Because the Indictment in this case charges that the defendant engaged in narcotics conspiracy offenses, considerations of release and detention pending trial are governed by 18 U.S.C. § 3142(e)(3).  Under that statute, the Court must presume that "no condition or combination of conditions will reasonably assure" the appearance of the defendant and the safety of the community.  It is the defendant who bears the burden of production, and it is the defendant who must present evidence to rebut the presumption in favor of detention.  *United States* v. *Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).  And even assuming the defendant successfully rebuts the presumption in favor of detention, that presumption does not vanish; instead, it "remains a factor to be considered among those weighed by the district court."  *United States* v. *Mercedes*, 254 F.3d at 436.  At all times, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community, and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight."  *United States* v. *English*, 629 F.3d 311, 319 (2d Cir. 2011) (quotations and citation omitted).

In considering the defendant's application for bail, the Court considers the following factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves . . . a controlled substance [or] firearm . . .;   (2) the weight of the evidence against the person;  (3) the history and characteristics of the person, including-- (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and  (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

As set forth below, no condition or set of conditions would reasonably assure the safety of the community or the defendant's appearance in court if the defendant is released.

I.    **Discussion**

Reid is closely associated with a violent street gang known as the Big Money Bosses ("BMB").  The danger he presents if bailed, and his incentive to flee the grave charges against him, thus stem in large part from the dangerous nature of that gang, and the crimes the defendant committed as part of his association with that gang.  This letter therefore discusses BMB as a whole, then examines the specific statutory factors as applied to each defendant.

A.    **The "Big Money Bosses"**

The Indictment charges that BMB constitutes a racketeering enterprise based on evidence obtained from: (1) four Title III wiretaps on the cellular phones of three BMB members and one BMB associate; (2) more than 30 undercover purchases of narcotics from members and associates of BMB conducted as part of this investigation, as well as numerous other undercover purchases conducted separately from this investigation; (3) evidence obtained through search warrants of seized cellular telephones and narcotics and other contraband seized from BMB members and associates; (4) ballistics evidence from the scene of certain shootings, including a murder, that are matches with firearms recovered from BMB members; (5) the expected testimony of civilian and law enforcement witnesses who witnessed some of the acts of violence and, in some instances, are able to identify the perpetrators; (6) the expected testimony of nine cooperating witnesses who were acquaintances of BMB members and associates at various times relevant to the Indictment, and three cooperating witnesses who were members of a rival gang and who became familiar with BMB members and associates as a consequence of the gang rivalry;[1] (7) Facebook, YouTube, and Twitter postings in which members and associates of BMB promote their gang and belittle rival gangs, brandish firearms, discuss the gang's narcotics trafficking, and allude to the primary territories of their gang; among other sources of evidence.

The above evidence shows, in sum, that BMB is a violent street gang that commits murders and other acts of violence, traffics narcotics, and commits other crimes.  BMB is a subset of the "Young Bosses," or "YBz" street gang, which operates throughout the New York City area.  BMB—whose members also sometimes refer to themselves as the "Money Making Mafia" or "Triple M"—operates primarily on White Plains Road from 215th Street to 233rd Street in the Bronx, which is a long stretch of road under a subway train overpass that is hedged on each side by single-family homes and local commercial establishments.  BMB's narcotics trafficking activity is based principally in the vicinity of White Plains Road and 224th Street, an open-air drug market that is referred to by gang members as the "Forts."  BMB members sell drugs up and down White Plains Road, however, including at a location on 219th Street and a

---

[1]    Each of the cooperating witnesses ("CWs") is cooperating with the Government in hopes of receiving leniency for past crimes.  Each of the CWs has provided reliable information in the past, and has been corroborated by, among other things, information previously known to law enforcement and evidence acquired independent of the CWs, such as Title III wiretaps, search warrants, and controlled purchases of narcotics, some of which are described herein.

house on 230th Street.  BMB members have kept firearms at each of these White Plains Road locations.  BMB members also operate a drug spot on Boston Road and Eastchester Road in the Bronx, which they refer to as "B Road."  BMB members who work principally at the B Road spot typically refer to themselves as "Blamma."   Generally speaking, BMB members are encouraged to openly "jack," or proclaim their membership in the gang, and many do so not only in person but also through social media websites.

BMB members and associates engage in acts of violence, including shootings, stabbings, and gang assaults.  These acts of violence protect the power of the gang, deter attacks from rivals, and secure the gang's territories and drug spots.  Members who engage in a sufficient amount of violence can earn a leadership position, which is referred to as a "Big Suit."  Members with "Big Suit" status are further subcategorized as, among other things, "Burberry Suits," "Louis Suits," "Gucci Suits," "Ferragamo Suits," and "Sean John Suits," in order to signify their relative rank in the gang.  Among other things, a BMB member with "Big Suit" status has the authority to recruit other individuals into the gang.  Two of the highest-ranking "Big Suits" in BMB are Nico Burrell, a/k/a "Zico Nico," and Douglas McLarty, a/k/a "Q Don."  Both Burrell and McLarty enhanced their status in the gang, in part, by committing attempted murders when they were juveniles.

Members of BMB can rise in status and rank within the gang not only by engaging in acts of violence, but also by maintaining their membership in the gang for a long period of time. Members who have been loyal associates for a substantial amount of time are referred to as "Day One Niggas," meaning that they have been associating with the gang since its earliest days.  For example, in a posting on Facebook on July 7, 2013, BMB member Rasheid Butler, a/k/a "Rah," writes, "i love my Day1 Niggas that was here since this #TripleM Shit 1ST STARTED." Similarly, BMB leader Burrell discusses the "Day One" concept in a rap video posted on YouTube in December 2015 and entitled "Live From Gutter."  In the video, Burrell raps, "No new niggas, only day one / I know they ain't tellin' if that day come," after which another rapper repeats in the background, "no snitchin.'"

BMB has, more generally, developed a gang rule against "snitchin,'" or cooperating with law enforcement.  For example, BMB associate Vashon Bennett, a/k/a "V-Bands," posted on Facebook on July 20, 2011, "Like QuDOn Said 'No Snitchin Policy.'"   The reference to "QuDOn" is believed to be a reference to McLarty, who is one of BMB's leaders and whose alias is "Q Don."  BMB's norm against "snitchin'" is fostered through YouTube videos and social media postings, including postings in which gang members are praised for their refusals to cooperate with law enforcement in particular instances.  The norm is also enforced through disparagement of and threats of violence against BMB members suspected of cooperating with law enforcement.   In one instance, for example, a BMB member's home was fired upon because he made a statement to law enforcement about individuals with whom he had committed a robbery.

Many of the specific acts of violence at issue in this case, including those discussed in the Indictment, relate to BMB's longstanding rivalries with other street gangs in the northern Bronx. In connection with these rivalries, BMB members have developed a practice of "mobbing," meaning to gather in large groups and travel to the base of operations of a rival gang to engage in

violence there.  Members of rival gangs also sometimes go "mobbing" and attack or attempt to attack BMB at its bases of operations.  Videos of "mobbing" incidents have been posted on YouTube.  The close proximity of BMB's and other gangs' bases of operations—all of which are in or on the border of the New York City Police Department's 47th Precinct—contributes to the frequency of acts of violence.

