```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


-----------------------------------X
                                   :
UNITED STATES OF AMERICA,          :  15-CR-00095 (AJN)
                                   :
               v.                  :  500 Pearl Street
                                   :  New York, New York
                                   :
BURRELL, et al.,                   :  June 27, 2016
                                   :
               Defendants.         :
-----------------------------------X


        TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL HEARING
          BEFORE THE HONORABLE JAMES L. COTT
                UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:          HAGAN SCOTTEN, ESQ.
                             U.S. Attorney's Office
                             Southern District of NY
                             One St. Andrew's Plaza
                             New York, New York 10007


For the Defendant:           DAWN CARDI, ESQ.
                             Cardi & Edgar LLP
                             2 Park Avenue
                             New York, New York 10016



Court Transcriber:           SHARI RIEMER, CET-805
                             TypeWrite Word Processing Service
                             211 N. Milton Road
                             Saratoga Springs, New York 12866
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1           THE CLERK:  <u>United States of America v. Calvin</u>

2  <u>Ruggs</u>.

3           Counsel, please state your names for the record.

4           MR. SCOTTEN: Hagan Scotten.  Good morning, Your

5  Honor.

6           THE COURT: Good morning, Mr. Scotten.

7           MS. CARDI:  Dawn Cardi, Cardi & Edgar.  Good

8  morning, Your Honor.

9           THE COURT: Good morning, Ms. Cardi, and good

10 morning, Mr. Ruggs.  Everyone may be seated.

11          MS. CARDI: Your Honor, this is Mr. Ruggs's family

12 sitting in that [inaudible] row there.  His mother, father and

13 sister and family members.

14          THE COURT: Welcome to you all.  I appreciate your

15 being here.

16          Ms. Cardi, did you see the letter that the

17 Government sent to me?  I believe it's dated --

18          MS. CARDI: It was Friday.

19          THE COURT:  -- Friday --

20          MS. CARDI: The day late afternoon.

21          THE COURT: Yes, have you seen that letter?

22          MS. CARDI: I have.

23          THE COURT: So let's assume for purposes of our

24 proceeding today that Mr. Scotten would stand up and say

25 everything in the letter.  So the burden obviously is on the

1   Government here and it is a presumption case but that said the

2   burden is still ultimately on the Government but I think

3   I'll -- since it's your application ultimately at this point

4   I'll turn to you now and then I'll let Mr. Scotten follow up

5   and then if he says anything that you feel you want to respond

6   to I want you to have an absolute opportunity to make the most

7   complete record you can and then we'll see where everything

8   shakes out.

9           MS. CARDI: So let me start, Your Honor, with some

10  personal information about my client.

11          THE COURT: Okay.

12          MS. CARDI: Calvin is 21 years old.  He has lived in

13  the same community and home for his entire life.  His mother

14  and father have been together for a lifetime as they told me.

15  His father, dad, is a UPS driver and has been so for 20 years.

16  He's one of the suretors in this case.  He earns approximately

17  $50,000 a year.

18          Kim Kelly, the defendant's uncle, my client's uncle,

19  is a bus driver for the MTA and Anthony Crawford, and he will

20  be one of the suretors, he makes approximately the same amount

21  of money as I believe Mr. Calvin Ruggs, Sr. earns.

22          Finally, Mr. Anthony Crawford, an elderly neighbor

23  and handyman who has worked for 150 Central Park West

24  Corporation for more than 18 years and he earns approximately

25  $53,000.  Mr. Crawford, who could not be here by the way, has

4

1  told me that he and his wife have been neighbors of the Ruggs

2  for the entire time that they've lived there and he has known

3  Calvin since he was a baby.  He wanted me to tell this Court

4  the fine upstanding family that Calvin comes from, what good

5  people they are, his [inaudible] of I think 38 or 40 years

6  suffered a stroke.  She was put into a nursing home.  The

7  nursing home is not a good nursing home and this family along

8  with this young man helped bring her home and cared for her

9  every day until she died.  So we have roots in the community

10  go really, really deep.

11          Let me talk a little bit about Calvin himself.  He

12  is 21 years old and he is -- has a job waiting for him when

13  and if he is released.

14          THE COURT: What's the job?

15          MS. CARDI: I have it here.  I'd like to pass up to

16  the Court the letter from the Burger King manager who is

17  prepared to hire him and I have also attached the certificates

18  that he received when he graduated from the [inaudible]

19  program in state court.  May I give that to your deputy, Your

20  Honor?

21          THE COURT: You may.  Does the Burger King manager

22  know the charges that Mr. Ruggs is facing?

23          MS. CARDI: Yes, yes.

24          THE COURT: Does it post date the charges?

25          MS. CARDI: Yes, she does, Your Honor.

5

1          THE COURT: All right.

2          MS. CARDI: And let me talk a little bit about the

3  Government's letter.  Because unfortunately having done this

4  as long as I have this letter is an indictment.

5          THE COURT: Can you hold on one second?  Because I

6  think I left the letter on the desk in here.

7                    [Pause in proceedings.]

8          THE COURT: I have it.  Thank you.

9          MS. CARDI: Thank you.

10         So you have to read as I know you will and have, you

11  have to read this letter very carefully because you have to

12  look at in fact what it does say and what it doesn't say.  And

13  you have to think about this investigation.  This is

14  investigation, an indictment spans from 2007 to 2016.  Yes,

15  the allegations in the indictment about the gang are

16  disturbing but what are the allegations against this young

17  man.  I have reviewed all of the evidence thus far that the

18  Government has presented to me and I have found allegations of

19  only marijuana sales and they are minuscule compared to the

20  depths and length of this indictment.

21         Now, are we going to incarcerate during the pendency

22  of this case a young man with roots in the community, solid

23  people here with a job because he sold marijuana and he was

24  swept up with a gang, a gang by the way that it appears

25  there's no proof that he belonged to.  He doesn't have the

6

1   tattoos.  He doesn't have the indicia of the gang.  Perhaps

2   the allegations of his selling marijuana might in fact be

3   accurate.  Do we incarcerate him during the pendency of this

4   case for that purpose?

5        There isn't a single allegation in this letter that

6   ties him to any violence.  He has not been tied to any guns.

7   He has been brushed with the aura of a youth gang with he

8   lives.

9        THE COURT: What about his prior criminal record

10  which includes a robbery charge?

11       MS. CARDI: Well, I'd like to address that.

12       THE COURT: Is that something I should be concerned

13  about?

14       MS. CARDI: Yes.  Your Honor, when he was 16 years

15  old he committed --

16       THE COURT: He's only 21 now.  So it's not like it

17  was sometime in the distant past.

18       MS. CARDI: I -- respectfully, you're right but I

19  also think between the ages of 16 and 21 and 25 there's a

20  whole development and let's think about this.  If in fact --

21  and I will tell you about that robbery.  Nothing in all of

22  those years is he tied to any violence in this indictment.  So

23  yes, did he have -- commit a crime when he was 16?  He did.

24  Did he steal cell phones?  Yes, he did.  He was prosecuted.

25  He received youthful offender treatment and he was on

7

1  probation for five years.

2          During that five-year period he completed the CASES

3  program.  During the five years --

4          THE COURT: What is the CASES program?

5          MS. CARDI: It's -- I gave you the certificates but

6  in state court --

7          THE COURT: Right.

8          MS. CARDI:  -- they put -- they divert youthful

9  offenders into programs to help give them things like court

10 employment, help them with their behavior.  He's got personal

11 growth certificates.

12         THE COURT: Right.  But now he's passed this program

13 while he's on probation but while he's on probation he is

14 alleged by the federal government at a minimum to have

15 multiple marijuana transactions with federal officials.  So

16 how do I rationalize that alleged misconduct during the

17 pendency of his being on probation?  That's not also a good

18 fact.

