*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 24, 2016

**By Electronic Mail**
The Honorable James L. Cott
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States* v. *Nico Burrell* et al., S2 15 Cr. 95 (AJN)

Dear Judge Cott:

      The Government respectfully submits this letter in opposition to the bail application of defendant Calvin Ruggs, a/k/a "GQ." This Court has scheduled a hearing on the defendant's application on June 27, 2016, at 11:30. The defendant should be detained both as a danger to the community and a risk of flight.

### I. Background

      On April 27, 2016, Indictment S2 15 Cr. 95 (AJN) (the "Indictment") was unsealed. The Indictment charges Ruggs in three counts: (1) racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d); (2) narcotics conspiracy, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A); and (3) firearms discharge, in violation of Title 18, United States Code, Section 924(c)(1)(a)(iii).

      Ruggs was arrested on or about April 27, 2016, and was presented that day before the Honorable James C. Francis IV, United States Magistrate Judge. Pretrial services recommended that Ruggs be detained pending trial. Ruggs consented to detention without prejudice to a subsequent bail application.

### II. Legal Standard

      Congress has enacted a statutory presumption that a defendant charged with certain offenses should be detained while awaiting trial because "no condition or combination of conditions will reasonably assure the appearance of the person and the safety of the community." 18 U.S.C. § 3142(e)(3). That presumption applies to the charges against Ruggs. *See id.* § 3142(e)(3)(B) (applying presumption to "an offense under section 924(c)"); *id.* § 3142(e)(3)(A) (applying presumption to "an offense for which the maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 et seq.)"); 21 U.S.C. § 841(b)(1)(A) (imposing maximum sentence of life imprisonment). This presumption requires the defendant to produce evidence that he does not pose a danger to

the community or a risk of flight.  "Satisfying the burden of production does not," however, "eliminate the presumption favoring detention; it 'remains a factor to be considered among those weighed by the district court.'" *United States* v. *English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting *United States* v. *Mercedes,* 254 F.3d 433, 436 (2d Cir.2001)).

In addition to the statutory presumption applicable in this case, courts considering a federal defendant's application for bail examine four factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, . . . or involves . . . a controlled substance [or] firearm . . .;   (2) the weight of the evidence against the person;  (3) the history and characteristics of the person, including-- (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and  (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).

### III.     Discussion

Ruggs is a key participant in the narcotics trade of a violent street gang known as the Big Money Bosses ("BMB").  The danger he poses if bailed, and his incentive to flee the grave charges against him, thus stems in large part from the dangerous nature of that gang, and the crimes he committed with it.  This letter therefore discusses BMB as a whole, then examines the specific statutory factors as applied to the defendant.

#### A.     The "Big Money Bosses"

The Indictment charges that BMB constitutes a racketeering enterprise based on evidence obtained from: (1) four Title III wiretaps on the cellular phones of three BMB members and one BMB associate; (2) more than 30 undercover purchases of narcotics from members and associates of BMB conducted as part of this investigation, as well as numerous other undercover purchases conducted separately from this investigation; (3) evidence obtained through search warrants of seized cellular telephones and narcotics and other contraband seized from BMB members and associates; (4) ballistics evidence from the scene of certain shootings, including a murder, that are matches with firearms recovered from BMB members; (5) the expected testimony of civilian and law enforcement witnesses who witnessed some of the acts of violence and, in some instances, are able to identify the perpetrators; (6) the expected testimony of nine cooperating witnesses who were acquaintances of BMB members and associates at various times relevant to the Indictment, and three cooperating witnesses who were members of a rival gang and who became familiar with BMB members and associates as a consequence of the gang

rivalry;[1] (7) Facebook, YouTube, and Twitter postings in which members and associates of BMB promote their gang and belittle rival gangs, brandish firearms, discuss the gang's narcotics trafficking, and allude to the primary territories of their gang; among other sources of evidence.

The above evidence shows, in sum, that BMB is a violent street gang that commits murders and other acts of violence, traffics narcotics, and commits other crimes. BMB is a subset of the "Young Bosses," or "YBz" street gang, which operates throughout the New York City area. BMB—whose members also sometimes refer to themselves as the "Money Making Mafia" or "Triple M"—operates primarily on White Plains Road from 215th Street to 233rd Street in the Bronx, which is a long stretch of road under a subway train overpass that is hedged on each side by single-family homes and local commercial establishments. BMB's narcotics trafficking activity is based principally in the vicinity of White Plains Road and 224th Street, an open-air drug market that is referred to by gang members as the "Forts." BMB members sell drugs up and down White Plains Road, however, including at a location on 219th Street and a house on 230th Street. BMB members have kept firearms at each of these White Plains Road locations. BMB members also operate a drug spot on Boston Road and Eastchester Road in the Bronx, which they refer to as "B Road." BMB members who work principally at the B Road spot typically refer to themselves as "Blamma." Generally speaking, BMB members are encouraged to openly "jack," or proclaim their membership in the gang, and many do so not only in person but also through social media websites.

