UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
UNITED STATES OF AMERICA                                          :
                                                                  :    S2 15 Cr. 95 (AJN)
                          - v. -                                  :
                                                                  :
ROBERT FELICIANO,                                                 :
                                                                  :
                                  Defendant.                      :
                                                                  :
------------------------------------------------------------------X

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

                                                  PREET BHARARA
                                                  United States Attorney
                                                  Southern District of New York
                                                  One St. Andrew's Plaza
                                                  New York, New York 10007

RACHEL MAIMIN
MICAH W.J. SMITH
HAGAN SCOTTEN
JESSICA FEINSTEIN
DREW JOHNSON-SKINNER
Assistant United States Attorneys
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
          :
UNITED STATES OF AMERICA        :
          :    15 Cr. 95 (AJN)
      - v. -              :
          :
ROBERT FELICIANO,            :
          :
           Defendant.    :
          :
------------------------------------------------------------------------X

## PRELIMINARY STATEMENT

The defendant in this case, Robert Feliciano, is scheduled to be sentenced on November 21, 2016. The Government respectfully submits this memorandum in advance of that sentencing and in response to Feliciano's sentencing memorandum, dated November 15, 2016, which requests a sentence of a year and a day—a major downward variance from the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 78 to 97 months' imprisonment. For the reasons that follow, the Government disagrees and respectfully requests that the Court impose a sentence within the Guidelines range. Feliciano was a member of a violent street gang—the Big Money Bosses ("BMB" or the "Gang")—with which Feliciano sold a large amount of crack cocaine. While there is no dispute that Feliciano was not a high-ranking member of BMB, the sentence Feliciano requests would not come close to meeting the statutory sentencing factors, especially the need to reflect the seriousness of the offense and Feliciano's history and characteristics, provide just punishment, and afford adequate deterrence to criminal conduct. A sentence within the Guidelines range is necessary to send the message that joining a violent street gang will be met severely by the Courts.

I.      **Procedural History**

On April 27, 2016, the S2 Indictment in this case was unsealed, charging 63 members and associates of BMB with: (1) racketeering conspiracy, in violation of Title 18, United States Code Section 1962; (2) narcotics conspiracy, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846; (3) narcotics distribution, in violation of Title 21, United States Code, Section 860; and/or (4) firearms discharge, in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii).

On July 15, 2016, Feliciano pled guilty to Count One of the S1 Indictment in this case, which charged him with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962. (PSR ¶ 8.)

II.     **Offense Conduct**

A.  **Background**

Beginning in December 2014, the New York City Police Department, the Drug Enforcement Administration, Homeland Security Investigations, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives conducted an investigation into two rival street gangs—BMB and the 2Fly YGz ("2Fly")—that were operating in the Bronx, New York. The investigation revealed that since at least in or about 2007, up until in or about 2016, members of BMB and 2Fly were involved in a variety of racketeering acts, including murders, attempted murders, robberies, narcotics trafficking, bank fraud, and counterfeit currency offenses.

B.  **BMB**

The structure of BMB is described accurately in the PSR at paragraphs 11-20.

2

BMB was a subset of the "Young Bosses," or "YBz" street gang, which operates throughout the New York City area. BMB—whose members also sometimes refer to themselves as the "Money Making Mafia" or "Triple M"—operated primarily on White Plains Road from 215th Street to 233rd Street in the Bronx, which is a long stretch of road under a subway train overpass that is hedged on each side by single-family homes and local commercial establishments. BMB's narcotics trafficking activity was based principally in the vicinity of White Plains Road and 224th Street, an open-air drug spot that was referred to by gang members as the "Forts." BMB members sold drugs and down White Plains Road, however, including at a spot on 219th Street and a house on 230th Street. BMB members sold crack cocaine, marijuana, and prescription pills, including Percocet pills (i.e., oxycodone). BMB members kept firearms at each of these White Plains Road locations. BMB members also operated a drug spot on Boston Road and Eastchester Road in the Bronx, which they refer to as "B Road." BMB members who worked principally at the B Road spot typically refer to themselves as "Blamma." Generally speaking, BMB members were encouraged to continue openly "jacking," or proclaiming their membership in the gang, and many did so not only in person but also through social media websites such as Facebook.

