UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------- X
                     :

UNITED STATES OF AMERICA         :

          - v. -          :        S2 15 Cr. 95 (AJN)

                     :

JOEL HARGROVE,          :

                     :

          Defendant.     :

                     :

----------------------------------------------------------------------- X


## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA


                            PREET BHARARA
                            United States Attorney
                            Southern District of New York
                            One St. Andrew's Plaza
                            New York, New York 10007


RACHEL MAIMIN
MICAH W.J. SMITH
HAGAN SCOTTEN
JESSICA FEINSTEIN
DREW JOHNSON-SKINNER
Assistant United States Attorneys
     - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- X
                               :

UNITED STATES OF AMERICA             :

                              :       S2 15 Cr. 95 (AJN)

              - v. -                  :

                              :

JOEL HARGROVE,                     :

                              :

                 Defendant.         :

                              :

------------------------------------------------------------------------- X

## PRELIMINARY STATEMENT

The defendant in this case, Joel Hargrove, is scheduled to be sentenced on January 26, 2017. The Government respectfully submits this memorandum in advance of that sentencing and in response to Hargrove's sentencing memorandum, dated December 9, 2016, which requests a sentence of time served, or approximately nine months in prison—a significant downward variance from the stipulated United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 21 to 27 months' imprisonment. For the reasons that follow, the Government disagrees and respectfully requests that the Court impose a sentence within the stipulated Guidelines range. Hargrove was an associate of a violent street gang—the Big Money Bosses ("BMB" or the "Gang")—with which Hargrove sold marijuana. Hargrove's requested sentence would not achieve the purposes of the statutory sentencing factors, especially the need to reflect the seriousness of the offense and Hargrove's history and characteristics, provide just punishment, and afford adequate deterrence to criminal conduct. A sentence within the stipulated Guidelines range is necessary to send the message that associating and selling drugs with a violent street gang will be met with serious consequences.

I.      **Procedural History**

On April 27, 2016, the S2 Indictment in this case was unsealed, charging 63 members

and associates of BMB with: (1) racketeering conspiracy, in violation of Title 18, United States

Code Section 1962; (2) narcotics conspiracy, in violation of Title 21, United States Code,

Sections 841(a)(1), 841(b)(1)(A), and 846; (3) narcotics distribution, in violation of Title 21,

United States Code, Section 860; and/or (4) firearms discharge, in violation of Title 18, United

States Code, Section 924(c)(1)(A)(iii).

On July 25, 2016, Hargrove pled guilty to Count One of the S2 Indictment in this case,

which charged him with racketeering conspiracy, in violation of Title 18, United States Code,

Section 1962(d).  (PSR ¶ 7.)

II.     **Offense Conduct**

**A.  Background**

Beginning in December 2014, the New York City Police Department, the Drug

Enforcement Administration, Homeland Security Investigations, and the Bureau of Alcohol,

Tobacco, Firearms, and Explosives conducted an investigation into two rival street gangs—

BMB and the 2Fly YGz ("2Fly")—that were operating in the Bronx, New York.  The

investigation revealed that since at least in or about 2007, up until in or about 2016, members of

BMB and 2Fly were involved in a variety of racketeering acts, including murders, attempted

murders, robberies, narcotics trafficking, bank fraud, and counterfeit currency offenses.

**B.  BMB**

The structure of BMB is described accurately in the PSR at paragraphs 11-20.

BMB was a subset of the "Young Bosses," or "YBz" street gang, which operates

throughout the New York City area.  BMB—whose members also sometimes refer to themselves

as the "Money Making Mafia" or "Triple M"—operated primarily on White Plains Road from 215th Street to 233rd Street in the Bronx, which is a long stretch of road under a subway train overpass that is hedged on each side by single-family homes and local commercial establishments.  BMB's narcotics trafficking activity was based principally in the vicinity of White Plains Road and 224th Street, an open-air drug spot that was referred to by gang members as the "Forts."  BMB members sold drugs and down White Plains Road, however, including at a spot on 219th Street and a house on 230th Street.  BMB members sold crack cocaine, marijuana, and prescription pills, including Percocet pills (i.e., oxycodone).  BMB members kept firearms at each of these White Plains Road locations.  BMB members also operated a drug spot on Boston Road and Eastchester Road in the Bronx, which they refer to as "B Road."  BMB members who worked principally at the B Road spot typically refer to themselves as "Blamma."  Generally speaking, BMB members were encouraged to continue openly "jacking," or proclaiming their membership in the gang, and many did so not only in person but also through social media websites such as Facebook.

