**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**vs.**                                                    **CASE NO.: 15 CR 095-10/AJN**

**MR. ANDERSON ROSS, et., al.,**

        **Defendant.**
_____/

## <u>SENTENCING MEMORANDUM</u>

Place yourself, if you can, in the shoes of this six-year-old child.  You watch as your mother goes to the hospital to have her baby, your little brother.  You have been anxiously awaiting his birth because you couldn't wait to become a 'big brother!'  As you go into the hospital you're with your grandmother, your aunts, and everyone is happy.  But during the birth of your little brother, something happened to your mother.  Something went wrong.  They ask you to leave the room where your mother is, not saying anything, and you don't see her again until the day of her funeral.  You've never know anyone who has passed away after going into the hospital.  Everyone you've know has gone to the hospitals and come out with babies.  You never knew that hospitals were also places where people go and they never come out, until the day your mother went in to give birth to your baby brother and never came out.

Imagine being this six-year-old child who would never see his mother alive again.  Imagine being that little boy who had to watch his mother, the person who protected him from the horrors of his world, put into the ground, watching as they throw dirt on her casket.  Imagine being this little boy, not knowing that this is just the beginning of the turmoil that is going to happen to your already, unstable, life.

At the age of six, Mr. Anderson Ross' life changed forever.  He is twenty-two (22) years old and currently serving a seven-year sentence, in New York state prison(s) from two Bronx County Supreme Court convictions, Ind. #'s 03426-2013 and # 01521-2014, that are relevant to the conduct charged in this matter.  Mr. Ross' brief, but turbulent, life, has always been filled with struggle.  Not only the environment in which he was raised, the Bronx is the poorest county in the nation, a majority minority county.  Couple these struggles with the type of trauma Mr. Ross has obviously experienced, the types of trauma that changes a person's life forever, and Mr. Ross' has had to carry a heavy burden, a burden most adults don't have to bear.   Everyone would agree that children should be protected from the kinds of trauma that Mr. Ross has experienced, and if they do happen to experience this type of trauma, receive treatment for that trauma.

Most everyone would agree that adolescence is a transitional period during which a child is becoming, but is not yet, an adult.  An adolescent is at a crossroads of changes where emotions, hormones, judgment, identity and the physical body are so in flux that parents and even experts struggle to fully understand.  As a society, we recognize the limitations of adolescents and, therefore, restrict their privileges to vote, serve on a jury, consume alcohol, marry, enter contracts, etc.  The U.S. spends billions of dollars to promote drug use prevention and sex education to protect the youth at the most vulnerable stage of life.  But when it comes to children committing offenses, especially Black children, we treat them as fully functioning adults.

Mr. Ross has recognized that his actions, in committing these offenses, is not the actions of the person he wishes to be.  After his incarceration, Mr. Ross begun trying to become a better person.  The trauma he experienced, from the age of six, and throughout his childhood,

influences young minds.  This trauma often becomes the building blocks for aggressive,
delinquent behavior in their adolescent years, unless they, and their families, receive the
treatment needed to counter the disabilities.  Mr. Ross, nor his family, never received that
treatment.  His appearance before this court is just another example of how the disabilities of
childhood trauma, coupled with the experiences of growing up in poverty, are debilitating factors
that affect too many young men, and women, especially People of color in America.  Like the
victims of his offenses, most involved in the same type of criminal activities that he was
involved in, Mr. Ross too is a victim and is deserving of a second chance at becoming a
responsible, productive, law abiding citizen.

Therefore, Mr. Ross respectfully request this Court to sentence him to xx months, with
credit for the months he served on his Bronx Supreme Court conviction on Indictment # xxxx-
20xx which Mr. Ross states, and the psr supports the fact that this conduct is relevant conduct to
the conduct alleged in this indictment, to be followed by a period of three (3) years supervised
release.

A. ***The Offense and Mr. Ross' Circumstances***

Mr. Ross is before this Court to be sentenced upon his conviction, after a plea of guilty,
pursuant to a plea agreement, of one (1) count of 21 U.S.C. § 1962(d), Racketeering Conspiracy.
In pleading to the conspiracy, Mr. Ross admitted his guilt to three underlying acts.  Those acts
were his admission to his participation in the drug conspiracy charged in the indictment; an
attempted murder that occurred on Nov. 15, 2011.  In this incident, an individual was assaulted
on a subway car by several individuals, one of which was Mr. Ross.  During the assault the
individual was stabbed.  Several of the individuals involved in the incident were arrested and

prosecuted for this assault in State court, including Mr. Ross.  It is of note that Mr. Ross was not

the person who stabbed the individual, nor was he armed with any weapon(s) at the time of this

incident.  Also of note is the fact that Mr. Ross was an adolescent, sixteen (16) years of age, at

the time of this incident.  The final underlying act, an attempted murder, involved an incident in

which Mr. Ross assaulted an individual with a firearm.  This individual was not seriously injured

and, per information derived from the government, Mr. Ross, and his friends, were involved in

an ongoing dispute with other individuals, from a different neighborhood, and this dispute turned

violent.  Again, of note, at the time of this incident, Mr. Ross was only eighteen (18) years of

age, still an adolescent.  Soon after this incident, Mr. Ross would be incarcerated, for another act,

that is conduct relevant to the conduct involved in this conspiracy, and he was eventually

sentenced to seven (7) years State imprisonment.  Mr. Ross was serving this sentence when he

was arrested for this indictment.

