UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

             v.

ONEIL DASILVA,

             Defendant.

15-CR-95 (AJN)

SENTENCING SUBMISSION ON BEHALF OF
ONEIL DASILVA

JOSEPH A. GROB, P.C.
By:  Joseph A. Grob
345 Seventh Avenue, 21st Fl
New York, New York 10001
Phone:     (516) 993-7336
Facsimile: (866)651-3196
Email:     jag@groblaw.us

**INDEX TO EXHIBITS**

Exhibit A                           Segment of Oneil Daslva's Medical Records obtained from Kingsbrook Medical Center in Brooklyn, New York

Exhibit B                           Letter from Dr. Marc Ross, Oneil Dasilva's Treating Physician at Kingsbrook Medical Center

Exhibit C                           Waiver of Presentment dated June 3, 2016

Exhibit D                           Plea Agreement between defendant and the Government

Exhibit E                           Transcript of Oneil Dasilva's change of plea proceeding dated December 8, 2016

Exhibit F                           Letter from Oneil Dasilva

Exhibit G                           Letter from Oneil Dasilva's mother Maxphfine Jones

Exhibit H                           Report of Dr. Sanford Drob

Exhibit I                            Records obtained from Truman High School

Exhibit J                           Police Ballistics Report from the September 4, 2011 shooting (Redacted from ECF pursuant to Protective Order)

Exhibit K                          Article from The Gothamist Newspaper dated September 7, 2011

Exhibit L                           Complaint filed again Oneil Dasilva on September 6, 2011, Bronx County Docket Number 2011BX049536 and complaint filed against Philip Muir (Redacted from ECF pursuant to Protective Order)

Exhibit M                         Certificate of Disposition related to dismissal of Bronx County Docket Number 2011BX049536

Exhibit N                           Letter from Oneil Dasilva's fiancé - Judy Kay Samuels

Exhibit O                           Objections to the PSR

Exhibit P                           Curriculum Vitae for Dr. Sanford Drob

**JOSEPH A. GROB, P.C.**
345 SEVENTH AVENUE – 21ST FLOOR
NEW YORK, NY 10001
TEL: 516-993-7336
FAX: 866-651-3196
EMAIL: JAG@GROBLAW.US

May 5, 2017

VIA ECF

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

*Re: United States v. Oneil Dasilva*
15 Cr. 95 (AJN)

Dear Judge Nathan:

This letter is respectfully submitted on behalf of defendant Oneil Dasilva ("Oneil") and in connection with his sentencing, which is currently scheduled to take place on May 12, 2017.

## I.  INTRODUCTION

On May 24, 2016, two things happened that changed Oneil Dasilva's life completely and permanently. First, Oneil was shot multiple times, he was severely injured and he almost died. He suffered life changing spinal cord injuries which left him partially paralyzed and partially incontinent. *See* Segment of Oneil's Medical Records obtained from ███████████ ██████████████████████████ annexed hereto as Exhibit A; *see also* Letter of ██████████ Oneil's Treating Physician at █████████, annexed hereto as Exhibit B.

The second thing that happened to Oneil on May 24, 2016, is that Oneil was arrested and charged with being an associate of a violent gang called "BMB" and with participating in a racketeering conspiracy, a narcotics conspiracy and acts of violence.[1]

The PSR and this sentencing memo tell the story of two Oneils. The first is the young, wild and sometimes violent Oneil who committed the crime in this case. The second is the Oneil who only started to exist after being shot several times on May 24, 2016. That Oneil is an L1

---

[1] Oneil was officially taken into federal custody on June 3, 2016, though he was not presented for arraignment until June 9, 2016. Annexed hereto as Exhibit C is a copy of the waiver of presentment dated June 3, 2016. Further, it is believed that Oneil was initially being held in state custody after he was shot on May 24, 2016, and thus, he may have been arrested as early as May 24, 2016, but no later than June 3, 2016.

Hon. Alison J. Nathan
May 5, 2017
Page 2

paraplegic who, for the last year, has been residing in a hospital room at ███████ under armed guard mostly handcuffed to his hospital bed.

The indictment in this case charged Oneil and 63 co-defendants with participating in 1) a racketeering conspiracy wherein violence was used in violation of 18 U.S.C. § 1962(d) (Count I); 2) narcotics conspiracies in violation of 21 U.S.C. § 846 and 21 U.S.C. § 860 (Counts II and III); and 3) possession and discharge of firearms during and in relation to a crime of violence and a drug trafficking offense in violation of 18 U.S.C. § 924(c) (Count IV).

