# CREIZMAN LLC

565 Fifth Avenue
7th Floor
New York, New York 10017
tel: (212) 972-0200
fax: (646) 200-5022
ecreiz@creizmanllc.com
www.creizmanllc.com

*By ECF and Federal Express*

May 25, 2017

The Honorable Alison J. Nathan
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

    Re:    *United States v. Shaquille Dewar*, 15-CR-95-021 (AJN)

Dear Judge Nathan:

    We submit this letter in connection with Shaquille Dewar's sentencing hearing, scheduled for June 1, 2017, for his guilty plea on December 20, 2016, to RICO conspiracy charged in Count One of Superseding Indictment S-2 on December 20, 2016.  Mr. Dewar was a member of the RICO conspiracy from age 16, when he joined, the Big Money Bosses gang until he was 20 years, when he was arrested by the NYPD for shooting at a rival gang member who had killed a close friend of his.  Following his arrest for that shooting on November 6, 2014, Dewar was incarcerated at Riker's Island until he was writted into the MCC in April 2016 on the present federal charges, where he has remained ever since.

    Mr. Dewar will be 23 years old this coming August.  For these past two years and six months, he has had time to contemplate his youth and the senseless cycle of violence intrinsic to gang life.  With the support of his family and his girlfriend, Kiana, who is a college student, he has made a conscious decision to change the trajectory of his life from the inevitable violence and despair of gang life to becoming a productive member of society.  He certainly has a support system to lean on when he is ultimately released from incarceration.  '

    For the reasons set forth in this letter brief, we respectfully submit that a sentence of 60 months' incarceration—the minimum sentence under New York State Law for attempted murder in the second degree, which Mr. Dewar's most serious conduct would be classified—is sufficient, but not greater than necessary to achieve the objectives of federal sentencing under 18 U.S.C. §3553(a).  Of course, pursuant to Section 5G1.3 of the Sentencing Guidelines, Mr. Dewar should be credited for having already served half of that proposed sentence (or, indeed, any

Hon. Alison J. Nathan
May 25, 2017
Page 2

sentence imposed by the Court)—17 months and 21 days in state prison on related conduct, and 14 months in federal prison on this case.

**Guidelines Calculation**

The district court is responsible for calculating the Guidelines range, and commits procedural error if it makes a mistake in its Guidelines calculation.  *See United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008).  As the Court admonished Mr. Dewar at his plea hearing:

> [I]f your lawyer or anyone has attempted to predict what your sentence would be, their prediction could be wrong.  No one, not your lawyer, not the government's lawyer—no one—can give you any assurance as to what your sentence will be, because I'm going to decide your sentence and I'm not going to do that right now.  I'm going to wait for the presentence report prepared by the Probation Department.  I will do my own independent calculation of the sentencing range.

Tr. of 1/30/17 Plea H'rg at 12-13.

Under the plea agreement, the government and Dewar stipulated to a total Guidelines offense level of 30, which corresponds to an advisory sentencing range of 97 to 121 months' imprisonment.  The Guidelines calculation was calculated using the two offenses to which Mr. Dewar allocuted: (1) the November 6, 2014 retaliation shooting that Dewar participated in when he was 20 years old, and for which he was arrested on state charges; (2) participation in a conspiracy to distribute and possess with the intent to distribute marijuana.  The November 6, 2014 shooting effectively was the only offense relevant for Guidelines purposes because of under the grouping Guidelines, the differential between the Guidelines for the shooting and the Guidelines for the marijuana distribution conspiracy was 9 or more levels.

The Guidelines range stipulated under the plea agreement was calculated based on a base offense level for attempted murder of 33 under Section 2A2.1(a)(1), which applies "if the object of the offense would have constituted first degree murder."  U.S.S.G. §2A2.1(a)(1).  Under New York Penal Law Section 125.27, a person is guilty of murder in the first degree where the intended victim was:

(i)     a police officer;

(ii)    a peace officer;

(iii)   an emergency responder who was engaged in emergency response activities at the time of the offense;

(iv)    a corrections officer on duty at the time of the offense;

(v)     a witness to a crime who was targeted to prevent his testimony in a criminal case;

(vi)    the target of a contract killing;

      (vii)    killed as part of a felony murder;

      (viii)   the target of defendant acting in an especially cruel and wanton manner for the purpose of inflicting torture on the victim;

      (ix)    killed after the defendant had already been convicted of murder; (xi) the target of a common scheme or plan by the defendant who had already killed two other people within the prior 24 months;

      (x)     a judge who was killed because he or she was a judge; and (ix) killed in furtherance of an act of terrorism.

