IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
UNITED STATES OF AMERICA,
Plaintiff,

S2 15 Cr. 95 (AJN)

v.

NICO BURRELL,
Defendant.
-------------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF PRE-TRIAL MOTIONS BY NICO BURRELL


*By*:   Judith Vargas
        Ying Stafford
        George Goltzer
        Attorneys for Nico Burrell

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ...............................................................................1

**FACTUAL BACKGROUND**

A.     The Highly Publicized and Celebrated "Take Down" 120 in the Bronx.....................1

B.     The Timeline of Events of the Case Against Mr. Burrell Reveal
       a Troubling Fact – The Entire Case is Premised Upon Co-Conspirator
       Cooperators and not a Real Police Investigation.................................................5

**POINT ONE**

**FUNDAMENTAL FAIRNESS REQUIRES DISCLOSURE OF ANY
AND ALL IDENTITIES
OF INFORMANTS**.................................................................................7

A.     Disclosure of *Brady/Giglio* Must be Immediate.........................................8

B.     Due Process Requires the Immediate Disclosure of
       Exculpatory Evidence...................................................................9

C.     Mr. Burrell Requests the Early Disclosure of *Jenks* Material
       30 Days Prior to Hearings or
       Trial.................................................................................11

**POINT TWO**

**THE GOVERNMENT SHOULD ALSO IMMEDIATELY
DISCLOSE ANY AND ALL CONTACT BETWEEN
GOVERNMENT AGENTS OR PROSECUTORS AND
POTENTIAL JAILHOUSE INFORMANTS
INCARCERATED WITH MR. BURRELL** ...............................................13

**POINT THREE**

**AFTER REVIEW OF *BRADY/GIGLIO* AND *JENCKS* AND
DEFENSE COUNSEL DETERMINES THAT THERE
IS A SUFFICIENT BASIS THAT FALSEHOODS WERE
PRESENTED TO THE GRAND JURY THROUGH THE
WITNESSES AND/OR THE GOVERNMENT, MR. BURRELL
REQUESTS INSPECTION OF THE GRAND JURY MINUTES**.............................16

**POINT FOUR**

**A RELIABILITY HEARING IS WARRANTED
TO PROTECT THE INTEGRITY OF THE TRIAL**................................................19

A.      Introduction.................................................................................19

B.      Legal Background..........................................................................21

C.      Cooperating Co-conspirators Are Inherently Unreliable.........................23

D.      Cross Examination is an Insufficient Guarantee of
         Mr. Burrell's Right to Due Process...................................................24

E.      A Pre-trial Reliability Hearing Would Protect the Integrity of the Case...........29

        1.   The Court has the Authority to Conduct a Reliability Hearing
             Under the Federal Rules of Evidence.........................................29

        2.   The Principles of *Daubert* Support the Holding of a
             Reliability Hearing..............................................................29

        3.   A Reliability Hearing is Warranted on the Facts of this Case.............30

        4.   Defense Should Be Given Power to Provide Immunity
             to its Witnesses in Fairness to the Defense................................31

**POINT FIVE**

**SPECIFIC REQUESTS CONCERNING GOVERNMENT'S
USE OF INFORMANTS, OPERATIVES AND
COOPERATING INDIVIDUALS**................................................................33

**POINT SIX**

**THE GOVERNMENT SHOULD IDENTIFY ANY SOCIAL MEDIA
THAT IT INTENDS TO INTRODUCE AT
TRIAL**............................................................................................38

**POINT SEVEN**

**THE COURT SHOULD PRECLUDE ANY RAP VIDEOS OR RAP MUSIC IN THIS
CASE**..............................................................................................39

A.      Mr. Burrell's Rap Lyrics are Entitled to heightened Protection
         Under State and Federal Free Expression Clauses...............................41

1.   The Rap Lyrics Are Protected Speech Under the Federal
     Constitutions..................................................................................41

B.   The Rap Lyrics Constitute Political and Social Discourse
     Entitled to Heightened Scrutiny.............................................................43

C.   The Admissibility of the Rap Lyrics as "Abstract Beliefs" is
     not Probative of Any Material Issue........................................................45

D.   Strict Guidelines as to the Admissibility of Fictional, Artistic Works are
     Necessary to Avoid a Chilling Effect on Free
     Expression...................................................................................45

E.   The Recent Holding in *State v. Vonte Skinner* Provides Some
     Guidance to the Court........................................................................49

## POINT EIGHT

**THE AFFIDAVIT SUBMITTED TO THE COURT THAT AUTHORIZED
THE TITLE THREE WIRETAP ON MR. BURRELL'S PHONE
CONTAINED FALSE STATEMENTS THAT WERE
KNOWINGLY AND INTENTIONALY MADE WITH A RECKLESS
DISREGARD FOR THE TRUTH AND THEREFORE THE
WIRETAP EVIDENCE MUST BE SUPRESSED**.....................................................50

A.   The Statutory Basics, Probable cause, and Franks............................................50

B.   Mandatory Suppression is the Remedy for Violations of TITLE III.........................55

## POINT NINE

**WE REQUEST MR. BURRELL'S RIGHTS BE PRESERVED
UNDER ANY POTENTIAL *JOHNSON V. UNITED STATES*[1]
RELATED ISSUE** ...............................................................56

## POINT TEN

**MR. BURRELL REUESTS TO BE PERMITTED TO JOIN IN
ANY MOTIONS MADE BY HIS CO-DEFENDANTS**.........................................57

---

[1]   *Cf. Beckles v United States*, 137 S.Ct. 886, 197 L.Ed.2d 145, 85 USLW 4086 (March 2017).

## POINT ELEVEN

**DEFENDANT REQUESTS PERMISSION TO MAKE ANY
ADDITIONAL MOTIONS THAT MAY BECOME NECESSARY
AS A RESULT OF FURTHER DISCOVERY**……………………………………………………57

**CONCLUSION**………………………………………………………………………………57

## *TABLE OF AUTHORITIES*

*Alderman v. United States*, 394 U.S. 165 (1969)..................................................................................19

*Appellate Court of Ill. v. Spraggins*, 723 N.E. 2d 359 (Ill. App. 1999)..............................46

*Bates v. Little Rock*, 361 U.S. 516 (1960).................................................................................47

*Best v. District of Columbia*, 291 U.S. 411 (1934).................................................................11

*Beckles v United States*, 137 S.Ct. 886, 197 L.Ed.2d 145, 85 USLW 4086
(March 2017)................................................................................................................................56

*Bank of Novia Scotia v. United States*, 487 U.S. 250 (1988)..............................................17

*Barnes v. State*, 469 So.2d 126 (Miss. 1984)...........................................................................17

*Brady v. Maryland*, 373 U.S. 83 (1963)...............................................2, 9, 10, 11, 12, 16

*Berger v. United States*, 295 U.S. 78 (1935).............................................................................27

*Boss v. Barry*, 485 U.S. 318 (1988)...........................................................................................47

*Cook v. State*, 45 S.W.2d 820 (Ark. 2001).......................................................................46, 48

*Commonwealth of the Northern Mariana Islands v. Bowie*, 243 F.3d 1109 (9th Cir. 2001)......22

*Crawford v, United States*, 212 U.S. 183 (1908)..................................................................15

*D'Agostino v. State*, 823 P.2d 283 (Nev. 1992).....................................................................15

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579  (1993)..............................29, 30

*Dawson v. Delaware*, 503 U.S. 159 (1992)...............................................................................45

*Dodd v. State*, 993 P.2d 778 (Ok. Crim. App. 2000)......................................................14, 30

*Dombrowski v. Pfister*, 380 U.S. 479 (1965)............................................................................47

*Dun & Bradstreet. Inc. v. Greenmoss Builders, Inc*., 472 U.S. 749 (1985) .........................43

*First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765 (1978).................................................43

*Garrison v. Louisiana*, 379 U.S. 64 (1964)..............................................................................43

*Giles v. Maryland* 386 U.S. 66 (1967).........................................................................................9

*Gelbard v. United States*, 408 U.S. 41 (1972)............................................................................19

*Gibson v. Florida Legis. Investig. Comm*., 372 U.S. 539 (1963).......................................47

*Golino v. City of New Haven*, 950 F.2d 864 (2d Cir. 1991)..................................................55

*Greene v. Commonwealth*, 197 S.W. 3d 76, 85 (Ky. 2006)...................................................46

*Hallinan v, United States*, 182 F.2d 880 (9th Cir. 1950)......................................................10

*Hannall v. State*, 23 A. 2d 192  (Md. 2009).............................................................................46

*Hoffa v. United States*, 385 U.S. 293, 311 (1966)....................................................................25

*Holmes v. State*, 608 S.E. 2d 726 (Ga. Ct. App. 2004)............................................................48

*Hurley v. Irish American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995)......41

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988).................................................................44

*Illinois v. Gates*, 462 U.S. 213 (1983)......................................................................................53

*In re Boston Globe Newspaper*, 729 F. Supp. 47 (1st Cir. 1984)........................................41

*Johnson v. United States*, 135 S.Ct. 2551 (2015)...................................................................56

*Joynes v. State*, 797 A. 2d 673 (Del. 2001)..............................................................................46

*Kuhlmann v. Wilson*, 477 U.S. 436 (1986).............................................................................14

*Lilly v. Virginia*, 527 U.S. 116 (1999)..............................................................................14, 15

*Lamont v. Postmaster General*, 381 U.S. 301 (1965)............................................................47

*Lee v. United States*, 343 U.S. 747 (1952)........................................................................15, 21

*McLawhorn v. State of North Caronna*, 484 F.2d 1  (4th Cir. 1973)...................................7

*McNeal v. State*, 551 So. 2d 151 (Miss. 1989).........................................................................15

*Maine v. Moulton*, 474 U.S. 159 (1985).....................................................................................13

*Massiah v. United States*, 377 U.S. 201 (1964)……………………………………………………13

*Maxwell v. Roe*, 628 F.3d 486 (2010),……………………………………………………………13

*NAACP v. Button*, 371 U.S. 415 (1963)……………………………………………………………47

*Napue v. Illinois*, 360 U.S. 264 (1959)………………………………………………………..9, 21

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)……………………………………………43

*People v. Olguin*, 31 Cal. App. 4th 1355 (Cal. Ct. App. 1994)……………………………...46, 48

*People v. Calbud*, Inc., 49 N.Y.2d 389 (1980)……………………………………………………18

*People v. Wright,* 2004 WL 516250 (Cal. App. Ct. 2 Dist., Mar. 17, 2004)……………………46

*Sandoval v. United States.* 426 U.S. 952 (1976)…………………………………………………15

*Sellers v. Estelle*, 651 F.2d 1074 (5th Cir. 1981)…………………………………………………10

*Silva v. Brown*, 416 F.3d 980  (9th Cir. 2005)……………………………………………………22

*Snyder v. Phelps*, 562 U.S. 443 (2011)………………………………………………..,40, 43

*State v. Allen*, 2006 N.C. App. LEXIS 1880 (N.C. App. 2006)…………………………………46

*State v. Edgar Goldsberry*, Ill. App. Ct., 1st Dist., 2nd Div. (decided Feb. 22, 1994)…………..46

*State v. Ross*, 561 So.2d 1004 (La.App. 4 Cir. 1990)……………………………………………16

*State v. Morris*, 444 So.2d 1200 (La. 1984)………………………………………………………16

*Street v. New York*, 394 U.S. 576 (1969)……..………………………………………………41

*Strickler v. Greene*, 527 U.S. 263 (1999)……………………………………………………....8

*Stewart v. Donges*, 915 F.2d 572 (10th Cir. 1990)………………………………………………54

*State v. Tirius*, 92 S.W. 3d 751 (Mo. 2002)………………………………………………………46

*Supreme Court v. Vonte Skinner Docket* No. A-57/58-12 (07164)………………………………49

*Rankin v. McPherson*, 483 U.S. 378 (1987)………………………………………………………43

*Reno v. ACLU*, 521 U.S. 844 (1997)……………………………………………………………47

*Rivera v. United States*, 928 F.2d 592 (2d Cir.1991)…………………………………………54-55

*TIBBS v, State,* 337 So.2d 788 (Fla. 1976)………………………………………………………15

*United States v. Bagley*, 473 U.S. 667 (1985)……………………………………………………9

*United States v. Bernal-Obeso*, 989 F.2d 331 (9th Cir. 1993)……………………………….....22

*United States v. Brio,* 907 F.2d 392, 394 (2d Cir. 1990)…………………………………………17

*United States v. Campino*, 890 F.2d 588  (2d Cir.1989)…………………………………………55

*United States v. Cederquist*, 641 F.2d 1347 (9th Cir. 1981)……………………………………18

*United States v. De Rosa*, 783 F.2d 1401 (9th Cir.)……………………………………………16, 17

*United States v. Dinitz*, 424 U.S. 600 (1976)……………………………………………………11

*United States v. Elmore*, 423 F.2d 775 (5th Cir. 1970)…………………………………………10

*United States v. Eniola*, 893 F.2d 383 (D.C. Cir. 1990)…………………………………………7

*United States v. Foster*, 939 F.2d 445 (7th Cir. 1991)………………………………………46, 48

*United States v. Gleason*, 265 F. Supp. 880 (S.D.N.Y. 1967)…………………………………10

*United States v, Henry*, 447 U.S. 264  (1980)……………………………………………13, 14

*United States v. Hinton*, 631 F.2d 769 (D.C. Cir. 1980)………………………………………..12

*United States v. Holmes,* 722 F.2d 37 (4th Cir. 1983)……………………….........11, 12

*United States v. Isgro*, 974 F.2d 191 (9th Cir. 1992)…………………………………………16, 17

*United States v. Marshank*, 777 F.Supp. 1507 (N.D.Cal. 1991)………………………………16

*United States v. Marin-Buitrago*, 734 F.2d 889 (2d Cir. 1984)…………………………………55

*United States v. Mccrane*, 527 F.2d 906 (3d Cir. 1975)…………………………………….....9

*United States v. McDonald*, 61 F.3d 248 (4th Cir. 1995)……………………………………….17

*United States v. Mechanik*, 475 U.S. 66 (1986)…………………………………………………17

*United States v. Michael Whitten*, 610 F. 3d 168 (2d Cir. 2010)…………………………….45, 47

*United States v. Piedrahita, 791* F.Supp. 418 (S.D.N.Y. 1992)......................................17
*United States v. Pitera,* 5 F.3d 624 (2d Cir. 1993).........................................................54, 55
*United States v. Sears, Roebuck & Co., Inc.,* 719 F.2d 1386 (9th Cir. 1983).......................17
*United States v. Swiderski,* 539 F.2d 854 (2d Cir. 1976)..................................................15
*United States v. Thompson,* 576 F.2d 784 (9th Cir. 1978).................................................15
*United States v. Twersky,* 1994 WL 319367 *4 (S.D.N.Y. 1994).....................................18
*United States v. Wilson,* 493 F. Supp. 2d 484 (E.D.N.Y. 2006)..........................................15
*United States v. Williams,* 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352,
60 USLW 4348 *(1992)*.....................................................................................17
*United States v. Leonard,* 494 F.2d 955 (D.C. Cir. 1974)....................................................5
*United States v. Peralta,* 763 F.Supp. 14 (S.D.N.Y. 1991)................................................18
*United States v. Pollack,* 534 F.2d 964 (D.C. Cir. 1976).................................................8, 9
*United States v. Poindexter,* 727 F. Supp. 1470 (D.D.C. 1989).............................................8
*United States v. Presser,* 844 F.2d 1275 (6th Cir. 1988)...................................................10
*United States v. Recognition Equipment, Inc.,* 711 F. Supp. 1 (D.D.C. 1989)...................8, 10
*United States v. Red Elk,* 955 F.Supp. 1170 (D.S.D. 1997).................................................16
*United States v. Snell,* 899 F. Supp. 17 (D. Mass. 1995)....................................................8
*United States v. Sarvis,* 523 F.2d 1177 (D.C. Cir. 1975)...................................................15
*United States v. Starusko,* 729 F.2d 256 (3d Cir. 1984).....................................................8
*United States v. Tarantino,* 846 F .2d 1384 (D.C. Cir. 1988)...........................................8, 12
*United States v. Wagner,* 989 F.2d 69 (2d Cir.1993)......................................................51, 33
*United States v. Wasko,* 473 F.2d 1282 (7th Cir. 1973)...................................................15
*United States v. Wright,* 667 F.2d 793 (9th Cir. 1982)......................................................18
*Wilson v. State,* 16 So. 304 (Miss. 1894)...........................................................14, 15, 45, 48
*Wright v. United States,* 508 A.2d 915 (D.C. 1986)..........................................................10
*Zappulla v. New York,* 391 F.3d 462 (2d Cir. 2004)..........................................................21

**Secondary Authorities**

Alexander, Michelle *The New Jim Crow:*
*Mass Incarceration in the Age of Colorblindness* (2012)....................................................40

Brown, Daryl Essay, *Rationing Criminal Defense Entitlements: An Argument From Institutional Design*, 104 COLUM. L. REV. 801, 824 (2004).............................................................21

Dennis, Andrea, *Poetic On Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence,* 31 Colum. J.L. & Arts 1, 22-23 (2007)....................................................................41, 47

Greene, Judith *Numbers Game: The Vicious Cycle of Incarceration in Mississippi*, ACLU/Justice Strategies (2011)............................................................................................40

Hannaford, Paula L.,Valerie P. Hans, Nicole L. Mott *Symposium: Communicating with Juries: Timing of Opinion Formation by Jurors in Civil Cases: An Empirical Examination*, 67 Tenn. L. Rev. 627
(2000)................................................................................................11

Harris, George C. *Testimony for Sale: The Law and Ethics of Snitches and Experts*, 28 Pepp. L. Rev. 1, 49-58 (2000)..............................................................................26, 27, 30

Hugo, Bedau & Michael Radelet, *Miscarriages of Justice in Potentially Capital Cases*, 40 Stan. L. Rev. 21, 173 (1987)..........................................23