### B.      Daquan Reid, a/k/a "DQ"

1.  Nature and Circumstances of the Offense

Daquan Reid, a/k/a "DQ," is charged in Counts Two and Three of the Indictment. Counts Two and Three charge Reid with narcotics offenses.   The Second Circuit has held that narcotics trafficking presents a serious danger to the community, and should be treated as such for purposes of bail determinations.  *See United States* v. *Leon,* 766 F.2d 77, 81 (2d Cir. 1985). That principle has special force here, because BMB's narcotics trafficking was not simply a means to make money, but the lifeblood and daily activity of a gang that controlled its drug territory through violence and threats of violence.   By converting poor neighborhoods into open-air drug markets such as "the Forts" and "B-Road," BMB members endangered the lives and the futures of the innocent families living there.  That danger is particularly captured by Count Three, which charges Reid with trafficking narcotics near schools and playgrounds.

The nature and circumstances of Reid's offenses also demonstrate that, if bailed, his return to court cannot be assured.   If convicted, Reid faces a mandatory minimum sentence of ten years and a maximum term of life imprisonment.  *See* 21 U.S.C. § 841(b)(1)(A). It is thus unsurprising that many of Reid's co-defendants have already chosen to flee rather than face the charges against them:  At this time, there are several charged defendants in this case and the corresponding case of rival gang 2Fly who remain fugitives.[2]

During the bail hearing before Judge Ellis, the defense argued that Reid is "safety-valve" eligible due to his criminal history, and therefore should not be detained.  However, in order to qualify under the "safety-valve" provision set forth in Title 18, United States Code, Section 3553(f), which would allow the Court to sentence the defendant below the mandatory minimum, the defendant would have to admit to the Government the full extent of his involvement in the criminal offenses with which he is charged—including the full extent of his association with BMB.  The Government would also have to find his safety valve proffer credible. Many defendants whose criminal history and offense conduct might otherwise allow them to avail themselves of the safety valve provision never come in and proffer, and for good reason: in doing so, they risk exposing themselves to higher penalties.  Defense counsel has not scheduled a

---

[2] The Government's investigation into both gangs is ongoing.  The Government expects to seek a Superseding Indictment in the BMB case charging certain defendants with multiple acts of violence in aid of racketeering, including murders in aid of racketeering, conspiracies to commit murder in aid of racketeering, and assaults and attempted murders in aid of racketeering, among other offenses.  Should Reid or Rodriguez be charged in a Superseding Indictment, he could face additional serious penalties, increasing the risk of flight.

time for his client to come in and proffer, and acknowledged that at this time he is merely "exploring" the option. Therefore, until such time as Reid comes in and confesses his criminal conduct, his possible eligibility for the safety valve is speculative and not properly considered as a factor weighing in favor of bail.

### 2. The Weight of the Evidence

The evidence against Reid is strong, consisting of the testimony of multiple cooperating witnesses who corroborate each other, as well as social media evidence and Reid's arrest record. Cooperating witness testimony will show that Reid, along with BMB member and co-defendant Michael Redley, sold resale quantities of crack cocaine and marijuana out of a residence located in the heart of BMB territory at the intersection of 226th Street and White Plains Road in the Bronx. On the day of the takedown in this case, law enforcement officers arrested BMB member and co-defendant Durrell Guy at that residence, and conducted a consent search. Pursuant to the search, agents recovered, among other items, three firearms, ammunition, a package containing over ten pounds of marijuana, a drug scale, and numerous other smaller packages of marijuana. Photographs taken of the residence are attached as Exhibit B. Reid was arrested at a different residence. Nevertheless, the evidence recovered from the search corroborates cooperating witnesses' information that the residence functioned as a location from which member and associates of BMB sold narcotics.

In addition, cooperating witness testimony will establish that Reid was involved in BMB's acts of violence. Specifically, he and BMB leader Nico Burrell, a/k/a "Zico Nico," discussed plans for a shooting against members of rival gang 2Fly in retaliation for an earlier shooting of Burrell's sister and fellow BMB member Michelle Jemison, a/k/a "Pebbles." Reid agreed to participate in the shooting.

Evidence obtained from the Facebook accounts of Reid and other BMB members provides powerful corroboration of Reid's association with BMB and his involvement in the sale of narcotics. Reid's Facebook account, which was publicly accessible until shortly after his arrest, bears the user name "DeeQu D QuaBank (TrapGod Dq)." The profile picture shows an individual recognizable as Reid. His username contains evidence of his association with BMB as well as his involvement in the drug trade: "QuaBank" is believed to be a reference to two former members of BMB who were murdered by rival gangs, Quarrozay Clarke, a/k/a "Qua," a/k/a "Rozay," and Antonio Lyles, a/k/a "Big Head," whom BMB members memorialized on social media as "BigBank." The phrase "TrapGod," which appears in his username, refers to a "trap," a term commonly used to refer to a location where narcotics are concealed.

The content of Reid's Facebook page contains further evidence of his association with BMB. For example, the "cover photo" on his profile page depicted a memorial for slain BMB member Quarrozay Clarke. The photograph shows a series of candles that spell out Clarke's street name, "Rozay." On November 30, 2013, Reid posted a photograph of a memorial that had been set up for BMB member Antonio Lyles. The photograph shows a cardboard box with the words "BigBank$," "LongLive BiggHead $$," and "Big Money" written on it. In addition, Reid is "friends" on Facebook with several members of BMB, including Brian Richards, a/k/a "B

Rich," Donque Tyrell, a/k/a "Polo Rell," Robert Houghton, a/k/a "Duke," and many others. These social media friendships are further evidence of Reid's association with the gang.

Records obtained pursuant to search warrants of Facebook accounts belonging to other BMB members provide further corroboration of Reid's association with BMB and narcotics trafficking; he engaged in drug deals using social media. For example, on May 7, 2015, BMB member Shawn Reid,[3] a/k/a "Sama," a/k/a "Sama Lama," sent a message to Daquan Reid and BMB member Martin Mitchell, a/k/a "Tyliek," stating, "Tell Fb & The Bros I Got The Dope Bro . . . . #SuperSour." This was an advertisement of marijuana that Shawn Reid had for sale. In connection with the message, Shawn Reid sent Daquan Reid a photograph of packaged marijuana. Daquan Reid responded, "Aight." On June 10, 2015, Daquan Reid wrote and offered to let Shawn Reid "hold" the "25 sacks" that were left. Shawn Reid responded, "It's sour? I'll dead pay for that on the Guyz," indicating that Shawn Reid was willing to pay upfront for the marijuana and then earn his money back from his purchasers. On June 14, 2015, Daquan Reid wrote to Shawn Reid, "Yo Sama Slide Up On Me Gotta Deal W Some Shit Soon," and when Shawn Reid did not respond in a timely manner, Daquan Reid wrote, "Wen u ignore me dats wen I think u tryna play me," and that Daquan Reid was concerned that "Now u going around me bro but aight," apparently because Daquan Reid was concerned that Shawn Reid might have secured a different marijuana supplier. Shawn Reid responded on June 20, 2015, asking where Daquan Reid was, and Daquan Reid responded that he was at "226," meaning White Plains Road and 226th Street, the residence which cooperating witnesses identified as the location where Daquan Reid sold narcotics. Shawn Reid then wrote Daquan Reid another message to give him assurances: "You know you my son."