19         MS. CARDI: Well, I think you have to look at two

20 things.  The presumption of dangerousness and is he --

21         THE COURT: There is a presumption of dangerousness

22 when it comes to dealing drugs, is there not?

23         MS. CARDI: I understand, Your Honor, but I think

24 that the level of presumption of dangerousness and drugs has

25 to be analyzed vis-a-vis the kind of drugs that you are

8

1  selling.  I'm not excusing the sale of marijuana but I hardly

2  compare that to the sale of heroin or crack or other drugs

3  that are being sold on the streets of New York.  So we have to

4  look at dangerousness.

5         THE COURT: Am I right that Mr. Ruggs would be living

6  with his family in the same apartment that he has been living

7  in during these other incidents, the robbery and the marijuana

8  dealing?

9         MS. CARDI: He would --

10        THE COURT: In other words, he's going back to the

11  same environment he's lived in.

12        MS. CARDI: He's going back with two very well

13  respected members of their community and his father has told

14  me and his mother that if this court required that he be

15  monitored with a bracelet they are willing to put the land

16  line in and willing to do whatever is necessary to have their

17  son returned to him and --

18        THE COURT: No.  But my point is that -- and this has

19  no -- nothing whatsoever to do with the family.  Everything

20  you tell me about the family makes me inspired by them but

21  this has nothing to do with his parents.  It has to do with

22  him and if he is living under the same roof that he has been

23  living in where he committed this robbery or he is now alleged

24  to have committed multiple marijuana violations his living

25  with them doesn't seem to matter as far as alleged criminal

9

1   misconduct is concerned.  That's my concern.

2            MS. CARDI: Your Honor, I have to disagree with you.

3   First of all, he's got a federal indictment.  He's in federal

4   court.  It's quite serious.  He really understands how serious

5   it is.  They understand how serious it is.  He will be under

6   intensive supervision by Pretrial especially if he's wearing a

7   bracelet during this period of time.  He will be working

8   hopefully so that he will have -- be occupied.  He will not be

9   out on the streets.  He will not be cavorting with other young

10  would be or wanna be gang members and he will have ample

11  opportunity to assist me in his defense.

12           THE COURT: Well, if we knew the world was exactly as

13  you described it that would be nice but the world isn't as you

14  describe it.

15           MS. CARDI: Well, how is it not different, Your

16  Honor, when you're on Pretrial detention with a bracelet?  My

17  client --

18           THE COURT: The pretrial services officer does not

19  live at the Ruggs house.

20           MS. CARDI: But he knows --

21           THE COURT: The pretrial services officer does not

22  come every day, every hour of every day, does not go to the

23  Burger King where he's working, does not know when he leaves

24  Burger King at 5:00 whether he's going from Burger King back

25  to the apartment which if he's on home incarceration he'd be

10

1  required to -- if he's on home detention, excuse me, he'd be

2  required to do it.  If he's on home incarceration he's not

3  even allowed to be employed.

4          So really I gather, although you haven't said it

5  yet, you're proposing a package where potentially there would

6  be multiple co-signers, he'd be on home detention but he could

7  work.  That's what it sounds like you're proposing.

8          MS. CARDI: Well, I mean, Your Honor, obviously --

9          THE COURT: Is that what you're proposing?

10          MS. CARDI: No.  Obviously my goal is to have him

11  released.  If Your Honor said that you would feel more

12  comfortable releasing him with home incarceration then

13  obviously that would be an option that I would proffer to the

14  Court.  For me it's a series of options so that I can address

15  for you real concerns that you have about my client, his

16  behavior, his activities, the safety of the community.  I

17  think we can put together such a package so that you can be

18  assured that he will not be engaging in any conduct that would

19  violate his bail conditions.

20          THE COURT: My concern given the allegations in the

21  charging instrument and what the Government has articulated,

22  and I'm sure Mr. Scotten will speak more to this, is what

23  affiliation if any Mr. Ruggs would have with other people in a

24  variety of ways either in person, by phone, through social

25  media, et cetera to advance the interests of this alleged

11

1  gang.

2         MS. CARDI: Well, let me --

3         THE COURT: That he is allegedly involved with.

4         MS. CARDI: Let me --

5         THE COURT: They're allegations, and let me be

6  crystal clear, let me be crystal clear to the family.  I'm not

7  presuming anything other than innocence on the part of Mr.

8  Ruggs.  That's not relevant to the bail decision I have to

9  make.  What I have to decide is is the Government sufficiently

10 able to prove there's clear and convincing evidence that he is

11 a danger to the community.  That's -- at least as to danger

12 that's what we're talking about.  We haven't talked about

13 flight risk yet which I'm sure Mr. Scotten will because he

14 wrote about it in the letter.  I assume what you're going to

15 tell me is where is he going to go, he's lived in the Bronx

16 his whole life; right?

17        MS. CARDI: No.  I'm going to tell you some other

18 things.  I'm going to say you get an opportunity to look at

19 past performance in the sense of flight risk but before I move

20 to flight risk let's talk about violence.

21        So he's not associated with guns.  They have not

22 come up with one iota of an example.

23        THE COURT: Is he not charged with that?

24        MS. CARDI: He's charged with it but I have been

25 given discovery and though thus far there isn't a single piece

1  of evidence that I have been given nor does it appear in this

2  letter which I assume if they had allegations of a particular

3  violent act on Calvin Ruggs's part they would have put it in

4  there but it's not there.

5         THE COURT: Well, I think what they have said --

6  maybe I misunderstood or misread this but Mr. Scotten again

7  can speak to this, is he is alleged to have sold marijuana

8  repeatedly in a particular location where there is considered

9  access to firearms by the members of the gang and so therefore

10 since they say he's a member of the gang he would have access

11 to guns there.  I think that's the argument.

12        I agree with you it's not like he was arrested with

13 a gun on him or there was a search warrant of the apartment

14 and the gun was found in his sock drawer or something.  I hear

15 you.  So --

16        MS. CARDI: You know, Your Honor --

17        THE COURT:  -- I think that's the argument they're

18 making.

19        MS. CARDI: But, Your Honor, are we going to

20 incarcerate him for the entire case because of a broad brush

21 of where he lives or where he might be selling marijuana.

22 Come up with the goods.  If you want him held for

23 dangerousness you tell me but you can't tell me and I've

24 gotten the evidence.  They can't attach him to the guns.  All

25 they can say is he sold marijuana at a location where guns

13

1    could have been, would have been, were available.

2            So my position is we are now a long way into this

3    case.  It was investigated for all of those years and the best

4    they can do is paint him with a broad brush of well, he's

5    around people who are violent or could have guns.

6            Let's talk about the social media in this letter.

7    True, they have social media up the wazoo on some of the

8    defendants in this hundred defendant case.  Not a single piece

9    of social media from my client because he wasn't on Facebook

10   and he wasn't on social media.  So yes, it's in here.  Yes, it

11   seems damning.  But it doesn't relate at all to my client.

12           What about his likelihood of returning to court.

13   Well, first of all, there's the moral suasion of his family

14   and his close relatives and friends being on the bail bond

15   which quite frankly is moral suasion and it's very important

16   and I've assured him and his family that the Government will

17   and do come after families who sign on these surety bonds no

18   matter how sad the story is.  Since Mr. Ruggs works for the

19   UPS and the uncle works for the Transit Authority you

20   easily -- and his other neighbor works for a corporation.