BMB members and associates engage in acts of violence, including shootings, stabbings, and gang assaults. These acts of violence protect the power of the gang, deter attacks from rivals, and secure the gang's territories and drug spots. Members who engage in a sufficient amount of violence can earn a leadership position, which is referred to as a "Big Suit." Members with "Big Suit" status are further subcategorized as, among other things, "Burberry Suits," "Louis Suits," "Gucci Suits," "Ferragamo Suits," and "Sean John Suits," in order to signify their relative rank in the gang. Among other things, a BMB member with "Big Suit" status has the authority to recruit other individuals into the gang. Two of the highest-ranking "Big Suits" in BMB are Nico Burrell, a/k/a "Zico Nico," and Douglas McLarty, a/k/a "Q Don." Both Burrell and McLarty enhanced their status in the gang, in part, by committing attempted murders when they were juveniles.

Members of BMB can rise in status and rank within the gang not only by engaging in acts of violence, but also by maintaining their membership in the gang for a long period of time. Members who have been loyal associates for a substantial amount of time are referred to as "Day One Niggas," meaning that they have been associating with the gang since its earliest days. For example, in a posting on Facebook on July 7, 2013, BMB member Rasheid Butler, a/k/a "Rah," writes, "i love my Day1 Niggas that was here since this #TripleM Shit 1ST STARTED." Similarly, BMB leader Burrell discusses the "Day One" concept in a rap video posted on

---

[1] Each of the cooperating witnesses ("CWs") is cooperating with the Government in hopes of receiving leniency for past crimes. Each of the CWs has provided reliable information in the past, and has been corroborated by, among other things, information previously known to law enforcement and evidence acquired independent of the CWs, such as Title III wiretaps, search warrants, and controlled purchases of narcotics, some of which are described herein.

YouTube in December 2015 and entitled "Live From Gutter." In the video, Burrell raps, "No new niggas, only day one / I know they ain't tellin' if that day come," after which another rapper repeats in the background, "no snitchin.'"

BMB has, more generally, developed a gang rule against "snitchin,'" or cooperating with law enforcement. For example, BMB associate Vashon Bennett, a/k/a "V-Bands," posted on Facebook on July 20, 2011, "Like QuDOn Said 'No Snitchin Policy.'" The reference to "QuDOn" is believed to be a reference to McLarty, who is one of BMB's leaders and whose alias is "Q Don." BMB's norm against "snitchin'" is fostered through YouTube videos and social media postings, including postings in which gang members are praised for their refusals to cooperate with law enforcement in particular instances. The norm is also enforced through disparagement of and threats of violence against BMB members suspected of cooperating with law enforcement. In one instance, for example, a BMB member's home was fired upon because he made a statement to law enforcement about individuals with whom he had committed a robbery.

Many of the specific acts of violence at issue in this case, including those discussed in the Indictment, relate to BMB's longstanding rivalries with other street gangs in the northern Bronx. In connection with these rivalries, BMB members have developed a practice of "mobbing," meaning to gather in large groups and travel to the base of operations of a rival gang to engage in violence there. Members of rival gangs also sometimes go "mobbing" and attack or attempt to attack BMB at its bases of operations. Videos of "mobbing" incidents have been posted on YouTube. The close proximity of BMB's and other gangs' bases of operations—all of which are in or on the border of the New York City Police Department's 47th Precinct—contributes to the frequency of acts of violence.

  B. Calvin Ruggs, a/k/a "GQ"

Calvin Ruggs, a/k/a "GQ," is narcotics dealer at BMB's "B Road" location, where he has engaged in serial narcotics trafficking despite being on probation after his previous conviction for a robbery offense. Ruggs should be detained pending trial both as a danger to the community and a risk of flight.