In addition to its narcotics trafficking, BMB members and associates engaged in acts of violence, including shootings, stabbings, and gang assaults; these acts of violence protected the power of the gang, deterred attacks from rivals, and secured the gang's territories and drug spots. Moreover, members who engaged in a sufficient amount of violence could earn a leadership position, which was referred to as a "Big Suit." Members with "Big Suit" status were further subcategorized as, among other things, "Burberry Suits," "Louis Suits," "Gucci Suits," Ferragamo Suits," and "Sean John Suits," in order to signify their relative rank in the gang.

Among other things, a BMB member with "Big Suit" status had the authority to recruit other individuals into the gang. Two of the highest-ranking "Big Suits" in BMB were NICO BURRELL, a/k/a "Zico Nico," and DOUGLAS MCLARTY, a/k/a "Q Don." Both BURRELL and MCLARTY enhanced their status in the gang, in part, by committing attempted murders when they were each juveniles.

Members of BMB rose in status and rank within the gang not only by engaging in acts of violence, but also by maintaining their membership in the gang for a long period of time. Members who were loyal associates for a substantial amount of time are referred to as "Day One Niggas," meaning that they have been associating with the gang since its earliest days. For example, in a posting on Facebook on July 7, 2013, BMB member RASHEID BUTLER, a/k/a "Rah," wrote: "i love my Day1 Niggas that was here since this #TripleM Shit 1ST STARTED." Similarly, BMB leader NICO BURRELL, a/k/a "Zico Nico," discusses the "Day One" concept in a rap video posted on YouTube in December 2015 and entitled "Live From Gutter." In the video, BURRELL raps, "No new niggas, only day one / I know they ain't tellin' if that day come," after which another rapper repeats in the background, "no snitchin.'"

BMB has, more generally, developed a gang norm against "snitchin,'" or cooperating with law enforcement. For example, a BMB associate posted on Facebook on July 20, 2011, "Like QuDOn Said 'No Snitchin Policy'"; the reference to "QuDOn" is a reference to MCLARTY, who is one of BMB's leaders and whose alias is "Q Don." BMB's norm against "snitchin'" was fostered through YouTube videos and social media postings, including postings in which gang members are praised for their refusals to cooperate with law enforcement in particular instances. The norm is also enforced through disparagement of and threats of violence against BMB members who are suspected of having violated the norm by cooperating. During

4

the course of this investigation, law enforcement learned of at least one instance in which a BMB member's home was fired upon because he made a statement to law enforcement about individuals with whom he had committed a robbery.  During another instance, the child of a suspected cooperator in this case was threatened and spat upon in the street.  The norm against cooperation facilitates the gang's criminal enterprise and is one of the reasons why members of BMB tend to commit their robberies and fraud offenses with other members of BMB.

Many of the specific acts of violence committed by BMB members related to its longstanding rivalry with 2Fly, which is based principally in the nearby Eastchester Gardens public housing development ("Eastchester Gardens"), but which also has members who live in the "Valley" area just east of BMB's "B Road" spot on Boston Road and Eastchester Road.  BMB also has developed rivalries with other street gangs in the northern Bronx, including the "Young Shooter Gang," or "YSGz," which is based in the Edenwald public housing development ("Edenwald"), and the "Slut Gang," which is based in the Boston-Secor public housing development ("Boston-Secor").  In connection with these rivalries, BMB members developed a practice of "mobbing," meaning to gather in large groups and travel to the base of operations of a rival gang to engage in violence there.  Members of rival gangs also sometimes went "mobbing" and attack or attempt to attack BMB at its bases of operations.  Videos of "mobbing" incidents were posted on YouTube.  The close proximity of the BMB, 2Fly, YSGz, and Slut Gang bases of operations—all of which are in or on the border of the New York City Police Department's 47th Precinct—contributed to the frequency of acts of violence.