In addition to its narcotics trafficking, BMB members and associates engaged in acts of violence, including shootings, stabbings, and gang assaults; these acts of violence protected the power of the gang, deterred attacks from rivals, and secured the gang's territories and drug spots. Moreover, members who engaged in a sufficient amount of violence could earn a leadership position, which was referred to as a "Big Suit."  Members with "Big Suit" status were further subcategorized as, among other things, "Burberry Suits," "Louis Suits," "Gucci Suits," Ferragamo Suits," and "Sean John Suits," in order to signify their relative rank in the gang. Among other things, a BMB member with "Big Suit" status had the authority to recruit other individuals into the gang.  Two of the highest-ranking "Big Suits" in BMB were NICO

BURRELL, a/k/a "Zico Nico," and DOUGLAS MCLARTY, a/k/a "Q Don."  Both BURRELL

and MCLARTY enhanced their status in the gang, in part, by committing attempted murders

when they were each juveniles.

Members of BMB rose in status and rank within the gang not only by engaging in acts of

violence, but also by maintaining their membership in the gang for a long period of time.

Members who were loyal associates for a substantial amount of time are referred to as "Day One

Niggas," meaning that they have been associating with the gang since its earliest days.  For

example, in a posting on Facebook on July 7, 2013, BMB member RASHEID BUTLER, a/k/a

"Rah," wrote: "i love my Day1 Niggas that was here since this #TripleM Shit 1ST STARTED."

Similarly, BMB leader NICO BURRELL, a/k/a "Zico Nico," discusses the "Day One" concept

in a rap video posted on YouTube in December 2015 and entitled "Live From Gutter."  In the

video, BURRELL raps, "No new niggas, only day one / I know they ain't tellin' if that day

come," after which another rapper repeats in the background, "no snitchin.'"

BMB has, more generally, developed a gang norm against "snitchin,'" or cooperating

with law enforcement.  For example, a BMB associate posted on Facebook on July 20, 2011,

"Like QuDOn Said 'No Snitchin Policy'"; the reference to "QuDOn" is a reference to

MCLARTY, who is one of BMB's leaders and whose alias is "Q Don."  BMB's norm against

"snitchin'" was fostered through YouTube videos and social media postings, including postings

in which gang members are praised for their refusals to cooperate with law enforcement in

particular instances.  The norm is also enforced through disparagement of and threats of violence

against BMB members who are suspected of having violated the norm by cooperating.  During

the course of this investigation, law enforcement learned of at least one instance in which a BMB

member's home was fired upon because he made a statement to law enforcement about

individuals with whom he had committed a robbery. During another instance, the child of a suspected cooperator in this case was threatened and spat upon in the street. The norm against cooperation facilitates the gang's criminal enterprise and is one of the reasons why members of BMB tend to commit their robberies and fraud offenses with other members of BMB.

Many of the specific acts of violence committed by BMB members related to its longstanding rivalry with 2Fly, which is based principally in the nearby Eastchester Gardens public housing development ("Eastchester Gardens"), but which also has members who live in the "Valley" area just east of BMB's "B Road" spot on Boston Road and Eastchester Road. BMB also has developed rivalries with other street gangs in the northern Bronx, including the "Young Shooter Gang," or "YSGz," which is based in the Edenwald public housing development ("Edenwald"), and the "Slut Gang," which is based in the Boston-Secor public housing development ("Boston-Secor"). In connection with these rivalries, BMB members developed a practice of "mobbing," meaning to gather in large groups and travel to the base of operations of a rival gang to engage in violence there. Members of rival gangs also sometimes went "mobbing" and attack or attempt to attack BMB at its bases of operations. Videos of "mobbing" incidents were posted on YouTube. The close proximity of the BMB, 2Fly, YSGz, and Slut Gang bases of operations—all of which are in or on the border of the New York City Police Department's 47th Precinct—contributed to the frequency of acts of violence.