Ms. Redrina Ross, Mr. Ross' mother, was a single mother of two children.  She died,

unexpectedly, after giving birth to her second son, Mr. Nassim Stansbury.  While speaking with

defendant's grandmother, Mrs. Ross, about the events surrounding her daughter's death, she

believes that her daughter's death was caused by medication that was given to her during the

birth of her second son.  "The doctor gave her the medication and it caused her to have severe

complications, during the birth, and she eventual died.  My daughter was a vibrant young

woman.  She was a good mother and she took care of Anderson.  She was strict with him, she

made sure he did his school work, chores, etc., but she gave him everything she had to give to

him.  She took him everywhere and they were always together.  She was working hard at trying

to build a life for her and my grandchildren.  No one has really ever gotten over her death, and I

know that Anderson hasn't."

Ms. Ross went on to further say that after graduating high school, her daughter worked several entry level positions, being last employed at Duane Reade as an assistant manager. Ms. Ross indicated that at the time of her daughter's death, her daughter and Mr. Ross had been living in a NYC shelter, due to the overcrowded conditions at her home, awaiting they were housing placement. "Anderson, and his mother, would spend most weekends at my house when they were living in the shelter anyway, so when she died Anderson just stayed here with me."

In speaking with Mr. Ross' family, they stated that they really didn't know his father that well, and they believe that his name was 'Andy Anderson.' "While my daughter was alive he would come around and take Anderson out and spend some time with him. I think he worked as a general laborer doing construction work, but whatever he did, he didn't provide much financial support for Anderson. After the death of Anderson' mother, his father quickly disappeared out of his Anderson' life. He would call and promise to come and get him and when the time came for him to show up, he would call and give a reason why he couldn't make it and promise to make it up to him. After a while the phone calls stopped. We didn't hear from him again until Anderson was about fourteen or fifteen years old. By that time, Anderson didn't acknowledge him as his father any longer.

After the death of his mother, Mr. Ross came to live with his grandmother and an already crowed household had one more person to look after. Mrs. Ross had already adopted two of her nephews, her younger brother's children, because of their parent's drug addiction, plus both of his aunts were also residing at her residence. "His nephews looked after him, because he was a little younger than they were." After coming to live with her, Mrs. Ross noticed subtle changes in her grandson. "He became very protective of me. I couldn't go anywhere without him

worrying if I was coming back.  He would want to do everything for me around the house, until the point where I had to remind him that I wasn't at that stage where I couldn't do things for myself.  Right before his mother went into the hospital I learned that I was suffering from an terminal illness.  I told the family, and Anderson."

Mrs. Ross states that she also began noticing changes in Mr. Ross' school grades and in his behavior.  "As he began to get older, he would became more drawn in and somewhat combative.  I also noticed that his school grades had begun to drop.  Anderson was always a good student in school, but when he reached thirteen (13), all of that changed.  His grades started to drop and his behavior began to change."

In speaking with Mr. Ross' Aunt, Ms. Sharema Bond, a N.Y.C. Dept. of Corrections officer for the past five (5) years, and nine (9) years prior to her employment with the Dept. of Corrections, a N.Y.C. School Safety Officer; she remembered her nephew as a loving child who went out of his way to help everyone.  "Anderson was a good kid.  He was always helping my mother, washing dishes, trying to help her clean.  He was also a good student in school, and he got along with a lot of the other kids.  She also spoke about the lack of male influences in his life.  "Anderson didn't have any real male influences in his life so we tried to be stern with him.  We would punish him and as he got older, we would even handcuff him to the bed so he couldn't get out of the house.  Sometimes, my children' father would include Anderson in some of the things he did with our children, but it just wasn't the same."

His Aunt, Ms. Shaneta Bond, a N.Y.C. School safety officer who is currently in the process of being hired by the N.Y.C. Dept. of Corrections, has found his incarceration even more burdensome, for her, than the rest of her family.  She states that her and Anderson were particurlary close and because she is in the process of being hired for the Dept. of Corrections

she cannot visit him.  She too speaks of Anderson as being a good kid who seemed to grow

sullener and closed in as time passed.  "I could tell that he missed his mother and his father not

being involved in his life made things that much worst.  We did what we could but Anderson

needed a male figure in his life and nothing we could do could replace that."

In speaking with Mr. Ross about growing up what he remembers the most is those days

after his mother passed, going to school and watching as kid's moms came to pick them up and

"me not having my mother or father."  "My grandmother did the best that she could and we

always had food on the table but we struggled financially.  With my grandmother being ill, she

really couldn't go out and get a job.  My Aunts helped but growing up, things were tough."

Ferguson, "Grandma Joyce."  Ms. Hilton spoke about how Ms. Ferguson raised Mr. Ross and his

brother, "like they were here own" while she struggled with her addiction and periods of

incarceration.  She spoke about how her Aunt Joyce tried to give her boys everything they

needed.  She would take them on trips and got them involved in sports.  Mr. Ross won a few

trophies for his skill on the baseball field as a youngster.