On December 8, 2016, Oneil pleaded guilty to discharging a firearm during and in relation to a crime of violence or drug trafficking crime pursuant to Count IV of the indictment and in violation of 18 U.S.C. § 924(c) pursuant to a plea agreement entered into with the Government. A copy of that plea agreement is annexed hereto as Exhibit D. During his allocution, Oneil admitted to discharging a firearm on September 4, 2011, in connection with a drug transaction and his involvement with the violent street gang known as BMB. *See* Transcript of Oneil Dasilva's change of plea proceeding dated December 8, 2016, annexed hereto as Exhibit E.

The plea agreement contemplates a sentencing range consisting of the mandatory minimum 10 year sentence required by statute. *See* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") §2k2.4. *See* Exhibit D.

The Probation Department, in the detailed Pre-Sentence Report ("PSR") concurs with the Guidelines analysis contained in the plea agreement. PSR at ¶¶ 29-30. After reviewing the Guidelines, Oneil's criminal history, Oneil's personal history, and the facts of this case, the Probation Department suggests that a Guidelines sentence of 10 years (120 months) would be appropriate in this case. PSR pp. 29-30.

As discussed more fully below, considering Oneil's background and the other factors set forth below, a Guidelines sentence of 10 years would be more than sufficient to meet the sentencing objectives of 18 U.S.C. § 3553(a) in this case.

## II.  GENERAL LEGAL PRINCIPLES RELATED TO FEDERAL SENTENCING

When imposing sentence, the Court is required to consider the Guidelines together with all of the factors set forth in 18 U.S.C. § 3553(a) in determining a reasonable sentence in each individual case. *See United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005). The overarching command of § 3553(a) is the Parsimony Clause, which instructs district courts to impose a sentence "sufficient, but not greater than necessary" to accomplish the goals of sentencing. *Pepper v. United States*, 562 U.S. 476, 131 S. Ct. 1229, 1242 (2011).

Among the factors to be considered pursuant to 18 U.S.C. § 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a).

Hon. Alison J. Nathan
May 5, 2017
Page 3

### III.   Oneil's Personal History And Characteristics

####   i.   Oneil's Personal Background Before His Arrest

23 years ago, on ████████████████, Oneil was born in Kingston, Jamaica.  PSR ¶ 54.
By then, his father had already disappeared and was never really heard from again.  PSR at ¶¶
51-52; *See* Letter of Oneil Dasilva, annexed hereto as Exhibit F.  Oneil has two maternal half
siblings.  His oldest brother, Shawn Alman, is 34 years old.  He resides in Jamaica and works for
a bank.  PSR at ¶ 51.  His other half-brother, Ramon Arjun, is 30 years old.  *Id.*  When Ramon
was 2 years old, his father rescued him from a life of poverty in Jamaica leaving Oneil's mother
to fend for herself.  PSR at ¶ 51.  Oneil's mother, Maxphfine Jones, and his grandmother, Evelyn
Rose, took care of Oneil together until he turned approximately 6 years old.  PSR at ¶ 51; s*ee*
Exhibit F; s*ee also* Letter of Maxphfine Jones, annexed hereto as Exhibit G[2] and Report of Dr.
████████████ annexed hereto as Exhibit H, at p. 1-2.

In Jamaica, the family was extremely poor and life was difficult.  *See* PSR ¶¶ 51-53; *see
also* Exhibit G.  Oneil's mother explains that her

> community was characterized by poverty and political violence. It
> was rough, gritty and poverty stricken. . ."

Exhibit G.  Oneil's mother reports further that Oneil was a good kid in Jamaica and that he never
got involved in trouble and he was never arrested while living there.  *Id.*  Oneil explains that,
when living in Jamaica, even though he got along well with his mom and grandmother, he was
still hit and disciplined.  *See* Exhibit H.  Occasionally Oneil was even hit with "boards and
bricks" as a means of discipline.  *See* Exhibit H at p. 2.

When Oneil was approximately 6 years old (in or around 1999), Maxphfine left Jamaica
for New York.  She was desperate to find a job and a place to live so that she could bring Oneil
to New York to join her and to make a better life for him.  Oneil stayed in Jamaica with his
grandmother, but three years later, when Oneil was approximately nine years old, his

---

[2] The letter from Oneil's mother (Exhibit G) was furnished to me via email.  Oneil drafted his
initial letter by hand.  Oneil does not have access to a computer with a word processor or a
typewriter at the hospital.  His handwritten letter was then typed up by my office staff (*see*
Exhibit F) and some non-substantive corrections were made.  The letter was then reviewed by
Oneil. Changes were then made at Oneil's request and the final letter which is annexed hereto
was prepared for Oneil's signature.

Hon. Alison J. Nathan
May 5, 2017
Page 4

grandmother died.  After her passing, Oneil stayed in Jamaica with his brother Shawn and a maternal aunt until 2007.[3]  PSR at ¶ 51-52.