*See* N.Y.P.L.§125.27.

      The Probation Department calculated the Guidelines level differently, determining that the object of the attempted murder about which Mr. Dewar allocated did not fall within any of the applicable categories necessary for conviction of first degree murder. *See* U.S.S.G. §2A2.1(a)(2). Indeed, the same November 6, 2014 attempted murder for which Mr. Dewar was charged by the State in *People v. Shaquille Dewar*, 2014-BX-059495, was a Class B felony based on an intention consistent with second degree murder under New York Penal Law Section 125.25. *See* Ex. A (N.Y. State Division of Criminal Justice Services, Repository Inquiry) at 3; Ex. B (N.Y. Penal Law Section 125.25).[1] Under Section 2A2.1 of the Guidelines, the applicable base offense level is 27. When grouped with the offense level for the marijuana distribution conspiracy, one additional level is added, for a total adjusted offense level of 28. Subtracting three levels results for Mr. Dewar's acceptance of responsibility results in the total offense level of 25, as calculated by the Probation Department. Based on a criminal history category of II, Mr., Dewar's sentencing range, as calculated by the Probation Department, is 63-78 months. The Probation Department recommends a sentence of imprisonment of 63 months.

**Sentencing Considerations**

      A Guidelines sentence is not presumptively reasonable for any particular defendant, and, accordingly, a district court must conduct its own independent review of the sentencing factors under 18 U.S.C. § 3553(a) to fashion appropriate sentence. *See Nelson v. United States*, 555 U.S. 350, 352 (2009). Under Section 3553(a), the court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant." Id. § 3553(a)(1), and then, fashion a sentence that is "sufficient, but not greater than necessary" to, in pertinent part: (i) "reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense." (*Id.* § 3553(a)(2)(A)); (ii) "afford adequate deterrence to criminal conduct" (Id. § 3553 (a)(2)(B)); "protect the public from further crimes of the defendant" (*Id.* 3553(a)(2)(C)); and (iv) "provide the defendant with needed . . . medical care . . . in the most

---

[1] Mr. Dewar's state court charges, based on conduct related to the offense conduct that is the subject of the charges here (PSR at page 34) were dismissed on April 24, 2017.

Hon. Alison J. Nathan
May 25, 2017
Page 4

effective manner." (*Id.* § 3553(a)(2)(D)).  The "sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *Cavera*, 550 F.3d at 188.

### I.     The Nature and Circumstances of the Offense

Like the young man he shot, Mr. Dewar was influenced at a young age to join a gang. Gang membership gave Dewar a sense of community and belonging.  When he was just 17 years old, about a year into his membership in the BMB, Dewar had clearly felt a strong sense of identity as being part of the BMB, posting such messages on Facebook as:

- "BmB The Team."

- "All Ma 'BMB' Bross InBoxx Me wen Yall see This"

- "Nikkaz Got Bmb In They F.B. Name And Aint Doing Shit For BMB . . . Nikkaz Kill Me."

(PSR ¶36).  Dewar took pride in his group, and considered his fellow BMB members as if they were family.  *Id.*  Naturally, and as is the sad, pointless nature of gang life in the inner city, Dewar and a fellow BMB member sought revenge after a rival gang member shot and killed one of his closest friends.  *Id.* ¶37.  To be a member of BMB meant that revenge had to be taken.  As Dewar once posted at age 17, "Nikkaz Kant Jack Dis Shit If They Not Bout It." *Id.* ¶36.  Living the gang life means being a potential target of violence and committing violence.  It's a childish and senseless moral code that nonetheless holds substantial appeal to poor children from broken families who feel the need to be a part of something larger than themselves.  This is a lifestyle that has plagued so many poor communities in this country for hundreds of years.