Illinois Governor's Commission on Capital Punishment (April 2002)..............................23

Julien, Alfred S. *Opening Statements* §1.01, at 2 (Supp.  1996).......................................11

Neuschatz, Jeffrey, Nicholaos Jones, Stacy A. Wetmore, and Joy McClung, *Unreliable Informant Testimony*, Ch. 10, in *Conviction of the Innocent, Lessons from Psychological Research*, ed. Brian Cutler (Washington D.C.: A.P.A. Press, 2012)..................................26

Schauer, Frederick, *Fear, Risk and the First Amendment: Unraveling the Chilling Effect* 58 B.U. L. Rev. 685, 693 (1978).......................................47

Scott, Robert C., Statement to the House, Judiciary Committee. *Law Enforcement Confidential Informant Practices*, Hearing, July 19, 2007 (Serial 110-112)......................................22

Scheck, Barry, Peter Nuefeld & Jim Dwyer, *Actual Innocence* 126-57 (Doubleday 2000).......23

Tarlow, Barry, *Perjuring Informants Brought to the Bar*, RICO Report, Champion 33-40 (July 2000).........................................................28

Federal Bureau of Investigation's *Compliance with the Attorney General's Investigative Guidelines, Special Report*, September 2005.................................................20, 24

U.S. Bureau of Justice, *Sourcebook of Criminal Justice Statistics* (2003)...........................20

Vinson, Donald E. *Jury Trials: The Psychology of Winning Strategy* 171 (1986)................11

White, Welsch S, *Regulating Prison Informers Under the Due Process Clause*, 1991 S. Ct. Rev. 103, 104-105...............................................................16

Winograde, Jana, *Comment, Jailhouse Informants And The Need for Judicial Use Immunity in Habeas Corpus Proceedings*, 78 Cal L. Rev 755 (1990)...........................................21

Yaroshefsky, Ellen *Cooperation with Federal Prosecutors: Experiences of Truth Telling and Embellishment,* 68 Fordham L. Rev. 917, 943-44 (1999)...........................................20

**Rules**

Fed. R. Crim. P. 16(a)(1)(C)...............................................................8
Fed. R. Crim. P. 26.2 with 18 U.S.C. § 3500(a)....................................9, 12
18 U.S.C.A. §
2515.................................................................................18, 55

18 U.S.C. § 2518(3)(a-d)..............................................................................50, 55

**Constitutional Authorities**

United States Constitution.................................................................7, 11, 14, 41

## PRELIMINARY STATEMENT

This Memorandum is respectfully submitted in support of Mr. Burrell's pre-trial motions requesting that the Court grant the following orders:

(1) directing the government to identify any and all informants and/or cooperating witnesses that are and/or were involved in the investigation of this case regardless of whether they have a cooperation agreement with the government;

(2) directing that the government immediately disclose any and all *Brady/Giglio*;

(3) directing the early disclosure of *Jenks* Act Material;

(4) granting an Informant Reliability Hearing;

(5) directing the government to provide the grand jury minutes to the Court for an *in camera* inspection upon a showing of any basis that any lies were proffered to the government by any informants and/or cooperating witnesses and those lies were subsequently presented to the grand jury;

(6) directing the government immediately to identify any and all social media evidence that the government intends to introduce at trial including rap videos and rap music so that defense counsel may effectively challenge it's admission prior to trial;

(7) directing the preclusion of any and all rap videos and/or music;

(8) directing that Mr. Burrell's rights be preserved under *Johnson v. United States,* currently before the United States Supreme Court; and

(9) directing that Mr. Burrell be permitted to join in any motions made by his co-defendants.

## FACTUAL BACKGROUND

**A.    The Highly Publicized and Celebrated "Take Down" 120 in the Bronx**

On April 27, 2016, a combined federal and NYPD Task Force comprised of nearly every branch of law enforcement in New York City descended upon two housing projects in the Bronx to "take down" and arrest the largest number of young black males alleged by the government to be associated with two of the most "violent" gangs in history. The roundup was touted by NYPD Commissioner William Bratton as the largest gang dragnet in modern history.[1]  Sadly, the highly-

---

[1]    Anthony M. DeStefano, *NYPD, Feds Round Up 120 in Gang Takedown, Officials Say*, NEW YORK NEWSDAY, April 27, 2016.   Available at:   http://www.newsday.com/news/new-york/dozens-of-suspected-gang-members-arrested-in-gang-takedown-1.11736841.

publicized raid resulted in the death of a young man.[2]

The images released by the press depict a chain gang of young black men and women being funneled into the criminal justice system and the various departments in law enforcement applauding the "take down." The frenzy did not end with the unprecedented arrest. The death penalty community was called upon to act quickly and get involved in the case, since according to the government the death penalty was in play and death eligible charges were soon to be filed against several individuals and most certainly against 23-year-old Nico Burrell – the alleged leader of the "Big Money Bosses" ("BMB").

The following is an abridged review of the press that was reported in relation to this case:

**New York police celebrate biggest gang 'takedown' in city's history**



"*New York police and prosecutors were celebrating what they described as the biggest "takedown" of gangs in the City's history on Wednesday, following a series of dawn raids across the Bronx. With helicopters hovering overhead, 700 police officers searched dozens of homes in the Eastchester Gardens housing project, arresting notorious gang members going by nicknames such as Mad Dog, Murder, and Money Making Kenny*"[3]

---

[2] "Officers executing a warrant as part of the gang raid this morning spooked a 21-year-old man who they weren't after in the Bronx, and he fell to his death from a sixth-story window, according to the police. The Daily News reports that the man was in the Wakefield apartment of the intended target of their arrest warrant and cops and U.S. Marshals made the collar, but they got suspicious when they left and noticed the other man outside on the fire escape. They told him to go back inside, but when they returned to the apartment, he was hanging from a window sill in an effort to hide, then lost his grip, according to the report. The man was purportedly wanted for several robberies in the Bronx, though the NYPD would not confirm this detail. He was transported to Jacobi Medical Center and died there, a police spokesman said. The NYPD is withholding his name pending family notification."

[3] http://www.telegraph.co.uk/news/2016/04/27/new-york-police-celebrate-biggest-gang-takedown-in-citys-history/



**Military Tactics Employed By Law Enforcement**



4    http://www.nydailynews.com/news/100-bronx-gang-members-arrested-largest-takedown-nyc-history-gallery-1.2616202?pmSlide=1.2616538
5    http://www.nydailynews.com/new-york/nyc-crime/4-arrests-made-massive-bronx-gang-sweep-article-1.2618058



POLICE CONDUCT ANTI-GANG RAIDS IN THE BRONX

Regrettably, for the unfortunate "gang members" ensnared in this colossal dragnet, and in particular for Mr. Burrell, the allegations on which this indictment is premised are based upon an incomplete investigation, which in turn was buttressed by mostly unreliable informant gossip; unreliable informant gossip that misrepresented facts that could have easily been uncovered by the government with a minimum of responsible investigating.

In fact, with little investigative effort, agents would have known that Mr. Burrell, the alleged boss of the "Big Money Bosses," was essentially homeless and had been referred by his parole officer to the Bellevue Men's Shelter just one month prior to his arrest. Prior to that, Mr. Burrell's residence was unstable. As documented in his parole records, he had been staying with various relatives and just weeks before his arrest, was planning on moving into his sisters' new apartment. Unfortunately, Mr. Burrell's sisters informed him that they needed to find a roommate who could contribute to the rent, which Mr. Burrell could not do. His sporadic income, from his music performances at local clubs (each one approved by Mr. Burrell's parole officer in advance), would be ploughed back into his professional development as an aspiring rap artist; working with his manager on videos, editing, marketing and promotions, a time consuming and sometimes costly effort. All of Mr. Burrell's professional activities would have come to light with even a cursory investigation.

Mr. Burrell's parole officer could also have informed agents that he had been on parole for nearly two years, reporting in person weekly since June 14, 2014, and that he was in compliance with his reporting conditions. Mr. Burrell was under stringent parole supervision. He had a 9:00 pm curfew, seven days a week, strictly monitored by nightly phone calls and random home visits by his parole officer to his approved residences. He was drug tested weekly, testing negative for each drug test administered during his two years of reporting. Significantly, Mr. Burrell had no violations while on parole.

Thus, all of Mr. Burrell's activities, which were rigorously monitored and documented by the New York State Parole Department, stand in stark contrast to these allegations, and certainly in stark contrast to what one would expect from a "boss" of one of the alleged "most violent gangs in history."

**B.    The Timeline of Events of the Case Against Mr. Burrell Reveal a Troubling Fact – The Entire Case is Premised Upon Co-Conspirator Cooperators and not a Real Police Investigation**

However, more than one year after this highly publicized takedown, neither Mr. Burrell, nor anyone else indicted in this case, has been charged with a death eligible offense or murder. This is particularly troubling given the time line of this case, as it reveals that the case is largely premised upon false statements by cooperating witnesses.

In or about April 12, 2016, (S2 indictment at ECF, Docket Entry "DE" 97). Nico Burrell was indicted along with 120 other young men for racketeering and narcotics conspiracy, and use of a firearm in furtherance of the racketeering and narcotics conspiracy. The indictments were divided into two cases: the instant matter, and United States v. Laquan Parrish, et. al., S1 16-Cr-212 (LAK). Shortly after the indictment and takedown, the defense was informed by the government that it intended to supersede the indictment with death eligible charges. The deadline imposed by the Court for the government to inform all counsel as to whether death eligible charges were going to be filed was September 27, 2016. (DE 220, p.2, ¶ 5).

On September 17, 2016, the government provided defense counsel with an Enterprise Letter that detailed criminal conduct by Nico Burrell that included the following:

1.    On or about February 11, 2009, NICO BURRELL and (REDACTED) traveled to the vicinity of ECG, where BURRELL fired approximately three gunshots at a victim associated with a rival gang, striking the victim in the chest and striking a second victim, a bystander, in the arm.

2.    In or about 2010, in Riker's Island, NICO BURRELL assaulted a member of 2Fly and an individual from Edenwald who were in Riker's Island with him (REDACTED).

3.    On or about October 22, 2014, NICO BURRELL, (REDACTED), and others drove to the vicinity of ECG and exchanged gunfire with Fabian Pennant, during which Pennant was struck by a bullet and killed.

4.    In or about late 2014 or early 2015, NICO BURRELL and others conspired to commit a shooting of members of 2Fly in retaliation for an earlier shooting that members of 2Fly had committed of BMB members (REDACTED) and (REDACTED)

5.      On or about May 2, 2015, NICO BURRELL and others drove to the vicinity of Gunhill Road in the Bronx and committed a shooting of members of 2Fly who were sitting inside of a pizza restaurant.

*See Government Enterprise Letter* dated September 16, 2017.

On or about September 2016, the government indicated that they had 12 cooperating witnesses.  Then in or about November, 2017 the government informed defense counsel that it would not seek to supersede with additional charges against Mr. Burrell.[6]  That no additional charges were to be brought against Mr. Burrell was a relief, yet it was also disconcerting; the government had provided an unprecedented and voluminous amount of discovery in the case.  A substantial portion of the discovery included Title III wiretap recordings of several of the co-defendants.  Yet the only discovery that has any connection to Mr. Burrell are approximately 5 conversations that appeared in the Title III wiretaps. Thus, it became clear that the only evidence against Mr. Burrell was derived from informants and/or cooperating co-conspirators.  This was problematic.  Since the defense was initially informed by the government that the indictment against Mr. Burrell would be superseded with death eligible charges, it is our belief that *that* information provided by those informants necessarily *had* to have been elicited from informants. Specifically, in September of 2016 the defense was informed by the government that Mr. Burrell allegedly was involved in a murder.   We believe this information came from informants.

Regardless of the purported evidence against Mr. Burrell, the government's intended case against Mr. Burrell was substantially weakened because some or all of the government's 12 cooperating witnesses were untruthful. This is clearly evident by the government's sparse indictment as to Mr. Burrell, the subsequent, *after the fact* acquiring of co-conspirator cooperators, the false information alleged in the Enterprise Letter and the near non-existence of discovery relating to Mr. Burrell.

Thus it is clear that the government relied upon exculpatory information that must be released to the defense immediately.  This exculpatory information will no doubt include *Jencks* material which must also be provided to the defense immediately.  If Mr. Burrell is to be afforded his right to effective assistance of counsel then the defense must have access to the materials

---

[6] This was an informal pronouncement; the government has not yet provided this information in writing.

immediately in order to have the time necessary time to investigate and utilize the information for trial. Mr. Burrell is a 23 year old man with a rising career in the rap music world. The defense has a right to prove through the falsehoods provided by the cooperating co-conspirators that the charges against Mr. Burrell are a fiction and were pursued after little or no investigation by the government prior to indictment.

**POINT ONE**

**FUNDAMENTAL FAIRNESS REQUIRES DISCLOSURE OF ANY AND ALL IDENTITIES OF INFORMANTS**

It is imperative that the accused be furnished the names, addresses and present locations of each and every informant and cooperating witness the government has used in its investigation. The identity of any participant or a witness to any charged or uncharged misconduct must also be disclosed as a matter of fairness. The Supreme Court in *Roviaro v. United States*, 353 U.S. 53 (1957), in balancing an accused's right to fundamental fairness guaranteed by the United States Constitution against the government's interest in withholding from disclosure the identity of an informant, recognized what has become known as the "informer's privilege":

> What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of the law... The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

*Id.* at 60 (citations omitted). Although the Supreme Court recognized such a privilege, it expressly pointed out limitations on its applicability. One such limitation "arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or the contents of his or her communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id* at 60; *accord, United States v. Eniola*, 893 F.2d 383, 388 (D.C. Cir. 1990); *McLawhorn v. State of North Caronna*, 484 F.2d 1, 4-5 (4th Cir. 1973).

To allow the government to provide late disclosure of this critical information gives the government an insurmountable strategic advantage over the defense at trial. An Order directing immediate production of this information is warranted here.

**A.      Disclosure of *Brady/Giglio* Must be Immediate**

*Brady/Giglio* material is immediately discoverable under both Fed. R. Crim. P. 16(a)(1)(C) (Information which is "material to the preparation of the Mr. Burrell's defense") and *Brady v. Maryland*, 373 U.S. 83 (1963).   In *Strickler v. Greene*, 527 U.S. 263 (1999), the Court emphasized that *Brady* material includes "impeachment evidence as well as exculpatory evidence." & at 280 (*citing United States v. Bagley*, 473 U.S. 667, 676 (1985)).

The government will undoubtedly take the position that witness statements are exempt from disclosure by virtue of the *Jencks* Act; however, that certain material may also be *Jencks* does not insulate it from disclosure if the material is also producible as *Brady/Giglio*.  *United States v. Tarantino*, 846 F .2d 1384, 1414 n.11 (D.C. Cir. 1988), *cert. denied.* 488 U.S. 840 (1988); *United States v. Recognition Equipment, Inc.*, 711 F. Supp. 1, 14 (D.D.C. 1989) (holding that the "government is not permitted to refuse to disclose *Brady* material merely because it is also *Jencks* material"); *United States v. Poindexter*, 727 F. Supp. 1470, 1485 (D.D.C. 1989) (noting that "*Brady* obligations are not modified merely because they happen to arise in the context of witness statements"): *United States v. Snell*, 899 F. Supp. 17, 21 (D. Mass. 1995) (holding that *Brady* obligations, which are constitutional in origin, trump the protections against disclosure set forth in the *Jencks* Act, which are statutory in origin).  As the Supreme Court noted in *Strickler*. "[o]ur cases make clear that *Brady's* disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness." *Strickler*, 527 U.S. at 282 n.21 (emphasis added, citation omitted).

With regard to *Brady* material, such information is to be turned over "at such time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case... " *United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976), cert. denied. 429 U.S. 924 (1976); *United States v. Starusko*, 729 F.2d 256. 261 (3d Cir. 1984) (noting that information which will require defense investigation or more extensive defense preparation should be disclosed at an early stage of the case); *see, e.g., Poindexter*, 727 F. Supp. at 1485 (noting the government's obligation to "immediately" produce to Mr. Burrell any exculpatory evidence, even if that evidence is contained in its *Jencks* materials); *Recognition Equipment. Inc.*, 711 F. Supp. at 14 (ordering immediate disclosure of exculpatory and impeachment evidence).

The government's only possible basis for resisting disclosure of *Brady/Giglio* is to claim that such disclosure will pose a threat to the government's witnesses. There is no basis for such an

assertion in this case. There has been no suggestion of any attempt to obstruct justice.  In fact, the witnesses are generally known to the defense.  In any case, any government "speculation" about potential threats to witnesses is far outweighed by Mr. Burrell's' right to a fair trial.  *See Pollack*, 534 F.2d at 974 (noting that courts should balance in each case "the potential dangers of early disclosure against the need that purports to serve of avoiding wrongful convictions," and that "timely disclosure should be required where the 'dangers' are speculative and where early disclosure is necessary...for a fair trial.").  Here, none of the defense counsel is aware of any potential risk posed by the disclosure of this information, other than the risk that the defense will have an opportunity to investigate these witnesses and conduct a more thorough cross-examination.  To the extent that the government maintains that any threat exists, the government should be required to demonstrate on a case-by-case basis the threat to a particular witness before the court issues a blanket order with regard to every witness.

Accordingly, in order to afford Mr. Burrell's a meaningful opportunity to contest the charges against him by confronting his accusers with the effective assistance of counsel in a fashion which will not jeopardize his standing before the jury, Mr. Burrell's requests that the government be ordered to disclose all *Brady/Giglio* material to defense counsel immediately.