As early as February 22, 2013, Shawn Reid sent Daquan Reid messages in which he offered to distribute some of Daquan Reid's marijuana. Shawn Reid began by writing, "So What Up Lets Talk $$$." Daquan Reid responded, "I'm Omw to burke to slapped one I'm reup tmm mornin so Wat u saying BRO," in which Daquan Reid meant that he was on his way to complete a drug sale at Burke Avenue, that he was going to get a new supply of drugs the next morning, and that he wanted Shawn Reid to clarify what his message meant. Shawn Reid responded with a string of messages: "Wat You Can't Throw Me Something & We Both Eat," "We Can Both Get This Money," "In Like 5 Days I Can Be Done," "You Take 280 I Take 280," "A Ounce Bagged UP In Dimes Is 560," "I Can Deal With That Asap." In these messages, Shawn Reid is offering to help Daquan Reid distribute his marijuana supply and is assuring Daquan Reid that if entrusted with product, he can distribute it quickly. Daquan Reid responded, later that day, "Kopy say nomore wen I get up n touch rd Imma link you brozay," by which Daquan Reid indicated that he was agreeing to supply Shawn Reid with product for resale. Together, these Facebook communications confirm that Daquan Reid sold marijuana along with BMB member Shawn Reid.

The testimony and social media evidence are further corroborated by Reid's prior encounters with law enforcement, when he was caught with distribution quantities of drugs and participating in drug deals. On January 26, 2015, NYPD officers executed a search warrant of the residence at 226th Street and White Plains Road. Reid, BMB member Michael Redley and one

---

[3] The Government does not believe that Shawn Reid and Daquan Reid are related.

of the main drug suppliers for BMB were arrested. A large amount of crack cocaine (approximately 200 grams) and marijuana were recovered. On April 8, 2015, Reid was arrested in the vicinity of 227th Street and White Plains Road, after an NYPD officer observed him take a large object appearing to be narcotics and exchange it for cash with another individual. The object turned out to be a large quantity of marijuana. This case was adjourned in contemplation of dismissal. However, it was just a few months later, on January 10, 2016, when Reid was stopped for a traffic infraction just blocks from the 226th Street and White Plains Road residence. He was arrested after an officer observed and recovered a pill jar that contained 10 oxycodone pills. Although these state cases against Reid did not result in convictions, the Government will introduce evidence of this conduct at Reid's trial on the narcotics conspiracy charges.

3.   The History and Characteristics of the Defendant

Reid's history and characteristics further favor detention.   As discussed above, the defendant has been arrested in BMB territory, in connection with narcotics, on three occasions, including as recently as January 2016. The January 2016 arrest indicates not only that he was very recently engaged in illegal activity—possessing 10 pills of oxycodone—but that Reid's two prior arrests did not deter him from continued engagement in the sale of narcotics. Furthermore, the Facebook messages discussing the sale of marijuana demonstrate that Reid has been involved in the narcotics conspiracy since at least February 2013.  His criminal record therefore does not adequately reflect the extent of his illegal activity.

4.   The Nature and Seriousness of the Danger to Any Person or the Community

Finally, the fourth factor also weighs strongly in favor of detention.  The defendant supplied crack and marijuana to members BMB.  The distribution of drugs is itself a danger to the community, especially when that drug-selling conduct fuels gang activity.  Furthermore, as set forth above, witness testimony will establish that Reid discussed and agreed to participate in a retaliatory shooting on behalf of BMB, a gang which has a strong policy against "snitchin'." Reid's involvement in the activities of the gang, including a willingness to commit violence, therefore constitutes a real threat if he remains at liberty to engage in unmonitored and undetectable communications with gang members and individuals with whom he has a close relationship. This is especially the case because Shawn Reid and Michael Redley, two of Reid's close associates and co-defendants in this case, remain at large in the community. Accordingly, the nature and seriousness of the danger to the community weighs strongly in favor of continued detention.

C.      **Conclusion**

The defendant has not rebutted the presumption that detention is appropriate.  In fact, the circumstances here establish that the presumption in favor of detention is fully warranted. The defendant poses a significant danger to the community, as well as a risk of flight. Accordingly, the defendant's application for bail should be denied.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____/s_____
Jessica K. Feinstein
Rachel Maimin
Micah W.J. Smith
Hagan Scotten
Drew T. Johnson-Skinner
Assistant United States Attorneys
(212)637-2460

Cc: Bryan Konoski, Esq.

# EXHIBIT A

1

g592reiH kjc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,            New York, N.Y.

4            v.                          15 Cr. 95(AN)

5   DAQUAN REID,

6               Defendant.

7   ------------------------------x

8                                        May 9, 2016
                                         10:45 a.m.
9

10  Before:

11               HON. RONALD L. ELLIS,

12                                       Magistrate Judge

13

14                       APPEARANCES

15

16  PREET BHARARA
         United States Attorney for the
         Southern District of New York
17  BY:  JESSICA K. FEINSTEIN
         Assistant United States Attorney
18

19  BRYAN KONOSKI
         Attorney for Defendant
20

21

22  ALSO PRESENT:

23  TIFFANY FRANCIS, Pretrial Services

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

g592reiH kjc

1          (Case called)

2          MS. FEINSTEIN:  Good morning, your Honor.  Jessica

3     Feinstein for the government.

4          THE COURT:  Good morning.

5          MR. KONOSKI:  Good morning, Judge.  Appearing for the

6     defendant, Bryan Konoski.

7          THE COURT:  Good morning.

8          Are we ready to proceed?

9          MS. FEINSTEIN:  Yes, your Honor.

10          THE COURT:  I have the parties' submissions.  I guess,

11     to be most efficient, if you took that into account in any

12     comments you made so that we could focus on what you thought

13     were the most salient points of the submissions.

14          I do want to begin by saying I notice that in both of

15     your submissions there was some comment about other defendants.

16     I do want you to focus on this defendant.  I am not sure what

17     your respective views are on the comparison between what

18     happened to other defendants.  My view is that since the Bail

19     Reform Act is about individuals, the value of what happens to

20     individuals, whether they are bailed or not bailed, can be of

21     limited value.  So I would like to focus on Mr. Reid.

22          Either of you can go first.  We will wind up in the

23     same place.  But since the government has made the first

24     submission, is there anything in particular in the submission

25     or other than the submission that you want the court to focus

3

g592reiH kjc

1    on?

2            MS. FEINSTEIN:  Yes, your Honor.  I would like to just

3    address a few points in the defendant's reply, response letter,

4    if that's all right with the court.

5            THE COURT:  That's fine.

6            MS. FEINSTEIN:  I will just very briefly note, we did

7    submit a two-sentence letter this morning addressing what your

8    Honor was just talking about, about the other defendants.  Just

9    very briefly -- and I won't go into it because I understand

10   your Honor's point -- Ricardo Stewart and Anthony King were

11   both retained on appeal.  I have spoken with defense counsel

12   about that.  It was not reflected in the record, and I believe

13   that's why that issue came up.

14           If your Honor has any questions about either of those

15   cases and how they appear in comparison with this defendant, I

16   am happy to go into it; but, understanding your Honor's point,

17   I will move on to other issues.

18           THE COURT:  Unless you would like to address the

19   comparison chart defense counsel had.  Is there some inaccuracy

20   in it?

21           MS. FEINSTEIN:  No inaccuracy, your Honor, other than

22   the fact that they were in fact detained on appeal.