21   It's easy to garnish their wages.  We're not talking about

22   individuals who are out there working either in quasi off the

23   books jobs.  Their wages will be garnished and I assured them

24   that that will happen to them if he violates any of the

25   conditions of his bail.

14

1          Now, let's look at the five years that he was on

2    probation.  There was never a warrant.  There was not a single

3    violation.  He participated and did everything that was

4    expected to [sic] him.  He didn't run away.  He never had a

5    dirty urine and he was tested randomly and on a regular basis

6    during the program.  So that we have some sense that he will

7    remain in the jurisdiction and depending upon what Your Honor

8    decides he will either have some -- a bracelet so he can work

9    or he will be on house arrest with the family but I think in

10   this particular case he should be given that opportunity.   I

11   think he -- I think we can rebut that presumption.

12          The issue on the domestic violence that the

13   Government puts a whole paragraph in on Page 6 was dismissed.

14   There was no order of protection.  The young lady never showed

15   up in court.  That was it.  So I don't think the Court should

16   be considering this in terms of dangerousness when you're

17   deciding whether or not he should be given some bail.

18          I don't know what this meant in Paragraph -- on Page

19   6 in Paragraph 4.  There is --

20          THE COURT: You're talking about the Government's

21   letter?

22          MS. CARDI: Yes.  They refer to him as an affiliate

23   of a violent gang.  I don't know whether that word was

24   selected purposefully or whether or not they mean he's a gang

25   member.

1          THE COURT: You're talking about the word affiliate?

2          MS. CARDI: Yes.  Because it was a well chosen word

3  and in this -- in my dealings with the Southern District U.S.

4  Attorneys they select their words very carefully and

5  purposefully.

6          THE COURT: In other words, they could have said

7  member if they had evidence that he was a member which is

8  stronger than saying he's an affiliate which is not as strong.

9  Is that your point?

10         MS. CARDI: That's exactly my point, Your Honor.

11         THE COURT: Okay.

12         MS. CARDI: In addition to that -- I just want to

13 make sure I put it in here.

14                    [Pause in proceedings.]

15         MS. CARDI: Actually one more thing I want to say

16 about access to firearms.  Ordinarily I would expect to find

17 in this letter at this stage some allegation that based on

18 cooperator's information they could tie him to having actual

19 access or being in a place where the guns would -- where he

20 could have used a gun or participated in moving a gun or

21 knowing a gun was there.  They don't have that her and that I

22 think is also really important in terms of your determination

23 as to whether or not dangerous -- we have overcome the

24 presumption of dangerousness.

25         Your Honor, unless you have some other questions --

16

1          THE COURT: Well, you know, you're talking about all

2    of the good he's accomplished while he's been on probation but

3    Mr. Scotten is going to stand up and say he's dealt drugs

4    repeatedly while he was on probation.  So why are you giving

5    him a clean bill of health when he really can't be given that?

6          MS. CARDI: Between 2007 and 2016 there is a total of

7    I think it's seven marijuana sales.  All of them --

8          THE COURT: While he's on probation.

9          MS. CARDI: All of them occurring in 2015.  You are

10   correct, Your Honor, while he is on probation.

11         THE COURT: Why isn't that problematic?

12         MS. CARDI: Of course it's problematic but to

13   incarcerate -- detain someone based on five marijuana sales.

14   Yes, I agree with you, it is problematic behavior but it

15   neither speaks to dangerousness nor does it speak to his

16   ability to return to court.

17         THE COURT: Well, I mean it does speak to

18   dangerousness to some extent because when you deal drugs

19   you're dealing drugs.  Where do the drugs come from?  Who's

20   controlling the drugs?  How do they come to where they come?

21   Is there violence associated with the importation or the

22   dealing of the drugs?  Often there is.  That's why Congress

23   has created presumptions in drug cases.  So it's not like one

24   marijuana cigarette passed like to one person one time in a

25   restaurant or something.  You're talking about multiple sales

1    in a location that the Government argues is one fraught with

2    all of this peril that has led to an enormous indictment in

3    this case.

4             I take your point.  They are painting with a broad

5    brush.  Half the letter is about the gang.  It's not about Mr.

6    Ruggs.  That's not lost on me.  But it's difficult for me to

7    see your client quite as squeaky clean as you're describing

8    him to me given sort of the continuum of events while he's on

9    probation.  That's not a fair characterization either I don't

10   think and my mind is open about what to do but I don't think

11   you should press too hard on that point because I think it

12   harms the argument.  It doesn't help it in some respects.

13            MS. CARDI: Your Honor --

14            THE COURT: Because if someone is on probation and

15   they are --

16            MS. CARDI: For me, Your Honor --

17            THE COURT:  -- disrespectful of the law and the

18   legal process in whatever way that is manifested, that doesn't

19   inspire a judicial officer to think that they will comply with

20   other orders, whatever they may be in the future.  That's just

21   a natural reaction for me as a judicial to have.

22            MS. CARDI: Your Honor, I do think that the

23   combination of what I discussed in terms of the package should

24   give you assurances that this is an -- and Mr. Ruggs surely

25   understands the seriousness of what he is facing in this case.

18

1   The -- I think there -- the opportunity and even his
2   willingness or desire to do anything that violated the law has
3   been sharply curtailed by his arrest in this case and by what
4   he's truly facing and by the outpour and the support and
5   concern that has been expressed by his parents.  I do think
6   that we have overcome the presumption.  I don't think there's
7   that -- we have overcome the presumption in the area of
8   dangerousness and we've also overcome the presumption I
9   believe in the area of whether or not he would return to
10  court.

11           I am not saying he is squeaky clean.  If I could
12  only made bail applications for people who were squeaky clean
13  I would be a silent lawyer.

14           THE COURT: You wouldn't be making applications.  You
15  would have agreements with the Government.

16           MS. CARDI: Exactly.  Exactly.  And you know, Your
17  Honor, that they never agree on a hundred defendant case.
18  They just don't.  It's so rare.  I mean it's practically --
19  forget it.  You have to have almost --

20           THE COURT: Well, that's a deeper philosophical
21  conversation.

22           MS. CARDI: Almost a saint.

23           THE COURT: Just to be precise about things because I
24  think we've talked somewhat mosaically if I can put it that
25  way about what your proposal is.  You're proposing I gather

19

1  that I set a bond that's going to be co-signed by three

2  financially responsible persons; correct?

3          MS. CARDI: Yes.

4          THE COURT: The father, the MTA person and the

5  employee at the building.

6          MS. CARDI: The father, the uncle and the neighbor.

7          THE COURT: Right.  Okay.  So it's going to be co-

8  signed by three financially responsible persons.  It sounds

9  like what you're proposing effectively is if I were amenable

10  to it home detention with electronic monitoring but he could

11  work at the Burger King.  Is that --

12          MS. CARDI: If you were agreeable to it.

13          THE COURT: But you would be amenable to home

14  incarceration if I thought that were necessary.

15          MS. CARDI: Yes.

16          THE COURT: You just want him out?

17          MS. CARDI: Yes.

18          THE COURT: I understand.  Can I ask this Burger King

19  on Boston Road, how close is that to where he lives,

20  proximity-wise?

21                  [Pause in proceedings.]

22          THE COURT: Is it a walk, is it a subway ride?  How

23  is he getting there?

24          MS. CARDI: It's a walk, Your Honor.

25                  [Pause in proceedings.]

20

1          MS. CARDI: So it sounds like it's about four blocks.

2          THE COURT: Anything else you want to say, Ms. Cardi,

3    before I hear from Mr. Scotten?

4          MS. CARDI: No, Your Honor.

5          THE COURT: As I say, I'll give you an opportunity to

6    respond further to what Mr. Scotten says.