  1. Nature and Circumstances of the Offense

Count One of the Indictment charges Ruggs with participation in a racketeering enterprise, and the predicate acts for that charge include numerous acts of violence such as murder, attempted murder, and robbery. (Indictment ¶ 11). Count One therefore constitutes a "crime of violence" under § 3142(g), weighing in favor of detention. *See United States* v. *Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002). That makes particular sense in cases, such as this one, where the enterprise uses violence to deter witnesses from cooperating with law enforcement. *See, e.g.*, *United States* v. *Salerno*, 481 U.S. 739, 753 (1987) ("[A] court may refuse bail when the defendant presents a threat to the judicial process by intimidating witnesses.").

Count Two charges Ruggs with conspiracy to distribute narcotics. The Second Circuit has held that narcotics trafficking presents a serious danger to the community, and should be treated as such for purposes of bail determinations. *See United States* v. *Leon,* 766 F.2d 77, 81 (2d Cir. 1985). That principle has special force here, because BMB's narcotics trafficking was not simply a means to make money, but the lifeblood and daily activity of a gang that controlled its drug territory through violence and threats of violence. By converting poor neighborhoods into open-air drug markets such as "the Forts" and "B Road," BMB members endangered the lives and the futures of the innocent families living there.

Count Three charges Ruggs with discharge of firearms in furtherance of the racketeering enterprise and narcotics conspiracy charged in Counts One and Two. This charge thus plainly "involves . . . a firearm" and constitutes a "crime of violence" under § 3142(g), further supporting detention. *See, e.g.*, *English*, 629 F.3d at 322 (upholding denial of bail for defendant charged with violations of 21 U.S.C. § 846 and 18 U.S.C. § 924(c)).

Finally, the nature and circumstances of Ruggs' offenses also demonstrate that, if bailed, his return to court cannot be assured. If convicted, Ruggs faces a mandatory minimum sentence of twenty years and a maximum term of life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A); 18 U.S.C. 924(c)(iii). It is thus unsurprising that many of Ruggs' co-defendants have already chosen to flee rather than face the charges against them: At the time of this filing—two months after the unsealing of the Indictment and the highly publicized initial arrests in this case—nine of Ruggs' co-defendants remain fugitives.

2.  The Weight of the Evidence

The evidence against Ruggs is strong. On seven separate days in 2015, law enforcement agents purchased drugs from Ruggs at BMB's "B Road" drug market. During each of these buys, an undercover officer made the purchase in exchange for cash. On March 9, 2015, the undercover officer purchased 10 bags of marijuana. On March 11, 2015, the officer purchased another 10 bags of marijuana. On April 13, 2015, the officer purchased 13 bags of marijuana. On April 20, 2015, the officer purchased seven bags of marijuana. On April 23, 2015, the officer again purchased seven bags of marijuana. Then on April 28, 2015, Ruggs was arrested after he sold an amount of marijuana to the officer. Undeterred, on May 20, 2015, Ruggs sold four bags of marijuana to a confidential informant who was acting under the control and supervision of law enforcement agents. In addition, Ruggs had also been arrested on November 12, 2014, after selling marijuana to an undercover officer conducting an earlier investigation.

Ruggs' pattern of selling marijuana in and around the B Road location is not only overwhelming proof of the narcotics charge. It also connects him to the racketeering enterprise as a whole. Witness testimony and social media searches, among other evidence, will establish that in order to sell drugs at the B Road location, the dealer must affiliate with BMB. Witness testimony will further establish that those dealing at B Road had access to firearms that the "Blamma" set of BMB kept hidden nearby, for use against rival gangs and other perceived threats.

### 3. The History and Characteristics of the Defendant

Ruggs' history and characteristics further favor detention.  In particular, Ruggs was arrested on November 11, 2011, for robbery causing injury to another.  Ruggs has since been on probation for that offense.[2]  That means that throughout his persistent activity as a drug dealer for BMB—including being arrested in April 2015 and going right back to selling in May 2015—the defendant was violating probation conditions arising from his prior conduct of a violent crime.  Given his serial violation of probation, Ruggs cannot reasonably be expected to obey any conditions of bail.

Ruggs is also the subject of an April 27, 2014 domestic violence report, in which his victim reported that he punched the victim several times in the head, then continued to kick the victim as the victim fell to the ground, leading to a hospital visit.  This complaint further evinces the danger Ruggs poses if released, because "willingness to strike loved ones offers probative evidence of a tendency to violence and dangerousness toward others." *Mercedes*, 254 F.3d at 437 (quoting *United States* v. *Quartermaine,* 913 F.2d 910, 917 (11th Cir.1990)).  And in addition to the risk of danger, Ruggs also poses a significant risk of flight, given that he is facing a 20-year mandatory minimum sentence backed by overwhelming evidence.  *See, e.g.*, *United States* v. *Sabhnani*, 493 F.3d 63, 76 (2d Cir. 2007) (when evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long, a defendant has stronger motives to flee).