In addition to acts of violence, members and associates of BMB promoted their gang and disparaged rival gang members by highlighting a distinguishing feature of BMB:  it is not based in a housing development, as are its principal rivals 2Fly (in the Eastchester Gardens), YSGz (in

Edenwald), and the Slut Gang (in Boston-Secor). As noted above, BMB principally operated along White Plains Road, a long stretch of road hedged on each side by single-family homes and local commercial establishments. The name of the gang ("Big Money Bosses") and the other allusions to wealth that the gang employs (for example, the brand-name clothing retailers used to identify leadership positions) all serve to underscore this difference. In addition, members and associates of BMB have publicly mocked the living conditions of the housing developments in which many of their rivals live. For example, in a Facebook post on July 10, 2014, BMB member DONQUE TYRELL, a/k/a "Polo Rell," posted a photograph of a young child laying on a bed and covered with cockroaches, with the caption "MEANWHILE IN EDENWALD." In connection with the posting of this picture, TYRELL wrote, "Dirty ass project," followed by six smiley-face "emoticons." Similarly, in a Facebook posting on May 28, 2014, BMB member MASHUD YODA, a/k/a "Papa Ola," writes, "No Lie ECG [*i.e.,* the Eastchester Gardens] The Dirtiest PROJECTS UPTOWN . . . . Like OBAMA Said CHANGE But I Guess He forgot Bout ECG !!"

Consistent with this feature of BMB, members and associates of the gang engaged not only in narcotics distribution and robberies to enrich and distinguish its members from rivals, but also engaged in a variety of frauds, including bank fraud and counterfeit currency offenses. To perpetrate some of these fraud offenses, BMB members and associates often employed their girlfriends and female acquaintances.

### C. Feliciano's Role in the Gang

Feliciano was a member of BMB. He did not hold a leadership position in the Gang. Rather, he was a drug dealer at BMB's Forts location—primarily crack cocaine, but also marijuana and powder cocaine, to a lesser extent. Relative to his co-defendants who also sold

crack with BMB, Feliciano was a mid-level dealer: he did not sell large wholesale quantities of crack, but he was not a bit player either. Feliciano sold crack cocaine day in and day out at the Forts. Feliciano was also known by his fellow BMB members to be a "shooter" with the Gang, although the Government does not have evidence of a particular shooting Feliciano committed.

On September 7, 2014, Feliciano was arrested at the Forts after police saw him with crack. Feliciano fled, and when the officers finally caught up with him, he no longer had crack, although he was still carrying two bags of marijuana. Two days later, Feliciano was again arrested near the Forts after a foot chase. This time police recovered drug paraphernalia—a small scale with eight empty glassine envelopes—that Feliciano threw as he attempted to flee. In addition, on May 30, 2013, Feliciano was arrested one block west of White Plains Road, after he was found with a small glassine envelope of cocaine. Another bag of cocaine was recovered from the front driver's side door of the vehicle he was driving.

## II. The Defendant's Criminal History

In addition to the arrests described above, which did not lead to convictions, Feliciano has three prior criminal convictions—including a conviction just last year for a brutally violent crime.

On March 4, 2014, Feliciano was ordered to pay a $75 fine after he pled guilty to possessing marijuana, which he tried to shove down his pants when the police saw him. (PSR ¶¶ 44-45.)

On August 6, 2015, Feliciano was sentenced to 6 months' imprisonment after being found guilty of assault at a trial. (PSR ¶ 46.) During this offense, outside of a nightclub in the Bronx, Feliciano and five others knocked a victim to the ground, punched him in the head and body, kicked him in the face, and struck the victim with a chair numerous times. (PSR ¶ 47.)

7

One of the attackers also slashed the victim in the face with a box cutter. (PSR ¶ 47.) The victim was knocked unconscious and required treatment in a hospital. (PSR ¶ 47.)

In 2014, Feliciano was also convicted of disorderly conduct, which resulted in a conditional discharge. (PSR ¶ 49.) Feliciano was still on conditional discharge, *i.e.,* a period of judicial supervision, when he committed the 2015 assault described above.