In addition to acts of violence, members and associates of BMB promoted their gang and disparaged rival gang members by highlighting a distinguishing feature of BMB: it is not based in a housing development, as are its principal rivals 2Fly (in the Eastchester Gardens), YSGz (in Edenwald), and the Slut Gang (in Boston-Secor). As noted above, BMB principally operated along White Plains Road, a long stretch of road hedged on each side by single-family homes and

local commercial establishments.  The name of the gang ("Big Money Bosses") and the other

allusions to wealth that the gang employs (for example, the brand-name clothing retailers used to

identify leadership positions) all serve to underscore this difference.  In addition, members and

associates of BMB have publicly mocked the living conditions of the housing developments in

which many of their rivals live.  For example, in a Facebook post on July 10, 2014, BMB

member DONQUE TYRELL, a/k/a "Polo Rell," posted a photograph of a young child laying on

a bed and covered with cockroaches, with the caption "MEANWHILE IN EDENWALD."  In

connection with the posting of this picture, TYRELL wrote, "Dirty ass project," followed by six

smiley-face "emoticons."  Similarly, in a Facebook posting on May 28, 2014, BMB member

MASHUD YODA, a/k/a "Papa Ola," writes, "No Lie ECG [*i.e.,* the Eastchester Gardens] The

Dirtiest PROJECTS UPTOWN . . . . Like OBAMA Said CHANGE But I Guess He forgot Bout

ECG !!"

Consistent with this feature of BMB, members and associates of the gang engaged not

only in narcotics distribution and robberies to enrich and distinguish its members from rivals, but

also engaged in a variety of frauds, including bank fraud and counterfeit currency offenses.  To

perpetrate some of these fraud offenses, BMB members and associates often employed their

girlfriends and female acquaintances.

### C.  Hargrove's Role

Hargrove was an associate of BMB.  He sold marijuana with BMB members and

associates.  Relative to his co-defendants who also sold marijuana with BMB, Hargrove was a

low-level marijuana dealer.  Hargrove was arrested in 2007, and again in 2014, after selling

marijuana to undercover police officers at or near BMB's "Forts" location on White Plains Road

and 224th Street.  (PSR ¶ 22).

Hargrove's submission asks for certain information in paragraphs 23 to 27 of the PSR to be removed because Hargrove did not plead guilty to these acts in connection with his racketeering offense.  While the Government informed the Probation Department of this information in order to be complete in our disclosures about the defendant, the Government cannot prove these facts by a preponderance of the evidence at this time (and, likewise, they were not included in the defendant's plea agreement), and we do not object to their exclusion from the PSR.

III.     **The Defendant's Criminal History**

The Plea Agreement between the parties calculated that Hargrove had one criminal history point as the result of a May 13, 2013 conviction for unlawful possession of marijuana (which resulted in one point, see PSR ¶ 47) and a May 30, 2008 conviction for disorderly conduct (which resulted in zero points, see PSR ¶ 43), and concluded that Hargrove was in Criminal History Category I.

The Presentence Report also included an August 12, 2009 youthful offender adjudication related to three reported offenses:  (i) a September 18, 2008 arrest for robbery; (ii) an October 20, 2008 arrest for resisting arrest; and (iii) a December 11, 2008 arrest for robbery.  (PSR ¶¶ 44-46).  The Presentence Report calculated that the September 18, 2008 arrest, which resulted in a sentence of 16 months' to 4 years' imprisonment, and the December 11, 2008 arrest, which resulted in the same sentence, each received three criminal history points.  (PSR ¶ 48). Accordingly, the Presentence Report calculated that Hargrove had seven criminal history points and was in Criminal History Category IV.