Mrs. Ross also spoke about Mr. Ross being a good student in elementary school, even

receiving school academic awards, but she said even in elementary school Mr. Ross exhibited

behavioral problems.  "He would get into fights and act out at times.  We always thought it was

just him being a child but then we realized that something was eating at him and we couldn't

help."  In speaking with Mr. Ross about his schooling, he stated that he thought he was an

average student, but he would get in trouble, from cutting classes to getting into fights.  He felt

that school wasn't for him and he dropped out in high school.

Mr. Ross grew up, and went to an underachieving school, in an improvised community of the Bronx.  The 'projects' in which he grew up in resembles an encampment of colorless buildings.  The poverty in the community is evident throughout the surrounding neighborhoods, liquor stores more prevalent than supermarkets with fresh food.  Corner stores, bodegas, extending credit so parents can get milk, eggs, and other essentials to feed their children until the 'beginning of the month.'  This is the stark reality of Mr. Anderson' world.

Mr. Ross stated that he began hanging with his friends in high school, at the age of fourteen (14).  In a few short years, he began getting in trouble with the law, his criminal history begins at the age of sixteen (16), with his first arrest for Assault 3rd Degree.  Between his first arrest in 2011 and his last arrest, for this matter, Mr. Ross has amassed four (4) convictions, two misdemeanor convictions and two (2) felony convictions.

### 1.  18 U.S.C. 3553(a) and Mr. Ross' age in considering his sentence

The mandate of 18 U.S.C. § 3553(a) is, of course, for the court to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in paragraph 2 of that same statute.  In *U. S. v. Cavera*, 550 F.3d 180, 188 (2nd Cir. 2008), the court summarized the factors that a sentencing court must consider:

> "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime.  In addition to taking into account the Guidelines range, the district court must form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).  The sentencing judge is directed, moreover, to consider: a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d)

the need for rehabilitation. *Id.* § 3553(a)(2).  Additionally, district courts must
take into account: the kinds of sentences available, *id.* § 3553(a)(3); any
pertinent Sentencing Commission policy statement, *id.* § 3553(a)(5); the need
to avoid unwarranted sentence disparities among similarly situated
defendants, *id.* § 3553(a)(6); and, where applicable, the need to provide
restitution to any victims of the offense, *id.* § 3553(a)(7)."

In Mr. Ross' case, it is the "circumstances of the offense and the history and
characteristics of the defendant" that justifies a sentence of one hundred and forty-four (144)
months, reduced to one hundred and seven (107) months and twenty-four (24) days, in order to
give Mr. Ross credit for the thirty-six (36) months and six (6) days that he has already served in
prison for his conviction under Bronx County Supreme Court Indictment(s) 03426-2013 and
01521-2014, the underlying conduct in the State case being relevant conduct for the present
offense.  Also, Mr. Ross request that his sentence of 107 months and 24 days run concurrent with
the remainder of the Bronx County sentences.  This sentence is sufficient in satisfying the goals
of sentencing as set forth in 18 USCA 3553(a).   This sentence would take in the need to afford
adequate deterrence to any further conduct of Mr. Ross; give adequate time for Mr. Ross to
receive the needed services, in both the State and Federal correctional systems; and with the
support of his family become the productive individual that society desires of its citizens, such a
sentence would fulfill the purposes set forth in the statute.

Mr. Ross's age is a consideration here in regard to his sentencing as well.  In a 2005
report from the Office of Juvenile and Delinquency Prevention of the United States Department
of Justice, the Department recognized that "the parts of the brain that govern impulse, judgment,
and other characteristics may not reach complete maturity until an individual reaches age 21 or

22."  *Id.*  at 8.[1].  The year before in a January 2004 article from the Juvenile Justice Center of the

American Bar Association entitled, Cruel and Unusual Punishment:  The Juvenile Death Penalty,

Adolescence, Brain Development and Legal Culpability, in quoting Jay Giedd, a researcher at

the National Institute of Mental Health, explains that during adolescence the "part of the brain

that is helping organization, planning and strategizing is not done being built yet... It's sort of

unfair to expect adolescents to have adult levels of organizational skills or decision making

before their brain is finished being built."[2]  The article goes on to further quote Dr. Deborah

Yurgelun-Todd of Harvard Medical School, who has studied the relation between brain

development and teen behavior, who has concluded that adolescents often rely on emotional

parts of the brain, rather than the frontal lobe.  She goes on to further explain, "one of the things

that teenagers seem to do is to respond more strongly with gut response than they do with

evaluating the consequences of what they're doing.  Also, appearances may be deceiving: Just

because they're physically mature, they may not appreciate the consequences or weigh

information the same way as adults do.  So, we may be mistaken if we think that, although,

somebody looks physically mature, their brain may in fact not be mature."[3]

The United States Supreme Court concluded that life sentences for juveniles violated the

Eighth Amendment prohibition against cruel and unusual punishment, largely because of the

immaturity and greater possibility for change associated with those under eighteen:

> As compared to adults, juveniles have a "lack of maturity and an underdeveloped
> sense of responsibility"; they "are more vulnerable or susceptible to negative
> influences and outside pressures, including peer pressure"; and their characters are
> "not as well formed." *Id.*, at 569-570, 125 S. Ct. 1183, 161 L. Ed. 2d 1. These

---

[1]The report is available at www.ncjrs.gov/pdffiles1/ojjdp/212757.pdf.
[2] PBS Frontline, Inside the Teen Brain, See Interview with Jay Giedd, online at
www.pbs.org/wgbh/pages/frontline/shows/teenbrain/.
[3] Id, at Interview with Deborah Yugelun-Todd.

salient characteristics mean that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.*, at 573, 125 S. Ct. 1183, 161 L. Ed. 2d 1. Accordingly, "juvenile offenders cannot with reliability be classified among the worst offenders." *Id*., at 569, 125 S. Ct. 1183, 161 L. Ed. 2d 1. A juvenile is not absolved of responsibility for his actions, but his transgression "is not as morally reprehensible as that of an adult." *Thompson*, *supra*, at 835, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (plurality opinion).  No recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles. As petitioner's amici point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. See Brief for American Medical Association et al. as Amici Curiae 16-24; Brief for American Psychological Association et al. as Amici Curiae 22-27. Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults. *Roper*, 543 U.S., at 570, 125 S. Ct. 1183, 161 L. Ed. 2d 1. It remains true that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Ibid*.

*Graham v. Florida*, 560 U.S. 48, 69 (2010).

Mr. Ross was a teenager when he committed the instant offense and the issue, of course, is not whether he should be sentenced to life imprisonment.  Nonetheless, as recognized by the Department of Justice, the American Bar Association, and the United States Supreme Court, the character and thinking process of even young adults is incomplete and much of what was said in *Graham* has meaning here.  Indeed, Mr. Ross' crime shows a failure to weigh his actions and an impetuous failure to seek a better solution, both traits commonly associated with immaturity.

Mr. Ross' youthful age is included in his "history and characteristics," part of the statutorily required consideration in the sentencing determination.  18 U.S.C. § 3553(a)(1). There was a time, of course, when district courts were limited in their ability to rely upon

circumstances such as age in arriving at a sentence.  That, though, is no longer the case, and
sentencing courts are required to consider such factors:

> The Commission has not developed any standards or recommendations that affect
> sentencing ranges for many individual characteristics. Matters such as age,
> education, mental or emotional condition, medical condition (including drug or
> alcohol addiction), employment history, lack of guidance as a youth, family ties,
> or military, civic, charitable, or public service are not ordinarily considered under
> the Guidelines. See United States Sentencing Commission, Guidelines Manual
> 5H1.1-6, 11, and 12 (Nov. 2006).n3.  These are, however, matters that § 3553(a)
> authorizes the sentencing judge to consider. *See, e.g.*, 18 U.S.C. § 3553(a)(1).

*Rita v. United States*, 551 U.S. 338, 364-365 (2007) (Stevens, J. concurring). *See also U. S. v.
Jarvi*, 537 F.3d 1256, 1263 (10th Cir. 2008) ("We have now held that district courts have broad
discretion to consider individual characteristics like age, employment, and criminal history in
fashioning an appropriate sentence under 18 U.S.C. § 3553(a), even when disfavored under the
Guidelines or already accounted for in another part of the calculation"); *U. S. v. Corsey*, 723 F.3d
366, 374 (2nd Cir. 2013);

In *Gall v. United States*, 552 U.S. 38 (2007), the court relied on the youth of the twenty-
one-year-old defendant as one of the reasons justifying a below-guideline sentence:

> In summary, the District Judge observed that all of Gall's criminal history
> "including the present offense, occurred when he was twenty-one-years old or
> younger" and appeared "to stem from his addictions to drugs and alcohol." *Id*., at
> 122-123. The District Judge appended a long footnote to his discussion of Gall's
> immaturity. The footnote includes an excerpt from our opinion in *Roper v.
> Simmons*, 543 U.S. 551, 569, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), which
> quotes a study stating that a lack of maturity and an undeveloped sense of
> responsibility are qualities that "'often result in impetuous and ill-considered
> actions.'"  The District Judge clearly stated the relevance of these studies in the
> opening and closing sentences of the footnote: "Immaturity at the time of the
> offense conduct is not an inconsequential consideration. Recent studies on the
> development of the human brain conclude that human brain development may not
> become complete until the age of twenty-five. . . . [T]he recent [National
> Institutes of Health] report confirms that there is no bold line demarcating at what
> age a person reaches full maturity.  While age does not excuse behavior, a

> sentencing court should account for age when inquiring into the conduct of a defendant." App. 123, n 2.

*Id.* at 57-58.

Several federal courts of appeals have upheld the relevance of collateral consequences to a determination of "just punishment" and the need for deterrence under 18 U.S.C. 3553(a), allowing them as a basis for varying downwards from the guidelines range.  The Second Circuit in *United States v. Stewart*, 590 F.3d 93, 141 (2nd Cir. 2009), approved as reasonable a variance from guidelines of 78-97 months to 20 months, because the defendant's conviction for violating rules against communicating with a prisoner "made it 'doubtful that [he] could pursue' his career as an academic or translator."  The court commented that "it is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *Stewart*, 590 F.3d at 141.