Oneil also experienced several traumas as a child growing up in Jamaica.  At the age of about 7 or 8, he was stabbed by another child and his injuries required stitches.  *See* Exhibit H at p. 2. When Oneil was approximately 10 years old, he was in a horrible school bus accident.  *Id.*  According to Oneil, during that accident he sustained a head injury and passed out, but several school age kids were killed.  *Id.*  Oneil believes that he had some "brain problems" as a result of those injuries.  *Id.*  In an interview with Oneil's mother, she confirms that Oneil was in a bus accident at that time.  She relates, however, that she was in New York when the accident took place.

In or around 2007, when Oneil was approximately 14 years old, Oneil's mom brought him to New York to join her. *See* Exhibits F and G.  Unfortunately, the transition from life in Jamaica to life in New York was very difficult for Oneil.  Maxphfine reports that when Oneil arrived in the United States and started attending school "[H]e was bullied, teased and mocked because of his accent."  *See* Exhibit G.  Oneil also confirms that he found transitioning to life in New York to be difficult.  He reports:

> When I went to school people used to make fun of me all the time because of the way I spoke. It made me feel angry and alone and depressed. It made me get into fights even when I was a kid."

*See* Exhibit F.  As a result, Oneil attended school minimally and he did very poorly in school. *See* Records from Harry S. Truman High School, annexed hereto as Exhibit I.

Oneil didn't like attending school where people would bully him and make fun of him. Unsurprisingly, instead of continuing to attend school, Oneil dropped out and began to hang out with the wrong people and he started to get into trouble by bullying others.  *See* PSR ¶¶ 42-48.  It was during that time period between 2008 through 2014, that Oneil, looking for acceptance and friends got into trouble and became friends with many of the people charged in this case.  *See* PSR ¶¶ 42-48; *see also* Exhibit H at p. 12 ("Mr. Dasilva was raised in a home without a father, and without positive male role models. He appears to have achieved his sense of masculine and identity through bonding and identification on the street with others his age").  Consequently, Oneil was arrested several times between 2008 and 2011.  *See* PSR ¶¶ 42-48.  In 2008, when Oneil was only 14, he was arrested and charged with a Robbery as a juvenile offender in Family Court.  At that time, Oneil underwent an evaluation and was diagnosed with having several mental health issues including an Impulse Control Disorder, an Expressive Language Disorder, an Oppositional Defiant Disorder and Attention Deficit Hyperactivity Disorder ("ADHD").  *See*

---

[3] Some of this information was not in the PSR and was discovered during a telephone interview that I conducted with Oneil's mother.  Oneil's mother reports that she never spoke to the Probation Officer in this case.  The PSR reflects that the Probation officer spoke to Oneil's half-brother Ramon, but we believe that no efforts were made to speak with Oneil's mother to gather or verify personal information.  Further, Ramon never lived with Oneil and was not authorized to speak on his behalf.  *See also* Objections to PSR, annexed hereto as Exhibit O.

Hon. Alison J. Nathan
May 5, 2017
Page 5

Exhibit H at pp. 8, 10-11.  He was medicated with Seroquel (Exhibit H at pp. 3, 11).  Dr. ██████
reports that:



Exhibit H at p. 12.

      On or about October 18, 2010, Oneil was involved in a gunpoint robbery.  *See* PSR at ¶ 44.  Oneil was released on bail with respect to that case, and on September 4, 2011, he was involved in the offense conduct at issue herein.  Namely, while at a gathering in the early morning hours of September 4, 2011, there was a dispute between other members or associates of BMB related to a drug sale and several people started shooting firearms, including Oneil.  In fact, ballistics evidence recovered at the scene showed that there were 22 shell casings recovered from four different firearms as a result of the September 4, 2011 shooting.  Annexed hereto as Exhibit J, is a copy of a segment of ballistics evidence obtained during discovery in this case (confirming this information.)[4]  Several people at the party were shot and injured as a result of the shooting. *See* PSR at 48.  The PSR notes that Oneil was arrested for attempted murder and then incorrectly goes on to say that the shooting on September 4, 2011 resulted in death.  PSR at ¶ 48.  The PSR is incorrect and the language indicating that the shooting resulted in death should be stricken from the PSR.

      Additionally, Oneil was not arrested at the scene.  Rather, Oneil discovered that he was named a suspect in that case and he voluntarily surrendered to authorities on September 6, 2011. *See* PSR at ¶ 22; *see also* newspaper article from The Gothamist dated September 7, 2011 (confirming that Oneil surrendered), annexed hereto as Exhibit K.  Oneil and an individual named Phillip Muir were charged with participating in the September 4, 2011 shooting.  *See* Exhibit K; *see also* copy of the complaints filed against Oneil (Bronx County Docket Number 2011BX049536) and Phillip Muir, annexed hereto as Exhibit L.