Dewar was essentially a child when he committed the offenses at issue and acted like one, more concerned about keeping his integrity as a gang member than aspiring to do something better with his life.  Much like the man who he shot.

### II.    Shaquille Dewar's Personal and Family Circumstances

#### A.  Shaquille Dewar has demonstrated the potential of becoming a productive, law abiding member of society.

Although Shaquille has committed very serious crimes, for which he has accepted responsibility, there is good reason to believe that during the time he has been incarcerated and, even before, that he will not become a recidivist and spend most of his adult life in prison. Rather, there is a very real likelihood that Shaquille will make something of himself.  One of those reasons is his girlfriend, Kiana Wright, with whom he has had a committed relationship for the past few years, after a long friendship before that.  Ms. Wright has studied in college and aspires to complete her schooling, working to earn enough money to pay for it.  (PSR ¶¶86-87). She is a church-going person who will not tolerate Shaquille ever returning to gang life or

committing crimes. Kiana talks with Shaquille on a daily basis. While she was not aware of his gang activity, and would not have become romantically involved with him had she knew about it, what she was attracted to was Shaquille's devotion to his family. (PSR ¶88).

Kiana believes that her influence, along with what she has recognized as Shaquille's genuine desire to "do it straight" going forward, will enable Shaquille to become a productive, law-abiding member of society. Both Kiana and Shaquille have talked about moving out of the Bronx to upstate New York, in Middletown, where Kiana's family owns a house, so that he can avoid the distractions and poor influences that led to his arrest. If actions speak louder than words, Shaquille has voluntarily taken and successfully completed an anger management course at the MCC.

Shaquille's past history provides further basis for hope. Beyond his BMB "family," by all accounts, Shaquille's flesh-and-blood Family means everything to him. At every court appearance, members of Shaquille's family have shown up. I have personally received calls regularly from his family members and from Kiana asking what they can do to help him. The collection of letters from Shaquille's friends and family members speaks volumes about him. Shaquille's arrest has had adverse consequences on his family's life. As Shaquille's mother, Natasha, reported to the Probation Department, she has had to limit her work hours to watch Shaquille's younger siblings. Shaquille used to do that for her. (PSR ¶84). And Shaquille's sister, Janesha, misses her brother, sometimes asking "to wear his clothing, . . . sleep in his bed, . . . [and] if there is any possibility he might be present for her 'Sweet 16' party." (*Id.*).

The anecdotes from the letters submitted to the Court in support of Shaquille present a different side of him than the dangerous gang member portrayed in the Indictment. Indeed, every Sunday, without fail, his mother Natasha cooked a big meal. His favorite dishes that she made were lasagna, baked ziti, and oxtail. For Shaquille, those Sunday meals, when family and friends got together around his mother's table, were the highlight of the week. But on Mondays, Natasha went to her job at Marshalls. Then, for the rest of the week, Shaquille took over as caregiver for his sister Janasha, who is now twelve, and his brother Kimarlie, who is now three. Shaquille looked after them and prepared food for them; he helped Janasha with her homework when she got home from school. Though raised without a father and barely an adult himself, Shaquille rose to the challenge of being the father-figure for Janasha and Kimarlie as well as for his sisters Hydeia and Kalesha. This is the Shaquille that comes through in the enclosed letters of support: a family-oriented, sensitive, respectful, resourceful and intelligent young man.

Shaquille has previously demonstrated his perseverance and ability to overcome significant obstacles. By all accounts, Shaquille was always a good student. Throughout elementary and middle school, he received good grades and was well liked by his teachers and classmates. However, in 2013, during Shaquille's sophomore year at DeWitt Clinton High School, his paternal grandfather Cleveland Dewar was diagnosed with terminal cancer, which had spread to his brain. The months that followed were extremely difficult for Shaquille. He remembers vividly the pain he felt when he visited his grandfather at the hospital. Cleveland Dewar was the kind of person who always lifted the spirits of those around him, but now he could communicate with his beloved grandson only by squeezing his hand. Cleveland died in December 2013. For Shaquille, the grief was overwhelming; life lost all meaning. Two of

Hon. Alison J. Nathan
May 25, 2017
Page 6

Shaquille's closest friends were murdered around the same time. Shaquille dropped out of school. Desperate to ease the pain, he started abusing alcohol and marijuana.