**B.**     **Due Process Requires the Immediate Disclosure of Exculpatory Evidence**

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that due process forbids a prosecutor from suppressing "evidence favorable to an accused upon request where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution" id at 87. *See Giglio v. United States*, 405 U.S. 150 (1972): *United States v. Mccrane*, 527 F.2d 906 (3d Cir. 1975), *affd after remand*, 547 F.2d 205 (1976).  The Supreme Court has also emphasized that impeachment evidence, as well as exculpatory evidence, falls within the rule. *United States v. Bagley*, 473 U.S. 669, 678 (1985).  Such evidence, if disclosed and used effectively, may make the difference between conviction and acquittal.  *Napue v. Illinois*, 360 U.S. 264 (1959) ("[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").  In acknowledging that the prosecution has a duty to disclose any favorable evidence that could be used at trial, it is frequently overlooked that the prosecution also has a duty to disclose any favorable evidence that could be used "in obtaining further evidence." *Giles v. Maryland* 386 U.S. 66, 74 (1967).

Additionally, favorable evidence need not be competent evidence or evidence admissible at trial. *United States v. Gleason*, 265 F. Supp. 880, 886 (S.D.N.Y. 1967); *Sellers v. Estelle*, 651 F.2d 1074, 1077 n.6 (5th Cir. 1981) (evidence suppressed was material to the preparation of petitioner's defense, regardless whether it was intended to be admitted into evidence).

The Supreme Court has never precisely pinpointed the time at which the disclosure under *Brady* must be made. It is abundantly clear, however, that disclosure by the government must be made at such a time as to allow the defense to use favorable material effectively in the preparation and presentation of its case, even if satisfaction of these criteria requires pre-trial disclosure. *United States v. Pollock*, 534 F.2d 964, 973 (D.C. 1976) *accord United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988); *United States v. Starusko*, 729 F.2d 256, 261 (3d Cir. 1984) (noting that information which will require defense investigation or more extensive defense preparation should be disclosed at an early stage of the case.); *see e.g. United States v. Recognition Equipment*, 711 F. Supp. 1, 14 (D.D.C. 1989) (ordering immediate disclosure of evidence regarding criminal records and other impeachment information for government witnesses, statements to the effect that any of defendant's accused co-defendants or co-conspirators were not members of the charged conspiracy, evidence supporting defendants' defenses). Manifestly a more lenient disclosure burden on the government would drain it of all vitality. *United States v. Elmore*, 423 F.2d 775, 779 (5th Cir. 1970).

The disclosures requested herein should be made immediately so that appropriate defense preparation can be made.  To make effective use of the information requested herein, it is essential to test the reliability of this information through thoughtful consideration and thorough investigation. This cannot be accomplished if disclosure is delayed.

It would be fundamentally unfair for Mr. Burrell to receive this information shortly before or after the commencement of trial. Mr. Burrell is entitled to make an opening statement. This is true whether or not he puts on evidence. *Wright v. United States*, 508 A.2d 915,919 (D.C. 1986). A defense attorney's opening statement, however, must remain "within the bounds of propriety and good faith." *Hallinan v, United States*, 182 F.2d 880, 885 (9th Cir. 1950).  It would be unethical, therefore, for counsel to simply predict during opening statement what the evidence will show. If the Court allows the government to make late disclosure of this critical material, Mr. Burrell will not be able to present an adequate opening statement. The case against Mr. Burrell is based almost entirely on the anticipated testimony of criminals. Thus, Mr. Burrell will be

profoundly prejudiced unless he discovers this information with sufficient time to consider, investigate and test the reliability of the evidence against him.

Jury studies have shown that as many as 80 to 90 percent of all jurors have reached their ultimate verdict during or immediately after opening statements. See Alfred S. Julien, *Opening Statements* §1.01, at 2 (Supp. 1996) (Jurymen ... have been prone to say that once the opening statements were made there was nothing left to the case.) and Donald E. Vinson, *Jury Trials: The Psychology of Winning Strategy* 171 (1986) ("[A]s many as 80 to 90 percent of all jurors have reached their ultimate verdict during or immediately after opening statements."); *Symposium: Communicating with Juries: Timing of Opinion Formation by Jurors in Civil Cases: An Empirical Examination*, 67 Tenn. L. Rev. 627 (2000). Therefore, it is critical that Mr. Burrell be given a full opportunity to assist the jurors in understanding the evidence presented. *See Best v. District of Columbia*, 291 U.S. 411, 415 (1934) (the purpose of an opening statement is to assist the jury in understanding the evidence to be presented); *accord, United States v. Dinitz*, 424 U.S. 600, 612 (1976) (Burger, C.J. concurring) (purpose of opening statement is "to state what evidence will be presented, to make is easier for the jurors to understand what is to follow and to relate parts of the evidence and testimony to the whole"). Given the nature of the anticipated evidence against Mr. Burrell and the expected duration of his trial, failure by the government to provide such information immediately will deny him the opportunity to adequately prepare for his case, which constitutes a denial of due process and of effective assistance of counsel.

Accordingly, in order to afford Mr. Burrell a meaningful opportunity to contest the charges against him by confronting his accusers with the effective assistance of counsel in a fashion which will not jeopardize his standing before the jury, Mr. Burrell requests that the government be ordered to disclose all *Brady/Giglio* material immediately.

## C.    Mr. Burrell Requests the Disclosure of *Jenks* Material 30 Days Prior to Any Hearings or Trial in this Case

*Jencks* material should be provided to the defense so as to furnish Mr. Burrell with sufficient time to examine and utilize this material in a meaningful manner before and during trial. *United States v. Holmes*, 722 F.2d 37, 40 (4th Cir. 1983). What that means in terms of timing depends on the specific facts and circumstances of the case. It is clear, however, that the Court, pursuant to the Fifth and Sixth Amendments to the United States Constitution, Rule 2 of the Federal Rules of Criminal Procedure and its inherent supervisory powers, has the authority to

override the timing provisions set forth in the *Jencks* Act and in Rule 26.2. Indeed, Rule 26.2, unlike its predecessor, the *Jencks* Act, contains no language explicitly precluding the disclosure of witness statements prior to trial. Cf. Fed. R. Crim. P. 26.2 with 18 U.S.C. § 3500(a). The Rule also provides that the Court may make an accommodation, upon request by defense counsel, so that counsel is provided adequate time to make use of *Jencks* material. Fed. R. Crim. P. 26.2(d). That section states:

> Upon delivery of the statement to the moving party, the court, upon application of that party, may recess proceedings in the trial from the examination of such statement and for preparation for its use in the trial.

The prosecution should disclose *Jencks* material to defense counsel within 30 days before trial because it will not only assist the defense in achieving a fair trial but also serve the public interest in expediting the fair resolution of criminal cases. *See ABA Standards for Criminal Justice*. §11-2.2; *see, e.g. United States v. Tarantino*, 846 F.2d 1384, 1415 n.12 (D.C. Cir.), *cert. denied*. 488 U.S. 840 (1988); *United States v, Hinton*, 631 F.2d 769,782 (D.C. Cir. 1980); *United States v. Poindexter*, 727 F. Supp. 1470, 1484-85 (D.D.C. 1989).

In *United States v. Hinton*, the District of Columbia Circuit recognized the potential impact of late *Jencks* disclosure upon the defendant's Sixth Amendment rights. 631 F.2d 769, 782 (D.C. Cir. 1980). There, during a suppression hearing, defense counsel was provided with "voluminous material in the form of FBI 302s. *Id.* at 781. The Court of Appeals held that "in the rush and confusion" of the hearing, counsel failed to recognize "the critical importance of the 302's" and, as a result, the appellant was deprived of her constitutional right to the "informed, professional deliberation of counsel." *Id.* at 782.

Here, in order to accomplish even a rudimentary investigation so as to begin to be able to provide effective assistance to Mr. Burrell, counsel and their investigators will require the *Jencks* material well before the jury is sworn. *See United States v. Holmes*, 722 F.2d 37, 41 (4th Cir. 1983) (noting that providing materials one day before trial began did not "afford[] a reasonable opportunity to examine and digest" the documents.).

Accordingly, Mr. Burrell respectfully requests this Court to grant his request for the disclosure of this information 30 days in advance of trial to permit Mr. Burrell to prepare to investigate, meet or use such information and evidence.

<u>POINT TWO</u>

**THE GOVERNMENT SHOULD ALSO IMMEDIATELY DISCLOSE ANY AND ALL CONTACT BETWEEN GOVERNMENT AGENTS OR PROSECUTORS AND POTENTIAL JAILHOUSE INFORMANTS INCARCERATED WITH MR. BURRELL**

Mr. Burrell respectfully requests that this Court order the government to immediately disclose any and all contact between government agents or prosecutors and potential informants incarcerated with Mr. Burrell. In support, Mr. Burrell relies upon Rules 12(b)(4) and 16(a)(l)(A) of the Federal Rules of Criminal Procedure, the Fifth, Sixth and Eighth Amendments, and submits the following.

Since his arrest, Mr. Burrell has been incarcerated at the New York Metropolitan Correctional Center with other pretrial detainees and convicted persons, some of whom are facing lengthy federal sentences. Jailhouse informants have been used frequently by prosecuting authorities and have surfaced seeking "deals" in return for testimony in a disturbing number of federal criminal cases. The possibility of manufactured conversations exists in these cases.

As a safeguard and to permit the required pretrial resolution of Mr. Burrell's objections to any testimony of this sort, he requests immediate disclosure of government (state or federal) sponsored or monitored contacts between an incarcerated informant and Mr. Burrell regarding the allegations in the indictment including any such conversation the prosecution is (or is not yet) aware of. This includes contact with or between incarcerated informants whether (or not) these were monitored by the government or the detention center.

Government tolerated, sponsored or planted informants are highly unreliable yet frequently used, particularly in serious cases. For example, the government planted an informant in the same cell as the defendant in *United States v. Henry*, 447 U.S. 264, 266-267 (1980). The informant was instructed not to interrogate the defendant about his involvement in the crime but to be alert to any statements. *Id.* The informant ultimately testified at the defendant's trial concerning incriminating statements made by the defendant. *Id.*

Relying on *Massiah v. United States*, 377 U.S. 201 (1964), the Supreme Court stated "the question here is whether under the facts of this case a Government agent 'deliberately elicited' incriminating statements from the defendant within the meaning of *Massiah*." Later, in *Maine v.*

*Moulton*, 474 U.S. 159 (1985), the Court expanded the *Henry* holding[7] by finding "knowing exploitation by the state of an opportunity to circumvent the right to counsel is equivalent to intentional creation of such an opportunity."

An incarcerated informant is as likely to provide perjured testimony as he is likely to be truthful.  Therefore, such testimony is inherently unreliable and requires pretrial judicial review. The Supreme Court in *Lilly v. Virginia*, 527 U.S. 116, 125 (1999), for example, suggested a jury instruction may be required regarding the credibility of informants.[8]  The Oklahoma court in *Dodd v. State*, 993 P.2d 778, 784 (Ok. Crim. App. 2000) adopted several protective procedures to ensure a full cross-examination of informant witnesses was possible. This is because the Constitution of the United States prohibits a jailhouse informant from testifying to a defendant's statements when the informant works for the government and "deliberately elicits" or coerces statements related to a crime for which an accused has been indicted. While the state action affected by such a government/informant relationship triggers careful constitutional scrutiny, it permits equally insidious reliability problems to escape attention. Consider the more common example of the informant who does not work for the government when procuring incriminating statements.  In these cases, there is no state action and therefore no constitutional concern.  But, this distinction matters little in terms of informant reliability or trustworthiness. Irrespective of whether initially contacted by the state, most informants relay incriminating statements to the state in expectation of a benefit in exchange. *Id.* at 784.

The use of informants in criminal cases has become a serious problem. The Mississippi Supreme Court has warned of:

> an unholy alliance between con-artist convicts who want to get out of their own cases, law enforcement who [are] running a training ground for snitches over at the county jail, and the prosecutors who are taking what appears to be the easy route, rather than really putting their cases together with solid evidence.

---

[7] The Supreme Court stated in dictum in *Kuhlmann v. Wilson*, 477 U.S. 436 (1986) that the right to counsel was not violated by the police placing in the cell an informant who merely listened and reported what the defendant said.

[8] California Penal Code § 1127a also requires that in any criminal trial or proceeding in which an in-custody informant testifies as a witness for the prosecution, upon request of a party, the jury shall be instructed the following:

> "The testimony of an in-custody informant should be viewed with caution and close scrutiny.  In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness.  This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case." *Id.*

*McNeal v. State*, 551 So. 2d 151, 158 n.2 (Miss. 1989).

The Mississippi Court's concern is a reflection of the fact that cases are built on opportunist "snitches" – the vernacular for witnesses with an incentive to lie -- on a frighteningly frequent basis. For this reason, the same court has warned that the testimony of either an accomplice or a snitch "is to be received and considered with caution, as from a polluted and suspicious source." *Dedeaux v. State*, 86 So. 664, 665 (Miss. 1921) (*citing Wilson v. State*, 16 So. 304 (Miss. 1894); *see also, Lilly*, 527 U.S. at 125.

The United States Supreme Court has noted that "[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility." On *Lee v. United States*, 343 U.S. 747, 757 (1952); *see also United States v. Swiderski*, 539 F.2d 854 (2d Cir. 1976) (informer paid $10,000 for his services, worked on a contingent fee basis); *United States v. Sarvis*, 523 F.2d 1177, 1180 (D.C. Cir. 1975); *United States v. Wasko*, 473 F.2d 1282 (7th Cir. 1973): *United States v. Leonard*, 494 F.2d 955, 961 (D.C. Cir. 1974); *United States v. Garcia*, 528 F.2d 580 (5th Cir.), *cert. denied sub nom.; Sandoval v. United States*. 426 U.S. 952 (1976).

For these reasons, the United States Supreme Court has held that cooperating informant "snitch" or accomplice testimony "ought not to be passed upon ... under the same rules governing other apparently credible witnesses ... " *Crawford v. United States*, 212 U.S. 183, 204 (1908). Indeed, the Nevada Supreme Court has noted "that a jail-house incrimination is now available in a fairly large number of homicide cases." *D'Agostino v. State*, 823 P.2d 283, 285 (Nev. 1992). The Court went on to hold that special precautions must be taken to avoid presenting unreliable evidence to the jury: "[a] legally unsophisticated jury has little knowledge as to the types of pressures and inducements that jail inmates are under to "cooperate" with the state and to say anything that is "helpful" to the state's case. It is up to the trial judge to see that there are sufficient assurances of reliability prior to admitting this kind of amorphous testimony to keep this kind of unreliable evidence out of the hands of the jury ... " *Id.* at 284; *see also* Cal. Penal Code §1127a (trial courts must instruct jurors that "testimony of an in custody informant should be viewed with caution and close scrutiny"); *People v. (Thomas) Thompson*, 45 Cal.3d 86 (1988), (on proportionality review, court finds prosecution's need to rely on "snitch" testimony "disconcerting"); *and see TIBBS v. State*, 337 So.2d 788, 790 (Fla. 1976) (reversing a murder conviction/death sentence as being against the weight of the evidence. The testimony of a cellmate

-15-

snitch was dismissed as "the product of purely selfish considerations."); *Barnes v. State*, 469 So.2d 126, 132 (Miss. 1984) (testimony of jailhouse snitches must "be viewed with caution and suspicion even in the absence of any proof of a leniency/immunity agreement."). The Louisiana Supreme Court views the word of an informant as being less credible than that of a law-abiding citizen when it comes to probable cause to search. A distinction must be drawn "between an 'informant' who is a member of the criminal community and an informant who is the witness or victim of a crime." *State v. Ross*, 561 So.2d 1004, 1009 (La. App. 4 Cir. 1990), *citing State v. Morris*, 444 So.2d 1200 (La. 1984). The testimony of a snitch may simply be too insubstantial to support a conviction. *See Jackson v. Virginia*, 443 U.S. 307 (1979)); White, *Regulating Prison Informers Under the Due Process Clause,* 1991 S. Ct. Rev. 103, 104-105.

Accordingly, Mr. Burrell requests that this Court require the government to immediately disclose any and all contact between government agents or prosecutors and informants incarcerated with Mr. Burrell so that he can seek appropriate relief.

## **POINT THREE**

**AFTER REVIEW OF *BRADY/GIGLIO* AND *JENCKS* [9] AND DEFENSE COUNSEL DETERMINES THAT THERE IS A SUFFICIENT BASIS THAT FALSEHOODS WERE PRESENTED TO THE GRAND JURY THROUGH THE WITNESSES AND/OR THE GOVERNMENT, MR. BURRELL REQUESTS INSPECTION OF THE GRAND JURY MINUTES**

The power to dismiss an indictment derives from two sources: constitutional error and the federal court's inherent supervisory power. *United States v. Red Elk*, 955 F.Supp. 1170, 1174 (D.S.D. 1997), *citing United States v. Isgro*, 974 F.2d 191, 1094–99 (9th Cir. 1992), cert. denied, 507 U.S. 985 (1993); United States v. De Rosa, 783 F.2d 1401, 1404 (9th Cir.), cert. denied, 477 U.S. 908 (1986); *see also United States v. Marshank*, 777 F.Supp. 1507, 1528 (N.D.Cal. 1991). In order to dismiss an indictment based on constitutionally offensive prosecutorial misconduct, "such as misleading or misinforming the grand jury," the court must either find that the "defendant suffers

---

[9] Counsel is aware of the holding in *United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001). In *Coppa*, the Circuit Court reversed the district court's ruling that *Jencks* Act material that included *Brady/Giglio* must be disclosed to the defense. However, the Circuit Court explicitly stated that it left open the option for the district court to allow early disclosure of *Brady/Giglio* that includes *Jencks* material as a matter of sound case management. We respectfully submit this Court has the same inherent power to provide the defense with early disclosure of *Jencks* material that contains *Brady/Giglio*.

prejudice as a result of the Government's actions", *United States v. Piedrahita, 791 F.Supp.* 418, 420 (S.D.N.Y. 1992), *citing Bank of Novia Scotia v. United States*, 487 U.S. 250,258, 108 S.Ct. 2369, 2373 (1988); *United States v. Brio,* 907 F.2d 392, 394 (2d Cir. 1990), or "a history of prosecutorial misconduct that is so systematic and pervasive and that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed." *Red Elk,* 955 F.Supp. at 1174, *citing Bank of Nova Scotia*, 487 U.S. at 259, 108 S.Ct. at 2375–76; *Isgro,* 974 F.2d at 1094. Prejudice may be presumed from constitutional error "where the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair. …" *Bank of Novia Scotia*, 487 U.S. at 257, 108 S.Ct. at 2374–75, *citing Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3105–06 (1986). Stated another way, a defendant is prejudiced when "'it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from substantial influence of such indictments." *Bank of Nova Scotia*, 487 U.S. at 256, 108 S.Ct at 2374, *quoting United States v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938, 946 (1986). *See also United States v. Breslin,* 916 F.Supp. 438, 441 (E.D.Pa. 1996). When determining whether constitutional error is present, the focus of the inquiry is "on the impact of the alleged misconduct on the grand jury's impartiality, not on prosecutorial culpability." *Red Elk*, 995 F.Supp. at 1174, *citing United States v. Sears, Roebuck & Co., Inc.*, 719 F.2d 1386, 1392 (9th Cir. 1983), *cert. denied*, 465 U.S. 1079 (1984); *De Rosa*, 783 F.2d at 1405.