23           THE COURT:  But in terms of their criminal records,

24   their criminal history, the charges within the indictment, I

25   gather that counsel's point is that even if I were to accept

4

g592reiH kjc

1    the notion that they were bailed or not bailed, his client is

2    on a different footing.  You might address, for example, his

3    assertion that the defendant might be safety-valve eligible.

4          MS. FEINSTEIN:  Absolutely, your Honor.  I will

5    address that.  I will just say briefly about the criminal

6    histories of both those defendants, they were very minor

7    criminal histories, actually.  They did have convictions,

8    whereas this defendant does not.  Mr. King had two convictions

9    for marijuana possession and Mr. Stewart had one conviction for

10   a firearm possession from Connecticut.  So, all told, those are

11   relatively minor criminal histories.  Everything else in the

12   chart, as far as I am aware of it, is the same.

13         So to address safety valve, then I will jump around

14   and touch on some other points, your Honor, I don't believe

15   that the defendant's safety-valve eligibility is appropriately

16   considered at this point, and this is why:

17         In order to be safety-valve eligible and be able to go

18   below the mandatory minimum, the defendant has to come in -- I

19   think your Honor knows -- confess to the government his

20   involvement, and then the government has to find him credible.

21   There are many cases, your Honor, in which that never happens,

22   even if a defendant is in the defendant's position, that his

23   criminal history makes him otherwise eligible, the reason being

24   that anything a defendant says in a safety valve proffer can be

25   brought up at sentencing.  It can increase the defendant's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5
g592reiH kjc

1    guidelines.  And particularly in a case like this, where a

2    defendant is alleged to be associated with a violent gang which

3    has a creed against cooperation, it is a very strong policy,

4    stronger than any I think the government has seen in recent

5    note.  Although, of course, coming in and safety valve

6    proffering is not the same as cooperation, in my personal

7    experience defendants frequently view it that way and are

8    therefore unwilling to come in.

9          At this time, your Honor, the defendant is facing a

10   ten-year mandatory minimum.  That weighs in favor of detention.

11   He is not at this time safety-valve eligible, and that is the

12   government's position on that.

13         If your Honor has no further questions on that point?

14         I would like to address the defendant.  In his

15   submission he noted that -- he was talking about the January

16   26, 2015, arrest, which was at a 226th Street residence where

17   the government has information from cooperating witnesses that

18   the defendant was selling narcotics along with and to other

19   members of BMB.  The defendant was present in the residence at

20   the time of his arrest.  That is reflected in arrest reports.

21   We also have information from a cooperating witness that the

22   defendant was present in that residence on the January 26,

23   2015, arrest.  So I just wanted to refute that point.

24         The defendant's association with that 226th Street

25   address is corroborated by a number of things, your Honor.  In

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

g592reiH kjc

1    addition to his other marijuana arrest, which was in -- I can

2    get that for you in a moment.  I believe that was in January

3    10, 2016.

4         In addition to that, there is very strong Facebook

5    evidence, your Honor, that corroborates the defendant's

6    association with the 226th Street address which of course also

7    comes from cooperating witness testimony.  And that

8    corroboration I would like to point your Honor to our

9    submission, page 6.

10        THE COURT:  Let me stop you for a moment because the

11   question of the association with the 226th Street address, I

12   take it you are suggesting that this 226th Street address is a

13   hub.

14        MS. FEINSTEIN:  Yes, it was a stash house.

15        THE COURT:  I use the term "hub," but I understand

16   "stash house."

17        MS. FEINSTEIN:  Yes.

18        THE COURT:  Are you saying anyone associated with that

19   is therefore, to the extent there are hierarchies within the

20   gang, everyone associated with that has to be at the top of

21   the --

22        MS. FEINSTEIN:  (Shakes head).

23        THE COURT:  So isn't it possible that someone who is

24   associated with it, associated with the gang which you say you

25   have evidence of, would have some association with the 226th

7

g592reiH kjc

1    Street address and therefore, by implication, almost anyone who

2    might be associated with the gang could be associated with that

3    address?  I am just wondering what the implication of being

4    associated with that address means in terms of where they fit

5    in with the hierarchy of your allegations.

6              MS. FEINSTEIN:  I understand, Judge.  The 226 address

7    was a residence that was in the heart of BMB territory.  You

8    can't sell drugs in that territory unless you have basically

9    the thumbs up of the gang.  The information we have is that

10   there were a small number of individuals in particular who were

11   selling out of that 226th Street address.  One of them was

12   Michael Redley, who is a codefendant in this case, who is also

13   a major supplier of crack cocaine to the gang who sold out of

14   that address; and the other person was this defendant, Daquan

15   Reid.  So it isn't the case that anyone in the gang is

16   associated with that 226th Street address.  What that shows is

17   that the defendant had a strong association with this gang.  We

18   are not saying he was a member of the gang at this point in the

19   case, your Honor.  What we are saying is that he was selling to

20   and along with other members of BMB, and that is corroborated

21   by this incredibly powerful Facebook evidence, your Honor,

22   where the defendant is actually discussing sales along with

23   Shawn Reid, who is a member of the gang, a codefendant in this

24   case.

25              Going back to 2013, and of course none of that is

g592reiH kjc

1    reflected.  It is only slightly reflected in the defendant's

2    criminal record.  He doesn't have convictions for that.  But

3    you can see it right here; and, in particular, you will note

4    that on June 20, 2015, Shawn Reid and Daquan Reid -- and we

5    don't believe there is any relation between the two of them,

6    your Honor -- were discussing the sale of marijuana, and Daquan

7    Reid responds that he is at 226 and, to that, he is talking

8    about White Plains Road and 226th Street in the Bronx.

9            What really sets this case apart, your Honor, in this

10   particular narcotics conspiracy allegation is that -- and Judge

11   Nathan recognized this when she was deciding the bail appeals

12   of Ricardo Stewart and Anthony King.  It is not, judge, the

13   sale of narcotics that is dangerous here -- although that is in

14   and of itself dangerous -- but it is the sale of narcotics to

15   and along with a gang that is incredibly violent.

16           And, moreover, this defendant isn't just sort of

17   selling in the territory with a thumbs up.  He is actually

18   engaging in multiple conversations with members of the gang,

19   including with the leader of the gang, Nico Burrell.  They have

20   a conversation, as we note in our papers, so I won't go too

21   much into depth about that, but about a retaliatory shooting

22   that Nico Burrell is planning to do and the defendant is

23   involved in a conversation and agreed to participate in that.

24   What that shows is this defendant is enmeshed in this gang, and

25   that makes the sale of narcotics, which he is charged with,

9

g592reiH kjc

1    incredibly dangerous here.  It elevates the danger, your Honor,

2    because drugs are the life blood of this gang.  It is how they

3    make a living.  It is why they protect the territory in part.

4            A few other points, your Honor, unless your Honor has

5    any further questions on those issues.

6            Just to talk about that conversation point with the

7    BMB leader, Nico Burrell, defense counsel argues that that is

8    weak evidence because it is uncorroborated, that particular

9    conversation.  What I would argue, your Honor, is that the

10   cooperating witnesses in this case, their testimony is

11   corroborated in other ways through the defendant's arrest

12   record in one; through the Facebook postings, for two.  And

13   that actually is very powerful evidence.  Even if a particular

14   piece of information isn't itself otherwise corroborated, the

15   fact that that witness is shown to be truthful in other ways

16   does make that strong, and juries convict on that all the

17   time.