7          MS. CARDI: Thank you.

8          THE COURT: Mr. Scotten.

9          MR. SCOTTEN:  Thank you, Your Honor.  I don't

10   believe anything the defense presentation overcomes the

11   presumption or should overcome Pretrial Services

12   recommendation here.

13          I will go briefly through the four factors

14   addressing only sort of the points as they came up.  I won't

15   say anything on the first factor other than note I don't think

16   there's any disagreement.  The first factor, the nature of the

17   charges supports detention here and that makes sense.  They're

18   very serious charges.  They carry statutory presumptions.

19   Precedent generally considers them to favor detention.

20          THE COURT: Can I ask you?  He's charged among other

21   things with a firearms discharge.  What does that mean in the

22   context of this case given what Ms. Cardi has said to me about

23   having no evidence produced to her related to his possession

24   or involvement in a firearms discharge?  How do I -- how do I

25   assess that if in fact defense counsel tells me she's been

1   given no evidence to support such a charge?  What -- can you

2   make some proffer to the Court with respect to this particular

3   defendant, not that he's affiliated with a group of people who

4   were involved, but this particular defendant, how do we

5   particularize it as to him and that charge?  How do I think

6   about that?  What's in the record that I could consider or

7   that you could proffer to me?

8            MR. SCOTTEN: So I do think, Your Honor, that the

9   proffer is going to be witness testimony which is why the

10  defense counsel doesn't have it yet because obviously we have

11  not disclosed witness testimony and I don't want to overplay

12  that it would be accessorial liability.  I'm not going to

13  proffer to you --

14           THE COURT: It would be what liability?

15           MR. SCOTTEN: Accessorial, 18 U.S.C. 2 as an

16  accessory to a discharge.  We are not going to tell the Court

17  there's a witness who's going to come forward and say Calvin

18  Ruggs was firing a gun on X occasion.  If I can sort of draw

19  the link there, Your Honor, I will.  It does start as was

20  extensively discussed with the narcotics evidence -- I am

21  going to get to Your Honor's question.  This is the train that

22  gets there which is extensive.

23           I think it's a little -- I have to correct defense

24  counsel saying it's an investigation that stretches back to

25  2007.  The indictment indicts crimes as far back as 2007.  The

1   investigation began at the very end of 2014.  So almost

2   immediately as we entered 2015 is when the defendant is again

3   and again and again making these sales.  There's a total of

4   eight to law enforcement officers.

5           What is highly significant about this is the context

6   of those buys and the location.  It is at this location which

7   the defendants refer to as B Road.  It sounds like it is just

8   blocks from where the defendant is now proposing to work. B

9   Road is Boston Road.  So it might be worth inquiring on.

10          THE COURT: B Road is Boston Road?

11          MR. SCOTTEN: Yes, Your Honor.

12          THE COURT: Because the Burger King is at 3500 Boston

13  Road.

14          MR. SCOTTEN: Right.  And I don't know the cross

15  streets but maybe it's way up Boston Road.  The defense would

16  have to speak to that.

17          But we're really talking about the same road.  So

18  this B Road spot is a location controlled by a subset of a

19  gang known as -- often referred to as Bland.  That's a subset

20  of the big money bosses.  And there is witness testimony about

21  a couple of things that is relevant given that I think the

22  evidence is overwhelming, given the presumption of innocence

23  but still the evidence is overwhelming that he sold drugs

24  there.  One, you can't sell drugs there unless you're

25  affiliated to the gang.  It's not as though he's selling in

1 his high school or out of his home where then you just have --

2 you're controlling all your -- what is the danger posed by his

3 drugs.

4           Second, the witness --

5           THE COURT: Can I stop you there?

6           MR. SCOTTEN: Yes, Your Honor.

7           THE COURT: You said you can't sell drugs unless

8 you're affiliated.  So, Ms. Cardi made much semantically of

9 the word affiliate as opposed to member.  Are you alleging

10 he's an affiliate of the gang, a member of the gang?  Does it

11 matter for these purposes?  What can you say on that subject?

12           MR. SCOTTEN: So, Ms. Cardi is right.  That was a

13 carefully chosen word.  We are not alleging he is a full

14 fledged member.  To be a member of the big money bosses are --

15 certain people must tell you you're a member.  A big suit

16 usually must formally tell you you're a member.  With that

17 come certain privileges.  You can display the gang sign, shout

18 things they shout and that does infer a higher status than at

19 this point we're willing to proffer, we can prove as to Mr.

20 Ruggs.

21           We're not saying he's not a member but we're

22 certainly not arguing that you should consider him one for

23 purposes of this hearing.  So he is --

24           THE COURT: So you're saying, however, he -- I'm just

25 trying to parse your words carefully because I think they

24

1   matter here.  You're saying he wouldn't be able to be selling

2   the drugs that he did multiple times in the location he did

3   were he not at least affiliated with the gang.

4            MR. SCOTTEN: That's correct.

5            THE COURT: Is that right?  And the evidence of that

6   is what?

7            MR. SCOTTEN: The evidence of that will be both

8   extensive cooperating witness testimony on this.  This is

9   something that is widely known and sort of we think easily

10  provable.  There's also social media evidence of particularly

11  the gang's leadership.  Nico Burrell, who's the lead defendant

12  on the indictment, at this location at the B Road spot talking

13  about being there with some Blammers [Ph.], that is that set

14  the controls that.  And when you get to Burrell and the

15  Blammer reference you're getting right at the heat of the

16  violence in this case which is extensive in that area because

17  it borders so closely --

18           THE COURT: Right.  But we have to be careful

19  about -- the Government may have extraordinarily strong

20  evidence about this gang and the leadership and the like but

21  we can't just allow that to scoop up every single person in

22  the indictment and require that all 100 and however many are

23  all going to be detained just sort of generically.

24           My job is to particularize each individual

25  application and given Mr. Ruggs individualized consideration

25

as I would any other defendant in this or any other case for
that matter.  So I mean I think -- I don't begrudge you.
You're right either in the letter or now to provide what I'll
call context here but ultimately we have to hone in on
precisely what the Government thinks is the reason this
defendant is a danger and a flight risk because I gather you
think he's both.

MR. SCOTTEN: Yes, Your Honor.  So I will try to keep
the focus on the defendant.  I do want to say that the
evidence of his membership in a -- or affiliation with a large
organization is important and proper for this Court to
consider.  For what it's worth we cited the Circone case which
says when you voluntarily joined a violent racketeering
organization the way that organization operates is in part
attributable to you and he's partly a threat because of his
loyalties to that organization because they can call on him,
because he can call on them --

THE COURT: Again, maybe I'm parsing too -- you're
talking about joining in an organization and his loyalty to
them but what do I know about that?  What is there before me
that makes me concerned that because he is loyalty to the
organization?  Do I know that?  You're telling me well,
because he's dealing drugs on the street and he'd only be able
to because the gang controls the street, he must be loyal to
them.  There's a lot of sort of a certiorari type analysis

1   you're requiring me to do which I'm not saying I can't or

2   won't but it's more of a connect the dots kind of argument

3   than a here's the evidence, here's the evidence, here's the

4   evidence.   Isn't it?

5           MR. SCOTTEN: With respect to the threat that he

6   would perform a violent act yes, Your Honor, it is a one step

7   -- his loyalty to the gang proved partly through that.   I

8   don't want to overstate the importance of family bonds but his

9   brother Kenneth Ruggs is a co-defendant is more closely

10  connected to the gang even than he.   But also the danger here

11  is not just that he might do something violent.   I don't think

12  that should be underrated.   He does -- it is not as though he

13  is a solely non violent person.   He has the robbery

14  conviction.   The domestic violence accusation is considerable

15  in a Mercedes.   The defendant there also had no convictions

16  but was detained.   Partly based on that and other factors,

17  some of which are present here.