### 4. The Nature and Seriousness of the Danger to Any Person or the Community

As an affiliate of a violent gang who has access to firearms, Ruggs represents a serious danger to the community if released.  Ruggs' prior misconduct while on probation should give this Court no confidence that he will comply with bail conditions.  Moreover, now that Ruggs is aware of the charges against him, and that they stem in part from witness testimony, no conditions of bail can reasonably be expected to deter Ruggs from efforts to intimidate witnesses, consistent with BMB's "policy" against "snitchin'."  And Ruggs' record makes plain the inability of judicial orders and unresolved arrests to deter him from selling drugs, which also constitutes a danger to the community under *Leon,* 766 F.2d at 81.

---

[2]  The records available to the Government do not indicate the exact charge or charges for which the defendant was convicted as a result of this robbery.  Records do, however, indicate that he received a sentence of five years' probation, beginning on September 20, 2012.  In addition, New York State probation records make clear that the defendant remained on probation until his arrest in his case, and indeed that a warrant has been issued for Ruggs because he failed to attend a June probation appointment after being detained in this case.

### 3. The History and Characteristics of the Defendant

Ruggs' history and characteristics further favor detention.  In particular, Ruggs was arrested on November 11, 2011, for robbery causing injury to another.  Ruggs has since been on probation for that offense.[2]  That means that throughout his persistent activity as a drug dealer for BMB—including being arrested in April 2015 and going right back to selling in May 2015—the defendant was violating probation conditions arising from his prior conduct of a violent crime.  Given his serial violation of probation, Ruggs cannot reasonably be expected to obey any conditions of bail.

Ruggs is also the subject of an April 27, 2014 domestic violence report, in which his victim reported that he punched the victim several times in the head, then continued to kick the victim as the victim fell to the ground, leading to a hospital visit.  This complaint further evinces the danger Ruggs poses if released, because "willingness to strike loved ones offers probative evidence of a tendency to violence and dangerousness toward others." *Mercedes*, 254 F.3d at 437 (quoting *United States* v. *Quartermaine,* 913 F.2d 910, 917 (11th Cir.1990)).  And in addition to the risk of danger, Ruggs also poses a significant risk of flight, given that he is facing a 20-year mandatory minimum sentence backed by overwhelming evidence.  *See, e.g.*, *United States* v. *Sabhnani*, 493 F.3d 63, 76 (2d Cir. 2007) (when evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long, a defendant has stronger motives to flee).

### 4. The Nature and Seriousness of the Danger to Any Person or the Community

As an affiliate of a violent gang who has access to firearms, Ruggs represents a serious danger to the community if released.  Ruggs' prior misconduct while on probation should give this Court no confidence that he will comply with bail conditions.  Moreover, now that Ruggs is aware of the charges against him, and that they stem in part from witness testimony, no conditions of bail can reasonably be expected to deter Ruggs from efforts to intimidate witnesses, consistent with BMB's "policy" against "snitchin'."  And Ruggs' record makes plain the inability of judicial orders and unresolved arrests to deter him from selling drugs, which also constitutes a danger to the community under *Leon,* 766 F.2d at 81.

---

[2]  The records available to the Government do not indicate the exact charge or charges for which the defendant was convicted as a result of this robbery.  Records do, however, indicate that he received a sentence of five years' probation, beginning on September 20, 2012.  In addition, New York State probation records make clear that the defendant remained on probation until his arrest in his case, and indeed that a warrant has been issued for Ruggs because he failed to attend a June probation appointment after being detained in this case.

**IV.     Conclusion**

       For the foregoing reasons, the Government respectfully submits that Ruggs cannot overcome the statutory presumption that he should be detained pending trial.

                                          Respectfully submitted,

                                          PREET BHARARA
                                          United States Attorney

                              By:  ___/s_____
                                          Hagan Scotten
                                          Rachel Maimin
                                          Micah W.J. Smith
                                          Drew T. Johnson-Skinner
                                          Jessica K. Feinstein
                                          Assistant United States Attorneys
                                          914-993-1924/(212) 637-2460/2439/1946/1587

Cc: Dawn Marcella Cardi, Esq. (by email)