### III.     The PSR and Guidelines Calculation

In keeping with the plea agreement between the parties, the PSR calculates the defendant's total offense level as 27. In Criminal History Category II, Feliciano's sentencing Guidelines range is 78 to 97 months' imprisonment. (PSR ¶ 96.)

### 3553(a) ARGUMENT

For the reasons that follow, a sentence within the Guidelines range is necessary to meet the statutory sentencing factors, in particular to provide just punishment and afford adequate deterrence to criminal conduct.

Feliciano was a member of BMB, a violent street gang that terrorized a community in the Bronx for years. In order to advance the Gang's drug business, BMB took control of, among other things, the Forts: a street corner where law abiding citizens were trying to live and work in peace. For years, on that corner, Feliciano sold crack cocaine—a lethal and addictive poison that destroys communities and families. Feliciano was also known as a shooter with the Gang. The nature of the offense alone provides sufficient reason to impose a Guidelines sentence in this case.[1]

---

[1] Feliciano disputes that he was a member of the Gang—agreeing only that he was an associate—and that he was a shooter with the Gang. Although the Government stands by its assertions, the Court has ample basis to impose a significant sentence on Feliciano, for the reasons detailed herein, even if the Court were to assume that his claims are true.

Feliciano's history and characteristics provide further justification for a substantial sentence. He participated in a savagely brutal beating of a victim on a Bronx street in 2014, beating a victim unconscious. He also has a history of disrespect for law enforcement and judicial authority. Feliciano forced the police to chase him down before each of his arrests for drug dealing at the Forts in September 2014. In addition, Feliciano was first arrested for the assault on February 16, 2014, and that case was not resolved until the summer of 2015. The two arrests at the Forts thus occurred while he was released pending resolution of his prior felony. In addition, at the time of the assault, the defendant was also released while awaiting resolution of a previous criminal charge—the marijuana offense. And resolution of that charge was not completed without the issuance of a bench warrant to return the defendant to court. Feliciano's history and characteristics paint a picture of an individual who has been involved in significant violence and who has been unmoved in the past by judicial supervision, suggesting that substantial incarceration is necessary in order to guide Feliciano onto a more law-abiding path.

Feliciano asks for a downward variance to a year and a day. However, there is no basis for a variance in this case, much less a variance of this length. In essence, Feliciano claims that he merits leniency because he has changed his ways. Even assuming that is true, however, a Guidelines sentence would still be warranted in order to reflect the seriousness of the offense, provide just punishment, and provide adequate general deterrence to criminal conduct: to send the message that destroying communities through drug dealing and gang membership is unacceptable and will be treated harshly. Moreover, Feliciano has already received a significant benefit by being permitted to plead guilty to an offense without a mandatory minimum—even though he agreed in his plea agreement that he is responsible for conspiring to sell a quantity of crack cocaine that would ordinarily subject him to a mandatory minimum of 10 years. There is

also nothing particularly mitigating in Feliciano's background; he describes his childhood as "happy" and has a supportive family. [2] (PSR ¶ 61.) Accordingly, in light of the statutory sentencing factors—and even taking into account Feliciano's early guilty plea in this case, which demonstrated a significant acceptance of responsibility—a Guidelines sentence is warranted.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence within the range of 78 to 97 months.

Dated: New York, New York
November 17, 2016

> Respectfully submitted,
>
> PREET BHARARA,
> United States Attorney for the
> Southern District of New York,
>
> By: __/s/_____
> Rachel Maimin
> Micah W.J. Smith
> Hagan Scotten
> Jessica Feinstein
> Drew Johnson-Skinner
> Assistant United States Attorneys
> (212) 637-2460

---

[2] While the presence of a supportive family is generally a positive factor, it is concerning that Feliciano's father and girlfriend believe that he is innocent, despite his guilty plea. (PSR ¶¶ 63, 67.) Given that Feliciano apparently lived with his girlfriend during his offense conduct, *i.e.*, while he was on the street selling drugs, it is unclear whether they will be able to help to monitor and steer him on a law-abiding path.