Hargrove's sentencing submission contests the application of the additional six points on the grounds, among others, that there is insufficient information to determine whether the

youthful offender adjudication should be deemed an adult conviction and therefore counted

under the Guidelines and that it is unclear whether the adjudication should be counted as two

sentences or one.  (Def. Br. 2-3).  The Government has been unable to locate additional

information regarding this adjudication.  For these reasons, the Government believes that the

Court should not include the youthful offender adjudication in calculating Hargrove's criminal

history points and that his Criminal History Category accordingly is I.[1]

Hargrove also has three pending state criminal cases as a result of his arrests for: (i)

burglary; (ii) criminal possession of stolen credit cards; (iii) and possession of a fraudulent

check.  (PSR ¶¶ 50-52).

## IV.    The PSR and Guidelines Calculation

In accordance with the plea agreement between the parties, the PSR calculates the

defendant's total offense level as 16.  As described above, the PSR calculates the defendant's

Criminal History Category to be IV, resulting in a Guidelines range of 33 to 41 months'

imprisonment.  (PSR ¶ 72).  The Probation Department recommends a sentence of 33 months'

imprisonment.  (PSR p. 27).  For the reasons explained above, the Government believes the

defendant's Criminal History Category is I, resulting in a Guidelines range of 21 to 27 months'

imprisonment.

---

[1] In the event the Court determines that Hargrove's Criminal History Category is higher than I, the Government nevertheless believes that a sentence within the stipulated Guidelines range of 21 to 27 months' imprisonment is warranted in this case for the reasons stated herein.

**3553(a) ARGUMENT**

For the reasons that follow, a sentence within the stipulated Guidelines range is necessary to meet the statutory sentencing factors, in particular to provide just punishment and afford adequate deterrence to criminal conduct.

Hargrove was an associate of BMB, a violent street gang that terrorized a community in the Bronx for years.  In order to advance the Gang's drug business, BMB took control of, among other things, the Forts: a street corner where law abiding citizens were trying to live and work in peace.  Hargrove sold marijuana with the Gang at that location.  Hargrove's conduct selling drugs with the Gang contributed to the harm the Gang inflicted on that neighborhood.  The nature of Hargrove's offense alone provides sufficient reason to impose a Guidelines sentence of 21 to 27 months in this case.

Hargrove's history and characteristics provide further justification for a Guideline sentence.  Hargrove has had repeated interaction with the criminal justice system, including his several arrests and convictions/adjudications in 2008 and 2009 for disorderly conduct, resisting arrest and robbery, his 2013 arrest and conviction for marijuana possession, and his open cases as a result of arrests in 2015 for burglary and fraud offenses.  Hargrove's history and characteristics paint a picture of an individual who has been unmoved in the past by judicial supervision and law enforcement intervention, suggesting that a meaningful sentence is necessary in order to guide Hargrove onto a more law-abiding path.

Hargrove asks for a downward variance to time served.  Hargrove's desire to spend time with, and provide support for, his family is encouraging.  However, the defendant has only himself to blame for the conduct that separated him from his family.  Moreover, his responsibilities to his family were insufficient to prevent his criminal conduct in the past.  Even

accounting for his family ties, a sentence within the Guidelines range of 21 to 27 months would still be warranted in order to reflect the seriousness of the offense, provide just punishment, and provide adequate general deterrence to criminal conduct: to send the message that destroying communities through drug dealing and gang conduct is unacceptable and will be treated harshly. Accordingly, in light of the statutory sentencing factors—and even taking into account Hargrove's early guilty plea in this case, which demonstrated a significant acceptance of responsibility—a Guidelines sentence is warranted.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence within the range of 21 to 27 months.

Dated: New York, New York
       January 23, 2017

Respectfully submitted,

PREET BHARARA,
United States Attorney for the
Southern District of New York,

By:     __/s/_____
        Rachel Maimin
        Micah W.J. Smith
        Hagan Scotten
        Jessica Feinstein
        Drew Johnson-Skinner
        Assistant United States Attorneys
        (212) 637-1587