Mr. Ross is well aware that Court is well aware of, and understands, the goals of sentencing set forth in 18 U.S.C. § 3553(2)-(7).  Mr. Ross' minor prior criminal history, his age, the circumstance that his crime was largely the product of his immaturity, and that as a young man, he has a greater capacity for change, suggests a reduced possibility of recidivism and are relevant to the need to promote respect for the law.[4]

---

[4] Just, however, as a sentence that is too short may fail to reflect the seriousness of the offense, promote respect for the law, or provide just punishment, so will a sentence that is excessively harsh.  *See, e.g., U.S. v. Ontiveros*, 07-CR-333, 2008 U.S. Dist. LEXIS 58774, *6 (E.D. Wis. July 24, 2008) ("[A] sentence that is disproportionately long in relation to the offense is unjust and likewise fails to promote respect [for the law]"); *U.S. v. Zavala*, No. 07-14851, 2008 U.S. App. LEXIS 24168, *8-9 (11th Cir. Nov. 25, 2008) ("[A]ny higher sentence would promote disrespect for the law.") (quoting the district court); and *U.S. v. Robles*, 2012 U.S. Dist. LEXIS 13542 (S.D.N.Y. Feb. 3, 2012)(In light of the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence to provide just

## 2. *Mr. Ross' history and circumstances in considering his sentence*

Trauma is a profound experience of the loss of security and welfare evoking feeling of fear, helplessness, harrow, and possibly disorganized agitation in children.[5]  The description of PTSD in the Diagnostic and Statistical Manual of Mental Disorders has increasingly taken into account child-specific features of PTSD, and PTSD has evolved from a disorder first associated with Vietnam veterans in the 1970's [6] to one which has now been well documented in the general population at an estimated 7.8% [7] and in specific groups of children, particularly high-risk children such as adolescent delinquents, through an estimate of PTSD in the population of children and adolescents is still forthcoming.  Dr. VV Ruchkin[8], pointed out in his article that twenty-five (25) percent of adolescent delinquents met DSM-III PTSD criteria and forty-two (42) percent fulfilled partial PTSD criteria, percentages comparable to and exceeding those found in the population of Vietnam veterans, suggesting the vulnerability of childhood or adolescent experiences and the subjective nature of trauma.

The latest DSM-IV-TR outlines the diagnostic criteria for PTSD following the occurrence of a traumatic event, including symptoms for longer than one month of (1) reliving the trauma, (2) avoiding associations related to the trauma, and (3) increased arousal resulting in "clinically significant distress or impairment in social, occupational, or other important areas of

---

punishment for the offense…a downward departure is appropriate to impose a sufficient sentence under 18 USCA 3553(a).)

[5]  American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders. 4th edition. Washngton, DC, USA: American Psychiatric Association; 2000.

[6]  Card JJ. Epidemiology of PTSD in a national cohort of Vietnam veterans.  Journal of Clinical Psychology, 1987; 43 (1):6-17 [Pubmed]

[7]  Kessler RC, Sonnega A, Bromet E, Hughes M, Nelson CB Posttraumatic stress disorder in the national comorbidity survey, Archives of General Psychiatry. 1995;52(12):1048-1060.

[8]  Ruchkin, V.V.; Schwab-Stone, M.; Koposov, R.; Vermeiren, R.; Steiner, H., Violence exposure, posttraumatic stress, and personality in juvenile delinquents, 41 Journal of the

functioning."[9]  The description is keen to note the impact of childhood development on the triad

of symptoms; for instance, in children, the response to the trauma may be expressed as

disorganized and agitated behavior rather than intense fear, horror, and helplessness, and the

reexperiencing may be expressed through repetitive play with traumatic themes, frightening

dreams without recognizable meaning, and trauma-specific reenactment.[10]

Children may suffer trauma in many significant ways including developmental delays;

numerous social, behavioral, and academic difficulties; somatic complaints; lower self-esteem;

and attachment issues.[11]  As an anxiety disorder, one may imagine PTSD to be a source of strife

for the victim and perhaps close a circle of contacts.  However, rather than being a quietly

contained disorder, the violence and chaos experienced by the victim through trauma may

manifest as outward acts of aggression, delinquency, and conduct disorder; conduct disorder

behaviors and the like may be considered as symptoms of PTSD, rather than isolated problems.[12]

The findings of Ryan, JP., and Testa, MF., in their article, *Child maltreatment and juvenile*

*delinquency: investigating the role of placement and placement instability,*  27 Children and

Youth Review, (2005) 227-249, resonate with this point.  Similarly, another report on

Posttraumatic stress and juvenile delinquents found that 31.7% of severely delinquent juvenile

---

American Academy of Child and Adolescent Psychiatry, 322-329 (2002)

[9] Pooja L. Amatya and Drew H. Barzman, ISRN Pediatrics, The Missing Link between Juvenile Delinquency and Pediatric Posttraumatic Stress Disorder: An Attachment Theory Lens (2012) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3384893/

[10] Id.