      When Oneil surrendered on September 6, 2011, he was remanded.  Later, Oneil was offered a plea bargain in connection with his October 18, 2010 arrest, and he was told that the new case arising out of the September 4, 2011 shooting was going to be dismissed as covered.  On or about March 14, 2013, Oneil pleaded guilty to his participation in the October 18, 2010 robbery and on May 16, 2013, he was sentenced to 42 months imprisonment for that case. *See* PSR at ¶ 44.  On or about April 8, 2013, attempted murder charges arising out of the September 4, 2011 shooting were dismissed as promised.  *See* Certificate of Disposition for Bronx County Docket Number 2011BX049536, annexed hereto as Exhibit M.  Oneil remained in prison from September 6, 2011 through his release on August 20, 2014.  *See* PSR at ¶44.

---

[4] Where documents were produced by the Government during discovery and pursuant to the protective order in place in this case, they will be filed but redacted from any ECF filing.  An unredacted copy shall be provided to the Court in a Courtesy copy.

Hon. Alison J. Nathan
May 5, 2017
Page 6

    In December 2015, Oneil violated parole and his parole was revoked for, *inter alia*, a new arrest, breaking curfew and for marijuana usage. *See* PSR at ¶ 44. He was returned to prison and was released from custody and returned to Parole supervision on February 2, 2016. *Id.*

    For the last few years, Oneil has been involved in a consensual relationship with Judy-Kaye Samuels, age 30, and they are now engaged to be married. *See* PSR at ¶ 56; *see also* Letter of Judy-Kaye Samuels, annexed hereto as Exhibit N. Ms. Kay-Samuels also relates that Oneil has a warm and loving relationship with her four year-old daughter and he has been there as a father figure in her life. *See* Exhibit N.

    *ii.      Oneil's Circumstances While in Detention.*

    As noted above, Oneil was shot on May 24, 2016, and after sustained multiple gunshot wounds.[5]  Oneil was either arrested on May 24, 2016, or within days thereafter while in the hospital. As a result of his injuries, Oneil was originally treated at ███████ Medical Center in the Bronx but he was transferred to ████████████ for rehabilitation services. Oneil has been at ██████████ since at least June 9, 2016. He has a private room, but is constantly handcuffed to the bed or wheelchair unless he in physical therapy.

    At ██████████, Oneil has received medical treatment and physical and occupational therapy for his spinal cord injuries. Oneil's stay at the hospital has nevertheless been extremely difficult. While in custody at the hospital, Oneil has been permitted only limited visitation and he is not permitted to make any unmonitored phone calls. The Marshal Service has refused to allow visits by anyone other than Oneil's mother and fiancé. There is no phone by Oneil's bed and phone calls are generally prohibited. The Marshal Service has allowed limited phone calls to Oneil's mom and fiancé when they will not be visiting, but I must make a formal request for Oneil to have such a call. Sometimes, even when a call is approved by the Marshal Service, the

---

[5] Oneil was shot by an individual named Aaron McFadzean and suffered multiple bullet wounds with some bullet fragments remaining inside of him. *See* Exhibit A. The circumstances related to how Oneil was shot are in dispute. Upon information and belief, and based upon conversations that I have had with AUSA Maimin, the Government believes that Oneil may have been shot in the course of a robbery. To date, Oneil has not been charged with a robbery and the defense disputes that version of the incident. The defense does not deny that on May 24, 2016, Oneil went to visit McFadzean. Upon information and belief, the two hung out and smoked some marijuana. At some point, McFadzean went into his house and returned with a semi-automatic firearm and opened fire on Oneil shooting him approximately six times. A weapon was recovered from McFadzean, while no weapon was recovered from Oneil. Oneil was hit in the face, arm, back and buttocks causing him to suffer a spinal cord injury and L1 Paraplegia. Medical records show that some of the bullet fragments are still inside Oneil. *See* Exhibit A. This incident is not discussed in the PSR.

Hon. Alison J. Nathan
May 5, 2017
Page 7

call still does not take place. In sum, Oneil is not permitted to use the phone without special permission. At best, he is permitted to speak with his mother once a week by telephone. Further, the guards who watch Oneil in place of the Marshal Service ███████████ have told me that they will not allow Oneil to write letters to friends and family and have indicated to me that they will not allow him to send any outgoing letters for security reasons.

## IV.    The Guidelines Calculations and Objections to the PSR.

The defense does not dispute the Guidelines calculation or the sentence recommended by the Probation Department. Further, Oneil does not deny his prior convictions or youthful offender adjudications. *See* PSR at ¶¶ 42-49.

Oneil does, however, contest some of the uncharged acts that the Probation Department has attributed to him and recited as background information in the PSR. The defense registered objections to certain uncharged crimes that the Probation Department mentions in the PSR at paragraphs 20-24. First, page 17, paragraph 20 of the PSR references an arrest on May 22, 2015, as proof of defendant's alleged crack dealing. Oneil does not dispute the arrest, but denies dealing crack at this time period. He admits that he was seeking to buy marijuana and that he was in possession of scales, but denies any crack distribution and no controlled substances were seized as a result of that arrest. On that day, Oneil was operating a motor vehicle that his girlfriend had rented, but Oneil was not listed on the rental agreement. Ultimately, Oneil was not charged and/or all of the charges against him were dismissed. *See* Exhibit O.