Yet Shaquille did not succumb, at least not entirely. His mother pushed him to return to school and get his degree. Shaquille found the will to lift himself up, despite the personal tragedies and bad influences that were pulling him down. He enrolled at Bronx Arena High School, a credit recovery school for over-age students, and in June 2014 he earned his high school diploma. At the time of his arrest in November 2014, Shaquille had applied to colleges and was accepted by Fulton Montgomery Community College. He hoped to continue his studies as the best path towards escaping a life of criminality and despair.

### B. Shaquille Dewar's background and character.

Shaquille was born out of wedlock on August 19, 1994 in Philadelphia, Pennsylvania. (PSR ¶ 77). His mother, Natasha Campbell, and his father, Charles Dewar, never lived together. When Shaquille was about five years old, he and his mother moved to the Bronx. Shaquille's father was not a significant presence in his life thereafter, and he did not provide Shaquille any financial support. In April 2006, when Shaquille was eleven years old, his father was arrested on drug charges and was subsequently deported to Jamaica (PSR ¶¶ 79-80).

Money was tight while Shaquille was growing up, but his mother provided for him and his younger siblings as best she could. Shaquille says she was always working, but she nevertheless had a strong bond with her children. (PSR ¶ 81). Shaquile loves and respects his mother, and as he has grown up, he has done his best to help her, especially by watching his younger siblings, Janasha and Kimarlie, while his mother was at work.

The conscientiousness instilled in Shaquille by his mother is a common theme in the letters of support addressed to the court. For example, Claudette Costley-Lodge, who is the mother of one of Shaquille's friends, writes, "I am proud of his commitment and devotion to his family and respect him for being the person he is." (Ex. C). Onika Grant, a former girlfriend, writes, "[H]e is … very caring. He tends to make sure everyone around him is okay before tending to his own needs." (Ex. D). And Monique O'Garro relates how "Shaquille had aspirations of going away to college, but was deterred by wanting to stay and help his mother take care of his younger siblings." (Ex. E). Monique calls Shaquille a "decent and humble young man." (*Id.*). Shaquille's current girlfriend, Kiana Wright, also describes Shaquille as "very humble" as well as "family oriented." (PSR ¶ 87).

Janasha and Kalesha are too young to write about what their brother means to them. However, Natasha told the probation officer who visited her home that Janasha especially misses her older brother (PSR ¶ 84). Shaquille's other sisters, Hydeia, Kalesha and Ashleigh, have written letters describing the profound positive influence he has had on their lives. Hydeia writes:

> I believe we were blessed with Shaquille's guidance, protection, and encouraging words. He has given me advice that I still hold dear to this

        day. Shaquille has also filled in all the empty spaces that a father was much needed in.

(Ex. F). Similarly, Kalesha Dewar writes:

> I am currently a junior at East Stroudsburg University and I am majoring in Biotechnology. I worked very hard to get where I am today and I couldn't have pushed through the way I did without my brother…. He was always there telling me that I could be the greatest I could be no matter what. He always pushed me to my fullest potential. Shaquille made sure that me and my sisters always had someone to turn to no matter what.

(Ex. G). Ashleigh Dewar writes, "We all miss him so much." She goes on to say that Shaquille is "such a strong person and he is truly the rock in our family." (Ex. H).

      Another theme in the letters is Shaquille's acute intelligence. Everyone who knows him recognizes that he is a person of great potential. Onika says:

> Shaquille is also very smart…. He was determined to graduate high school, and he did just that. No matter how overwhelming it became, he did everything that was required because that was a very important goal for him especially because it wasn't a common goal for many of the people around him.

(Ex. D). His friend's mother, Claudette, writes that Shaquille "is a very smart young man, filled with great potential." (Ex. H).