In *United States v. Williams*, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352, 60 USLW 4348 (1992), the Court expressly held that the government is under no obligation to present exculpatory evidence to the grand jury. *Id.* 504 U.S. at 50, 112 S.Ct. at 1743–44. "However, the government's creation or acceptance of an erroneous impression that related to such evidence could support a defendant's argument that a supposed mistake was intentional misconduct." *United States v. McDonald*, 61 F.3d 248, 253 (4th Cir. 1995). Notwithstanding *Williams*, "a prosecutor may not deliberately mislead a grand jury or instill false impressions to it in an effort to obtain an indictment." *Red Elk*, 955 F.Supp. at 1182, citing *De Rosa*, 783 F.2d at 1404–07. Moreover, the knowing use of perjured testimony is obviously a compelling basis to dismiss an indictment, even in the post-*Williams* era. *See Basurto*, 497 F.2d at 785; *Samango,* 607 F.2d at 882 (*quoting United States v. Thompson,* 576 F.2d 784, 786 (9th Cir. 1978)); *United States v. Hogan*, 712 F.2d 759 (2d Cir. 1983). And, as the Ninth Circuit noted in *Samango*: "[a]lthough deliberate introduction of

perjured testimony is perhaps the most flagrant example of misconduct, other prosecutorial behavior, even if unintentional, can also cause improper influence and usurpation of the grand jury's role." 607 F.2d at 882; *see also Hogan*, 712 F.2d at 762. The extent that any FBI agent testified before the grand jury returning any of the subject indictments claiming (defendant and/or co-defendants) engaged in unauthorized criminal activity or describing the enterprise and conspiracies alleged in the indictment, such testimony was perjurious. *See Hogan*, 712 F.2d at 761–62 (DEA agent's false testimony to the grand jury on issues of predisposition and inducement, along with other factors, mandates dismissal). This case does not involve an instance where there exists simply a failure to put some exculpatory information before the grand jury. Rather the government is engaged in indicting individuals whom should not be subject to indictment, and, as to the non-informant codefendants, is misleading the grand jury as to the existence of a criminal enterprise and conspiracies. This is so because such criminal enterprises or conspiracies cannot factually exist where one side of the alleged criminal group are agents of the government.

Assuming that the prosecutors in this case met their obligation "[a]s a legal advisor to the grand jury" by providing the grand jury "with sufficient information concerning the relevant law 'to enable it intelligently to decide whether a crime has been committed'," *United States v. Twersky*, 1994 WL 319367 *4 (S.D.N.Y. 1994) (*quoting People v. Calbud*, Inc., 49 N.Y.2d 389, 395, 426 N.Y.S.2d 238, 241 (1980)), the grand jury in this case must have been misled by the instructions or it would have rejected the government's theory of enterprise, at a minimum. While erroneous instructions given to a grand jury do not automatically invalidate an otherwise lawful indictment, where the instructions deceive a grand jury and thus "significantly infringe upon the ability of the grand jury to exercise independent judgment" dismissal is warranted. *See United States v. Wright*, 667 F.2d 793, 796 (9th Cir. 1982), *citing United States v. Cederquist*, 641 F.2d 1347, 1352–53 (9th Cir. 1981): *Twersky*, 1994 WL 319367 at *4, *citing Hogan*, 712 F.2d at 761, and *United States v. Peralta*, 763 F.Supp. 14, 19 (S.D.N.Y. 1991). At the very least, examination of the instructions (or lack thereof) provided to the grand jury in this case is warranted. *See Twersky*, 1994 WL 319367 *5.

As discussed above, the Supreme Court in *Williams* specifically recognized that the exercise of the court's supervisory power would be warranted if 18 U.S.C. § 2515 were violated. 504 U.S. at 46 n.6, 112 S.Ct. at 1741 n.6. Section 2515 prohibits, among other matters, the receipt in evidence by the grand jury of any intercepted wire or oral communications, or any evidence

derived therefrom, if the disclosure would be in violation of Title III. *See Gelbard v. United States*, 408 U.S. 41, 50–51, 92 S.Ct. 2357, 2362–63 (1972*); In re Boston Globe Newspaper*, 729 F. Supp. 47, 54 (1st Cir. 1984), *citing Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961 (1969); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507 (1967).

Accordingly, for the reasons stated we respectfully request that the Court grant our request and conduct an *in camera* inspection of the grand jury minutes.

## POINT FOUR

### A RELIABILITY HEARING IS WARRANTED TO PROTECT THE INTEGRITY OF THE TRIAL

#### A. Introduction

In exchange for having incriminated Mr. Burrell, the cooperators have received compensation from the government in the form of charging and sentencing consideration. It is not known whether they also received other benefits. In particular, as a result of their statements implicating Mr. Burrell, they will be permitted to plead guilty to lesser sentences. Their anticipated testimony is also self-serving, as it reduces their own culpability while potentially aggravating Mr. Burrell's charges. In view of the self-serving nature of their testimony and the compensation that the cooperating witnesses may have received (and potentially will receive) in exchange for implicating Mr. Burrell, their testimony is biased and inherently unreliable.

First, Mr. Burrell is denied due process and equal protection because he cannot legally offer financial consideration, leniency or immunity in the same way the government can, to witnesses that he wishes to call to testify on his behalf at trial. As a result, the Court should prohibit the government witnesses who have been paid and/or assisted by a combination of payment and other consideration from testifying.

Second, Mr. Burrell is denied equal protection and due process when the government is allowed to call witnesses that it has materially assisted when Mr. Burrell is not in a position to offer similar consideration, and it would be illegal, and given his indigence, impossible, for Mr. Burrell to pay a witness as the government does (for example, by making a lump sum payment to the witness).

At a minimum, Mr. Burrell requests that the Court hold a pre-trial reliability hearing at which the cooperators shall be made available for examination by counsel, to permit the Court to

decide whether their testimony is sufficiently reliable, and therefore sufficiently probative, to be admissible under Federal Rule of Evidence 403. In this case, a hearing is especially important, because at this point the government's case against Mr. Burrell rests solely on cooperating informant testimony which has already proven to be unreliable.

Often, statements from people with incentives to testify are the central evidence in convicting an innocent person.[10]   Informant testimony is commonplace, and heavily relied upon by the government. "Since the inception of the FBI in 1908, informants have played major roles in the investigation and prosecution of a wide variety of federal crimes."[11]   Federal statistics indicate that 60% of drug defendants cooperate with prosecutors in some fashion in exchange for lenience, the dismissal of charges, reduced sentences, or to avoid arrest.[12]

According to the Center on Wrongful Convictions, false testimony by informant witnesses is the leading cause of wrongful convictions in death penalty cases in the United States.[13]   False testimony has been found not only in capital cases. Testifying falsely in exchange for an incentive is the last resort for a desperate inmate.  Providing informant testimony may be the only option for those who are not in prison but want to avoid being charged with a crime.

As investigating police increasingly rely on criminal informants, prosecutorial reliance on criminal informant testimony also increases.  Prosecutors themselves are often the first to complain about this dynamic, commenting that

> [t]hese [drug] cases are not very well investigated . . . our cases are developed through cooperators and their recitation of the facts. Often, in DEA, you have agents who do little or no follow up so when a cooperator comes and begins to give you information outside of the particular incident, you have no clue if what he says is true.[14]

Courts, legislatures, Governor's Commissions, police departments, and public defenders

---

[10]   Informants, THE INNOCENCE PROJECT, available at http://www.innocenceproject.org/understand/Snitches-Informants.php.
[11]   The Federal Bureau of Investigation's Compliance with the Attorney General's Investigative Guidelines, Special Report, September 2005.
[12]   U.S. BUREAU OF JUSTICE, SOURCEBOOK OF CRIMINAL JUSTICE STATISTICS 439 tbl.5.34 (2003). The Center reviewed 111 capital cases of persons released from death row after their exonerations between 1973 and 2004. They found false testimony by informants in 45.9% of the cases.  Center on Wrongful Convictions, *The Snitch System: How Snitch Testimony Sent Randy Steidl and Other Innocent Americans to Death Row*, p. 3 (2005), available at http://www.law.northwestern.edu/wrongfulconvictions.
[14]   Ellen Yaroshefsky, Cooperation with Federal Prosecutors: Experiences of Truth Telling and Embellishment, 68 FORDHAM L. REV. 917, 943-44 (1999).

have begun instituting measures to prevent convictions based upon unreliable testimony by informants. These measures, including a pre-trial reliability hearing, a requirement that police departments record interviews with an informant, and a requirement that there should be sufficient corroboration of informant testimony before it is admitted in court, should at a minimum be adopted here.

## A.    Legal Background

The Supreme Court "has long recognized the 'serious questions of credibility' informers pose." *Banks v. Dretke*, 540 U.S. 668, 701 (2004) (*citing On Lee v. United States*, 343 U.S. 747, 757 (1952). In *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the Supreme Court explained that "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," and "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *See also United States v. Agurs*, 427 U.S. 97, 103 (1976) (stating that "the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair").

The Second Circuit has noted that "numerous scholars and criminal justice experts have found the testimony by 'jail house snitches' to be highly unreliable." *Zappulla v. New York*, 391 F.3d 462, 470, n.3 (2d Cir. 2004) (*citing Daryl K. Brown, Essay, Rationing Criminal Defense Entitlements: An Argument From Institutional Design*, 104 COLUM. L. REV. 801, 824 (2004)). The Court spoke about jailhouse informants, but the problems exist with all cooperators: "[s]everal reports have found that jailhouse informants have a significant incentive to offer testimony against other defendants in order to curry favor with prosecutors and that the proffered testimony is oftentimes partially or completely fabricated." *Zapulla*, 391 F.3d at 470. The Court went on to state that "the use of jailhouse informants to obtain convictions may be 'one of the most abused aspects of the criminal justice system.'" *Id.* (*citing Jana Winograde, Comment, Jailhouse Informants And The Need for Judicial Use Immunity in Habeas Corpus Proceedings*, 78 CAL L. REV 755, 756 (1990).

Similarly, the Ninth Circuit has "recognized the unreliability of jailhouse informants — who are themselves incarcerated criminals with significant motivation to garner favor." *Maxwell v. Roe*, 628 F.3d 486 (2010), *cert. denied*, 628 U.S. 456 (2010). The Ninth Circuit has called for increased judicial scrutiny of deals between informants and the government, holding that "where the

prosecution fails to disclose evidence such as the existence of a leniency deal or promise that would be valuable in impeaching a witness whose testimony is central to the prosecution's case, it violates the due process rights of the accused and undermines confidence in the outcome of the trial," *Horton v. Mayle*, 408 F.3d 570, 581 (9th Cir. 2005), and calling such lack of disclosure "unscrupulous." *Silva v. Brown*, 416 F.3d 980, 991 (9th Cir. 2005).

Thus, courts have to date recognized the endemic problems with informant testimony. However, the reforms and safeguards implemented by courts are not sufficient to protect a criminal defendant from being prosecuted or executed based on unreliable testimony. On July 19, 2007, the House Judiciary Committee held a hearing dealing with the unreliability of informants. Chairman of the Subcommittee on Crime, Terrorism and Homeland Security, Robert C. Scott acknowledged the lack of safeguards in place: "despite the impact informants have in the criminal justice system, their use has been subject to scant oversight.  And thanks to the get tough on crime policies and the war on drugs, police departments are under increasing pressure to make arrests and recruit more informants. Without increasing supervisory personnel and enhancing internal controls, departmental oversight of informants and rogue police officers will not be sufficient." Scott, Robert C., Statement to the House, Judiciary Committee. *Law Enforcement Confidential Informant Practices*, Hearing, July 19, 2007 (Serial 110-112).

Courts, recognizing the inherent unreliability of compensated informants and those who minimize their own culpability, have gone so far as to take judicial notice of their tendency to lie. "The use of informants to investigate and prosecute persons engaged in clandestine criminal activity is fraught with peril.  This hazard is a matter 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned' and thus of which we can take judicial notice." *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993) (citation omitted). "Our judicial history is speckled with cases where informants falsely pointed the finger of guilt at suspects and defendants, creating the risk of sending innocent persons to prison." *Id.* Another court has noted that "[n]ever has it been more true that a criminal charged with a serious crime understands that a fast and easy way out of trouble with the law is . . . to cut a deal at someone else's expense and to purchase leniency from the government by offering testimony in return for immunity, or in return for reduced incarceration." *Commonwealth of the Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1123 (9th Cir. 2001).  Indeed, long before snitching became a pervasive aspect of the criminal justice system, the Supreme Court recognized that "[t]he use of informers,

accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility." *On Lee*, 343 U.S. at 755.

**B.      Cooperating Co-conspirators Are Inherently Unreliable**

A growing body of literature documents the inherent unreliability of compensated witnesses, cooperating co-conspirators, "jailhouse snitches," and other types of informants. Numerous horror stories of wrongful convictions based on perjurious informant testimony have emerged, and they have prompted official review of the practice of permitting compensated informant testimony. The following list contains just a few of the efforts to document and control informant unreliability:

1.      The founders of the Innocence Project discovered that twenty-one percent of the innocent defendants on death row were placed there by false informant testimony.[15]

2.      The Illinois Governor's Commission on Capital Punishment unanimously concluded that "[t]estimony from in-custody witnesses has often been shown to have been false, and several of the thirteen cases of men released from death row involved, at least in part, testimony from an in-custody informant."[16] The Commission recommended the holding of reliability hearings to mitigate the chances of perjury, and Illinois passed a law adopting the Commission's recommendation. Ill. Comp. Stat. ch. 725, s. 5/115-21c.

3.      Bedau and Radelet in their comprehensive historical study discovered that one-third of the 350 erroneous convictions they studied were due to "perjury by prosecution witnesses," twice as many as the next leading source – erroneous eyewitness identification – and stemming in large part from the prevalence of co-conspirator testimony.[17]

4.      On July 19, 2007, the House Judiciary Committee held a hearing on law enforcement confidential informant practices. The Chairman of the Subcommittee on Crime, Terrorism and Homeland Security stated that "perhaps most disturbing is the effect false testimony has in death sentences.  One study has shown that almost half of the documented wrongful capital convictions have included false information from an informant." Scott, Robert C., Statement to the House, Judiciary Committee. *Law Enforcement Confidential Informant Practices*, Hearing,

---

[15]   BARRY SCHECK, PETER NEUFELD & JIM DWYER, ACTUAL INNOCENCE 126-57 (Doubleday 2000).

[16]   Illinois Governor's Commission on Capital Punishment, Chapter 8 (April 2002).

[17]   Hugo Bedau & Michael Radelet, *Miscarriages of Justice in Potentially Capital Cases*, 40 Stan. L. Rev. 21, 173 (1987).

July 19, 2007 (Serial 110-112).[18]

5.      Samuel Gross and Michael Schaffer published a Report by the National Registry of Exonerations, detailing the circumstances of a comprehensive review of 873 individual exonerations in the United States.  Exonerations in the United States, 1989-2012, June 2012. The authors found that perjury and false accusation accounted for 66% of the exonerations in homicide cases, 72% in drug cases, and 19% in robbery cases, averaging 53% for all cases, including sexual assault, child sexual assault, and non-violent cases. The study found that homicide cases produce the most errors of perjured testimony or lying witnesses. This is because: "Co-defendants, accomplices, jailhouse snitches and other police informants can all hope for substantial rewards if they provide critical evidence in a murder case – even false evidence – especially if the authorities are desperate for leads.  The police themselves may be tempted to cut corners and falsify evidence to convict a person they believe committed a terrible murder. The net result is that exonerations in homicide cases include comparatively few eyewitness errors, substantially more deliberate misidentifications, and a high proportion of cases with perjury or false accusations by other types of witnesses." (Citation omitted) *id.* at 55.