18           With regard to the playgrounds and schools, your

19   Honor, defense counsel addressed that point and said that we

20   hadn't specified or proffered which particular playgrounds and

21   schools the defendant was selling narcotics within a thousand

22   feet of.  It is alleged in the indictment, and they were near

23   that 226th Street residence, one is the Rienzi Playground and

24   there is also a school on the same block.  So I can point your

25   Honor to the paragraph of the indictment, if you would like.

g592reiH kjc

1               THE COURT:  No, I --

2               MS. FEINSTEIN:  You take my word for it.

3               THE COURT:  I assume that factually it has a basis.

4               With respect to the question, though, of the

5       responsibility of the individuals who will then corroborate, I

6       took counsel's pointing that out to suggest that, unlike some

7       of the cases we have, when you have individuals who are not

8       part of the enterprise, they may be seen as, I guess, more

9       reliable in terms their credibility.  I take it the cooperating

10      witnesses you are talking about are all individuals who were in

11      the enterprise.

12              MS. FEINSTEIN:  Or associated with it, your Honor,

13      yes.  And what I would say about that is those are individuals

14      who, like many of the cooperating witnesses that the government

15      presents, most of them, in fact, they have had to plead guilty

16      to very serious crimes, and the penalties to them for lying are

17      very steep.  That is generally true, of course.  Any time you

18      have cooperating witness testimony it is subject to attack.

19      But what I would argue is that here, where you have such

20      powerful evidence that the defendant is in fact guilty of the

21      things that the cooperating witnesses are saying he is doing,

22      selling drugs along with other members of BMB at the 226th

23      Street location, that goes a long way to showing that that

24      witness --

25              THE COURT:  Although we started this colloquy when you

g592reiH kjc

1  were talking about the allegations concerning the discussions

2  about retaliatory violence.

3          MS. FEINSTEIN:  Of course, your Honor.  We are not

4  setting forth at this time that we have any corroboration of

5  that particular conversation, but I think the point is that

6  this is a witness -- these witnesses are individuals who are

7  corroborated in other respects and that, therefore, you can

8  sort of read truth into other things they are saying as well.

9          THE COURT:  Is defense counsel right that there are no

10 allegations either in the indictment or otherwise that the

11 defendant was in possession of any weapons?

12         MS. FEINSTEIN:  That is correct, your Honor.  At that

13 time, that is correct.

14         THE COURT:  With respect to this discussion about the

15 revenge or retaliation, did something actually take place?

16         MS. FEINSTEIN:  Your Honor, I don't believe we know

17 whether something took place.  It could have, but at this time

18 we don't know that.  There are plenty of things that happen

19 that the government doesn't receive information on, so I am not

20 going to represent to you that it did or it didn't.

21         THE COURT:  And with respect to the defendant's

22 agreeing to participate, is it your allegation or you want the

23 court to infer that he said he was going to agree because you

24 have independent evidence that he was part of an inner circle

25 or should I just accept it because if he said he was going to

g592reiH kjc

1    do it, it must mean that he wanted to participate, if you

2    understand the difference.

3              Obviously, if there is going to be retaliation and you

4    have a gang, there are going to be some people who are going to

5    be talking about retaliation because they are the people who

6    are in a position to effectuate the retaliation.  Anybody else

7    that is there who is not in the inner circle, it puts them in a

8    bit of a dilemma, doesn't it?

9              MS. FEINSTEIN:  I think, your Honor, just to take a

10   sort of larger view of this conversation, if that's all

11   right -- maybe I am dodging your question, but I do not mean to

12   be.

13             THE COURT:  Don't use the term "dodge."  Reframing

14   is -- you understand the question I am --

15             MS. FEINSTEIN:  I think, your Honor, what matters

16   about this conversation is not, frankly whether the defendant

17   did or didn't commit the act of violence in question, and there

18   is no evidence to indicate at this point that he did, but that

19   this conversation took place at all shows that this defendant

20   was really wrapped up in the activities of this gang, and

21   that's shown through his Facebook page as well, where even his

22   Facebook name has references that are gang references to

23   individuals who are members of BMB who were shot and killed.

24   Many members of this gang then put those individuals a/k/a's up

25   as part of their user name on Facebook.  So that conversation

g592reiH kjc

1   shows that this is someone who is in the life of the gang,

2   selling drugs with the gang and to the gang, and willing even

3   to engage in conversations and agree to do those retaliatory

4   acts.  Whether he meant it at the time or not, I don't know,

5   but the fact that you are even there having that conversation

6   is a very significant factor, your Honor, in terms of

7   dangerousness to the community.

8           I will move on to a couple of other points, your

9   Honor?

10          THE COURT:  Go ahead.

11          MS. FEINSTEIN:  Your Honor, with regard to risk of

12  flight, defense counsel says, well, my client didn't flee.

13  That's because he was arrested on the day of the takedown.

14  Your Honor, I do think it is relevant that two individuals that

15  we know this defendant was associating with, Shawn Reid and

16  Michael Redley, are both at large right now.  They could offer

17  assistance to the defendant and serve as an example to the

18  defendant, frankly.  I think it also reflects how the fact that

19  there are many codefendants in this case that have decided to

20  take off I think kind of raises a red flag in terms of risk of

21  flight here.

22          I would also just note that the defendant is proposing

23  to live with his mother when he gets out, and what I would say

24  about that, your Honor, is according to the PSR the defendant

25  resided with his mother throughout all of this, including

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

g592reiH kjc

1    throughout many of the Facebook conversations and the fact that

2    he was selling at this stash location at 226th Street.

3           So while I have no doubt that the defendant's mother

4    is a law abiding citizen, it does not give the government great

5    confidence in the fact that he will cease to continue these

6    activities when he is out, when he continues to reside in the

7    exact same place as he did before when he was committing those

8    activities, and the same goes for --

9           THE COURT:  Activities that he is accused of.

10          MS. FEINSTEIN:  Correct, your Honor.

11          THE COURT:  To the extent that he is not only residing

12   with his mother but under some form of restraint, he wouldn't

13   be a very effective drug seller under those circumstances.

14          MS. FEINSTEIN:  Well, your Honor, what I would

15   actually say is it is very easy to sell drugs out of the home.

16   It is very easy to engage in conversations over the Internet,

17   over cell phones with other individuals to help arrange sales

18   and so that actually home detention --

19          THE COURT:  I wouldn't go so far as to say it is very

20   easy.  It can be done.  Although, as I understand, the

21   allegations against this defendant don't include that kind of

22   activity.  It is hand-to-hand allegations he is accused of.

23          MS. FEINSTEIN:  The Facebook messages, your Honor,

24   actually suggest this is someone who is using his cell phone

25   and computer to arrange these sales so, yes, it was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

g592reiH kjc

1    hand-to-hand of course.

2            THE COURT:  They are arranging drug sales on the

3    street.  They are not arranging drug sales at his mother's

4    place.

5            MS. FEINSTEIN:  That's correct, your Honor.

6            THE COURT:  That is a difference, so at least to the

7    form of activity he made.  Where does his mother live?  I

8    assume in the same area?