18          THE COURT: I don't know anything about it.   What do

19  I know about it other than it existed but it was dismissed?

20  It doesn't mean it didn't happen but I don't know anything

21  about it.

22          MR. SCOTTEN: So I --

23          THE COURT: I just know it as a line.   Domestic

24  violence incident dismissed.   I mean what do I do with that?

25          MR. SCOTTEN: I think you take it as one small factor

27

1   that a person came forward and complained to the police that

2   the defendant was striking her.  That is what it's worth.

3   It's somebody who will strike a loved one is more likely to be

4   dangerousness than someone who isn't.  I don't suggest that is

5   the rock end which we found this case but it is something Your

6   Honor can and should consider.

7           THE COURT: Okay.

8           MR. SCOTTEN: I suppose I should talk briefly

9   about -- well, finish up the [inaudible] first.  So the

10  Government also comes through this location and this is I do

11  fairly concrete.  Witnesses, and not just cooperating

12  witnesses -- there's at least one civilian witness here --

13  will testify that this particular location -- we're not

14  talking the gun as a whole having access.  I'm sorry, the gang

15  as a whole having access to guns but this particular location

16  there were guns stored nearby in particular locations that

17  people who were dealing there could run to and grab.  Although

18  we're not suggesting we have evidence that Mr. Ruggs did in

19  fact grab one and fire one, the people dealing there did grab

20  those guns and did fire them primarily to ward off the rival

21  gang which is right next door.  The other gang in the other

22  indictment in this case.

23          THE COURT: But don't I need evidence that Mr. Ruggs

24  was involved in that for that to matter with respect to this

25  application?

1    MR. SCOTTEN: I don't think you need evidence, Your

2 Honor, that he personally grabbed the gun.  If you look at the

3 Circone case it's a racketeering organization with violent

4 predicate acts charged against it but the particular defendant

5 who was applying for bail in that case, the only predicate act

6 against him was money laundering.  The Second Circuit still

7 denied bail and said look, he's joined this organization, he's

8 furthering it.  He's contributing to it and they have guns and

9 they shoot at people and he is aiding that and that makes him

10 dangerous.  Not as dangerous as the hit man who's actually

11 carrying the gun but still dangerous.  So if you are dealing

12 drugs in a neighborhood, essentially a residential

13 neighborhood, guns are stored there for your protection, you

14 are part of that enterprise.  It dominates that block, it

15 turns that block from a place that people can live safely into

16 a place where drugs are sold openly, where guns are stored,

17 where gun fire is exchanged, you are a danger.  You are

18 contributing to danger.

19    I think this Court should have no assurance that the

20 defendant won't continue to contribute to that on bail which

21 is going to move me briefly to history and characteristics.

22    The Government is no position to deny any of the

23 wonderful and we assume truth things about the defendant's

24 family but as the Court pointed out he has lived with his

25 family his whole life during the robbery conviction, this -- I

1  think it's significant also that he does not appear to ever

2  had a job until now that -- after what appears to be

3  [inaudible] drug dealing he's got an application that will be

4  granted now that he's finally been arrested and incarcerated

5  for that drug dealing.

6          THE COURT: Well, but that's a good thing though,

7  isn't it?  I mean he'd be gainfully employed.  If he's

8  gainfully employed by someone who -- am I right about this?

9  He was hired on April 25th.  When did the indictment come

10  down?  When was he arrested?

11          MR. SCOTTEN: April 12th is when the indictment came

12  out.  I don't know the date of his arrest.  I'm sorry.  April

13  27th is the indictment, Your Honor.  So he's hired --

14          THE COURT: Two days before.

15          MR. SCOTTEN: Right?

16          MS. CARDI: Yes.

17          MR. SCOTTEN: Two days before the indictment.

18          MS. CARDI: Two days before, Your Honor.

19          THE COURT: Well, then that raises a question.  Well,

20  this says 6/1/16 is written next to Ms. Valinda's [Ph.]

21  signature.  So I assume she understands he's facing criminal

22  charges but notwithstanding that he has a job waiting for him.

23  Is that your understanding, Ms. Cardi?

24          MS. CARDI: Yes.  In fact, she says in the letter

25  that the job I guess offer was April 25th.

30

1          THE COURT: Right.

2          MS. CARDI: Which was two days before but then she

3    wrote this letter on June 1st which is after he's been

4    indicted.  She knows -- she is well aware of his -- of the

5    charges.

6          THE COURT: Mr. Scotten, if someone is facing charges

7    isn't it better that they have a job than they don't have a

8    job on some level?

9          MR. SCOTTEN: Taken in a vacuum absolutely, Your

10   Honor.  I guess I"m just suggesting that as to how you would

11   weigh employment, this -- well, I waited until 21 to get a job

12   and I got one two days before the indictment should be at the

13   very bottom end on how much you would weigh having -- he

14   doesn't have a job but he supposedly has a job he can get but

15   he never did get when he was selling drugs for all this time.

16         THE COURT: Okay.

17         MR. SCOTTEN: I think really the most important

18   history, the history [inaudible] is the fact that he was on

19   probation for five years during which time police officers

20   again and again bought narcotics from him.  Marijuana, but

21   still drugs.  In particular significance that they once

22   arrested him for selling drugs during this time.  I don't know

23   why his probation wasn't violated.  Then the next month they

24   arrested him again for selling drugs in the same location.  So

25   it's not just being on probation for robbery didn't deter him.

1   It's even getting caught while on probation didn't deter him

2   from going right back to selling.

3          I know Your Honor has a statistic you some quotes

4   about how relatively few people on bail commit crimes.

5          THE COURT: Is there some email in the U.S.

6   Attorney's Office when you go before Judge Cott he will say

7   that?

8          MR. SCOTTEN: I've actually been here before, Your

9   Honor.

10         MS. CARDI: There's a whole file, Your Honor.

11         THE COURT: Probably so.  But it's statistically

12   accurate as far as I understand it which is very few people

13   flee in this District.  Very, very few people flee.

14         MS. CARDI: Very few.

15         MR. SCOTTEN: I think what that points to, Your

16   Honor, is that the courts in this District do a good job of

17   figuring out who should be on bail and who should be detained.

18   There are, in fact, I believe it's nine but I'm not sure, nine

19   or ten defendants in this case who are on bail either at the

20   Government's consent or a magistrate judge ruled against us

21   and we did not seek to appeal to the District Court.  So it's

22   not as though we don't think any defendants in this case

23   should be on bail.

24         There are also nine defendants in this case who are

25   still fugitives two months after an highly public indictment

1  in which everybody heard of.  I would suspect that among the

2  group of people who seldom get bail are people who have been

3  on probation for five years and repeatedly commit crimes while

4  on probation and it's because -- and it's also a statutory

5  factor.  Because they don't get bail that's one of the reasons

6  you don't see people often violating this Court's bail orders

7  because people who are going to ignore a court order by

8  selling drugs on bail aren't bailed, shouldn't be bailed here.

9  I think Your Honor hit on this but it shows that the defendant

10 is not  -- I think -- it's not [inaudible] to say in the least

11 concerned with judicial authority given what he's done already

12 while on probation.

13        I think that brings us to flight and he is facing a

14 20 year mandatory minimum as currently charged.  There has

15 been a flight in this case.  Every defendant is considered

16 individually but I just note that all the defendants in this

17 case are from the area.  They grew up in the area.  They have

18 ties in the community.  This isn't an international narcotics

19 trafficking organization but that doesn't prevent you from

20 fleeing.  Some --

21        THE COURT: He's going to jeopardize the bond of the

22 neighbor, the uncle and the father?  I mean that's what he

23 would be doing and I'm sure Ms. Cardi has talked to him very

24 intensely about that among other things.  So it's not that

25 that couldn't happen and doesn't happen but that would be the

33

1  consequences.  So he would be harming his family very

2  significantly if he did it.