[11] Trickett, PK, McBride-Chang, C.,

[12] Pooja L. Amatya and Drew H. Barzman, ISRN Pediatrics, The Missing Link between Juvenile Delinquency and Pediatric Posttraumatic Stress Disorder: An Attachment Theory Lens (2012) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3384893/

offenders with PTSD and 20% meeting partial criteria. [13]

Mr. Ross has not been diagnosed, as of this sentencing, with PTSD, but the circumstances of his life are such that a diagnosis of PTSD seems to be highly probably if he was examined for and subsequently treated for it.  Mr. Ross was raised in an environment of poverty that included factors conducive to juvenile delinquency such as parental psychopathology, drug use, neighborhoods with criminal subculture, low participation, and frequent mobility among residents; poor school conditions with chaotic environments that often include violence.  As well as being factors that are conducive to juvenile delinquency, they are also factors that are conducive to trauma.

Mr. Ross's calculated guideline range for count one is 188 – 235 months.  That sentence, does not comport with the admonishment of 18 USCA 3553 (a) in that a sentence be sufficient but not greater than necessary to comply with" the goals of sentencing.

This Court, in arriving at the sentencing decision in this case, must, of course, consult the United States Sentencing Guidelines as the starting point in any sentencing determination. *See U. S. v. Dorvee*, 3023799 WL (2nd Cir. Aug. 4, 2010); *U. S. v. Marrero*, 325 F.Supp.2d 453, 456 (S.D.N.Y. 2004).  Nonetheless, courts must also consider the other factors set out in § 3553(a). Indeed, in some instances, the guidelines may have little persuasive force considering some of the other § 3553(a) factors:

> Although "judges must still consider the sentencing range contained in the Guidelines, . . . that range is now nothing more than a suggestion that may or may not be persuasive . . . when weighed against the numerous other considerations listed in [§ 3553(a) ]." *Id.* at 787 (Stevens, J., dissenting). Indeed, as one district judge has already observed;

---

13

the remedial majority in Booker directs courts to consider all of the § 3553(a) factors, many of which the guidelines either reject or ignore. For example, under § 3553(a)(1) a sentencing court must consider the "history and characteristics of the defendant." But under the guidelines, courts are generally forbidden to consider the defendant's age, his education and vocational skills, his mental and emotional condition, his physical condition including drug or alcohol dependence, his employment record, his family ties and responsibilities, his socio-economic status, his civic and military contributions, and his lack of guidance as a youth. The guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant.

*U. S. v. Ranum*, 353 F. Supp. 2d 984, 986 (E.D.Wis.2005) (citations omitted).

Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all but the most unusual cases are now potentially relevant in every case. *U. S.  v. Crosby*, 397 F.3d 103, 113 (2nd Cir. 2005). *See also*, *U. S. v. Johnson*, 567 F.3d 40, 47 (2nd Cir. 2009)("post-Booker, the Sentencing Reform Act (SRA) requires the sentencing court to regard the guidelines' ranges as one of the many factors to consider in determining the sentence").  Mr. Ross believes that the guideline sentence set forth in his pre-sentence report by the probation department falls short of "the need to avoid unwarranted sentence disparities among defendants. . . who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The fact is that the Guidelines, while proclaiming the goal of uniformity, sometimes fails to accomplish that goal when the sentence is based primarily on drug quantity. The Constitution Project recognized as much.[14]   The Project's Sentencing

---

[14] It is a group which describes itself as "a bipartisan nonprofit organization that seeks consensus on controversial legal and constitutional issues thorough a unique combination of scholarship and activism," www.constitutionproject.org/index.cfm,   Its Sentencing Initiative

Initiative report concludes that the Sentencing Guidelines "place excessive emphasis on quantifiable factors such as monetary loss and drug quantity, and not enough emphasis on other considerations such as the defendant's role in the criminal conduct."[15]  In its report Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform, at 50, the United States Sentencing Commission recognized the criticism of the over-reliance on drug quantity: "Drug quantity has been called a particularly poor proxy for the culpability of low-level offenders, who may have contact with significant amounts of drugs, but who do not share in the profits or decision-making."  The result is that the Guidelines produce sentences that, while uniform by the standards of the Guidelines, sometimes sentence those minimally involved much like those who are central figures in the crime.[16]

The goals set forth in §3553(a)(2) consist of the "need for the sentence imposed"

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational, training, medical care, or other correctional treatment in the most effective manner.

---

Project includes such preeminent conservative jurists as United States Supreme Court nominee Samuel Alito and United States District Court Judge Paul Cassel, author of the decision in United States v. Wilson, 350 F.Supp.2d 910 (D. Utah 2005).

[15] http://www.constitutionproject.org/article.cfm?messageID=101.

[16]Even the uniformity of sentencing under the Guidelines is probably overstated. According to the United States Sentencing Commission's 2010 Sourcebook of Federal Sentencing Statistics, which presents the most current statistics available, the median sentence in the Southern District of New York for cocaine offenses was more than the median national average. (63 months to 65.7 months)

Mr. Ross's guideline sentencing range is hard pressed in meeting these goals.  In this case, though, Mr. Ross is facing a sentence of 15.6 years to 19.5 years in prison, partly because of the amount of drugs attributed to him.  *See* ¶¶ 47, 102 PSR.  Thus, this court will necessarily be imposing a significant sentence on someone who has was an adolescent when he committed his offense and whose involvement with the criminal justice system is limited to the action involved in this conspiracy, a mere 3 years of his life.