Additionally, the defense objects to and denies the allegations in paragraphs 22 and 23 regarding the alleged March 20, 2010 incident and the alleged July 14, 2011 robbery. *See* Exhibit O. These incidents that the Probation Department seeks to attribute to Oneil are episodes that Oneil denies and that the Government might have tried to prove had this matter proceeded to trial on the racketeering counts. *See* Exhibit O. at pp. 1-2. Oneil did not plead to the racketeering charge and the incidents are not relevant to whether Oneil committed the offense of conviction. Defendant's objections to these items in no way diminishes his admission of guilt and his guilty plea. Even if some of the incidents described by the Probation Department took place in some fashion, a sentence of 10 years to someone like Oneil, who will be in a wheelchair and who requires assistance ambulating, showering and toileting while in prison, is akin to a life sentence. There is no need for the Court to rely on those incidents in imposing sentence in this case.

Finally, the PSR suggests that Oneil should be assessed two criminal history points for committing the instant offense while under a criminal justice sentence. *See* PSR at ¶ 45. The PSR is incorrect. PSR does not identify the offense for which Oneil was allegedly under a criminal justice sentence at the time of his commission of the instant office. When the offense in this case was committed on September 4, 2011, Oneil was not yet under a criminal justice sentence as he had not yet been convicted of the robbery that took place on or about October 18, 2010 or the burglary charge from July 29, 2010. *See* PSR at ¶¶ 42-44. Thus, at the time of the offense, defendant was not subject to any criminal justice sentence, and accordingly, the criminal

Hon. Alison J. Nathan
May 5, 2017
Page 8

history score is six and the criminal history category should be category III.[6]  The response by the Probation Department is that "Dasilva was under parole supervision during periods of time when he committed overt acts in the conspiracy." PSR at p. 29.  Oneil did not plead guilty to the conspiracy and the overt act that he did plead guilty to, took place long before he was placed on parole supervision.

### V.   Other Factors

As set forth above, 18 U.S.C. § 3553(a) requires that the Court consider other traditional sentencing considerations like the need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to provide adequate deterrence;" "to protect the public;" "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" "to avoid unwarranted sentence disparities" and "the need to avoid restitution."  In this case, it is respectfully submitted that a lengthy custodial sentence, above the mandatory ten-year term that must be imposed pursuant to 18 USA § 924(c) is not needed to meet any of these goals.

### i.   The Seriousness of the Offense and Promoting Respect for the Law

There is no question that Oneil's conduct in this case of possessing and discharging a firearm and causing injuries is a serious offense.  There is also no question that Oneil is aware of the seriousness of the offense and that he regrets his misconduct.  *See* Exhibit F.

As a result of his conduct, Oneil has now been separated from his family, he is partially paralyzed and he will have to serve at least 10 years in a federal prison.  It is respectfully submitted that under the circumstances of this case, the 120 month mandatory minimum is a significant enough sentence to address the seriousness of the offense and to promote respect for the law.

### ii.   The Need to Provide for Adequate Deterrence

The goals of protecting the public, promoting respect for the law, and providing for adequate deterrence are all similar. They seek to promote good civic behavior and prevent crime. The 120 month mandatory minimum/guideline range is more than enough to punish Oneil and deter him or others from committing further crimes or to protect the public.

### a.  Specific Deterrence

18 USC § 3553(a)(2)(B) requires that the sentence provide adequate deterrence to criminal conduct.  This requires a Court to consider both "general" and "specific" deterrence.

Oneil's conviction in this case and the knowledge that he will have to serve a minimum of ten years before he can be released sends a loud and clear message to Oneil to never again

---

[6] While the recommended sentence does not change based upon the number of criminal history points, a guidelines calculation must still be done and it should be accurate.

Hon. Alison J. Nathan
May 5, 2017
Page 9

engage in criminal conduct.  He realizes that the violence that he engaged in as a teenager had horrible consequences and that those consequences could have been much worse.  In his letter to Your Honor, Oneil demonstrates a new level of maturity and remorse.  He acknowledges and recognizes how bad his conduct was, how he could have seriously hurt people and how he regrets his past conduct.

At 23 years old, having been paralyzed by someone else's bullet, Oneil understands the severity of his situation and his prior misconduct and he will be personally deterred from ever violating the law again.

There is no doubt that a sentence to the mandatory minimum term of 10 years for the violation of 18 U.S.C. § 924(c), would still be a significant punishment that would send a clear message to deter Oneil from engaging in any misconduct again.