      It was difficult to nurture Shaquille's intelligence in the environment in which he grew up. Shaquille excelled in middle school – he attended John Phillip Souza in the Bronx – and especially enjoyed history, social studies and math. He was popular among his fellow students and was a sprinter on the track team. Things got much tougher, however, as he grew older. He was enrolled in high school at DeWitt Clinton. He had problems there. Other students bullied him because he was the only kid in his class from his neighborhood in the Bronx. During his freshman year, he developed severe asthma and had to quit the track team. Shaquille asked a counselor to help him find another school, but no one helped him. As a result, he started cutting school and spending time with friends who were a bad influence on him.

      During this difficult time in his life, Shaquille got involved in an organization called New York Youth Club. The organization's director, Nathan Jackson, writes that Shaquille was held "in the highest regard" within NYYC and that Shaquille had a positive influence on his peers. (Ex. I). However, there were two sides to Shaquille. One was "productive, respectful, humorous and sensitive to the needs of others." (*Id.*). But the other made "life-scarring choices" that ultimately resulted in his incarceration. Nathan writes that, in his view, the first Shaquille is the "real" Shaquille. (*Id.*).

Hon. Alison J. Nathan
May 25, 2017
Page 8

A watershed event, as discussed above, was the death of Shaquille's grandfather in 2013. Cleveland Dewar had a personality like Shaquille's. He was funny and caring. He lifted up the people around him and knew how to make others happy. He was a family man. Sadly, cancer struck him down, very quickly. Shaquille would visit him at Jacobi Medical Center on Pelham Parkway, and was heartbroken when his grandfather died.

Shaquille was also profoundly affected by the deaths of two of his closest friends, Antonio Lyles and Quaysean Thomas. Onika, who was Shaquille's girlfriend at the time, saw the change in him:

> After two of his friends were killed, it was hard for Shaquille to be his normal, funny, witty self. I witnessed Shaquille randomly break down and cry numerous times because he would have flash backs of memories with his friends. … I know in Shaquille's instance, he didn't know how to correctly cope and grieve, so instead he lashed out to hinder his true emotions. Shaquille has been very emotional and sensitive since he was young, and for a young man being as emotional as Shaquille is is sort of frowned upon, so he tried to hide those emotions as best he could, which led to anger instead. (Ex. D).

Onika's account vividly encapsulates the pain Shaquille was experiencing in 2013 and 2014. For this sensitive and intelligent young man, who essentially never had a father and for whom positive role models were few and far between, the grief was too much to bear. Onika says he was overcome with anger. He also looked for an easy way out by turning to alcohol and marijuana. He dropped out of school entirely.

But Shaquille did not completely descend into darkness. His mother helped pull him up by demanding that he finish high school. He could have ignored her. But the old Shaquille, the one who dreamed of going to college, had survived. He enrolled in a credit recovery program. Arena High School was a better environment for him than DeWitt Clinton had been. The classes were smaller, and the school was more orderly. Shaquille got his diploma. Monique O'Garro writes that Shaquille was "so excited and proud of himself when he finished" his high school degree. (Ex. E). Others were proud of Shaquille as well; his mother Natasha says the school put Shaquille's picture up on the wall to inspire others.

Unfortunately, the other Shaquille, the one who made bad choices, eventually dragged down the Shaquille who was so proud of earning his diploma. Shaquille allowed himself to succumb to bad influences, and now he regrets the destructive choices he made. His remorse for the crime he committed is another refrain in his letters of support. Shaquille's sister Ashleigh writes:

> I know he regrets the decisions he made that got him into this situation he is in now…. He's matured so much, his attitude is so much different and I'm glad to know that he's learning from his mistakes and wants to be a better man and is ready to turn his life around and make something of himself.

(Ex. H).

It is not too late for Shaquille. He is still only 22, and by the end of the summer will be 23. As Monique writes, "Shaquille is a very smart young man and I feel if he is given the opportunity to be released and received some additional education and job training he would be a productive citizen." (Ex. E). Shaquille is realistic about the impact his actions and guilty plea will have on his future. While he still hopes to go to college, he is now focusing more on learning a trade after his release, so that he can support himself and help his family financially as well.