Numerous other agencies have published reports attempting to deal with the problem of the unreliability of informant testimony and its infection of our criminal justice system.  In Mississippi, the ACLU published a report "identifying the rampant use of criminal informants as 'one of the most troubling aspects of the state's criminal justice system." *Numbers Game: The Vicious Cycle of Incarceration in Mississippi, ACLU/Justice Strategies* (2011).[19] The FBI has published its own report to Comply with the Attorney General's Investigative Guidelines, recognizing the problem it has had in dealing with informants: The FBI's Compliance with the Attorney General's Investigative Guidelines, U.S. Dep't of Justice Office of the Inspector General (2005).[20]

## D.      Cross Examination is an Insufficient Guarantee of Mr. Burrell's Right to Due Process

Despite the recognized unreliability of compensated informant witnesses, courts have

---

[18]   Available at:
https://www.google.com/search?q=Law+Enforcement+Confidential+Informant+Practices%2C+Hearing%2C+July+19%2C+2007&oq=Law+Enforcement+Confidential+Informant+Practices%2C+Hearing%2C+July+19%2C+2007&aqs=chrome..69i57.1871j0j8&sourceid=chrome&ie=UTF-8
[19]   Available at:
http://www.justicestrategies.org/sites/default/files/publications/DLRP_MississipppiReport%20Final%20Mar%202011.pdf.
[20]   Available at:  https://oig.justice.gov/special/0509/final.pdf.

traditionally permitted them to testify on the assumption that cross-examination will adequately test an informant's truthfulness. *See, e.g., Hoffa v. United States*, 385 U.S. 293, 311 (1966). In *Hoffa*, the Supreme Court upheld the use of a compensated informant, holding that his testimony did not violate the defendant's right to due process, in large part because of the availability of cross-examination, reasoning that "[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Id.* at 311; *see also Cervantes-Pacheco*, 826 F.2d at 315 (procedural protections of discovery, cross-examination, and jury instructions regarding informants satisfy due process).

However, studies of juries' reactions to cooperators' testimony shows that jurors tend to believe cooperators. The reason for this is that criminal informants are highly incentivized to convince the government of their lies, and therefore, they must convince juries too. While no disrespect is meant to the individual prosecutors in this case, it is true that because of the way the system has been established, prosecutors rely too heavily on criminal informants. Alexandra Natapoff, *Beyond Unreliable: How Snitches Contribute to Wrongful Convictions*, 37, Golden Gate U. L. Rev. 107 (2006). This is problematic because prosecutors usually do not have firsthand knowledge about the information given from criminal informants, which makes it difficult for them to discern when informants are lying. *Id.* at 108. The typical pattern of the transaction-- an informant obtains a benefit and the prosecutors receive inculpatory information -- creates no incentive for the informant or the prosecution to critically examine the information obtained, which jurors are inclined to believe. *Id.*

This last point is worth highlighting, as most courts presume that an instruction to jurors guarding against the credibility of informants is sufficient. However, researchers conducted a study about unreliable informant testimony, both examining the tendency of people to lie when faced with threats or incentives, and the likelihood of jurors to believe them. The authors found that, whether the source being a jailhouse informant, an accomplice witness, a witness who received an incentive for testifying, and a witness who had no incentive, jurors did not see an incentive as a reason to doubt the validity of the testimony, regardless of the source or the cooperating witness' potential motivation. Nor did the fact that the witness had a history of testifying affect the jurors' determination of their credibility. *See* Jeffrey Neuschatz, Nicholaos Jones, Stacy A. Wetmore, and Joy McClung, *Unreliable Informant Testimony*, Ch. 10, in

*Conviction of the Innocent, Lessons from Psychological Research*, ed. Brian Cutler (Washington D.C.: A.P.A. Press, 2012) 212-238.[21]  Juries often afford undue credibility to criminal informant testimony on the assumption they have "inside knowledge" about the crime. Such assumptions, which may operate on a subconscious level, are not easily dispelled by cautionary instructions. Juries who place undue weight on the testimony of compensated informants are a major factor contributing to the prevalence of wrongful convictions.[22]

Wrongful convictions attributable to this practice continue because insufficient procedural safeguards exist to regulate the use of compensated informant testimony.  Police and prosecutors are not obligated to maintain a central file system that tracks an informant's record.  Courts do not mandate pre-trial hearings during which the truthfulness of criminal informants can be examined prior to trial.  Uncorroborated informant testimony is allowed to be the basis for a conviction.

In this case in particular, the cooperators' testimony will be nearly impossible for defense counsel to penetrate on cross-examination.  Mr. Burrell does not have all of the government's discovery, nor has it seen any specific cooperator agreements or witness statements.  As far as Mr. Burrell knows, the cooperator(s) are the only witnesses to the crime, and their stories can neither be independently confirmed nor disproved. The assertion that Mr. Burrell possessed firearms or sold drugs rests entirely upon these self-serving statements of the cooperating witnesses.

Cross-examination will be further hampered because the defense lacks pre-trial access to many of the cooperators.  No plea agreements, 302s of interviews with corroborators, or other notes of conversations with the informants has been disclosed to the defendants.  However, it is known that the government has unfettered access to the cooperators, and that the cooperators have had multiple opportunities to hone their version of events in preparation for court. This combination of one-sided access and government preparation will render these witnesses overly prepared and difficult to examine at trial.

Finally, unlike uncharged lay witnesses, the cooperators have compelling incentives to pin responsibility on Mr. Burrell.  The more culpable they make Mr. Burrell, the less culpable they are. Their future literally hangs in the balance, based on their ability to maintain a consistent story. For all these reasons, in-trial cross-examination will be insufficient to determine whether the

---

[21]   Available at: http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.464.3743&rep=rep1&type=pdf
[22]   George C. Harris, *Testimony for Sale: The Law and Ethics of Snitches and Experts*, 28 Pepp. L. Rev. 1, 49-58 (2000).

cooperators are being truthful.

Professor George Harris has analyzed the difficulty of cross-examining informants whose compensation depends on their usefulness to the prosecutor.  As Professor Harris explains:

> Paradoxically, the more a witness's fate depends on the success of the prosecution, the more resistant the witness will be to cross-examination. A witness whose future depends on currying the government's favor will formulate a consistent and credible story calculated to procure an agreement with the government and will adhere religiously at trial to her prior statements.[23]

In this case, the motivations of the cooperators are precisely those described by Professor Harris. Years of their lives literally depend on the success of this prosecution, and therefore they will be more resistant to cross-examination than the typical witness.

For these reasons, the Court should not rely on defense counsel's eventual cross-examination of these witnesses to establish their truthfulness, but rather should have the opportunity, unfettered by the rules of evidence and the presence of the jury, to determine for itself whether the testimony of these witnesses bears sufficient indicia of reliability to permit its presentation at trial. The sufficient indicia of reliability should be independent of any other informants' statements. The prosecution should not be allowed to buttress one informants' unreliable, honed and prepared statement with that of another informant.

Because of the difficulty ascertaining these matters in the heat of trial in the presence of the jury, a pre-trial reliability hearing is warranted.  Courts have established that a "prosecutor who does not appreciate the perils of using rewarded criminals as witnesses risks compromising the truth-seeking mission of our criminal justice system [and courts] expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery." *Commonwealth of the Northern Mariana Islands*, 236 F.3d at 1089; *see also Levenite*, 277 F.3d at 459-62. This obligation stems from two sources: first, the government enlists and controls and rewards its informants and is therefore in a unique position to evaluate their reliability; second, the prosecutor, as the representative of the sovereign, has an ethical obligation to ensure that the defendant is given a fair trial. *See Commonwealth of the Northern Mariana Islands*, 236 F.3d at 1089 (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)).

We are in the unique position that we have a strong basis upon which to believe that at least

---

[23]   George C. Harris, *Testimony for Sale: The Law and Ethics of Snitches and Experts*, 28 Pepp. L. Rev. 1, 54 (2000).

one cooperator has lied in this case.  Specifically, that basis is the governments' initial reliance on the following:  that Mr. Burrell had committed a death eligible murder, the government's Enterprise letter that indicated numerous acts of violence, and the assertion that Mr. Burell was involved in the murder of Fabian Pennant.  It is for these reasons the government is in a weak position to guarantee the reliability of the cooperators' testimony.  From the inception of this case, the cooperators have been well aware that any hopes of lenience rested on their ability to provide the government with useful information.

The hopeful cooperating witnesses in this case have also had access to most of the discovery produced by the government and they are well aware that government's primary target is Mr. Burell. The government is thus the primary target of the cooperators' efforts to escape punishment, and if the cooperators are lying, they will presumably be particularly careful not to reveal it to the government.

The Ninth Circuit addressed these issues of reliability and government obligations in *Commonwealth of the Northern Mariana Islands*. There, three co-conspirators were charged with murder and kidnapping. There was some evidence that two of the three conspired to pin the murder on the third. The government's failure to fully investigate the possibility of collaborative perjury caused the court to reverse the conviction. In its decision, the court noted that when the government makes a deal with an informant, "each contract for testimony is fraught with the real peril that the proffered testimony will not be truthful, but simply factually contrived to 'get' a target of sufficient interest to induce concessions from the government." *Commonwealth of the Northern Mariana Islands*, 236 F.3d at 1095. The court concluded that "rewarded criminals represent a great threat to the mission of the criminal justice system." *Id.*

Barry Tarlow has likewise documented the significant difficulties that prosecutors experience in holding their criminal informants accountable.[24]  Tarlow, a former prosecutor, explains how prosecutors may be drawn in by informants who have strong motivations to pin responsibility on others, and notes the heavy pressures on prosecutors to rely on unreliable compensated witnesses when others are unavailable.

Given the inherent "peril" of rewarded testimony and the government's heavy reliance on it in this case, the government should not be permitted merely to proffer its good faith belief in the reliability of its witnesses and neutral questioning by the Court.

---

[24]   *See* Barry Tarlow, *Perjuring Informants Brought to the Bar*, RICO Report, CHAMPION 33-40 (July 2000).

**E.      A Pre-trial Reliability Hearing Would Protect the Integrity of the Case**

Where the unreliability of a particular type of witness is so well-established, it is appropriate for the court to take protective steps to guarantee the integrity of the process. *Cf. Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 595 (1993) (court to act as "gatekeeper" to ensure reliability of scientific evidence).

1.   *The Court has the Authority to Conduct a Reliability Hearing Under the Federal Rules of Evidence*

In this case, the interests of justice and a fair trial require a pretrial reliability hearing to permit the Court to ascertain the reliability and probative value of the cooperators' testimony.  The Court has clear authority to hold such a hearing pursuant to Federal Rule of Evidence 104(c), which provides: "Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury.  Hearings on other preliminary matters shall be so conducted when the interests of justice require . . . ."

The rules of evidence likewise obligate the Court to screen out unfairly prejudicial, harmful, confusing or otherwise unhelpful evidence.  Federal Rule of Evidence 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Likewise, Federal Rule of Evidence 701, limits lay witness testimony to testimony that is "helpful" to the trier of fact.

2.   *The Principles of Daubert Support the Holding of a Reliability Hearing*

The law's treatment of expert witnesses further supports the holding of a reliability hearing in this instance.  In *Daubert*, the Supreme Court determined the need for a special mechanism to evaluate the reliability of expert witnesses because experts pose thorny problems of cross-examination and persuasion.  Experts, for example, rely on specialized information that is not directly available to the jury.  *Daubert*, 509 U.S. at 592.  The court held that the concerns underlying Rule 403 are preeminent because expert witnesses can have such a potent effect on juries:

> Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 [] exercises more control over experts than over lay witnesses.

*Daubert*, 509 U.S. at 595. Moreover, as Professor Harris has noted, expert witnesses are compensated, violating the usual presumption against the use of paid testimony.[25] The suitability of compensated expert testimony is thus determined in part by pre-trial judicial examinations of reliability.

Informants pose many of the same special concerns as expert witnesses. Unlike typical lay witnesses, they are compensated, they have personal interests in the outcome of the case, their testimony is difficult to test on cross-examination, and they are selected and controlled by the propounding party.[26] Like experts, moreover, informant testimony can be "powerful and quite misleading." At least one court has expressly extended the principles of *Daubert* to cover informants, imposing a "reliability hearing" requirement whenever the testimony of a so-called "jailhouse snitch" is involved. *Dodd v. State*, 993 P.2d 778, 784 (Ok. Ct. of Crim. App. Jan. 6, 2000) (Strubhar, J., concurring) (approving lower court imposition of "reliability hearing" comparable to *Daubert* hearing).

In this case, the cooperators are the sole witnesses to the alleged crime and their version of the story will carry heavy weight with the jury. In the same way that courts act as "gatekeepers" with respect to experts, it is appropriate here for this Court to act as gatekeeper to ensure that unreliable informant testimony does not taint the jury.

### 3. *A Reliability Hearing is Warranted on the Facts of this Case*

In this case, the cooperators' testimony presents a substantial danger of "unfair prejudice" because it is the government's primary evidence against Mr. Burrell, it is highly unreliable, because the cooperators have overwhelming motivations to lie, and because their testimony cannot be disproved. Their testimony will not be helpful to the trier of fact if it is so biased and unverifiable that no trier of fact can conclusively determine whether it is truthful or not. Indeed there is an even greater danger that such testimony would be taken as reliable and believed by a jury.

It is particularly important that the cooperators' reliability be tested prior to trial outside the presence of the jury. The cooperators' reliability, their incentives to fabricate, the details of the crime, and their relationship to the Mr. Burrell, are matters which may only be susceptible to

---

[25] *See* Harris, *Testimony for Sale,* 28 Pepp. L. Rev. 1 at 1-5.
[26] *Id.*, at 49-59.

penetration through the more informal inquiries permitted under Rule 104, where the rules of evidence do not apply. Moreover, the Court is better suited to recognize reliability and credibility concerns that may elude the jury. The inquiry into such matters also could be highly prejudicial if heard by a jury and incurable by subsequent jury instruction.

Finally, as noted above, the procedural requirements set forth in *Levenite* can best be met at a preliminary hearing. At such a hearing, the informant will be subject to cross-examination, and the government can provide to the Court and counsel any corroboration it might have and provide assurances that the arrangement with the witnesses indeed protects against perjurious testimony.

4. *Defense Should Be Given Power to Provide Immunity to its Witnesses in Fairness to the Defense*

Some Circuits have clearly expressed concern about the nature of a process that tolerates a gross lack of symmetry in the development and presentation of evidence in part because the defense cannot match the government's power and resources in cultivating witnesses. Increasingly, the government is empowered to provide forms of consideration to witnesses that the defense does not have at its disposal -- and in some cases that would be illegal for the defense to try to provide.

The Ninth Circuit in *United States v. Straub*, 538 F.3d 1147 (9th Cir. 2010) reversed a conviction, finding that a defense witness should have been granted use immunity. Reiterating the test laid forth in *Burrell v. Woodford*, 384 F.3d 567 (9th Cir. 2004), the Court said that in order for a defense witness to be granted immunity, the witness' testimony would have to be relevant, and the prosecution's refusal to grant the witness use immunity was deliberately intended to distort the fact-finding process. *Id.* at 1157 (*citing Burrell*, 384 F.3d at 600). In *Straub*, the prosecution offered immunity to many of its witnesses, but refused to offer immunity to a defense witness. The defense did not argue that the prosecution acted with deliberate intent to distort the fact-finding process, but that the prosecution's selective use of immunity had the effect of distorting the fact-finding process. The Court held that this violated due process, and adopted the "effects test": "one may prove that the prosecution acted with a certain purpose merely by demonstrating that the prosecution committed a set of acts (the selective denial of use immunity described) that had the effect of distorting the fact-finding process." *Id.*

While Mr. Burrell will certainly request use immunity when and if he determines it is

necessary, nonetheless, this does not resolve the issue of fairness for the defense.  In *Straub*, the Court acknowledged that, in satisfying the first prong that the testimony be "relevant," the defense "need not show that the testimony sought was either clearly exculpatory or essential to the defense." *Id.* at 1157 (citing *United States v. Westerdahl*, 945 F.2d 1083, 1086 (9th Cir. 1991)). Mr. Burrell recognizes that in *United States v. Duran*, 189 F.3d 1071 (9th Cir. 1999), the Court held that it was not error to deny immunity to the proposed defense witness, because "the government did not grant use immunity to any witness whose testimony would have been contradicted by [the witness]." *Id.* at 1087.

A grant of immunity to a defense witness would ensure due process, because even assuming witnesses may be granted immunity when testifying for the defense, this only deals with the situation of testifying. Witnesses' reluctance and the defense's total inability to shield them from the oppressive weight of the government have hindered the defense efforts to adequately present a defense from the start of the case.  Thus, with respect to some witnesses, the defense will not be in a position to even request immunity, for it will not even be able to speak to a witness to know what the witness would say.  For some witnesses, a grant of immunity at trial will be too little, too late.

On the flip side, the government has been at a huge advantage over the defense in its choice of mechanisms through which to cultivate potential witnesses. This case presents examples of virtually every tool available to the government to pursue and acquire witnesses, and to make a case.

In addition, the defense has no power to (a) immunize witnesses or seek their immunity in the absence of stringent conditions precedent; (b) no way of relocating witnesses, or obtaining the logistics for their relocation; and (c) no way of matching the government in the panoply of consideration that can be offered.  The defense cannot legally offer a witness the combination of tangible and intangible benefits that the government can, and does, offer its witnesses.

Accordingly, because of the inherent inequity between the defense's ability to present witnesses in its defense and the multitude of resources available to the government, which cannot be cured, Mr. Burrell requests that the testimony of any witnesses who have been offered any consideration by the government be excluded.

## POINT FIVE

## SPECIFIC REQUESTS CONCERNING GOVERNMENT'S USE OF INFORMANTS, OPERATIVES AND COOPERATING INDIVIDUALS

Mr. Burrell requests the following exculpatory evidence concerning the government's use of informants, operatives and cooperating individuals who participated in any way or who are material to any of the events charged in the indictment. Mr. Burrell requests that the identities of any such class of person and the information requested below be produced immediately to the defense.

1. Whether such informant, witness, confidential source or cooperating individual was suspected, apprehended or convicted of any crime(s) at any time during which he/she agreed to gather information on behalf of the United States or any other government agency.

2. What crime(s) or other breaches of law (including jurisdiction and case number) such informant, witness, confidential source or cooperating individual had committed or was suspected of having committed at any time during which he/she agreed to gather information on behalf of the United States or any other governmental agency.

3. Whether any potential or actual criminal charges against any informant, witness, confidential source or cooperating individual were abandoned, altered, or otherwise disposed of upon his/her agreement to gather information on behalf of the United States or any other governmental agency.