9            MS. FEINSTEIN:  Your Honor, I am going to have to look

10   at the Pretrial Services report here.  236th Street.  I would

11   have to look it up on my cell phone.  It is within the vicinity

12   obviously of 226th Street in the Bronx.  Could be, I suppose,

13   far east or west, but I haven't looked it up, your Honor.

14           I would also just say, your Honor, in a case like

15   this, where the defendant now knows that there are individuals

16   who have testified against him or would testify against him and

17   where the gang that he is so strongly associated with has this

18   creed against cooperation, it is actually very easy for an

19   individual -- well, I will qualify that.  It is possible for an

20   individual, when they are at home, to make phone calls to

21   individuals in jail, to arrange bad things happening to people

22   who may or may not be cooperating against them.  There was an

23   individual who was released on bail with the government's

24   consent just recently, and that individual was viewed to be

25   apparently a cooperator -- I am not saying whether that

g592reiH kjc

1     individual was or wasn't -- in the jail and was almost attacked

2     by members of these two gangs.  So they take this very

3     seriously, and the fact that the defendant is going to be out

4     at all, regardless of whether he is stuck inside his home or

5     not, is a danger to the community.

6            THE COURT:  If he were out, would he have more

7     information than he does now?  If he is out, what would he add

8     to the equation of other members of the gang who might want to

9     retaliate, for example.

10           MS. FEINSTEIN:  Well, he could do their bidding

11    outside of the jail, your Honor.  I understand -- it seems to

12    me your Honor might be considering some sort of home detention

13    or electronic monitoring, but in the government's experience

14    those don't prevent danger from happening.  It alerts Pretrial

15    Services when a defendant violates that, but you can certainly

16    step out and do something or make a phone call without anyone

17    knowing.

18           THE COURT:  Which implicates the question of whether

19    there is clear and convincing evidence that he specifically

20    poses a danger.  We have the drug sales.  We have the

21    association.  We don't have him associated with any particular

22    violence, except for the conversation that you mention.  So I

23    agree with you in the sense that forms of detention may be less

24    effective if somebody is a danger, but then the question is

25    what is the specific danger that we are talking about?  If it's

1    a gang affiliation, I'm not sure how one translates, even if we

2    grant what you say as true, the gang affiliation into him being

3    an inherent danger if he is under some form of restraint.

4         MS. FEINSTEIN:  Your Honor, I think I have covered all

5    of the points that I wanted to make.  The bottom line here,

6    your Honor, is this is a gang where -- he is sitting in jail

7    with these people right now, and there are conversations in

8    which they were associated, and this gang as a whole commits

9    violent acts.  So what I would say is there is a risk of a more

10   than appreciable risk that regardless of whether this defendant

11   in the past actually committed violent acts, the fact that he

12   engaged in the conversation about retaliatory shootings and

13   agreed to participate in one indicates this is someone who is

14   willing to kind of go along with the flow of this and to sort

15   of maybe do what he is told by other people, like the leader of

16   BMB, who he is in prison with.  So in the government's view,

17   that is a significant danger to the community.

18        Just to close, quickly, your Honor, what I would say

19   is in the defendant's letter, the defendant hasn't proffered

20   any facts that I can see that meet its burden of production to

21   overcome the presumption here.  So, all told, your Honor, we

22   believe that the defendant is a danger to the community, a

23   flight risk, and that he has not overcome the presumption of

24   detention here, your Honor.

25        THE COURT:  Before you sit down, with respect to how

g592reiH kjc

1   the defendants are housed, are they actually housed in a way in

2   which they can actually have conversations with each other?

3         MS. FEINSTEIN:  I believe so, your Honor.  That's my

4   best understanding.  And usually, frankly, your Honor, even if

5   they aren't housed together, there are often means of

6   communication within a jail.

7         THE COURT:  Counsel.

8         MR. KONOSKI:  Yes, Judge.  So I will start first by

9   addressing the government's statements with respect to the

10  safety valve.  I took a look at the application of the elements

11  for safety valve, and of course there are five elements.  There

12  are four that I believe are likely to be met right off the bat,

13  especially as this case proceeds.  The fifth one, which is the

14  one that the government addressed, is whether or not my client

15  would be someone who would proffer and be truthful in a

16  proffer.  Their argument is that because that safety valve is

17  not met right now.  Of course it is not met right now.  We

18  would still have to go in for that proffer and to make sure

19  that all of the elements of the statute are met.  What I argued

20  in my papers is that it is theoretically possible that my

21  client is safety-valve eligible and certainly, as his attorney,

22  I am fully exploring all options.  He has got a ten-year

23  mandatory minimum.  As his counsel, I am going to be doing

24  everything in my power to make sure we are under that ten-year

25  mandatory minimum if we can.

g592reiH kjc

```
 1              Certainly there is potential for litigation in the
 2       future.  There is potential for the government to object and
 3       say, well, the safety valve hasn't been met.  But, on the other
 4       hand, assuming that the proffer takes place, and I don't want
 5       to state in open court right now whether it will or it won't,
 6       but if it does and my client meets that element or tries to
 7       meet that element, then it would be on my argument in the
 8       future that the safety valve would have been met.  Because my
 9       client has such a lack of a criminal history.  He has got
10       nothing, Judge.  The pretrial Services report lists an arrest
11       for which he has an ACD.
12              THE COURT:  First of all, I think the government
13       didn't concede that the record isn't the sticking point as you
14       have indicated.
15              MR. KONOSKI:  Correct.
16              THE COURT:  But with respect to the question raised by
17       the government, the requirement that one be totally truthful
18       and come forward has a particularly compelling appeal when we
19       are dealing with allegations of gang affiliation.  It is not
20       just that -- you could probably make the argument that any type
21       of drug conspiracy, it might be hard to get people to talk
22       about their involvement, but overlay that with the question of
23       the sort of the gang mantra that nobody talks, so on the one
24       hand you have the safety valve, but on the other you have all
25       the negatives that come from even being considered -- even if
```

20

g592reiH kjc

1  people think that you are telling stories, that can be

2  problematic even if it is not true.

3       MR. KONOSKI:  Sure, Judge, and that is true, but we do

4  know a few things.  The government has just told you that they

5  have a number of cooperating witnesses who are affiliated with

6  the gang and who are talking, so it doesn't prevent somebody

7  from doing the talking, and it may not certainly do that in

8  this case.  The second thing, which is also important, is my

9  understanding based on the information that I have right now

10 that my client wasn't technically a member of BMB.  Why I am

11 saying --

12      THE COURT:  I think the government did not allege

13 that, just to be clear.

14      MR. KONOSKI:  Right.  So they also indicated that they

15 are not alleging at this time that he is a member.  Again,

16 that's another piece of information that would demonstrate to

17 the court that my client doesn't have those types of close knit

18 ties where the government is saying BMB has a policy of no

19 snitching.  My client is not alleged to be technically part of

20 BMB or have those types of tight knit relationships.

21      THE COURT:  But a serious wannabe, according to the

22 conversations he --

23      MR. KONOSKI:  That is the government's allegation.  I

24 understanding the allegation.  But the government also told the

25 court that there are people who are currently cooperating who

g592reiH kjc

1    are not wannabes, they are BMB.  And so the government has got

2    people to cooperate and proffer who are BMB.  So I don't think

3    that the court should take into conversation the possibility

4    that my client may not proffer or may not be truthful.  What I

5    am telling the court is that I am --

6              THE COURT:  Although, just to be clear, you don't need

7    to get me to not take it into account, only to find that it is

8    not dispositive.  Because, as I tell people, if there is risk

9    of flight or risk of danger, that means that the court has to

10   fashion a bail package which addresses it.  You don't have to

11   be 100 percent convinced as a court that there is no

12   possibility.  I understand, just so you understand, for me, it

13   is not dispositive whether or not he might be tempted to flee

14   or might be tempted to not appear.  That is inherent in the

15   fact that if there is no temptation, release people on their

16   own recognizance.  So I will take into account whatever

17   potentials there are for flight, but I have to, in following

18   the law, determine whether or not the evidence and the burdens

19   that are placed on each side are met.