3          MR. SCOTTEN: He would.  On the other hand, so for

4  example, in Mercedes the Court basically proffered a package

5  essentially identical to this one of strong community ties,

6  substantial bond and ongoing electronic monitoring and the

7  Second Circuit said that does not suffice to overcome the

8  presumption of dangerousness or risk of flight and that's

9  understandable.  I mean yes, if --

10         THE COURT: The dangerousness -- let's stick with

11 dangerousness because --

12         MR. SCOTTEN: Yes, Your Honor.

13         THE COURT: -- that's what this is about for me

14 mostly.  I mean I take the point that he's facing significant

15 time.  That's a factor but generically it doesn't do much for

16 me.  If you said, you know, he had family ties outside of the

17 United states or some other part of the country then we'd

18 start to hone in on that and I could understand where he might

19 go and why the argument would carry some more concrete force.

20 To me this is mostly a case about danger.

21         I think this is a close case because of the

22 arguments that Ms. Cardi has constructed which is if you took

23 this case outside the construct of it being 100 plus defendant

24 case and a gang case and we were just looking at Mr. Ruggs --

25 if this were just United States v. Calvin Ruggs, the end,

1  okay, I'm not even sure you wouldn't have worked something out

2  as long as it was a very serious package.  You might have but

3  I think you're constrained here in part and you may know more

4  than you're even telling me and I can only rely on what you

5  tell me.

6          That this is a case where because the activities of

7  a gang are alleged to be so serious and so significant and so

8  widespread that anyone even to use the word of the morning,

9  affiliated, is someone who with rare exception really --

10 especially if they have a prior criminal record as he does,

11 which is not insignificant, including a prior criminal record

12 that's violent, including a prior criminal record that while

13 he's on probation he's doing this activity, when you start to

14 put all of that together Judge, how can you let him out.

15 There is some force to that to be sure.  That's why I say it's

16 a close case.

17          But I look at this and it says the indictment

18 charges him in three counts, racketeering conspiracy,

19 narcotics conspiracy and firearms discharge.  Now, naturally

20 as a human being the first thing I look at is firearms

21 discharge, what is that about, and now you're telling me it's

22 going to be a 18 U.S.C. 2 charge and he's an accessory and no

23 one says he had a gun, used a gun, was next to someone who

24 used a gun or whatever.  I mean I don't know what the evidence

25 is.  So it isn't as strong as I would think it might be if

1   you're really pressing that and Ms. Cardi tells me she has no

2   discovery about it.

3           So then we have that and then we have a narcotics

4   conspiracy.  Well, we have a lot of evidence of narcotics

5   dealing and that's troublesome to be sure.  It's a problem.

6   It's a big problem and I don't know if I will be able to set

7   conditions but that's really what this is ultimately about.

8           But what you're telling me is I have to consider

9   where this happened and where it happened is a location that

10  could only happen by affiliation with the gang that's done all

11  of this heinous activity.  So it's really kind of a connect

12  the dots application more than some and that makes it harder

13  it seems to me.  I'm not saying I won't detain.  I haven't

14  decided yet.  This is a hard case.

15          I'm going to take a recess and talk to the Pretrial

16  Services officer about it.  I'm going to hear from you again

17  but before I do let me just see if Mr. Scotten has anything

18  else he wants to say in reaction to my musings.

19          MR. SCOTTEN: Sorry.  I guess in response to that,

20  Your Honor, just very few things.  I think you're right that

21  the factors here that are driving us to oppose bail that would

22  not in an isolated marijuana case are two.  One, it's an

23  affiliation with a gang which I'll try to be more concrete in

24  a second, and two, it's the probation issue, that we don't

25  think he can be relied upon to go back out and not continue

36

1    doing what he was doing and that -- back to the narcotics

2    issue.  To make that concrete, we're talking about a very

3    specific intersection on Boston Road in the Bronx and if you

4    think about it in terms of affiliation with the gang as an

5    esoteric concept it may seem to connect the dots.

6              If you think about a very specific block where Mr.

7    Ruggs has sold drugs again and again to police officers and in

8    one case to a confidential informant where he has gone back to

9    selling drugs despite being arrested, despite being on

10   probation, this is a block where there is gun fire.  This is a

11   block where we will have witnesses testify the dealers on that

12   block are associated with that gang, they are loyal to that

13   gang and where they can run to very specific locations, X

14   garbage can, and grab a gun.  That is dangerous because it

15   means he can grab a gun and he's somebody who's already

16   committed a robbery.  So we know he's not necessarily shying

17   away from it.  And it's significant because it says we're

18   going to turn someone back out in the neighborhood who is part

19   of what plagues that block, who turns it away from a place

20   where people should live into a violent place filled with

21   drugs and guns and he's given every indication he will not

22   adhere to judicial orders.  That does make him a danger to the

23   community whether you want to consider it directly under Leon,

24   the narcotics are a danger that he's going to be dealing drugs

25   there, or indirectly under a case like Circone that he's going

37

1  to be supporting a violent organization that dominates a

2  neighborhood and makes it a violent place.  It's a danger for

3  both of those reasons, Your Honor.

4      THE COURT: Would it be better if he were to work at

5  a Burger King that would be in midtown Manhattan than on

6  Boston Road?

7      MR. SCOTTEN: It would, Your Honor.  In some of the

8  cases where we have been able to come to terms the condition

9  that we've asked for has almost always been not live in the

10  neighborhood, not work in the neighborhood.  Here, because

11  again really the probation issues, we weren't willing to

12  propose that condition because we don't think he'll abide by

13  any conditions but a defendant who had a track record of

14  obeying judicial orders and was willing to live outside the

15  Bronx and do other things those were the cases where we have

16  been able to come to a bail agreement.

17      I realize it's a minor factor for Your Honor but I

18  would be remiss if I didn't add that on risk of flight we

19  agree with Your Honor.  I'm not suggesting he's going to flee

20  to France and assume a new identity.  Most of the defendants

21  in this case who are still fugitives are still right in the

22  Bronx and you can be a fugitive without connections anywhere

23  else and you can escape detention for a very long time as some

24  of them already have and are continuing to do without ever

25  leaving the county of your birth.

1          THE COURT: But the minute he were to flee if he's on

2    conditions he has then jeopardized his entire family's

3    financial circumstances.  So you're assuming that this

4    individual would do that.  I'm not saying he wouldn't.  How

5    would I know?  It's all speculation.  When you set bail

6    everything is speculation.  As one of my colleagues says, it's

7    an impressionistic event.  It's an art.  Not a science.  If I

8    had a book I could use and look up and there was some grid

9    like the sentencing guidelines for bail decisions I would use

10   it but it doesn't exist.

11         So I mean a lot of this is speculative frankly.  I'm

12   not saying there isn't force to what you're saying but it's

13   speculative as is much just like when I set conditions I think

14   well, did I do the right thing and I'm betting on a person not

15   to do something that would make me regret having set

16   conditions.  It's a bet and I have to hope I'm making the

17   right choice as a legal matter applied to the facts that are

18   presented.