This Court' obligation under 18 U.S.C. § 3553(a)(2) to consider carefully, the need for his sentence to "reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and also "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, is an obligation that is imposed by law. 18 U.S.C. § 3553(a)(2).  Excessively long sentences, however, fail to reflect the seriousness of the offense, undermine respect for the law, and fail to provide just punishment. *See U.S. v. Carr*, 792 F.Supp.2d 343, 516 (E.D.N.Y. 2011) ("A sentence must be proportional to the defendant's crime.  A sentence that is disproportionately long in relation to the offense is unjust and fails to promote respect for the law.  There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist.").  In *United States v. Williams*, 481 F. Supp.2d 1298, 1304 (M.D. Fla. 2007) the District Judge, Judge Presnell, recognized that the 262 to 327 months' sentence called for by the career offender guidelines in that case "would not provide just punishment."  He went on to say that

such a sentence "offends the very notion of justice."  In considering deterrence, Judge Presnell, echoing the proportionality concern of others, stated that "it seems appropriate to consider the deterrence factor in light of the seriousness of the offense, the deterrent effect of a harsh sentence should be reserved for those serious crimes where society's need for protection is the greatest." *Id.* at 1304.

Mr. Ross is aware that he is not facing sentencing under the career offender guidelines and not facing a sentence length that Mr. Williams faced.  And in urging this consideration by the Court, Mr. Ross does not intend to minimize the nature of the instant offense or his knowing participation in the offense.  Nonetheless, Mr. Ross urges this Court, while considering deterrence, to also consider the fact that consideration must also be given to the concept of proportionality.

The Court in *U.S. v. Ennis*, 468 F.Supp.2d 228 pointed out the importance of proportionality:

> "The Introduction to the Guidelines notes that a primary purpose of the Guidelines, and indeed, a significant purpose of all sentencing, is not just to avoid disparity in the sentencing of offenders, but also to ensure "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity." U.S.S.G. § 1A1.1, Introductory cmt. (n.3). The drafters could have avoided disparity by sentencing all offenders to life imprisonment no matter what they did. But while that would have made sentencing uniform across the country, it would have been uniformly disproportionate, not to mention grotesquely unfair. In the instant case, Nicholson [who is a career offender] is facing 20 years for drug distribution, a sentence which matches the maximum punishment for the following offenses: Sexual abuse, 18 U.S.C. § 2242; sexual exploitation of children, 18 U.S.C. § 2251; enticement into slavery, 18 U.S.C. § 1583; terrorism, 18 U.S.C. § 2322; torture, 18 U.S.C. § 2340A; kidnapping, 18 U.S.C. § 1201; seditious conspiracy, 18 U.S.C. § 2384; and, biological weapons, 18 U.S.C. § 175c. Likewise, under the Guidelines, selling someone in the slave trade is "only" an offense level 22, U.S.S.G. § 2H4.1 and transmitting top secret national defense information is

"just" a 29, U.S.S.G. § 2M3.3, while Nicholson's base offense level is 34. *Ennis*, 468 F.Supp.2d at 236.

Furthermore, given the fact that he is already serving a state sentence for acts that are part of the conspiracy in which he now stands before this Court, a lesser sentence in Mr. Ross' case would be in accordance with the Second Circuit precedent. *See U.S. v. Mishoe*, 241 F.3d 214, 220 (2nd Cir. 2001):

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses. If, for example, a defendant twice served five or six years and thereafter committed another serious offense, a current sentence might not have an adequate deterrent effect unless it was substantial, perhaps fifteen or twenty years.

*See also*, *United States v. Oliveras*, 2010 WL 46872 (2nd Cir. Jan. 8, 2010); *United States v. Hodges*, 2009 WL 366231 (E.D.N.Y. Feb. 12, 2009).

 Mr. Ross expressed great remorse when looking back on his past actions. Mr. Ross has consistently stated that he wants something different for his life and has attempted to do that with taking courses during his incarceration to better himself, get his GED, and he hopes to be able to continue his education once he is released.

Anderson Ross was a teenager when he began committing the offenses for which he now stands before this Honorable Court. He was, at the time, unemployed and living with his grandmother in a low-income neighborhood, in a home that was overcrowded. Having a minimum criminal justice history, his personal history, and given his age at the time of his offense, a sentence of one hundred and seven (107) months and 24 days, would be "sufficient, but not greater than necessary," to comply with the goals of sentencing. 18 U.S.C. § 3553(a).