> b. *General Deterrence*

A sentence to a 10 year mandatory minimum term will also satisfy the goal of general deterrence.

It is respectfully submitted further that there is no empirical relationship between sentence length and specific or general deterrence.  In all categories of crime, from white collar to drug offenses, from violent crimes to larcenies, severe sentences have proven not to deter crime. Indeed, studies have shown that lengthy sentences actually increase the rate of recidivism. *See* Lynne M. Vieraltis et. al., *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Pub. Pol'y 589, 591-93 (2007); U.S. Sent'g Comm'n Staff Discussion Paper, *Sentencing Options under the Guidelines* at 18-19 (Nov. 1996)[7]; Miles D. Harer, *Do Guideline Sentences for Low Risk Drug Traffickers Achieve Their Stated Purposes?* 7 Fed. Sent. Rep 22 (1994).

While many believe that the higher the sentence, the greater the effect in deterring others, research shows no relationship between sentence length and deterrence.  In fact, empirical research on general deterrence shows the opposite.  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).  To that end, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." *Id.*   Further, "[t]hree National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

Indeed, in a very recent study by the Sentencing Commission, the commission found that:

---

[7] Available at www.ussc.gov/Research/Working_Group_Reports/Simplification/SENTOPT.PDF (last visited May 1, 2017).

Hon. Alison J. Nathan
May 5, 2017
Page 10

> Offenders with shorter lengths of imprisonment generally had
> lower recidivism rates. For instance, offenders with sentences of
> imprisonment of fewer than six months had the lowest rearrest rate
> at 37.5 percent, followed by offenders with sentences from six to
> 11 months (50.8 percent), and 12 to fewer than 24 months (50.8%).
> Conversely, the highest recidivism rates are generally found
> among offenders with longer sentences.

*See generally Recidivism Among Federal Offenders*: *A Comprehensive Overview* ("*Recidivism*") (March 2016) at p. 22 (located at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf last visited 5/4/17).

The fact that "general deterrence" is not contemplated by people considering committing crimes is best demonstrated by the studies of white-collar crimes. For purposes of argument it can be rationally presumed that the white-collar criminal is the most rational of criminal offenders: if any criminal offenders were going to consider all of the pluses and minuses of committing a criminal act, a white collar criminal would be most likely to indulge in that exercise. However, the studies show that there is no difference in the deterrence factor between probation and imprisonment for white-collar offenders. That is, offenders given terms of probation were no more or less likely to re-offend than those given prison sentences.[8]

In a previous report on recidivism, the Sentencing Commission similarly found that:

> [t]here is no correlation between recidivism and Guidelines'
> offense level. Whether an offender has a low or high Guideline
> offense level, recidivism rates are similar. While surprising at first
> glance, this finding should be expected. The Guidelines' offense
> level is not intended or designed to predict recidivism.

*See generally* Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines (May 2004).[9]

In this case, as outlined above, the goal of general and specific deterrence can easily be met by the imposition of any term of incarceration because it is the fact of incarceration that deters, not the length of the sentence.  Further, in this case, the mandatory minimum sentence of 10 years for the instant offense is not an insignificant amount of jail time and would send a very strong message to anyone thinking of committing any crime in the future.  It is respectfully submitted that such a sentence is more than adequate to deter Oneil from ever committing an offense again.  Moreover, such a sentence is still very substantial and will serve as deterrence to anyone else considering committing a similar crime.  There is no reason to think that any greater

---

[8] David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995).

[9] A copy of which is available at: http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (last visited May 4, 2017).

Hon. Alison J. Nathan
May 5, 2017
Page 11

sentence is necessary to deter Oneil or the public any more than the ten-year mandatory sentence that must be imposed pursuant to 18 U.S.C. § 924(c).

In light of all of the above, it is respectfully submitted that the Court need not impose a sentence in excess of ten years to meet the objectives of protecting the public or deterrence.

> iii. *The Need To Provide The Defendant With Needed Educational Or Vocational Training, Medical Care, Or Other Correctional Treatment In The Most Effective Manner*

Section 3553(a)(2)(D) requires this Court to consider the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the "most effective manner." Thus, rehabilitation and the improvement of the defendant are express goals of sentencing. *See Harmelin v. Michigan*, 501 U.S. 957, 999 (1991); and *United States v. Giraldo*, 822 F.2d 205, 210 (2d Cir.), *cert. denied*, 484 U.S. 969 (1987). Rehabilitation is designed to instill "in the offender proper values and attitudes, by bolstering respect for himself and institutions, and by providing [] the means of leading a productive life." Charles E. Torcia, 1 Wharton's Criminal Law § 18 (15th ed. 1993).

Oneil certainly needs educational and vocational training and he can certainly get that training during the ten year term mandated by statute in this case.