### C. The goals of just punishment and general deterrence will be satisfied by a sentence of 60 months' imprisonment.

A sentence of 5 years is the minimum sentence in New York State for the principal offense—the November 6, 2014 shooting—that Mr. Dewar engaged in. It must be remembered that Mr. Dewar's crime was committed at the age of 20, when he was deeply influenced by the gang lifestyle. He shot the rival gang member because of the uncontrollable rage he felt because that gang member murdered his friend. Shaquille is older now, has a better sense of himself, is in a committed relationship, has worked to improve himself in prison (including successfully completing an anger management course), and is committed to living a law-abiding life and getting away from the Bronx—starting anew.

### D. The goals of specific deterrence will be satisfied by a sentence of 60 months' imprisonment.

Mr. Dewar has demonstrated tremendous promise as a family man, who is kind, sensitive, and caring, He has demonstrated the aptitude to succeed intellectually in the outside world and to get a job. And he has a support system of family members, Kiana, good friends, and role models, to whom he can turn to keep him out of trouble. Mr., Dewar has seen the pain he has caused his mother and the siblings he has cared for. He understands and is remorseful for the impositions that his absence has caused on his family's day-to-day life. The "personal . . . and family consequences [Mr. Dewar has] experienced will likely deter him] from future misconduct." *United States v. Redemann*, 295 F. Supp. 2d 887, 897 (E.D. Wis. 2003).

### E. A sentence of 60 months' imprisonment will promote rehabilitation.

The prisons in this country are inundated with gang members serving draconian sentences, losing all hope for a productive life. At some point, the influence of fellow inmates in such an environment, where altercations are common, gang culture is elevated, and criminality is admired, will only leave someone like Mr. Dewar, who has promise, demoralized, with low expectations, and seeing crime as the only option to turn to. It does not have to be this way. It should not be this way in this case.

Hon. Alison J. Nathan
May 25, 2017
Page 10

Courts in this Circuit have long recognized that rehabilitation is a powerful basis to impose a sentence below the Guidelines range.  *See United States v. Bryson*, 163 F.3d 742, 747 (2d Cir. 1998) ("This Court has held that a sentencing judge may exercise discretion and depart from the applicable guideline range in light of a defendant's efforts toward rehabilitation, provided those efforts are extraordinary.").  Indeed, "the power to depart may be based upon significant pre-sentence rehabilitation and the probability of continuing steps toward permanent good behavior."  *United States v. Rosado*, 254 F. Supp. 2d 316, 320-21 (S.D.N.Y. 2003) (granting downward departure for extraordinary rehabilitation where the defendant obtained his high school equivalency degree, appeared to have given up drug use, found employment, and had begun supporting his children).

As the sentencing letters written on his behalf demonstrate, Mr. Dewar has the support of his friends and family in moving forward and leading a law-abiding life upon his release.  His close relationship with his family members and Kiana and his desire to provide for them also provides Mr. Dewar powerful incentives to avoid any criminal behavior in the future.  *See United States v. Smith*, 08-CR-545 (JBW), 2009 WL 971682, at *2 (E.D.N.Y. April 2, 2009) (imposing a below-Guidelines sentence where court found it was "unlikely that defendant [would] engage in further criminal activity in light of his family circumstances, expressions of remorse, and his stated desire to use treatment programs to improve himself and lead a law-abiding life"); *DeJesus*, 75 F. Supp. 2d at 144 (Defendant "is now a husband and first-time father, and this responsibility provides a strong incentive for rehabilitation.").

Mr. Dewar has demonstrated that he is capable of leading a productive life and doing the right thing, and, with the support of his family and friends, he has both the desire and the ability to succeed in the future.  Accordingly, a below-Guidelines sentence of 60 months' imprisonment, and crediting his 31 plus months already served towards that sentence, is appropriate to encourage and help Mr. Dewar get a second chance as a young adult, while he still has the hope and will to succeed.

**Conclusion**

For the foregoing reasons, we respectfully submit that a sentence of no greater than 60 months' imprisonment, for which he has already served approximately half, is sufficient, but not greater than necessary to satisfy the goals of sentencing.

Respectfully,

/s/ Eric M. Creizman
Eric N. Creizman
Zachary S. Taylor

Attachments

cc:     Rachel Maimin
        Assistant United States Attorney