4. What financial arrangements existed or exist between any informant, witness, confidential source or cooperating individual and the agencies of the United States, New York or any other state, including but not limited to:

   (a) any sums of money paid to any informant, witness, confidential source or cooperating individual; and

   (b) copies of any vouchers for payment to any informant, confidential source, cooperating individual or witness.

5. The names, addresses, and criminal records of any informant, witness, confidential source, or cooperating individual to be called as a witness for the government.

6. The substance of any plea bargain(s) entered into by any agency of the United States, New York or other jurisdictions, and the authority for any such plea bargains.

7. The substance of any formal or informal agreements made by the United States, New York or other jurisdictions with any informant, witness, confidential source or cooperating individual not to charge crimes or to enter into a plea agreement and the authority for any such agreements.

8. Information tending to show bias and/or prejudice on the part of any informant, witness, confidential source or cooperating individual whom the government intends to call at trial.

9. Information tending to show that any informant, confidential source or cooperating individual has made contradictory or inconsistent statements relative to this case, to any related case, or to Mr. Burrell.

10. Information tending to show that any informant, witness, confidential source or cooperating individual suffers from any material defect in perception, memory, veracity or articulation.

11. The nature of any past or present relationship between any informant, confidential source or cooperating individual utilized in this case and the FBI, CIA, NSA, NSC, DIA, BATF, U.S. Secret Service, IRS, DEA, U.S. Customs or any other federal agency, or state agency, including but not limited to the date of such relationship and whether a continuing relationship exists.

12. The exact date, time and place that any federal or state agency, and the name of the agency or agencies that engaged any informant.

13. Whether any informant utilized by the government has taken a polygraph examination regarding the allegations which are the subject of this indictment, and if so, as to each such person:

    (a) the name of the person;
    (b) the date, time and place or the examination or examinations;
    (c) how many tests were given;
    (d) how many tests the person has passed or failed to show deception;
    (e) how many tests the person has failed or showed deception;
    (f) the names and credentials of the operators;
    (g) a copy of the polygraph chart and the examiner's notes for independent evaluation by the defense;
    (h) a copy of the pre-test questionnaire and answers;
    (i) the purpose for which the person was polygraphed.

14. Whether any informant is or was at the time of the events alleged in the indictment an abuser or alcohol or controlled substances, and if so, then a description of:

    (a) the substance;
    (b) the amount used;
    (c) the extent of addiction;
    (d) current status with regard to alcohol or drug abuse;
    (e) any and all psychological or psychiatric reports concerning any informants' alcohol or drug abuse problems.

15. Whether any informants utilized by the government in this case have ever had or required any psychiatric or psychological treatment and, If so, then a description of:
    (a) when and where the treatment occurred;
    (b) the exact nature of the condition treated;
    (c) whether the informant has ever been admitted to a hospital and, if so, when and where, the diagnosis and prognosis; and
    (d) whether the informant is currently receiving treatment and, if so, the nature of such treatment and the nature of the condition being treated.

16.  All evidence regarding any witness the government intends to call who is listed as an informant for any agency of the United States government, or any agency of state government, including but not limited to:

    (a) the exact nature of the relationship between the witness and the agency;

    (b) the date, time and circumstances that such relationship came into existence;

    (c) whether such a relationship was entered into voluntarily by the witness, or as a result of an agreement to forbear prosecution or for sentencing leniency;

    (d) any other reason a relationship was entered into other than a voluntary basis by the witness;

    (e) the exact reason the relationship was established;

    (f) the exact amount of money paid to any informant, when and by what method.

17.  A full and complete statement of all promises, considerations, rewards, or inducements made by the government, its prosecutors, agents or agencies to induce or encourage any witness the government intends to call at trial and who is listed as an informant for any agency of the United States government, wherein the government has agreed to any of the following (including the equivalent under state law):

    (a) not to prosecute said person for any crime or crimes;

    (b) not to prosecute a third party for any crime or crimes where the reason for not prosecuting the third party is a consideration to the person;

    (c) to provide a formal grant of statutory immunity, or to provide an informal assurance that the person will not be prosecuted in connection with any testimony, cooperation, or information given;

    (d) to recommend leniency or a particular sentence for any crime or crimes for which the person stands convicted or is expected to be convicted;

    (e) to comply with any prior agreements although said witness may have previously violated a part of their agreement;

    (f) to recommend or not oppose a reduction of the offense level of the person under the United States Sentencing Guidelines for acceptance of responsibility;

    (g) to recommend to the sentencing authority under the United States Sentencing Guidelines a downward departure from the guidelines if that person provides substantial assistance to authorities;

    (h) To recommend or not oppose any downward departures or offense level reductions for the person under the United States Sentencing Guidelines;

    (i) to seal any plea or plea agreement of that person;

    (j) to provide favorable treatment or consideration, including but not limited to, money, expenses, subsistence, a job, a new location, a new start, etc. to the person or to friends or relatives of the person in return for that person's testimony, cooperation, or provision of information;

    (k) to make any beneficial recommendation, regarding the person to any state or federal agency;

(l) to cooperate with any state law enforcement agency and that agency's agreement not to prosecute said person for any crime or crimes prohibited by state law; or

(m) to make any other recommendation of benefit, or give any other consideration to the person or friends or relatives of said person.

(n) to provide a statement to, or speak with, any law enforcement agency, prosecution official or court concerning the witness' assistance or cooperation.

18. With respect to any informants, all materials contained in the main files of the   FBI, DEA or other governmental agencies, including but not limited to:

(a) correspondence requesting approval to initiate suitability and pertinence inquiry;

(b) indices checks;

(c) correspondence requesting authority to operate following suitability and pertinence inquiry;

(d) NCIC inquiry and response;

(e) Identification Division Report;

(f) local arrest records;

(g) credit checks;

(h) FD 302s, DEA 6s or equivalent government agency documents in which the identity of the informant has been revealed;

(i) FD 209s or equivalent government agency documents containing administrative information that may tend to identify the informant;

(j) payment request memos;

(k) requests to FBI HQ for additional payment authority;

(l) requests to FBI HQ for lump sum payment authority;

(m) all other administrative type correspondence and any correspondence that identifies or tends to identify the informant.

(n) With respect to any informants utilized in this case, any and all information contained in any file designated by the FBI or DEA as "subfile" including, but not limited to FD 302s and DEA 6s in which the identity of the informant is concealed, inserts that conceal the identity of the informant, and annual letters.

20. Inasmuch as the indictment alleges criminal acts beginning in 2007, the accused requests a copy of any supervisor's informant file review log or its equivalent, with respect to any informant utilized in the investigation of this case.

21. Copies of all memoranda requesting payment for services and/or expenses to any informant, which memoranda contain a justification for the request for payment.

22. All approvals for payment for services and/or expenses to an informant utilized in the investigation of this case.

23. Copies of any and all teletypes or faxes furnished to the FBI HQ, DEA HQ or any other governmental agency requesting lump-sum payments to any informants and the approval for such payments with respect to any informant utilized in the investigation of this case.

24. Whether any informant has testified or is expected to testify in connection with this case, and any proposal to pay the informant for such testimony or pay the purported expenses of the informant, and the nature of any discussions with the U.S. Attorney's Office.

25. Any and all receipts obtained from any informants utilized in the investigation of this case obtaining, if no receipts exist, the written justification for not obtaining a receipt.

26. If the obtaining of a receipt was not possible, the memorandum setting forth the complete circumstances of payment.

27. Whether any informants utilized in the investigation of this case were offered any rewards or if any such awards were offered to any private individuals and, if so, the approval and all documentation relating to such rewards.

28. Copies of all federal tax returns of any informant utilized in this case filed during the investigation and up until the time of trial.

29. All receipts signed by prospective government witnesses or informants utilized in this case.

30. Any and all representations made to informants concerning the potential of reward or payment for information including fees or payments, which may be earned from forfeited assets or collected fines.

31. Whether any informant utilized in this case has previously been used as an informant and/or witness by any federal or state agency or in any federal or state prosecution and, if so state:

    (a) the agency or agencies for which the individual was an informant;
    (b) the dates when such a relationship existed and the length of such relationship;
    (c) the dates when and places where the individual testified as a witness;
    (d) the exact payments the individual received for services and expenses.

32. Any and all documentation detailing or setting forth the accomplishments by informants utilized in this case.

33. The date(s) on which all persons who were informants utilized in this case were 'open' or 'closed' as informants.

34. Whether any persons are currently open as informants.

35. Copies of all instructions required to be given to any informant used on a continuing basis including any informant authorized to associate in activities, participation in which otherwise authorized involvement in unauthorized past or continuing criminal activities, and any informant confidential source providing substantial operational assistance in conjunction with this case.

36. A copy of the written record in any informant's or confidential source's file of instructions given.

37. Any authorization or approval for any informant or confidential source to engage in any activity that would constitute a crime under state or federal law if engaged in by a private person and the written findings by supervisory officials that such conduct is necessary to

obtain information or evidence and that the need outweighs the seriousness of the conduct involved.

38.   Copies of pretrial services reports on any informant or confidential source prepared for any informant or confidential source that have been arrested for a federal offense.

39.   Copies of presentence reports prepared on any informant or confidential source upon conviction or plea of guilty.

## POINT SIX

### THE GOVERNMENT SHOULD IDENTIFY ANY SOCIAL MEDIA THAT IT INTENDS TO INTRODUCE AT TRIAL

As stated previously there is such voluminous social media evidence that the government has produced in this case that it is literally impossible to anticipate what the government will introduce at trial.  By the government's own admission it has stated the following regarding the social media discovery:

> Social Media: The Government sought and obtained warrants for over one hundred Facebook, Twitter, or Instagram accounts, and has downloaded numerous publicly-available YouTube videos. The Government will produce application materials and the returns relating to each gang. The Government is awaiting some of these returns and will produce them promptly upon receipt.

> Contents of Cellular Phones: Pursuant to search warrants, the Government searched and is in the process of searching numerous cellular phones belonging to gang members and associates. The Government will produce the application materials and reports of the contents of the phones on a rolling basis.

See *Government Letter in Connection with Unsealed Indictments*, dated April 27, 2016 at 3, attached as **Exhibit A**.  In order for the defense to evaluate and be permitted to argue the relevancy and/or the prejudice or probative value of such evidence, the government must identify which videos, if any, it intends to introduce into evidence.  Without this designation of evidence it will be impossible for Mr. Burrell to prepare his defense at trial.  The defense should not be forced to search for the needle in the proverbial haystack and then to surmise what social media the government intends to introduce against Mr. Burrell.

## POINT SEVEN

### THE COURT SHOULD PRECLUDE ANY RAP VIDEOS OR RAP MUSIC IN THIS CASE

Based on the discovery to date, we believe the prosecution will seek to introduce several "rap"[27] videos allegedly created by Mr. Burrell. The government should not be allowed to introduce any of those videos -- videos created solely for entertainment purposes -- into evidence. The government will undoubtedly broadly justify any request for admission under various theories including characterizing the media as direct evidence of the charges, that is, the substantive charges of racketeering, racketeering conspiracy, narcotics conspiracy and gun possession. The prosecution will certainly contend admission of all the media is admissible under the Federal Rules of Evidence: Fed R. Evid. 801 (d)(2)(a) - admissions of a party opponent; Rule 801(d)(2)(e) - coconspirator statements; Rule 804(b)(3) - statements against interest. However, any such broadly sweeping justification lacks the appropriate specificity required to justify admission. Thus, we strenuously object and request preclusion of these videos, on both constitutional grounds pursuant to the First Amendment, and based on relevant evidentiary principles, including the hearsay rule, since much that is spoken on the videos is not spoken by the defendant. Thus, the Court should exclude any of these rap videos or music the government intends to introduce in this case.

Rap music has become the focus of many cases, both in this District and elsewhere. In those cases the courts have analyzed the use of fictional expressions as evidence of character or motive and intent in criminal proceedings.

There is little doubt that there are individuals whom would find the lyrics at issue in these videos offensive. As is particularly common in the "gangsta"[28] sub-genre of rap, the lyrics sometimes are profanity-laden, and replete with misogynistic, sexist, and racist language, images, and epithets; they graphically depict a world of brutal and unremitting violence. However repugnant, these are artistic expressions entitled to constitutional protection. Moreover, they are expressions of political and social commentary, sitting on the highest rung of First Amendment

---

[27]   A type of music of U.S. black origin in which words are recited rapidly and rhythmically. See Google definition available at:
https://www.google.com/search?q=definitian+rap&oq=definitian+rap&aqs=chrome..69i57j0l5.77283j0j4&sourceid=chrome&ie=UTF-8#q=definition+rap.

[28]   Gangsta rap is a subgenre of hip hop music that evolved from hardcore hip hop and purports to reflect urban crime and the violent lifestyles of inner-city youths. https://en.wikipedia.org/wiki/Gangsta.

hierarchy. *See Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207, 1215, 179 L. Ed. 2d 172, 181 (2011). As Brown University Professor Tricia Rose explains:

> Rap music brings together a tangle of some of the most complex social, cultural, and political issues in contemporary American Society. Rap's contradictory articulations are not signs of absent intellectual clarity; they are a common feature of community and popular cultural dialogues that always offer more than one cultural, social, or political viewpoint. These unusually abundant polyvocal conversations seem irrational when they are severed from the social contexts where every day struggles over resources, pleasure, and meanings take place. Rap music is a black cultural expression that prioritizes black voices from the margins of urban America. . . . From the outset, rap music has articulated the pleasures and problems of black urban life in contemporary America. Male rappers often speak from the perspective of a young man who wants social status in a locally meaningful way. They rap about how to avoid gang pressures and still earn local respect, how to deal with the loss of several friends to gun fights and drug overdoses, and they tell grandiose and sometimes violent tales that are powered by male sexual power over women.

Tricia Rose, *Black Noise: Rap Music and Black Culture in Contemporary America* (1994).

Rap is generally written in the first person, saturated with violent metaphors, and often tells a violent "yarn." Andrea Dennis, *Poetic (In) Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence,* 31 Colum. J.L. & Arts 1, 22-23 (2007). That a rap artist wrote his lyrics in the first person is no more reason to ascribe to him the acts and conduct described in the lyrics than to ascribe Gulliver's beliefs to Swift or Nick Carraway's beliefs to Fitzgerald. And that a rap artist wrote lyrics seemingly embracing the world of violence is no more reason to ascribe to him a motive and intent to commit violent acts than to saddle Dostoevsky with Raskolnikov's motives or to indict Johnny Cash for having "shot a man in Reno just to watch him die." A-Z Lyrics, available at: http://www.azlyrics.com/lyrics/johnnycash/folsomprisonblues.html. The iniquitous fact is that artistic expressions like those of Swift, Fitzgerald, Dostoevsky, and Cash have never been used by prosecutors to ascribe "motive and intent" to criminal defendants, but those of rap artists have been.

In her seminal book, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness,* Ohio State University law professor Michelle Alexander ascribed the emergence of rap, and "gangsta" rap in particular, to the stigmatization of inner-city black youth's being labeled "criminals" in numbers grossly disproportionate to their population. Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* 171-75 (2012).

This "mass incarceration," Professor Alexander contends, has immense effects on every aspect of black life, leading to a downward spiral of denials of employment, housing, public benefits and the right to vote, spurring young black men to identify with criminals by writing rap music. *Id*. at 174-75. In this context, it seems a cruelly ironic contribution to the vicious cycle of mass incarceration for rap music to be singled out as a medium of artistic expression utilized to support criminal convictions.

A First Amendment analysis should lead to a providing of "breathing space" for this art form. For these reasons as more fully presented below, it is a violation of Mr. Burrell's constitutional rights to premise a prosecution on a form of expression, however distasteful, which the Constitution tolerates and protects." *Street v. New York*, 394 U.S. 576, 594, 89 S. Ct. 1354, 1367, 22 L. Ed. 2d 572, 586 (1969). Further, we ask this Court to recognize the significant free speech overlay on this case, and adopt a more stringent set of standards to guide courts in admitting into evidence a criminal defendant's fictional, artistic expressions.

## A.   Mr. Burrell's Rap Lyrics are Entitled to Heightened Protection Under State and Federal Free Expression Clauses

The admission of Mr. Burrell's rap lyrics into evidence to demonstrate a "motive and intent" as to the charges in the indictment is a violation of Mr. Burrell's right of free expression guaranteed under the United States Constitution. The government has not indicated if or what rap videos they will seek to introduce at trial. When the government does provide that information the defense respectfully requests an opportunity to provide a more factually detailed argument specific to the rap videos in this case.

### 1. *The Rap Lyrics Are Protected Speech Under the State and Federal Constitutions*

Freedom of speech and expression are protected under the First Amendment to the United States Constitution and contains prohibitions against abridging the liberty of speech.

Mr. Burrell's rap lyrics are protected speech, and they should not be admitted under the circumstances of this case. The federal free speech clause is not limited to conduct that communicates a political, social, philosophical or religious message. Rather "expressive conduct," including "artistic expression such as painting, music, poetry and literature" is protected as freedom of expression. *Id., and see Hurley v. Irish American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569, 115 S. Ct. 2335, 2345,132 L. Ed. 2d 487, 501 (1995); *Ward v. Rock Against Racism*, 491 U.S. 781, 790, 109 S. Ct. 2746, 2753, 105 L. Ed. 2d 661,674 (1989). As one

observer has noted, "[c]ourts do not acknowledge that defendants authoring rap music lyrics are engaging in an artistic process that challenges everyday expectations regarding language." Dennis, *supra*, 31 Colum. J.L. & Arts at 13-14. She continues:

> Similar to other art forms, rap lyrics have their own artistic or poetic conventions. The use of these conventions is commonly understood in more traditional arts such as fiction writing and poetry. *Id*. at 20.

Rap lyrics have a unique blend of "metaphors and boasts," narratives deriving from the oral and literary traditions of the black community, and role-playing. *Id*. at 22-23.