20             MR. KONOSKI:  So, Judge, I certainly understand the

21   court's questioning with respect to that fifth element, which

22   is the proffer element.  We are early in the case.  My

23   expectation is we are exploring the safety valve as a possible

24   option in this case and that I could tell the court.  And

25   certainly I need more time, as my client's attorney, to fully

22

g592reiH kjc

1   get through the elements, to deal with the prosecution, to

2   check on the evidence, and to know exactly what we are dealing

3   with.  But I didn't raise the safety valve as a possible option

4   in the paperwork just to put it there.  It is a serious

5   consideration at this point.

6            I also want to point out that the government concedes

7   a number of things.  I have already touched upon that they are

8   conceding that they are not saying that he is officially a

9   member of BMB.  They reference a threat to a retaliatory

10  shooting and that my client may have made some statements about

11  wanting to assist.  However, the government does specifically

12  note -- I think this is the sum and substance -- their

13  statement was they don't know whether he meant it when he said

14  it.  And, Judge, there is no proof that my client engaged in

15  any wrongdoing associated with that alleged threat.  There is

16  no allegation that he engaged in violence, that he tried to

17  assault anyone, that he possessed any firearms.  And while the

18  government tried to tell the court that they don't want to say

19  that nothing happened, the reality is they have no proof that

20  anything happened.  And the indictment itself doesn't charge my

21  client with racketeering, any violent acts, or possession or

22  use of a firearm.

23            So what we are dealing with here are a number of

24  incidents as far as I can tell of potential drug dealing, and I

25  don't think that, based on what the government has said, that

g592reiH kjc

1    there are no conditions here that can be met to satisfy the

2    court that my client was rushing to court, that this would

3    reduce any risk of flight, and that there would be no danger to

4    the community.  The government has tried to allude to the fact

5    that crimes can be committed from the home, drugs can be sold

6    from the home, but as the court had actually noted, I think, in

7    some of the questions the government -- when the prosecution

8    was making those arguments is that all of the hand-to-hand

9    transactions and the allegations that the government put

10   forward were instances where my client was allegedly outside of

11   the home.  So adding an ankle monitor and home confinement and

12   the fact that he would be regularly observed by his mother and

13   would have to check in with Pretrial Services, that all puts a

14   significant hamper on anyone who would be trying to engage in

15   drug sales, especially when their history, according to the

16   government anyway, demonstrates that those drug sales were at

17   the street level.  So I would argue, Judge, that there are

18   conditions here that can be met to ensure safety to the

19   community and to ensure that my client would return to court.

20          The government says that there is -- they try to paint

21   my client as potential for violence claiming that he is someone

22   who goes along with the gang and goes with the flow.  I

23   understand the court just pointed out that the government has

24   essentially argued that my client is effectively a wannabe gang

25   member, but again as I have already stated before, there is no

g592reiH kjc

1    proof that if he is going along with the flow and he engaged in

2    some drug transactions, there is absolutely no proof at all

3    that he has ever gone along with the flow with any violent

4    actions whatsoever.  As I have indicated already, that is

5    demonstrated by a lack of a racketeering charge, a lack of a

6    firearms charge, and the fact that the government cannot point

7    to a single instance of violence that my client has ever even

8    committed.

9           Based on the totality of the circumstances here,

10   Judge, my client is 21, he lives at home, if the court sets

11   conditions requiring my client to have home confinement, it is

12   clear that he is going to be very much restricted.  It is clear

13   that he has got family support.  He has got family members here

14   in the courtroom.  They have been very much associated with

15   this case in the term that they were very much in contact with

16   me from day one.  They have been at my office.  They have been

17   on the phone with me repeatedly, all through the weekend, all

18   through last week, we have been in touch numerous times.  They

19   obviously care about Mr. Reid.  This isn't you a situation

20   where sometimes defendants come to court --

21          THE COURT:  Let me stop you for a moment because this

22   comes up often, that is, I believe that the family members care

23   about the defendant.

24          MR. KONOSKI:  Correct.

25          THE COURT:  But also it is true that, based upon the

g592reiH kjc

1    allegations, it appears that there is a part of his life that

2    they don't share.  How do you suggest that the court address

3    the fact that very often we have family members -- husbands,

4    wives, sons, daughters -- who are engaged in activity and the

5    family members who love and support them are often unaware of

6    the extent of those activities, and so the person that they are

7    loving and supportive of is not the same person that's being

8    presented here in court.

9         MR. KONOSKI:  I understand that question, Judge, and

10   certainly that would appear to be the case in many instances

11   where somebody is arrested.  It is almost like a family just

12   wasn't aware.  But in this kind of situation where you have the

13   type of family support that Mr. Reid has, home detention, home

14   confinement situation, where he would be living at home with a

15   mother that's very supportive, that's very much active in this

16   case, who wants to see that this case proceeds in a manner

17   where hopefully in the future maybe there will be a safety

18   valve addressed, but that the case would hopefully be resolved

19   in the best manner possible for their loved one, a loved one,

20   mind you, who has no criminal history of criminal convictions.

21   I think that having that kind of family support is important

22   for the court to take into consideration because it shows that

23   the family will be there for his support, will be watching him,

24   will be making sure he is in the home, and that, coupled with

25   Pretrial Services and an ankle monitor and location monitoring,

g592reiH kjc

1    all provides plenty of ways to ensure that Mr. Reid comes back

2    to court and remains out of trouble while this case is pending.

3    Somebody like Mr. Reid, who is 21 years old, who has no

4    criminal convictions, and in this indictment who only has two

5    of the charges, not a racketeering charge and not a firearms

6    charge, it demonstrates that he would be, I guess the

7    description I would put it is that he is low man on the totem

8    pole.  He is not a high player in this.  It is not even alleged

9    by the government that he is an organizer, a manager or has

10    kind of dealings with the gang in that regard.  They can't even

11    say he is officially a gang member.  At best you have got a

12    wannabe gang member.  And while that makes it still serious,

13    Judge, I understand that, but it shows that there may be ways

14    to resolve this case at some point in the future that would

15    give Mr. Reid every incentive to return to court, not be a

16    flight risk.  So, taking everything into consideration, Judge,

17    I think we have proposed a bail package here that would be

18    appropriate.  It would include home confinement, it would

19    include the signing of financially responsible persons who of

20    course would be there for Mr. Reid, and it would -- and I

21    think, Judge, that the court should find that Mr. Reid will be

22    properly monitored if he is released.