19         MR. SCOTTEN: I guess if I could help with the map at

20   all [inaudible].  I think the Saboni case is somewhat relevant

21   when it says risk of flight is much greater when the penalties

22   are high and the evidence is overwhelming.  And I do think you

23   have that here.  It's not an entirely irrational calculation

24   even taken from a family perspective.  Twenty years in prison

25   is a terrible thing.  Maybe you flee and you recoup the money

1   because who wants to go to jail for 20 years.  That is not --

2   that is a difficult decision for any defendant.  It's not a

3   case where it's irrational to flee so that weighs more heavily

4   than in another case where the evidence is weaker and the

5   sentences are lower.  The calculus to flee is less and you may

6   be less willing to endanger your family.

7           THE COURT: Okay.  Ms. Cardi.

8           MS. CARDI: Your Honor, I think in the Circone case

9   the issue is joining the organization.  He did not join the

10  organization and obviously he had ample opportunity to join

11  the organization because he's lived in the community his

12  entire life.  But at 21 years old he had not joined the

13  organization and my position is that's because he had no

14  intention of joining the organization.  So how can we

15  attribute to him all of the horror of the organization

16  because --

17          THE COURT: Well, hold on.  You say he had no

18  intention of joining the organization but Mr. Scotten has just

19  told me that the only way he's allowed to deal drugs where

20  he's alleged to have dealt them is because he's affiliated

21  with the organization.  So it's -- you're making it sound like

22  he is in fact affirmatively disavowed himself from the

23  organization and I'm not sure that that's what the evidence

24  has shown or been proffered to show.

25          MS. CARDI: Your Honor, respectfully, respectfully --

40

1          THE COURT: I hate it when people say that.

2          MS. CARDI:  -- I'm sure --

3          THE COURT: Respectfully what?

4          MS. CARDI:  -- that if you walked up to that street

5    today you could buy marijuana on it and the gang still exists

6    and the people are still out there and because you can buy

7    marijuana on the street corner in a housing project does not

8    necessarily mean that you are affiliated with the group there.

9    So I think that we have to look at that and we have to think

10   about well, yes, the Government feels very confident that they

11   can somehow show that this affiliation is going to make him a

12   member of the gang, make him subjected to the horrific

13   penalties of RICO, make him subjected to a firearms charge.  I

14   don't think any -- I have not heard anything that the

15   Government has said today which makes I believe me, my

16   argument any weaker than what it was when I first made this

17   argument.  I think he hasn't joined the organization.

18          I want to just briefly address the domestic violence

19   issue because I have another hat that I wear and I practice

20   family and matrimonial law as well as criminal defense, and

21   if -- perhaps the Government is not aware of it but there are

22   many, many, many times when people make allegations of

23   domestic violence when they are not true and when they are

24   done for reasons other than the fact that domestic violence

25   actually occurred.  We do not have anybody saying that they

1   talked to the witness in that case who reported to them that

2   there was domestic violence.  If we can't rely on a case being

3   dismissed as being dismissed then what can we rely on?  I mean

4   just because you're arrested doesn't mean you've done the

5   crime.

6          Again, this is a broad brush of where there's smoke

7   there's fire but honestly I think there's just smoke and I do

8   agree with Your Honor that your concern is, is he going to

9   live a law abiding life, no violations, no -- obviously no --

10  not violating one iota the conditions of Pretrial Services and

11  I've had many clients on Pretrial Services and I will tell you

12  they are not easy people, the Pretrial Services officers.

13  They have very high standards.  They're very strict.  They

14  don't put up with any kind of bad behavior or breaking of the

15  rules.  They set very close parameters.

16         For example, if I have someone who's on home

17  detention who is going to come and see me, we have to give

18  them the time, we have to tell them when they're there.  We

19  have to tell them when they're leaving.  We have to really

20  touch base with them and I do believe that that would be

21  sufficient for this Court to know that the presumption of

22  dangerousness has been overcome and that you can set a bail

23  where Mr. Ruggs will in fact come back to court, in fact abide

24  by all of the rules and regulations set by Pretrial Services

25  and I believe that in this particular case we have overcome

42

1  the presumption.

2         THE COURT: Can I just ask a couple of other

3  questions?  Who else lives in the apartment besides his

4  parents?

5         MS. CARDI: I believe his sister.  His younger sister

6  who's sitting in court.

7         THE COURT: Okay.  Do you know if he were to work at

8  this Burger King what his hours would be?

9         MS. CARDI: If I could have a moment.

10                [Pause in proceedings.]

11         MS. CARDI: Your Honor, I've been told that the

12  original job offer is five to eleven in the evening but

13  obviously that might -- we'd have to adjust that if Pretrial

14  Services thought that that was not an acceptable time for him

15  to be working.

16         THE COURT: What's your response to Mr. Scotten's

17  concern about the fact that the venue is exactly on the same

18  avenue as where he's alleged to have committed these narcotic

19  violations?  Does that matter here?

20         MS. CARDI: I mean I don't think it does, Your Honor.

21         THE COURT: It doesn't matter?

22         MS. CARDI: I know -- I mean I think he lives where

23  he lives for all of his life.

24         THE COURT: I know but I mean on some level -- you

25  could make the argument both ways.  On the other hand, if he

43

1   worked at McDonalds in midtown Manhattan he would be far

2   removed from that in the same way that not that the Government

3   would agree to bail in Mr. Ruggs's case but if you said he had

4   an uncle who lived outside Philadelphia and he could live

5   there while the charges were pending and he could work at a

6   Burger King outside Philadelphia, that would be more appealing

7   on some level to the Government if I could speak for them I

8   suppose than being told he's going to work on the very street

9   where he's alleged to have committed multiple violations of

10  the federal narcotics laws.  That doesn't give Mr. Scotten

11  much assurance.

12          In fact, what he's concerned about is -- he didn't

13  say it but if Mr. Ruggs is working at a Burger King what he's

14  doing on the street he's saying he's going to do in a Burger

15  King because it's so close to where he was doing it which he

16  didn't say but that's really I think a concern.

17          MS. CARDI: I think you're right, he could sell drugs

18  anywhere, you're right.  If he gets out he could sell drugs

19  anywhere.  But what are the -- what is it about the package

20  that we put together that would speak against him doing such a

21  thing.  First of all, again, he would jeopardize his family by

22  any kind of new arrest.  Secondly, he would jeopardize his

23  position in fighting this case and it would be serious and

24  very detrimental.  Obviously in the event that he were to be

25  convicted and be sentenced at a later date it would speak

44

1    volumes to the sentencing court about that behavior during the

2    time that he was out pending -- out on bail in a case in a

3    case where the Court took a leap of faith in order to give him

4    that bail package.

5            So I mean there's a lot weighing against his doing

6    something that is illegal again while he's out on bail.

7            I mean the other thing is that the proximity to his

8    home would also mean that Pretrial would know that when he

9    gets to of work at a particular time he should be back in the

10   house within ten minutes and that can be arranged.  Again, if

11   Pretrial Services goes and talks to the person there and says

12   I don't think this is a place for him to work, it wouldn't be

13   the first time that I had Pretrial Services tell me that this

14   might not be a location that my client could work at and I

15   understand that and we would work to see -- and the family

16   would work to see if they could get him some other kind of

17   employment but that should not prevent him from being out

18   pending the trial or plea in this case.

19           THE COURT: Let's take a recess.

20           MR. SCOTTEN: Your Honor, if I could.  It's not a sur

21   rebuttal.  It's just one factual point that I think might be

22   helpful.

23           THE COURT: Sure.  Go ahead.

24           MR. SCOTTEN: I do want to be clear about the concept

25   of joining the organization.  It is our allegation, our

45

1  proffer that he has joined the organization.  He's not a full

2  fledged member in the same way there are many people in the

3  U.S. Attorney's Office who are not AUSA's.  The people in this

4  case --

5          THE COURT: He's like a paralegal?  What does that

6  mean?