### 2. Role of the Advisory Sentencing Guidelines

As recognized in *U. S. v. Capanelli*, 479 F.3d 163, 165 (2nd Cir. 2007) the Second Circuit resolved a continuing debate among the circuits' as to how much weight should be given to one of the listed factors, the Sentencing Guidelines.  In the decision in *Capanelli*, the court rejected "any across-the-board prescription regarding the appropriate deference to give the guidelines." 459 F.3d at 1184.  Rather, "The recommended guideline range "*should* serve as 'a benchmark or a point of reference or departure'" for a sentencing court.  *U.S. v. Fernandez*, 443 F.3d 19, 28 (2nd Cir. 2006)(emphasis added)(quoting *U.S. v. Rubenstein*, 403 F.3d 93, 98-99 (2nd Cir. 2005), cert denied, 546 U.S. 876 (2005).  While a district court must consider each § 3553(a) factor in imposing a sentence, the weight given to any single factor "is a matter firmly committed to the discretion of the sentencing judge and is beyond our review." *Id.* at 32.  As recognized by Judge Tjoflat in *U. S. v. Glover*, 431 F.3d 744, 752-753 (11th Cir. 2005), in some cases the Guidelines may have little persuasive force in light of some of the other § 3553(a) factors:

> Although "judges must still consider the sentencing range contained in the Guidelines, . . . that range is now nothing more than a suggestion that may or may not be persuasive . . . when weighed against the numerous other considerations listed in [§ 3553(a) ]." *Id.* at 787 (Stevens, J., dissenting).

Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all but the most unusual cases are now potentially relevant in every case.

Then, too, a sentence imposed outside of the Guidelines' scheme does not require extraordinary circumstances:

> "Before *Booker*, we recognized that district courts were required to sentence within the guideline range except in unusual cases, *U. S. v. Johnson*, 347 F.3d 635, 640 (7th Cir. 2003), and anything but a loose comparison to pre-Booker

departure cases would vitiate the post-Booker discretion that sentencing courts

enjoy.  All that is necessary now to sustain a sentence above the guideline range

is "an adequate statement of the judge's reasons, consistent with section 3553(a),

for thinking the sentence that he has selected is indeed appropriate for the

particular defendant. <u>Dean</u>, 414 F.3d at 729."

*U. S. v. Castro-Juarez*, 425 F.3d 430, 436 (7th Cir. 2005).

"Since *Booker*, [however], the Guidelines are no longer a straight-jacket binding courts to

artificially created and cruel paradoxes of sentencing. . ." *United States v. Hawkins*, 380 F. Supp.

2d 143, 161 (E.D.N.Y. 2005).

*3. The relationship between the sentence for the current offense
and prior time served.*

The 2nd Circuit has said that a court should consider the "appropriate relationship

between the sentence for the current offense and the sentences, particularly the times served, for

the prior offenses." *U.S. v. Aguilar*, 2010 U.S. Dist. Lexis 6198 (S.D.N.Y. Nov 16, 2009)

(quoting *U.S. v. Mishoe*, 241 F.3d 214, 220 (2nd Cir. 2001).  As observed by this Circuit with

respect to the rationale of specific deterrence and the relationship between the sentence for the

current offense and prior time served, albeit in the context of career offender criminal history

categories, and the over-representation of criminal history categories, "if a defendant served no

time or only a few months…, a sentence of even three to five years for the current offense might

be expected to have the requisite deterrent effect. *U.S. v. Castillo*, 2007 U.S. Dist. Lexis 101879

(S.D.N.Y. Jan. 24th, 2007), quoting *Mishoe*, 241 F.3d at 220; see also *U.S. v. Aggrey-Fynn*, 2006

U.S. Dist. Lexis 85694 * 9-10 (S.D.N.Y. November 22, 2006) (District court departed from

guideline range of 151 – 188 months and sentenced defendant to 120 months as a first time

offender provided an adequate deterrent effect.)

Despite having several prior convictions, all acquired while Mr. Ross was between the ages of 16 – 19, all of his conduct was related to conduct of alleged to have occurred in the present indictment, in which he is serving a sentence of seven years.  Yet pursuant to the sentencing calculation proposed by the probation department Mr. Ross faces a guideline sentence of 188 months to 235 months.  The proposed upper guideline sentence, two hundred and thirty-five months would be almost 5 ½ times greater than any sentence previously imposed on Mr. Ross.

*Conclusion*

Sentencing courts are, of course, charged with the responsibility of treating those that come before them as individuals.  *See* <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") Courts are charged by Congress, as well, to impose a sentence that is sufficient, but not greater than necessary to fulfill the goals of sentencing established by Congress. *See* 18 U.S.C. § 3553(a). Mr. Ross respectfully requests this Court to follow that tradition and impose a sentence of one hundred and forty-four (144) months, reduced to one hundred and seven (107) months and twenty-four (24) days, in order to give Mr. Ross credit for the thirty-six (36) months and six (6) days that he has already served in prison for his conviction under Bronx County Supreme Court Indictment(s) 03426-2013 and 01521-2014.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic delivery to Rachel Maimin, Assistant U.S. Attorney, One St. Andrews Place, New York, NY 10007, this May 1, 2017.

Respectfully Submitted,

*Kafahni Nkrumah*,
KAFAHNI NKRUMAH, Esq.
Counsel for Mr. Ross

Nkrumah Law PLLC
20 Vesey St., ste. 400
New York, New York 10007
(718) 496-8744(o)
(917) 722-2430 (f)
kankruamahesq@aol.com

cc: AUSA Rachel Maimin (by ECF)