With respect to delivering medical care, the Guidelines recognizes that "[p]hysical condition . . . may be relevant in determining whether a departure is warranted," and has always recognized that "in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." USSG § 5H1.4. The defense recognizes that this Court may not impose a sentence that is under the mandatory minimum of ten years in this case, but if a defendant's medical condition can serve as the basis for a downward departure or a downward variance, *a fortiori*, that it can also serve as the basis for a sentence at the 10 year mandatory minimum applicable to this case.

For the last 11-12 months, the Bureau of Prisons and/or the Marshal Service have been housing Oneil at a medical facility under armed guard and not at the local detention centers like the Metropolitan Correctional Center ("MCC") or the Metropolitan Detention Center ("MDC") because he has suffered a traumatic spinal cord injury and because he has needed and continues to need extensive physical rehabilitation. *See* Exhibit B (Letter of Dr. Marc Ross).

██████, Oneil's treating physician at ████████ explains that Oneil is:

> an L1 complete spinal cord injury sustained from a gunshot wound. He has made progress since his admission to our unit and is presently independent with mobility at a wheelchair level.

*See* Exhibit B. Further, Dr. ████ indicates that he believes that Oneil should not be placed in a regular prison setting and that Oneil will require the services of a prison hospital. ███████ writes:

Hon. Alison J. Nathan
May 5, 2017
Page 12

> At present, due to his spinal cord injury, Neil [sic] Dasilva cannot
> return to a prison setting. He will require assistance for ambulation.
> He will require a facility that can accommodate him using a
> wheelchair. He will have to be able to access bathrooms and
> showers using a wheelchair. I recommend a medical facility that
> can handle patients with his type of spinal cord injury.

*See* Exhibit B.  Clearly, Oneil will need help with all of his daily living activities including but
not limited to showering and using the restrooms.  *Id.*

The defense is concerned that Oneil may not receive effective medical care in a Bureau
of Prisons facility.  In that regard, an audit by the Office of the Inspector General found systemic
deficiencies in the Bureau of Prisons' delivery of health services.  It found that at a number of
institutions, the Bureau of Prisons "did not provide required medical services to inmates,"
including inadequate treatment for chronic conditions, failure to properly monitor side effects of
medication, allowing unqualified providers to render medical services, and failure to meet
performance target levels on treatment of serious conditions, including diabetes.  *See* U.S. Dep't
of Justice, Office of the Inspector General Audit Division, The Federal Bureau of Prison's
Efforts to Manage Inmate Health Care ii-xix, 32-34 (2008), available at
https://oig.justice.gov/reports/BOP/a0808/final.pdf  (last visited May 1, 2017).

Moreover, in a custodial environment, Oneil cannot simply go to the hospital or to his
primary care physician when he has a medical issue.  Rather, Oneil would first have to put in a
request for medical care.  That procedure itself has the potential to wreak havoc for someone,
like Oneil.  Further, in light of the Inspector General's audit, there is no reason to believe that a
regular Bureau of Prisons facility will provide "the most effective" medical treatment in a timely
manner.  This factor militates in favor of a sentence at or near the mandatory minimum of 120
months and in favor of a recommendation that Oneil be designated to a Federal Medical Center
instead of a regular Bureau of Prisons facility.

>         iv.    *Oneil's Mental Health Status Currently and at the Time of the Offense*

In anticipation of sentencing, the defense retained ███████████, a forensic
psychologist, to conduct a forensic evaluation of Oneil.  A copy of ████████ most recent
curriculum vitae (CV) is annexed hereto as Exhibit P.  As referenced above, ████████ report is
annexed hereto as Exhibit H.

Hon. Alison J. Nathan
May 5, 2017
Page 13



Exhibit H at p. 7.

██████████ examination of the defendant also revealed that Oneil is currently ██████████



Exhibit H at p. 11.

Further, ████████ acknowledges that Oneil improved when he previously received treatment while in custody. ████████ explains that the records from ██████████ and treatment reflect that:

Hon. Alison J. Nathan
May 5, 2017
Page 14



Exhibit H at p. 9.

Dr. ▮▮▮ explains further:



Exhibit H at pp. 12.

      In light of all of the above, we submit that Oneil's mental health issues and intellectual deficits had an impact on Oneil's willingness to engage in the conduct at issue in this case. The defense notes that pursuant to U.S.S.G. §5K2.13 there are times when a downward departure is warranted based upon a defendant's diminished capacity at the time of the offense. Here, no downward departure is being requested, but the defense points out that Dr. ▮▮▮ evaluation and report and the mental health records reviewed from when Oneil was in juvenile custody reflect that Oneil was suffering from several mental disorders and limited intellectual functioning from the time that he was a teen and which likely continued through the time of the offense at issue in this case. *See* Exhibit H. The fact that Oneil was suffering from mental health issues at the time of the offense militates in favor of mitigation at sentencing. Finally, the fact that Oneil appears to have been suffering with mental health issues at the time of the offense also militates against imposing a sentence in excess of the mandatory minimum in this case.