> The intention of the narrator of the [rap music] Yam[29] is to tell outrageous stories that stretch and shatter credibility, overblown accounts about characters expressed in superlatives .... We listen incredulously, not believing a single word, our delight based on skepticism and wondering whether the storyteller can top the last, preposterous episode he's spun - by definition the traditional Yam is always episodic in structure, one outrageous lie after another.

*Id. See also* Rose, *supra* at 55: "The most frequent style of rap was ... a boastful, bragging form of oral storytelling sometimes explicitly political and often aggressive, violent and sexist in content." Professor Rose has described the rap artistic techniques:

> Rappers tell long, involved, and sometimes abstract stories with catchy and memorable phrases and beats that lend themselves to black sound bite packaging, storing critical fragments in fast-paced electrified rhythms. . . . For rap's language wizards, all images, sounds, ideas, and icons are ripe for recontextualization, pun, mockery, and celebration.

Rose, *supra* at 3. Mr. Burrell's lyrics precisely fit this mold. His lyrics depict a world where violence is so intense and all-pervasive that it makes the reader hold his or her breath. They are no more relevant to Mr. Burrell's general "motive and intent" to commit a violent crime than would be the lyrics of "I Shot the Sheriff" to Bob Marley's motives and intentions.[30] Mr. Burrell's lyrics are no less entitled to protection under the First Amendment.

---

[29] Yams is a service that gives music recommendations and personalized playlists made by an actual, knowledgeable human who understands your taste and knows what they're talking about. The Yams website indicates that it was created for people who are enlivened by art, inspired by new sounds, and wish they had time to comb through the infinite maze of music on the internet but can't because they have actual lives. *See* http://theyams.com/about.

[30] *See* Lyrics Freak, available at http://www.lyricsfreak.com/b/bob+marley/i+shot+the+sheriff_20021744.html; or those of "Bohemian Rhapsody" to Freddy Mercury's ("Mama, just killed a man. Put a gun against his head. Pulled my trigger, now he's dead.") Queen Words, available at www.queenwords.com/Jyrics/songs/sngll_html.

**B.     The Rap Lyrics Constitute Political and Social Discourse Entitled to Heightened Scrutiny**

The overarching image created by Mr. Burrell's lyrics is of an urban environment where violence is the gestalt. The essence of the writings, in the words of Mr. Burrell, is lyrics that are Mr. Burrell's social and political commentary on impoverished black neighborhoods in our inner cities.   As such, they are entitled to even greater protections than other artistic expressions. "[S]peech on 'matters of public concern' ... is 'at the heart of the First Amendment's protection.'" *Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207, 1215, 179 L.Ed. 2d 172, 180 (2011), *quoting Dun & Bradstreet. Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985) (opinion of Powell, J.) (*quoting First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 776, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978)): "The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed. 2d 686 (1964). That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145, 103 S. Ct. 1684, 75 L.Ed.2d 708 (1983) (internal quotation marks omitted). *Snyder v. Phelps*, *supra*, 562 U.S. at 445, 131 S. Ct. at 1215, 179 L. Ed. 2d at 180-81.

The Supreme Court has described two ways in which speech can be found to deal with matters of public concern: (1) when it can be "fairly considered as relating to any matter of political, social, or other concern to the community," and (2) when it is "a subject of legitimate news interest; that is a subject of general interest and of value and concern to the public." *Id.*, 562 U.S. at 445, 131 S. Ct. at 1216, 179 L. Ed. 2d at 181. These are contrasted with matters of purely "private concern," such as the information about an individual's personal credit report that was involved in *Dun & Bradstreet*, *supra*.   Mr. Burrell's rap lyrics easily fall within both categories of "public concern."   The world of crime and violence that he so graphically describes is of obvious concern to the community at large and is a subject of general interest to that community. That the language Mr. Burrell used may be offensive, outrageous, or inappropriate is not only "irrelevant to the question whether it deals with a matter of public concern," *Rankin v. McPherson*, 483 U.S. 378, 387, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987), quoted with approval in *Snyder v. Phelps, supra*, 562 U.S. at 447, 131 S. Ct. at 1216, 179 L. Ed. 2d at 181, it is the very "reason for

according it constitutional protection." *Hustler Magazine v. Falwell*, 485 U.S. 46, 55, 108 S. Ct. 876, 882, 99 L. Ed. 2d 41, 52 (1988).

In determining whether speech is of private or public concern, this Court must make an independent examination of all the circumstance of the speech, including as revealed in the whole record, to analyze the "content, form, and context" of the speech. *Snyder v. Phelps*, 562 U.S. at 444, 131 S. Ct. at 1211, 179 L. Ed. 2d at 176. As in *Snyder*, where the Supreme Court found repugnant speech directed at homosexuality at a military funeral as discussing issues of public import even though they contained words directed specifically and personally against the officer being buried, Mr. Burrell's writings discuss issues of "public import": urban crime and violence and drug wars, and the utter lack of hope in our inner cities.

However crude, the lyrics constitute statements of social commentary. However visceral they are statements of political protest: rap music is "a contemporary stage for the theater of the powerless," rendering "a critique of various manifestations of power" with jokes and stories, enacting "ideological insubordination." Id. At 101. Professor Rose concludes:

> Rap music is fundamentally linked to larger social constructions of black culture as an internal threat to dominant American culture and social order. Rap's capacity as a form of testimony, as an articulation of a young black urban critical voice of social protest has profound potential as a basis for a language of liberation. Contestation over the meaning and significance of rap music and its ability to occupy public space and retain expressive freedom constitute a central aspect of contemporary black cultural politics.

*Id.* at 144. Professor Alexander has a slightly different take on rap, but nevertheless one that underscores its political nature. In her view, rap emerged as part of the struggle of young, black youths to preserve a positive identity by "embracing their stigma" in the face of the punitiveness and despair of the racialized "system of mass incarceration," where the war on drugs is waged "almost exclusively against poor people of color - people already trapped in ghettos that lacked jobs and decent schools." *Alexander*, supra at 175. In her view, rap, and Gangsta rap in particular, is a significant form of political expression:

> Indeed, the act of embracing one's stigma is never merely a psychological maneuver; it is a political act - an act of resistance and defiance in a society that seeks to demean a group based on an inalterable trait.

*Id.* at 171. It would be a cruel irony, indeed, were the very type of social and political expression that may have been spawned by a deplorable assault on one group of people, used to further the vicious circle of conviction and despair.

Mr. Burrell's rap lyrics paint a portrait of a city and of a people seemingly beyond help and without hope. Whether the lyrics represent an assertion of power, an embrace of stigma, or something else, they convey messages of profound public concern. As in *Snyder*, despite that "these messages may fall short of refined social or political commentary," *Snyder v. Phelps*, supra, 562 U.S. at 456, 131 S. Ct. at 1217, 179 L. Ed. 2d at 182, they are entitled to and must receive heightened First Amendment and state constitutional protection.

**C.    The Admissibility of the Rap Lyrics as "Abstract Beliefs" is not Probative of Any Material Issue**

The United States Supreme Court has recognized the necessity of a constitutional analysis of evidence offered in the face of a free speech claim, notwithstanding the applicability of evidentiary rules. *Dawson v. Delaware*, 503 U.S. 159, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992).

In *Dawson*, the Court ruled that the admission of evidence of defendant's membership in a racist, white supremacist prison gang was not probative of any issue relevant to his sentencing, and therefore violated his First Amendment right to free association. The Court held that the First Amendment prohibited the use of evidence that proved nothing more than a defendant's possession of such "abstract beliefs." *Dawson v. Delaware*, supra, 503 U.S. at 167, 112 S. Ct. at 1099, 117 L. Ed. 2d at 319.

Here, the evidence fails to meet constitutional standards for many reasons. Although the government has not identified the rap videos and/or rap music files that it intends to use in its case, we contend that a review of the files will demonstrate that they are protected free speech.

The constitutional issues described above provide additional ballast for the decision to exclude this evidence.  First, the artistic, fictional nature of the writings in and of itself should serve as a red flag against admissibility here.  Second, that the expressions are of public, and not private, concern should further caution against admissibility.

**D.    Strict Guidelines as to the Admissibility of Fictional, Artistic Works are Necessary to Avoid a Chilling Effect on Free Expression**

Defense counsel has identified 18 cases from around the country, analyzing the admissibility of rap lyrics written by a criminal defendant. Fourteen of these decisions admitted the rap lyrics into evidence.[31] Three decisions had convictions reversed and one decision ruled

---

[31]    *United States v. Wilson*, 493 F. Supp. 2d 484 (E.D.N.Y. 2006), *aff'd* on other grounds *sub nom. United States v. Michael Whitten*, 610 F. 3d 168, 180,215 (2d Cir. 2010)(no discussion in opinion of basis for upholding admissibility

the admission of this type of evidence was prejudicial but the error was harmless.[32] Not one discussed the First Amendment implications of the issues raised, although in slightly different circumstances, the court *in State v. Tirius*, 92 S.W. 3d 751 (MO. 2002), recognized that the First Amendment might be implicated where rap lyrics are admitted into evidence:

> While it is possible that under some scenarios, playing a rap song during a trial could be violative of First Amendment principles or could be irrelevant and constitute reversible error, here, taken in context of Bulington's testimony and considering the temporal proximity of the repeated playing of the song to the murders, the music was admitted properly to show circumstantial evidence of Appellant's mental state and preparation for the murders.

*Id.*, 92 S.W.3d at 761.[33]

---

of rap lyrics dealing with gang violence); *United States v. Foster*, 939 F. 2d 445 (7th Cir. 1991) upholding admission of rap lyrics in drug distribution case); *United States v. Stuckey*. 325 F.Supp.2d 793 (2004) (upholding admission of rap lyrics narrating defendant's dislike of snitches, and his killing of them by shooting them, wrapping them in blankets, and dumping them in road, which was similar to actual crime alleged); *United States v. Williams*, 97 F.3d 240 (upholding admission of rap lyrics in RICO action, specifically describing defendant's gang as drug dealers); *Cook v. State*, 45 S.W. 2d 820 (Ark. 2001) (upholding admission of rap song to show intent to commit armed robbery); *People v. Olguin*, 31 Cal. App. 4th 1355, 1372-73 (Cal. Ct. App. 1994) (upholding admission of defendant's rap lyrics relating to gangs); *People v. Wright*, 2004 WL 516250, at *6 (Cal. App. Ct. 2 Dist., Mar. 17, 2004), *rev. denied*, June 19, 2004 (upholding admission of defendant's rap lyrics relating to gangs); *Joynes v. State,* 797 A. 2d 673, 677 (Del. 2001)(upholding admission of defendant's rap song that indicated that the victim of the assault was on defendant's "hit list" and that defendant was proposing to put the heads of his enemies on a shelf); *Holmes v. State*, 608 S.E. 2d 726 (Ga. Ct. App. 2004) (upholding admission of defendant's rap lyrics into evidence as evidence of bad character); *Appellate Court of Ill. v. Spraggins*, 723 N.E. 2d 359, 360 (Ill. App. 1999) (upholding admission of rap song defendant sang in jail, in which he substituted his own words indicating his intent to kill a witness against him for the actual words); *Bryant v. State*, 802 N.E. 2d 486, 498 (Ind. App. 2004) (upholding admission into evidence of defendant's rap lyrics that referenced placing of body into a trunk, where murder victim was found in trunk; defendant invited introduction of other portions of lyrics); *State v. Deases*, 476 N.W. 2d 91, 93 (Iowa App. 1991) (upholding admission into evidence of rap song defendant wrote about killing the actual victim); *Greene v. Commonwealth*, 197 S.W. 3d 76, 85 (Ky. 2006), cert. denied, 549 U.S. 1184, 127 S. Ct. 1157, 166 L. Ed. 2d 1001 (2007) (upholding admission of rap lyrics written after defendant killed his wife, stating that his wife "made me mad, and I had to take her life. My name is Dennis Greene and I ain't got no f---king wife"); *State v. Allen*, 2006 N.C. App. LEXIS 1880, at *12 (N.C. App. 2006), *review denied*, 638 S.E. 2d 904 (court admitted rap lyrics written by the defendant because they were "sufficiently similar to the facts and circumstances surrounding the murder ... " without further discussion).

[32] The others are *State v. Edgar Goldsberry*, Ill. App. Ct., I st Dist., 2nd Div., decided Feb. 22, 1994 (reversing murder conviction where trial court admitted rap lyrics describing gang violence); *Hannall v. State*, 23 A. 2d 192, 201-02 (Md. 2009) (reversing conviction for attempted murder where prosecutor introduced rap lyrics that showed defendant had "propensity for violence"); *State v. Cheeseboro*, 552 S.E. 2d 300, 312-13 (S.C. 2001) (ruling that rap lyrics that were written after the murder was committed and that referenced "leaving no prints" and "bodies left in a pool of blood" should not have been admitted because of prejudicial value, but that admission was harmless error); see also *Hanson v. State*, 731 P. 2d 1140 (Wash. App. 1987) (reversing murder conviction where State had introduced defendant's crime fiction writings (but not rap lyrics) into evidence).

[33] The issue in *Tirius* was the admissibility of rap lyrics which defendant had not written, but listened to over and over immediately before the crime was committed. The song had the refrain "mo' murda." *State v. Tirius*, supra, 92 S.W. 3d at 759.

Freedom of speech deserves more. Because it is so fundamental a right, it needs "breathing space to survive," *NAACP v. Button*, 371 U.S. 415,433, 83 S. Ct. 328,338, 9 L. Ed. 2d 405,418 (1963), and protection against more "subtle governmental interference," as well as frontal attacks, *Bates v. Little Rock*, 361 U.S. 516,523, 80 S. Ct. 412,416, 4 L. Ed. 2d 480, 485(1960), so as to prevent a "chilling effect" on free expression. *See Gibson v. Florida Legis. Investig. Comm.*, 372 U.S. 539, 83 S. Ct. 889, 9 L. Ed. 2d 929 (1963); and *see Lamont v. Postmaster General*, 381 U.S. 301. 85 S. Ct. 1493, 14 L. Ed. 2d 398 (1965). Chilling effects occur when "individuals seeking to engage in activity protected by the first amendment are deterred from so doing by governmental regulation not specifically directed at that protected activity." Frederick Schauer, *Fear, Risk and the First Amendment: Unraveling the Chilling Effect* 58 B.U. L. Rev. 685, 693 (1978). The vagueness and uncertain application of governmental regulations may have a chilling effect. *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 871-72, 117 S. Ct. 2329, 2345. 138 L. Ed. 2d 874, 897 (1997) (chilling effect of free speech threatened by statute criminalizing transmission of vaguely defined "indecent" material). That providing the necessary breathing space to free expression rights may result in the "ultimate failure" of criminal prosecutions is a price that we as a country have determined is fair. See *Dombrowski v. Pfister*, 380 U.S. 479, 494, 85 S. Ct. 1116, 1125, 14 L. Ed. 2d 22, 33 (1965) (finding facially unconstitutional state law criminalizing "subversive" organizations unless they registered, with the state). And this need for "breathing space" intensifies in the arena of public debate, where our citizens "must tolerate insulting, and even outrageous, speech .... *" Boss v. Barry*, 485 U.S. 318, 322, 108 S. Ct. 1157, 1164, 99 L. Ed. 2d 333, 345 (1988) (finding unconstitutional D.C. ordinance that made it illegal to hold a sign criticizing a foreign government within 500 feet of an embassy).

The threat of admitting fictional, artistic writings into evidence to prove generalized notions of "state of the mind" evidence in criminal trials will have such a chilling effect, and therefore requires "breathing space." In several of the cases where courts have admitted a defendant's fictional writings into evidence, there was no evidence of any connection between the facts described in the writing and the facts of the crime with which the defendant was charged. For example, in *United States v. Wilson*, 493 F. Supp. 2d 484 (E.D.N.Y. 2006), *aff'd* on other grounds *sub nom, United States v. Michael Whitten*, 610 F. 3d 168, 180, 215 (2d Cir. 2010) (no discussion of admissibility issue in trial for murder of two police officers, but lyrics described as reflecting "group pride in its violent character" and "that celebrated violence and that could have

been interpreted to refer to the crimes"); *United States v. Foster*, 939 F.2d 445 (7th Cir. 1991) (upholding admission of rap lyrics in drug distribution case to show defendant's knowledge of the "reality" around "urban life"); *Cook v. State*, 45 S.W.2d 820, 821-25 & n.1 (Ark. 2001) (upholding admission of rap song entitled "Give up (the Strilla ['street slang' for 'money,')" ["If you don't ... I'ma have to kill ya"] to show intent to commit armed robbery even though lyrics were written two to three years before crime); *Holmes v. State*, 608 S.E.2d 726 (Ga. Ct. App. 2004) (upholding admission of defendant's rap lyrics into evidence as evidence of bad character, because not objected to on that ground below). The *Tirius* case appears to be, unfortunately, a common mistake.  As one critic of rap has written:

> We all know that rap is narrative, with unreliable narrators, and that the point of view in any narrative is not necessarily the point of view of the writer, but then we occasionally choose to forget this; in those moments, we make judgments on rap songs without making the effort to first understand them on the tenets of the form.

Chris Jackson, *Hip-Hop, Comedy, and the Great Kanye West Debate*, The Atlantic Monthly (Jan. 13, 2011, 11:45 AM), available at *http://fwww.theatlantic.com/entertainment/archive/201l/01/hip-hopcomedy-and-the-great~kanye-west-debate/69432.*

This potential for the conflation of fiction with fact is only one of the concerns when dealing with the admissibility of fictional, artistic writings, and rap lyrics in particular. The other is the danger that vague notions of the "state of mind" concepts of "motive and intent" may,  when the vivid, but fictional, descriptions of gang life so often portrayed in rap music are introduced to show "motive and intent," or even "knowledge" of gangs.  *See, e.g., United States v. Wilson, supra*; *United States v. Williams,* 97 F.3d 240 (upholding admission of rap lyrics in RICO action, specifically describing defendant's gang as drug dealers); *People v. Olguin*, 31 Cal. App. 4th 1355, 1372-73 (Cal. Ct. App. 1994) (upholding admission of rap lyrics that demonstrated membership in specific gang and "inferentially his motive and intent on day of killing"); *People v. Wright, 2004 WL 516250*, at \*6 (Cal. App. Ct 2 Dist., Mar.17, 2004), *rev. denied*, June 19, 2004 (upholding admission of rap lyrics written by defendant into evidence as "relevant to Wright's motive for killing Lopez (to enhance his reputation in the PDL gang) and to prove the charge of gang enhancement").  The inherent nature of rap lyrics, with its first-person narrative and pervasive violence, makes them particularly susceptible to misuse in these respects.