23          THE COURT:  Tell me something about the family.

24          MR. KONOSKI:  So I have been in touch with the family.

25    In terms of -- I think I have it here -- those that are

g592reiH kjc

1    financially responsible in particular, I have names of a number

2    of people.  I propose three cosigners.  In fact, pretrial has

3    proposed two.  So I would ask the court to consider the two

4    which would make things easier on the family.  However, I have

5    proposed three.  We have Natasha Courtwright, she is a legal

6    assistant and she is gainfully employed.  We have Patricia

7    Reid, who is an executive assistant, also who is gainfully

8    employed.  Maria White-Fraser is gainfully employed.

9            THE COURT:  What's the relationship to the defendant?

10           MR. KONOSKI:  Maria White is here.  She is my client's

11   aunt.  Sandra Wallace is my client's godmother.  The first

12   person I listed, Natasha Courtwright, I think is a family

13   friend.  And then I think there is Tanisha Monroe is listed in

14   the Pretrial Services report as being the person who was

15   interviewed by pretrial.  She is also present in court, and she

16   has been very much in contact with my office.  According to

17   Pretrial Services, she would be willing to sign bond, but I

18   think she is unemployed at the moment, so she is not proposed

19   as one of the potential cosigners right now.

20           So, Judge, I think that there is demonstrated family

21   support here by close family members as well as friends.

22           THE COURT:  Anything else?

23           MR. KONOSKI:  No, Judge, not unless you had any

24   further questions for me.

25           THE COURT:  Anything from the government?

g592reiH kjc

1          MS. FEINSTEIN:  Your Honor, I believe everything is in

2     our submission.

3          (Pause)

4          THE COURT:  I have reviewed the indictment, the

5     Pretrial Services report, and taken into account the arguments

6     of counsel, and the presumption to which the government is

7     entitled.

8          I find that, under these circumstances, the defendant

9     has overcome the presumption that there are no conditions.  I

10    note some specific things that entered into the court's

11    opinion, although sadly I think the first thing that entered

12    into my consideration is the fact that the defendant, who lives

13    in an area that appears to be gang controlled and drug

14    infested, has reached the age of 21 years old without a serious

15    criminal record and apparently no convictions.  I say "sad"

16    because the idea that not having a criminal record being a

17    positive actually turns out to be one of the things that

18    happens in this court.  We see so many people come in with

19    records and so many people who, even before they have reached

20    the age that they can vote, have records that will disqualify

21    them from actually voting.

22         In addition to that, I note that with respect to the

23    defendant, while there were a number of inferences that the

24    government wanted the court to make, the bottom line is that

25    the defendant has no charge involving racketeering, no actual

g592reiH kjc

1    claim that he is a member of the gang, no claims involving the

2    possession or use of firearms, and most of the actual

3    activities by the defendant appear to be low level,

4    hand-to-hand drug deals.  I would note with some confidence

5    that were there evidence to suggest that the defendant were

6    involved reasonably in activities that would support the other

7    charges, I am confident that the office here would have

8    presented that evidence.

9             As I indicated to defense counsel, I don't expect

10   people here who come before the court to be totally free of the

11   pull of nonappearance.  As indicated by defense counsel and I

12   believe largely conceded by the government, at least on paper,

13   the defendant is safety-valve eligible.  That does not mean

14   that it is automatic.  But, again, as pointed out by defense

15   counsel, the government has been successful in getting a number

16   of cooperating witnesses.  Those are individuals who presumably

17   were deeply ensconced in the gang and the activities of the

18   gang.  Notwithstanding that, it is certainly true that

19   individuals have been convinced that their best opportunity for

20   resolution of any charges is to be honest and forthcoming going

21   forward.

22            So taking all of those things into account, I find

23   that obviously there are still enough indicators here in the

24   record that the defendant does pose a risk of nonappearance and

25   danger to the community, but kind of balancing that, I think

g592reiH kjc

1     that to the extent that the defendant has individuals who are

2     willing to stand up for him, notwithstanding the fact that, as

3     I have indicated, it is certainly true that sometimes those

4     individuals who are willing to stand up have not heard the

5     things that have been said in court on any prior occasion, but

6     they will -- to the extent that they will go into this with

7     their eyes a little more open, I think if the defendant can get

8     that support, it will, first of all, indicate that he has

9     significant ties to the community and also that support will

10    also make it more likely that he will abide by the conditions

11    that the court will set.

12          Those conditions will include a $50,000 personal

13    recognizance bond to be cosigned by three financially

14    responsible persons; travel restricted to the Southern and

15    Eastern District of New York, surrender of any travel

16    documents; strict pretrial supervision with drug testing and

17    treatment.  Obviously, as I have indicated, the defendant needs

18    some form of restraint.  I notice that Pretrial Services

19    recommends home detention as opposed to home incarceration,

20    although it wasn't entirely clear to me what the thinking was

21    with respect to that.

22          PRETRIAL SERVICES:  I am not entirely sure I am not

23    the one who wrote the report, I also believe we are

24    recommending that he be enrolled in either a GED program or

25    some kind of work.  That would be the reason why.

g592reiH kjc

1          THE DEFENDANT:  Yeah.

2          THE COURT:  I understand that, although I was

3     wondering whether the realistic possibilities of this happening

4     in this circumstance.

5          MR. KONOSKI:  Judge, I think my client is okay with

6     enrolling into a GED program, but that was one issue I wanted

7     to raise with the court is that practically I think the

8     suggestion from pretrial was all conditions to be met

9     pending -- before his release, but I don't know practically if

10    that's even a possibility or when the enrollments would take

11    place or anything of that nature.

12         THE COURT:  I understand.  I think that might be a

13    little bit of an impossibility to enroll.  On the other hand,

14    we can always say all conditions except that to be met,

15    although the idea is that he would seek some form of

16    educational activity.

17         Even if I forget to put that down on the form, it will

18    be implicit that even if it says "all conditions" that does not

19    imply the conditions such as getting a GED or getting

20    employment, which I think might pose a problem if one is

21    incarcerated.

22         I am going to impose home detention with the proviso

23    that Pretrial Services can reevaluate that in six months and

24    with electronic monitoring or location monitoring I guess.

25    Should I put location monitoring?

32

g592reiH kjc

1          PRETRIAL SERVICES:  Location monitoring.

2          THE COURT:  Location monitoring.  We are in the

3    process of changing the form.

4          Is there anything else?

5          MS. FEINSTEIN:  Your Honor, the government would

6    respectfully request that you stay the decision while we seek

7    review.

8          THE COURT:  Well, is there any reason that the judge

9    is not going to be available in the near future?

10          MS. FEINSTEIN:  Your Honor, I haven't checked the

11    schedule with chambers, but last week she was able to quickly

12    hear appeals.

13          THE COURT:  I tell you what, I will stay it for 48

14    hours.

15          MS. FEINSTEIN:  Understood.  Thank you, Judge.

16          THE COURT:  That also is probably consistent with the

17    setting up of the electronic monitoring and all, so it

18    shouldn't delay the defendant if he meets the conditions, but

19    it will give the government a set time in which they can file

20    their appeal.

21          Anything else?

22          MR. KONOSKI:  Nothing from the defense, Judge.

23          MS. FEINSTEIN:  Nothing further.  Thank you.

24          THE COURT:  We are adjourned.  Thank you.

25          MR. KONOSKI:  Thank you very much, Judge.
                                  -  -  -

# EXHIBIT B