7          MR. SCOTTEN: He's not like a paralegal but I take

8  Your Honor's point.  In the same -- there are many defendants

9  in this case who are charged only in the narcotics conspiracy,

10 not in the racketeering conspiracy because they did some drug

11 business with the gang but their connection wasn't close

12 enough.  We felt they could call on the gang, the gang could

13 call on them and that they had agreed to the gang's other

14 acts.  That is not this defendant.  He is charged in a

15 racketeering conspiracy because his particular actions we

16 think, we think the evidence will show manifests membership in

17 the organization even if he's not at a sort of full fledged

18 members status.

19         MS. CARDI: Nothing --

20         THE COURT: This is the affiliate versus membership

21 distinction reducts?

22         MR. SCOTTEN: That's correct, Your Honor.  I just

23 don't want to -- we're not saying he didn't join the

24 organization.  We wouldn't want Your Honor to base any ruling

25 on it.

46

1          MS. CARDI: Your Honor, I think if they're going to

2     trial in a RICO count with what they've said in court today

3     I'm ready, I'm ready to defend him.

4          THE COURT: Yes, I understand that.

5          MR. SCOTTEN: We do have a couple of witnesses.

6          THE COURT: I understand that too but we're not

7     trying the case today.  So can I see you all inside?

8                    [Off the record.]

9          THE COURT: So, as I said before, I do think that

10    this is a close case in a lot of ways.  I think Ms. Cardi made

11    some very forceful arguments that make me think long and hard

12    about what the right result is here from my perspective.

13          Let me start by acknowledging again in thanking Mr.

14    Ruggs's family for being here.  That always makes a big

15    difference to the Court to see a show of support.  That I

16    think is very significant and I'm very appreciative you have

17    taken time from your respective commitments to be here.

18          Let me also say in an abundance of caution because I

19    think lawyers have a tendency to talk in ways that the general

20    public doesn't entirely understand through no fault of their

21    own, that we talked a lot during the back and forth I had with

22    the lawyers about what the presumptions are here and I wanted

23    to just address that primarily for the benefit of Mr. Ruggs

24    who I'm sure has talked to his lawyer and the family about

25    that.

47

1          In certain kinds of cases the criminal charges

2     necessitate that there be a presumption that someone be

3     detained unless that presumption can be overcome.  Now, the

4     burden is always on the Government to prove in this case by

5     clear and convincing evidence that the defendant is a danger

6     to the community.  But the defendant has to overcome that

7     presumption by making a showing to the Court that there are

8     some set of conditions that could be set to insure the safety

9     of the community or that the defendant won't be a flight risk.

10          Let me start briefly by talking about flight risk.

11     I take the points that the Government made in that regard but

12     I would not rely on flight risk here to detain Mr. Ruggs.  I

13     think he obviously comes from a very grounded home, a very

14     well established home, and I think that location monitoring

15     for purposes of flight risk probably would be a successful

16     condition to monitor Mr. Ruggs's movements such that I am not

17     overly concerned that he is a flight risk despite the fact

18     that he faces very serious charges.

19          I think the substance and significant part of our

20     discussion that I had with both Mr. Scotten and Ms. Cardi

21     focused on danger.  If this were a case where Mr. Ruggs didn't

22     have a prior record I think it would be an easy case.  I think

23     I would set conditions.  But when I start peeling the onion

24     back and I start evaluating what all the other factors are it

25     becomes more complicated.

48

1          So we have a case of an individual who at age 16 was

2    charged and convicted of robbery and was placed on probation

3    in 2012 through 2017 and a result of the pending charges in

4    this indictment there is now a warrant that has been issued

5    such that were he to be released on conditions here he would

6    be facing a separate warrant.  That's a factor.  The nature of

7    those charges is a factor.

8          The fact that he is alleged to have committed

9    multiple violations of the federal narcotics laws on or

10   around -- in the same period of time and in the same location

11   is also a factor.  It speaks to both a lack of respect for the

12   court process that already existed in his facing the probation

13   as a result of the state charges and it reflects a continuing

14   disrespect for the law more generally.  So that is also a

15   concern.

16         I'm not placing much, if any, weight on the domestic

17   violence incident because I frankly don't know enough about it

18   to know anything other than it being a generic issue as

19   identified.  So it doesn't really carry much weight.

20         So I peel the onion back so to speak and I consider

21   all those factors and we start getting much closer to my being

22   concerned about whether there really are any conditions that I

23   could set here and then I think where the rubber meets the

24   road as far as I'm concerned is what not surprisingly both Ms.

25   Cardi and Mr. Scotten focused on which was what do we mean by

49

1  Mr. Ruggs being an affiliate of the gang.

2          I think given the totality of the circumstances

3  here, given the pattern of the criminal conduct and where it

4  occurred and what the Government has proffered to me about

5  where it occurred and how it could only have occurred if Mr.

6  Ruggs had some relationship to this gang that effectively as

7  the Government charges controlled this location.  Mr. Ruggs

8  does not have to be a full fledged member of the gang in order

9  for detention to be appropriate here in my opinion.

10         I think given the totality of the circumstances with

11 the prior arrest and his criminal record as well as the nature

12 of the offenses charged, most importantly the multiple

13 incidents that occurred while the defendant was on probation

14 for all of those reasons and all of those factors I just can't

15 find my way clear towards setting conditions here.  While I

16 agree that it's a close call I think it tips toward detention

17 by clear and convincing evidence that the Government has

18 proffered to me both in the letter that it submitted and in

19 its presentation today.

20         As Ms. Cardi well knows, Judge Nathan has this case

21 and I encourage you in the strongest terms to appeal my

22 decision to Judge Nathan, Ms. Cardi, because I may not be

23 right although I don't think it's a math problem.  So I don't

24 think it's really the kind of thing where there's a right

25 answer or wrong answer.  I'm giving you my best judgment

1   having sat in this chair for six and a half years now and

2   seeing hundreds of bail arguments and trying to do my level

3   best to individualize my determination based on the facts that

4   are presented to me here.

5        As I said, if Mr. Ruggs had no criminal record I

6   would very much be inclined to set conditions here but I think

7   it's for lack of a better way of putting it the totality of

8   the circumstances when I combine the criminal history with the

9   current charges, with the current charges and the affiliation

10  that the Government has proffered that this defendant has,

11  when I take all of that as a mosaic if you will in totality,

12  that's what makes me unable to set conditions.

13       Believe me, I'm not happy sitting here not setting

14  conditions.  I don't like not setting conditions.  I'm not

15  happy for the family that I don't feel that I can set

16  conditions.  I'm not happy for Mr. Ruggs that I can't set

17  conditions.  But I feel constrained based on my understanding

18  of what the law requires of me and what the facts presented

19  have suggested to not set them in these circumstances.

20       But Judge Nathan has this case and the law allows

21  the defendant to appeal this decision to her and even if she

22  affirms my decision to appeal that decision to the Second

23  Circuit.  So this is a close case and I've said that

24  throughout the colloquy and I'll say it as part of this

25  adjudication and Judge Nathan can either agree or disagree

1  with me that it's a close case and she can either agree or

2  disagree with the decision I've made but I assume the parties

3  will order the transcript and take whatever action they think

4  is appropriate but the application on the record presented

5  before me is denied.

6          MS. CARDI: Thank you, Your Honor.

7          THE COURT: Anything else?

8          MR. SCOTTEN: Not from the Government, Your Honor.

9  Thank you.

10          MS. CARDI: No, Your Honor.

11          THE COURT: I appreciate the argument of counsel.

12          MS. CARDI: Thank you.

13                    * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

52

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                            Shari Riemer, CET-805

7   Dated:  August 9, 2016