Hon. Alison J. Nathan
May 5, 2017
Page 15

> v.      *Oneil's Current Physical Condition*

As noted above, Oneil is considered an L1 paraplegic.  *See* Exhibit B.  He can only ambulate with assistance and while using a walker.  *Id.*   Although Oneil is considered continent in his bowel and bladder, "he requires effort to achieve continence" and has tremendous difficulty when urinating or defecating.  *Id.  see also* Exhibits F and G.  Medical records also reflect that Oneil still has bullets or bullet fragments inside his body that cause him pain.  *See* Exhibit A.  Clearly, Oneil's physical and medical condition has changed permanently and drastically from the time when he was on the streets and engaging in the conduct at issue in this case.

> The Guidelines recognize that a defendant's physical condition can be relevant to

>> whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.  An extraordinary physical impairment may be a reason to depart downward; <u>e.g.</u>, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

*See* U.S.S.G. §5H1.4.

In this case there is a mandatory minimum of ten years that must be imposed pursuant to 18 U.S.C. § 924(c)(1)(A)(iii) and the parties have agreed that there are no upward or downward departures or variances applicable under the circumstances.  *see* Exhibit D.   Nevertheless, Oneil's physical impairment and his current suffering is so significant that it militates in favor a sentence at the mandatory minimum of ten years.

> vi.      *Oneil's Remorse and Other Considerations*

Oneil knows that he committed a serious offense and that he must pay the price for his decision to engage in the conduct at issue in this case.  He sincerely regrets his conduct in this case.  First, at the time of his plea of guilty, Oneil articulated his remorse for his conduct.  *See* Transcript from December 8, 2016, annexed hereto as Exhibit E; *See also* PSR at ¶28.

In his letter to Your Honor, Oneil explains that he is remorseful for his conduct.  He writes:

> Judge I know what I did was wrong and I apologize to the victims and to the court and I'm sorry I was ever involved with any of this. If I could I would take it all back.

*See* Exhibit F.

It is respectfully submitted that the Oneil Dasilva that committed the offense in this case is not the same Oneil Dasilva who is appearing before Your Honor for sentencing.

Hon. Alison J. Nathan
May 5, 2017
Page 16

At the time of the offense in this case, Oneil was approximately 17 years old.  He was impulsive and reactionary and he had no positive male role models in his life.  He was wild, impetuous and dangerous.

Now, Oneil is an L1 paraplegic and he will never walk again without substantial assistance and he has difficulty voiding.  *See* Exhibit B, F and G.  Oneil's mother also recognizes that Oneil was too wild when he was younger and that he has now paid a heavy price.  She is worried about how depressed Oneil is now and what kind of life he will have in or out of prison. She writes:

> O'Neil [sic] DaSilva is paralyzed and may never walk again. Going to the bathroom is a grave concern because of spinal damage. Oneil is unable to control his urine and his stool has to be pulled out manually from his rectum by hand because the muscle in his rectum does not contract to allow for release of feces. He may never have a family of his own and may continue to feel pain for the rest of his life. Judge Nathan, I am here at your mercy and the mercy of the court.

*See* Exhibit F.

In the years since the offense, Oneil has matured.  He has come to realize that violence is no solution to anything.  Indeed, once he became the victim of a shooting, he realized how bad his conduct had been in the past.  He realized that he could have really hurt someone or killed someone when he was younger and he regrets all of his misconduct.  *See* Exhibit F.

He writes:

> I'm sitting here writing this letter from my wheelchair. Now I know firsthand what it's like to be shot and almost die. I got shot in the spine and now I'm paralyzed and I don't know if I will ever walk again. That made me think about how I could have possibly hurt people in the past and it made me feel very bad and I'm sorry.

*See* Exhibit F.

Hon. Alison J. Nathan
May 5, 2017
Page 17

## CONCLUSION

While Oneil participated in a serious offense, he has pleaded guilty, he acknowledged his guilt and he is remorseful for his misconduct.  In a certain respect, Oneil's case shows that old adage "what goes around, comes around" is very true.  Oneil, who previously discharged his firearm in a backyard which might have recklessly caused injuries to others has now suffered a life-changing serious spinal cord injury as a result of a firearms offence.   He is now an L1 paraplegic and it appears that he will always need some assistance while ambulating and that he will likely require assistance with showering and toileting as well.

In light of all of the above, we submit that the mandatory minimum sentence of 120 months will adequately punish Oneil for his misconduct, will account for the seriousness of the offense and will promote respect for the law and deterrence.

Based upon all of the above, we respectfully request that this Court temper justice with mercy and impose a sentence of no more than the 10 year mandatory minimum applicable to this case.

Respectfully,

Joseph A. Grob

cc:      AUSA Rachel Maimin