Finally, this Court should take special care before admitting such evidence for "state of mind" purposes such as motive or intent, because of the clear risks that such expressions would

be improperly used as evidence of the defendant's character and that fiction would be conflated with fad.

**E.      The Recent Holding in *State v. Vonte Skinner*[34] Provides Some Guidance to the Court**

In the criminal trial of *Skinner v. New Jersey,* Mr. Skinner was charged with attempted murder and related charges.  A state's witness was permitted to read to the jury, at great length, violent and profane rap lyrics that had been written by the defendant before the events at issue. There was no assertion at trial that the violence-laden verses were in any way revealing of some specific factual connection that strongly tied defendant to the underlying incident. Nevertheless, the state maintained that the lyrics helped to demonstrate Mr. Skinner's "motive and intent" in connection with the offense because the rap lyrics addressed a street culture of violence and retribution that fit with the state's view of defendant's role in the attempted murder.

The Appellate Division disagreed and reversed Mr. Skinner's conviction based on the admission of the rap lyrics into evidence in defendant's trial. In reaching its conclusion, the panel used an N.J.R.E. 404(b) analysis and determined that the prejudicial impact of defendant's rap lyrics vastly outweighed any potential probative value. The Appellate Division held the following:

> We hold that the violent, profane, and disturbing rap lyrics authored by defendant constituted highly prejudicial evidence against him that bore little or no probative value as to any motive or intent behind the attempted murder offense with which he was charged. The admission of defendant's inflammatory rap verses, a genre that certain members of society view as art and others view as distasteful and descriptive of a mean-spirited culture, risked poisoning the jury against defendant. Fictional forms of inflammatory self-expression, such as poems, musical compositions, and other like writings about bad acts, wrongful acts, or crimes, are not properly evidential unless the writing reveals a strong nexus between the specific details of the artistic composition and the circumstances of the underlying offense for which a person is charged, and the probative value of that evidence outweighs its apparent prejudicial impact. In the weighing process, trial courts should consider the existence of other evidence that can be used to make the same point. When admissible, such evidence should be carefully redacted to ensure that irrelevant and inflammatory content is not needlessly presented to the jury.

We respectfully submit that the holding in *State v. Vonte Skinner*, represents a trend among the criminal justice system that weighs against the introduction of this type of evidence in this case.  The trend reflects an understanding by the courts that the introduction of rap lyrics against a criminal defendant as evidence of a crime is prejudicial and simply unjust.

---

[34]    (A-57/58-12) (071764) (Aug. 2014).  See attached opinion as **Exhibit C)**

Therefore, for all of these reasons, we respectfully request that the Court preclude the introduction by the government of any rap lyrics and/or video against Mr. Burrell at trial.

For all of the reasons stated, we respectfully request that the Court preclude the introduction of any rap lyrics and/or video against Mr. Burrell.

<strong><u>POINT EIGHT</u></strong>

**THE AFFIDAVIT SUBMITTED TO THE COURT THAT AUTHORIZED THE TITLE THREE WIRETAP ON MR. BURRELL'S PHONE CONTAINED FALSE STATEMENTS THAT WERE KNOWINGLY AND INTENTIONALY MADE WITH A REKLESS DISREGARD FOR THE TRUTH AND THEREFORE THE WIRETAP EVIDENCE MUST BE SUPRESSED**

The government misrepresented its showing of probable cause to the Magistrate in obtaining authorization for a Title III wiretap of Mr. Burrell's phone. Specifically, in its affidavit to the court the government stated:

> Target Subject NICO BURRELL, a/k/a "Zico Nico," is also featured in YouTube videos relating to BMB's narcotics trafficking and violence, including gun violence. For example, in a YouTube video entitled "Zico Nico Feat. Polo Rell - Aryan Nation," which was published on the YouTube website on April 16, 2015, BURRELL himself raps, in substance and in part, about a planned robbery of drugs from a fellow drug dealer, which robbery BURRELL and others then act out during the video. During the video, BURRELL-accompanied by Donque Tyrell, a/k/a "Polo Rell," another BMB member under investigation in this case discusses "casing" a "trap house," from which they will steal a "brick of Aryan Nation." Based *upon my experience* (emphasis added) and this investigation, as well as the context of the video described more fully below, I understand that "Aryan Nation" is a reference to cocaine. BURRELL then states that he is going to "cook a brick of Aryan Nation," i.e., cook the cocaine into crack cocaine. Next to BURRELL at various points in the video is an individual holding a brick of what appears to be cocaine and tasting a sample off of his finger. The video also shows what appears to be a dramatization of the planned robbery, during which several masked figures with guns break into a room where there are bricks of cocaine on the table, beat the victims, and steal the bricks. BURRELL states: "I could be there where your kids at ... I could find out where your crib at. Open up the safe or see your daughter cry."

See *Excerpt of Affidavit* attached **Exhibit B**.

**A.    The Statutory Basics, Probable Cause, and *Franks***

The basic requirements for wiretap interceptions under Title III are set forth in 18 U.S.C. § 2518(3)(a-d). Before issuing an order for interception of wire communications, the judge must determine, based upon the facts in the affidavit, that there is probable cause to believe that a crime has been, is being, or is about to be committed; probable cause to believe that communications

-50-

about the crime will be obtained through the wiretap; that alternative means have been tried and failed or appear too dangerous or unlikely to succeed; and probable cause that the premises or telephone(s) to be wiretapped are being used for criminal purposes or are used or owned by the target of the wiretap. *United States v. Wagner, 989 F.2d 69, 71 (2d Cir.1993)*.

The government led the judge authorizing the wiretap to believe that the rap video and music lyrics were in fact evidence of a crime. It did this by misrepresenting and omitting material facts. Prior to his arrest, Mr. Burrell was a recognized rap artist.[35] Mr. Burrell's' rise in the rap music world was well documented on the internet and especially through social media.

The affiant provided material misleading facts and made glaring omissions of material facts to the court authorizing the warrant. As a baseline, the affiant stated that Mr. Burrell's rap video was evidence of a racketeering and narcotics conspiracy. As we argued extensively above, Mr. Burrell's' artistic expression on the rap videos are protected speech and must not be used as evidence of any crimes against him.

It is patently clear that the affiant did not even minimally attempt to investigate the background and circumstances of the making of the rap video presented to the authorizing court. The affiant stated in his affidavit that "Aryan Nation" is cocaine. That is the storyline in the *video*. It is a fictional story-not a factual video of a real incident. It is theatre pure and simple. The actual term Aryan Nation does not refer to cocaine – it is a play on words that was developed and created artistically by Mr. Burrell. In the many interviews that Mr. Burrell conduced prior to his arrest in this case he describes that he was an avid reader during his previous incarceration and how in his daily readings while incarcerated he learned of the term "Aryan Nation." Mr. Burrell was often asked about his choice of use of the term "Aryan Nation" because he had received negative feedback from the black community. Mr. Burrell's answer was the same each time. That he had done a considerable amount of reading and had come across research on Hitler's pejorative notions and beliefs about the purity of the white race.[36]Thus the use of this "Aryan Nation" video as support for a finding of probable cause in obtaining a wiretap order is not only disingenuous but wholly unsupported by any factual basis within the context of the government's investigation. A search of the discovery provided by the government reveals a striking lack of any references to the term

---

[35]   See, **Exhibit D** *Media Cards of Performances in Which Mr. Burrell Performed Between 2015 and 2016.*
[36]   A DVD copy of the interview with *Melo and Ceno DJ* on May 15th 2015 is available to the Court and parties upon request.

"Aryan nation" nor that the term was code for cocaine.  Further, there is not a single wiretapped call indicating that Mr. Burrell's alleged co-conspirators used the term "Aryan Nation" to refer to the alleged cocaine that was being sold in this conspiracy.

Had the affiant conducted even the most marginal investigation into Mr. Burrell's' rap music -- and in particular the Aryan Nation video – the affiant would have discovered that the purported guns and cocaine used in the video were merely "props" gathered by the producers of the video.  With regard to the alleged cocaine depicted in the video –a close-up screenshot of the video – the government's own evidence—reveals that it is a clear plastic bag containing a white substance and stamped with Chinese characters on the bag.



Fig. 1 (*screenshot from "Aryan Nation" video provided by government in discovery*).

Had the affiant requested a similar product (as that shown in Fig. 1, above) to any grocer in any of New York City's Asian neighborhoods the affiant would have received a bag of Chinese cooking flower – not cocaine.  In this case, the cooking flour – not cocaine – was purchased in a Chinese store in Teaneck, New Jersey. The affiant failed to conduct any investigation into this rap video beyond what was depicted on YouTube.com. Had a proper investigation been conducted the government would have discovered that the rap videos were professionally produced utilizing

professional videographers. The professional videographers created story boards and determined the content of the rap video after listening to Mr. Burrell's lyrics – not Mr. Burrell.   An investigation by the government would have revealed that for each video there were contracts and record labels - standard legal paperwork often ascribed to by an aspiring rap artist.   Rather the affiant presented facts that were based upon supposition, lack of corroboration and outright misrepresentations regarding the affiants' *professional* opinion – that in his opinion rap videos indicate drug dealing and violence.  This was a clear misrepresentation by the government agent and a violation of Mr. Burrell's rights. We therefore, respectfully request that Court conduct a *Franks* Hearing since material evidence was omitted and misrepresented to the authorizing court by the government in obtaining this wiretap order.

The test for determining probable cause for a wiretap is the same as that for a search warrant. *Wagner*, 989 F.2d at 71. That test, set forth in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), provides that the issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." 462 U.S. at 238, 103 S.Ct. at 2332. However, owing to the intrusiveness of wiretaps, additional requirements and standards apply to review of Title III affidavits and orders.

In *Franks, supra,* the issue before the Court was whether "... a defendant in a criminal proceeding ever [has] the right, under the Fourth and Fourteenth Amendments, subsequent to the *ex parte* issuance of a search warrant, to challenge the truthfulness of factual statements made in an affidavit supporting the warrant?" *Id.* at 155, 98 S.Ct. 2674. The Court held that a defendant is constitutionally entitled to a hearing at his request if he can make a substantial showing that a false statement was made intentionally or with reckless disregard for the truth, and if the allegedly false statement is necessary to the finding of probable cause. *Id.* at 155-56, 98 S.Ct. 2674.  In rejecting the government's request for a flat non-impeachment rule, the Court relied upon the Warrant Clause and a critical assumption upon which the Clause rests:

> [A] flat ban on impeachment of veracity could denude the probable-cause requirement of all real meaning. The requirement that a warrant not issue but upon probable cause, supported by oath or affirmation, would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile.

*Id.* at 168, 98 S.Ct. 2674. Thus, if the probable cause requirement is to carry any real weight, defendants must have the right to challenge both the sufficiency of the affidavit (i.e., whether the statements, assuming their truth, actually establish probable cause), *id.* at 171, 98 S.Ct. 2674, and the integrity of the affidavit (i.e., whether the statements were made honestly and in good faith, or at least without reckless disregard for the truth), *id.,* upon a proper showing.  An affidavit and resulting warrant that are immune to attack would strip the probable cause requirement of any real meaning. "Because it is the magistrate who must determine independently whether there is probable cause, ... it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." Id. at 165, 98 S.Ct. at 2681.

Accordingly, the Supreme Court held in *Franks* that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." 438 U.S. at 155-56.  At the hearing, the defendant need only establish the violation by a preponderance of the evidence. *Id.*

A *Franks* challenge succeeds where, if the false information is disregarded, and the omitted information is included, the affidavit fails, under the totality of the circumstances, to support a finding of probable cause. *United States v. Pitera,* 5 F.3d 624 (2d Cir. 1993). *See also Stewart v. Donges*, 915 F.2d 572, 581 n.13 (10th Cir. 1990) (noting that *Franks* speaks in terms of deleting falsehoods from the affidavit, but that omissions cannot be deleted, and therefore concluding that the "better approach ... would be to delete false or misleading statements and insert the omitted truths revealed at the suppression hearing."). Accordingly, the Supreme Court held in *Frank*s that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." 438 U.S. at 155-56. At the hearing, the defendant need only establish the violation by a preponderance of the evidence. *Id.*

A defendant is also entitled to a *Franks* hearing upon a proper showing of a material omission from the wiretap affidavit.  As the Second Circuit noted in *Rivera v. United States*, 928

F.2d 592 (2d Cir.1991): "Intentional or reckless omissions of material information, like false statements, may serve as the basis for a *Franks* challenge." *Id.* at 604. *See also United States v. Campino*, 890 F.2d 588, 592 (2d Cir.1989) ("Material omissions from an affidavit are governed by the same rules as false statements."). Moreover, "[r]ecklessness may be inferred where the omitted information was clearly critical to the probable cause determination." *Id.* (internal quotation marks omitted).

"Facts omitted from a warrant affidavit are material if "they cast doubt on the existence of probable cause." *United States v. Marin-Buitrago,* 734 F.2d 889, 895 (2d Cir. 1984). In the case of an omission, the question is whether the affiant "... knows, or has reason to know, that he has materially misled the magistrate on the basis for a finding of probable cause, as where a material omission is intended to enhance the content of the affidavit as support for a conclusion of probable cause." *Golino v. City of New Haven*, 950 F.2d 864 (2d Cir. 1991) (citing *Rivera* and *United States v. Strini,* 658 F.2d 593, 597 (8th Cir. 1981)). In short, it is improper for the affiant to "suppress facts that would cast doubt" on the existence of probable cause. *Rivera,* 928 F.2d at 605.

Thus, we believe that a *Franks* challenge will succeed here. When the Court disregards the false information, and includes the omitted information, the affidavit submitted by government agents will fail under the totality of the circumstances test to support a finding of probable cause. *United States v. Pitera,* 5 F.3d 624 (2d Cir. 1993). *See also Stewart v. Donges*, 915 F.2d 572, 581 n.13 (10th Cir. 1990) (noting that *Franks* speaks in terms of deleting falsehoods from the affidavit, but that omissions cannot be deleted, and therefore concluding that the "better approach ... would be to delete false or misleading statements and insert the omitted truths revealed at the suppression hearing.").

**B.      Mandatory Suppression is the Remedy for Violations of Title III**

The Supreme Court explained the statutory remedy for violations of Title III as follows: [18 U.S.C. § 2515 provides that no part of the contents of any wire or oral communication, and no evidence derived therefrom, may be received at certain proceedings, including trials, "if the disclosure of that information would be in violation of this chapter." What disclosures are forbidden, and are subject to motions to suppress, is in turn governed by Section 2518(10)(a), which provides for suppression of evidence on the following grounds: "(i) the communication was unlawfully intercepted;" "(ii) the order of authorization or approval under which it was

intercepted is insufficient on its face;" or "(iii) the interception was not made in conformity with the order of authorization or approval." *Giordano*, 416 U.S. at 524-25.

Accordingly, for all of these reasons we request a *Franks* hearing.

## POINT NINE

### WE REQUEST MR. BURRELL'S RIGHTS BE PRESERVED UNDER ANY POTENTIAL *JOHNSON V. UNITED STATES* RELATED ISSUE

*Johnson v. United States*, 135 S.Ct. 2551 (2015) ruled the "residual clause" of the Armed Career Criminal Act was unconstitutionally vague and in violation of due process. In particular, the Supreme Court ruled that the Armed Career Criminal Act (ACCA) was a part of the Comprehensive Crime Control Act of 1984 that was enacted to impose tougher sentences in illegal firearms cases on defendants who have previously been convicted three or more times for "violent" felonies. 18 U.S.C. § 924(e)(2)(B) defined a "violent felony" as an act that threatens "use of physical force against the person of another," "is burglary, arson, or extortion," "involves use of explosives," or "otherwise involves conduct that presents a serious potential risk of physical injury to another." The last part of this definition became known as the "residual clause." [37]

The *Johnson* case is extremely important and relevant to Mr. Burrell's case. We therefore respectfully request that the Court preserve Mr. Burrell's rights under *Johnson*.

## POINT TEN

### MR. BURRELL REUESTS TO BE PERMITTED TO JOIN IN ANY MOTIONS MADE BY HIS CO-DEFENDANTS

Mr. Burrell requests leave to join any motions made by counsel on behalf of his co-defendants. This includes all similar arguments and relief sought by co-defendants' counsel as well as any other relief requested, and not included in the herein motion.

---

[37] *Cf. Beckles v United States*, 137 S.Ct. 886, 197 L.Ed.2d 145, 85 USLW 4086 (March 2017).

## POINT ELEVEN

**DEFENDANT REQUESTS PERMISSION TO MAKE ANY ADDITIONAL MOTIONS THAT MAY BECOME NECESSARY AS A RESULT OF FURTHER DISCOVERY**

The Defendant requests permission to make any additional motions that might become necessary upon further discovery, namely if the court grants any motions that provide for the disclosure of any *Brady/Jencks* material which may require the filing of additional motions. Accordingly, Mr. Burrell respectfully requests the permission to file such additional motions should they become necessary.

## CONCLUSION

**FOR THE REASONS STATED ABOVE,** we respectfully request that Mr. Burrell's motion be granted in its entirety.

Dated: May 31, 2017
      New York, New York

Respectfully submitted,

/S/ Judith Vargas

/S/ Ying Stafford

/S/ George Goltzer

*Attorneys for Nico Burrell*

All Counsel by ECF

-57-